**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CTN HOLDINGS, INC.,[1] | Case No. 25-10603(TMH) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I)
AUTHORIZING THE DEBTORS TO (A) OBTAIN POST-PETITION FINANCING AND
(B) USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING CLAIMS
WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING
ADEQUATE PROTECTION TO THE PREPETITION TERM LOAN SECURED
PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING
A FINAL HEARING AND (VI) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "<u>Debtors</u>") respectfully move (this "<u>DIP Motion</u>")[2] as follows:

**<u>PRELIMINARY STATEMENT</u>**

1.      The Debtors require immediate access to incremental liquidity in the form of post-petition financing and access to cash collateral. Such relief is critical to preserving and maximizing the value of the Debtors' estates. The Debtors commenced these chapter 11 cases (the "<u>Chapter 11 Cases</u>") to facilitate a value maximizing sale of their assets under section 363 of the Bankruptcy Code. The Debtors intend to run a sale process, for which a bidding procedures motion

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are CTN Holdings, Inc. (9122), CTN SPV Holdings, LLC (8689), Make Earth Green Again, LLC (4441), Aspiration QFZ, LLC (1532), Aspiration Fund Adviser, LLC (4214), Catona Climate Solutions, LLC (3375) and Zero Carbon Holdings, LLC (1679).  The mailing address for the Debtors is 548 Market Street, PMB 72015, San Francisco, CA 94101-5401.

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Credit Agreement or the Interim Order, as applicable.

is expected to be filed shortly, providing for the sale of substantially all of the assets of the Debtors that are used or useful in the operation of the Debtors' business.

2.      The Debtors will not be able to achieve any of these goals, and will instead suffer immediate and irreparable harm absent access to additional liquidity. Indeed, at the time of the commencement of the Chapter 11 Cases, the Debtors have insufficient funds to preserve their business, which by extension impairs its ability to effectuate a sale process. The proposed DIP Facility (as defined below), provides a crucial lifeline to the Debtors and is reasonable and fair. The liquidity made available under the DIP Facility, coupled with the Debtors' access to cash collateral, signals to the Debtors' customers, and employees that the Debtors have the liquidity necessary to continuing operating while they complete a successful going concern sale of their assets. Without the DIP financing, the value of the Debtors' business and assets would quickly deteriorate, materially and irreparably harming the Debtors' estates. Therefore, relief requested by this Motion is a necessary step to both preserving the Debtors' operations as well as bridging to a sale transaction that maximizes value for the Debtors' estates and their stakeholders.

3.      For these reasons, and as set forth in greater detail in the *Declaration of Miles Staglik in Support of Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), and below, the Debtors believe entry into the DIP Facility is in the best interest of their estates, represents a sound exercise of the Debtors' business judgment, and should be approved.

## RELIEF REQUESTED

4.    The Debtors seek the entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order"),[3] among other things:

(a)    authorizing CTN Holdings. Inc. (the "DIP Borrower") to obtain postpetition financing pursuant to a superpriority, senior secured and priming debtor-in-possession term loan credit facility (the "DIP Facility") subject to the terms and conditions set forth in that certain Superpriority Senior Secured Debtor-in-Possession Loan and Security Agreement and Guaranty attached hereto as **Exhibit B** (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement"), by and among the DIP Borrower, the DIP Guarantors (as defined below), Inherent Aspiration, LLC (the "DIP Lender"), and Inherent Group, LP, as administrative agent (the "DIP Agent" and, collectively with the DIP Lender, the "DIP Secured Parties"), in an aggregate principal amount not to exceed $18,015,000.00 (the commitments in respect thereof, the "DIP Commitments"), in the form of delayed-draw term loans (the "DIP Term Loans") (i) in a new-money aggregate principal amount not to exceed $4,210,000.00, of which (x) up to $2,210,000.00 of the new-money DIP Commitment will be made available upon entry of the Interim Order and (y) the full remaining amount of the new-money DIP Commitment will be made available upon entry of the final order approving the DIP Facility (the "Final Order" and together with the Interim Order, the "DIP Orders") and (ii) (x) upon entry of the Interim Order a deemed term loan "roll up" of $1,175,000 of the Prepetition Secured Note Obligations held by the DIP Lender (or its affiliates) (the "Interim Roll-Up"), which amount equals the sum of certain pre-petition advances made by the DIP Lender prior to the Petition Date necessary to bridge the Debtors to the filing of this case, to be deemed incurred as of the date of the entry of the Interim Order, and (y) upon entry of the Final Order a deemed term loan "roll up" of $12,630,000.00 of the Prepetition Secured Note Obligations held by the DIP Lender (or its affiliates) (the "Final Roll-Up" and, together with the Interim Roll-Up, the "Roll-Up Loan" and the Roll-Up Loan with the DIP Term Loans, the "DIP Loans"), to be deemed incurred as of the date of the entry of the Final Order, in accordance with the terms and conditions set forth in the DIP Credit Agreement;

(b)    authorizing Make Earth Green Again, LLC, Aspiration QFZ, LLC, Carbon Sequestration I, LLC, Carbon Sequestration II, LLC, Carbon Sequestration III, LLC, Reforestation Initiatives I, LLC, Reforestation Initiatives II, LLC, Zero Carbon Holdings, LLC, and Catona Climate Solutions, LLC (the "DIP Guarantors") to jointly and severally guarantee the DIP Loans and the other DIP Obligations (as defined below);

(c)    authorizing the Debtors to execute, deliver and perform under the DIP Credit Agreement and all other loan documentation related to the DIP Facility, including, without limitation, as applicable, security agreements, pledge agreements, control agreements, mortgages, deeds, charges, guarantees, promissory notes, intercompany notes, certificates, instruments,

---

[3]    The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

intellectual property security agreements, notes, and such other documents that may be reasonably requested by the DIP Agent and the DIP Lender, in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Credit Agreement and any other Loan Documents (as defined in the DIP Credit Agreement), the "<u>DIP Documents</u>");

(d)     authorizing the Debtors to incur loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees (including, without limitation, commitment fees and any other fees payable pursuant to the DIP Documents), costs, expenses and other liabilities, and all other obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the DIP Documents (collectively, the "<u>DIP Obligations</u>"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(e)     subject to the Carve-Out (as defined herein), granting to the DIP Agent, for itself and for the benefit of the DIP Secured Parties, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations of the Debtors, which shall be payable from Avoidance Proceeds only upon entry of the Final Order;

(f)     granting to the DIP Agent, for itself and for the benefit of the DIP Secured Parties, valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all prepetition and postpetition property of the Debtors' estates (other than certain excluded property as provided in the DIP Documents (the "<u>Excluded Assets</u>")) and all proceeds thereof, including, subject only to and effective upon entry of the Final Order, any Avoidance Actions and Avoidance Proceeds (each as defined herein), in each case subject to the Carve-Out;

(g)     authorizing the DIP Agent, acting at the direction of the DIP Lender, and the Prepetition Secured Parties (as defined herein), to take all commercially reasonable actions to implement and effectuate the terms of the Interim Order;

(h)     authorizing the Debtors to waive, subject to entry of the Final Order, (a) their right to surcharge the Prepetition Collateral (as defined herein) and the DIP Collateral (as defined herein) (together, the "<u>Collateral</u>") pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(i)     subject to entry of the Final Order, waiving the equitable doctrine of "marshaling" and other similar doctrines (i) with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (ii) with respect to any of the Prepetition Collateral (including the Cash Collateral (as defined herein)) for the benefit of any party other than the Prepetition Secured Parties;

(j)     authorizing the Debtors to use proceeds of the DIP Facility solely in accordance with the Interim Order and the DIP Documents;

(k)     authorizing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

(l)     subject to the restrictions set forth in the DIP Documents and the Interim Order, authorizing the Debtors to use the Prepetition Collateral, including Cash Collateral of the Prepetition Secured Parties under the Prepetition Secured Note Documents (as defined herein), and the Subordinated Note Collateral (as defined herein) of the Subordinated Note Parties under the Subordinated Note Documents, and provide adequate protection to the Prepetition Secured Parties and the Subordinated Note Parties for any diminution in value of their respective interests in the applicable Prepetition Collateral and Subordinated Note Collateral (including Cash Collateral), including, without limitation, any diminution in value resulting from the imposition of the automatic stay under section 362 of the Bankruptcy Code (the "<u>Automatic Stay</u>"), the Debtors' use, sale, or lease of the Prepetition Collateral and Subordinated Note Collateral (including Cash Collateral), and the priming of their interests in the Prepetition Collateral and Subordinated Note Collateral (including Cash Collateral);

(m)    vacating and modifying the Automatic Stay to the extent necessary to permit the Debtors and their affiliates, the DIP Secured Parties and the Prepetition Secured Parties to implement and effectuate the terms and provisions of the Interim Order, the DIP Documents and, upon entry, the Final Order and to deliver any notices of termination described therein;

(n)     waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order and, upon entry, the Final Order; and

(o)     scheduling a final hearing (the "<u>Final Hearing</u>") to consider final approval of the DIP Facility and use of Cash Collateral pursuant to a proposed Final Order and in the DIP Documents.

## <u>JURISDICTION</u>

6.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The Debtors consent pursuant to Rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>") to the entry of a

final order by the Court in connection with this DIP Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.     The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506(c), and 507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Local Rules 2002-1, 4001-1, 4001-2, and 9013-1(m).

## BACKGROUND

### I.     General Background

9.     On March 30, 2025 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court. The Debtors continue to manage their assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or official committee has been appointed in these cases.

10.     The Debtors are a climate finance company that sells carbon credits to enterprise clients sourced from the Debtors' diverse project developer network. To ensure a reliable supply of the highest quality carbon, the Debtors partner with project developers by providing financial investment, project monitoring, technical assistance and marketing services to carbon credit generators. These partnerships in turn yield high-quality carbon credits made available to the Debtors' customers through a variety of offered products.

11.     Additional details regarding the Debtors, their businesses, the events leading to the commencement of these cases, and the facts and circumstances supporting the relief requested herein is set forth in the First Day Declaration, filed concurrently herewith and incorporated herein by reference.

**II.    The Prepetition Capital Structure**

12.    As of the Petition Date, the Debtors had approximately $170 million in total in debt obligations. Approximately $110 million of that debt is purportedly secured by substantially all of the Debtors' assets. The most significant sources of the Debtors' secured and unsecured indebtedness are identified and described below.[4]

**A.    The Prepetition Secured Note Obligations**

13.    The Debtor(s) are indebted to the Prepetition Secured Parties (as defined below) pursuant to that certain Third Amended and Restated Senior Secured Promissory Note and Guaranty, dated as of October 30, 2024, as amended by the First Amendment thereto dated as of December 30, 2024, as amended by the Second Amendment thereto dated as of March 11, 2025 and as amended by the Third Amendment thereto dated as of March 24, 2025 (as further amended, restated, supplemented or otherwise modified prior to the Petition Date, collectively, the "Prepetition Secured Notes", and the obligations thereunder, the "Prepetition Secured Note Obligations"), and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date (collectively, the "Prepetition Secured Note Documents"), by and among (1) CTN Holdings, Inc., as issuer (the "Prepetition Secured Note Issuer"), (2) Make Earth Green Again, LLC, Aspiration QFZ, LLC, Carbon Sequestration I, LLC, Carbon Sequestration II, LLC, Carbon Sequestration III, LLC, Reforestation Initiatives I, LLC, Reforestation Initiatives II, LLC, Zero Carbon Holdings, LLC, and Catona Climate Solutions, LLC (each, a "Prepetition Secured Note Guarantors" and together with the

---

[4]    In addition to the sources of indebtedness described below, there are also other sources of indebtedness described in other motions filed contemporaneously herewith, such as indebtedness related to the Debtors' employee payroll and benefit obligations, as well as other debt accruals.

Prepetition Secured Note Issuer, the "Prepetition Secured Loan Parties"), (3) Inherent Aspiration LLC, AGO Special Situations LP, Zion Consulting and Advisory LLC, and Mark Villanueva, as holders (the "Prepetition Secured Note Holders") and (4) Inherent Group, LP, as collateral agent (in such capacity, the "Prepetition Collateral Agent", together with the Prepetition Secured Note Holders, the "Prepetition Secured Parties").

14.    The Prepetition Secured Notes are comprised of the following:

(a)    the Third Amended and Restated Senior Secured Promissory Note and Guaranty, dated October 30, 2024, issued by CTN Holdings Inc. (f/k/a Aspiration Partners, Inc.) ("CTN") and payable to Inherent Aspiration, LLC in the original principal amount of $51,907,049.86 (as subsequently amended, the "Inherent Note");

(b)    the Third Amended and Restated Senior Secured Promissory Note and Guaranty, dated October 30, 2024, issued by CTN and payable to AGO Special Situations LP ("AGO") in the original principal amount of $2,800,107.47 (the "AGO Note");

(c)    the Third Amended and Restated Senior Secured Promissory Note and Guaranty, dated October 30, 2024, issued by CTN and payable to Mark Villaneuva in the original principal amount of $42,715.53 (the "Villaneuva Note"); and

(d)    the Third Amended and Restated Senior Secured Promissory Note and Guaranty, dated October 30, 2024, issued by CTN and payable to Zion Consulting and Advisory LLC ("Zion") in the original principal amount of $170,862.12 (the "Zion Note.

15.    The Prepetition Secured Note Obligations are secured on a first priority basis by valid, perfected, and unavoidable liens on substantially all assets of the Debtors (subject to customary exceptions) (the "Prepetition Collateral").

16.    As of the Petition Date, the estimated aggregate principal amount of the Senior Secured Notes is not less than approximately $61.5 million.

B.       **The Prepetition Subordinated Debt**

17.      The Debtors are party to certain Subordinated Secured Convertible Promissory Notes (the "Subordinated Notes") payable to among others, AGO Special Situations Credit, LP, AGO Special Situations II LP, Harmony Holdings, LLC, Lonsdale Group Limited, Long Live Bruce, LLC and OCM Aspiration Holdings, LLC (collectively, the "Subordinated Note Holders").

18.      The Debtors' obligations to the Subordinated Note Holders (the "Subordinated Note Obligations") are  subordinated to the Prepetition Secured Note Obligations pursuant to that certain Intercreditor and Subordination Agreement, dated July 12, 2023 (the "Intercreditor Agreement") among Inherent Group, LP in its capacity as Prepetition Collateral Agent and AGO III, GP, LLC in its capacity as the collateral agent with respect to the Subordinated Note Obligations (the "Subordinated Note Collateral Agent" and collectively with the Subordinated Note Holders, the "Subordinated Note Parties").

19.      The Debtors understand that the Subordinated Note Parties assert that Subordinated Note Obligations are secured by junior liens on certain of the Debtors' collateral (the "Subordinated Note Collateral").

20.      As of the Petition Date, the purported aggregate amount owed to the Subordinated Note Holders (the "Subordinated Debt") totals approximately $50 million.

C.       **Unsecured Debt**

21.      The Debtors estimate that, as of the Petition Date, they have approximately $55.6 million in vendor and other unsecured obligations.

### III.    The Debtors' Efforts to Obtain Post-petition Financing

22.    As set forth above, the Debtors filed the Chapter 11 Cases to facilitate a value maximizing sale under section 363 of the Bankruptcy Code of substantially all of the Debtors' assets subject to Court approval and any topping bids that emerge during the sale process. In order to facilitate a sale process, prior to the Petition Date, the Debtor engaged its restructuring advisors, CR3 Partners, LLC ("CR3") to assist in various projects, including the development and administration of its short-term cash flow forecasting, budgeting, cash management planning and to assist the Debtors with securing the requisite post-petition financing.

23.    Prior to the start of the marketing process for post-petition financing, the Debtors determined that most likely source of post-petition financing would be one or more of the Debtors' existing lenders. Accordingly, the Debtors and their advisors, including CR3, initiated a marketing process and engaged in negotiations the DIP Lender and numerous other potential parties in an effort to secure debtor-in-possession financing.

24.    The Debtors contacted the DIP Lender to inquire whether it would be willing to provide DIP financing on an unsecured or junior lien basis.  The DIP Lender was a promising source of financing given its first-lien position and the fact that it had made pre-petition bridge loans to the Debtors totaling $1,175,000 to enable the Debtors to pay necessary expenses in the lead-up to the filing of these cases.  The DIP Lender indicated it was unwilling to lend on an unsecured or junior lien basis but expressed an interest in providing financing on a senior, priming basis. Thereafter the parties began negotiating the terms of the proposed DIP Financing.

25.    Additionally, the Debtors and CR3 contacted Oaktree Capital Management, LP, one of the Debtors' investors and claimants under the Prepetition Subordinated Debt, who declined to provide debtor in possession financing to the Debtors. CR3 also solicited alternative

proposals for post-petition financing on terms similar to or better than those offered by the DIP Lender. CR3 contacted ten (10) well-established and experienced financial institutions. However, due to the Debtors' existing obligations under the Prepetition Secured Notes and Subordinated Notes and its current dire financial position, no lender was willing to provide postpetition financing on an unsecured or junior priority basis. Ultimately, none of the parties contacted by CR3 expressed any willingness to provide debtor-in-possession financing. The only proposal received by the Debtors was a proposal by the DIP Lender to provide debtor-in-possession financing ("DIP Financing") pursuant to a superpriority, senior secured and priming term loan credit facility (the "DIP Facility"). In light of the market feedback, the Debtor's financial condition, and substantial preexisting liens as of the Petition Date, the Debtors believe that it would be highly unlikely for another lender to commit to equal or superior financing to that proposed by the DIP Lender.

26.     The negotiations with the DIP Lender to enter into the DIP Facility were conducted at arm's length and in good faith by the Debtors and their advisors. Prior to the Petition Date, the Debtors and the DIP Lender actively negotiated over the size and scope of a post-petition financing package that would allow the Debtors to achieve their restructuring goals. Additionally, the Debtors and the DIP Lender specifically negotiated for the Roll Up Loan in the context of their commitment to provide the DIP Facility. The Debtor negotiated significant concessions from the DIP Lender during the course of these negotiations and submits that the DIP Facility and Approved Budget represent the best available financing option for the Debtors and their estates.

27.     Crucially, the DIP Facility provides the Debtors with the liquidity necessary to continue their operations without disruption and to implement a value maximizing sale process for the benefit of the Debtors, their estates, and all stakeholders. Moreover, the DIP Facility was the product of arms-length negotiations and includes terms that are customary in this District. Given

the Debtors' prepetition capital structure and their unsuccessful efforts to solicit other debtor-in-possession financing offers, the Debtors' do not believe that better financing would be available with more time.

## SUMMARY OF TERMS

28.     Pursuant to Bankruptcy Rule 4001(b), (c), and (d), and Local Rule 4001-2(a), the following is a concise summary highlighting the proposed material terms of the DIP Financing, as specified in the DIP Credit Agreement and the Interim Order:

| Material Provision | Summary Description of Material Provision[5] |
|---|---|
| **Obligors**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(J) | **Borrower**: CTN Holdings, Inc.<br><br>**Guarantors**: Make Earth Green Again, LLC, Aspiration QFZ, LLC, Carbon Sequestration I, LLC, Carbon Sequestration II, LLC, Carbon Sequestration III, LLC, Reforestation Initiatives I, LLC, Reforestation Initiatives II, LLC, Zero Carbon Holdings, LLC, and Catona Climate Solutions, LLC<br><br>**Lender**: Inherent Aspiration, LLC<br><br>*See* DIP Credit Agreement Preamble and Interim Order Preamble § (a). |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(A) | DIP Commitments in an aggregate principal amount not to exceed $18,015,000.00, in the form of delayed-draw term loans (i) in a new-money aggregate principal amount not to exceed $4,210,000.00, of which (x) up to $2,210,000.00 of the new-money DIP Commitment will be made available upon entry of the Interim Order and (y) the full remaining amount of the new-money DIP Commitment will be made available upon entry of the Final Order.<br><br>*See* DIP Credit Agreement § 2; Interim Order, Preamble § (a). |
| **Term**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i) | The DIP Loans shall mature and be due and payable on the earliest to occur of the following (such date, the "Maturity Date"): (i) the seventy-fifth (75th) day following the Petition Date; (ii) the consummation of a sale of all or substantially all of the assets of the Debtors; (iii) the termination of the Stalking Horse Purchase Agreement for any reason without the prior written consent of the DIP Lenders and the Stalking Horse Purchaser; (iv) the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Case that is confirmed pursuant to an order entered by the Bankruptcy Court; (v) entry of an order by the Bankruptcy Court approving (A) a motion seeking conversion or dismissal of any or all of the Chapter 11 Case or (B) a motion |

---

[5] This summary is qualified in its entirety by the provisions of the DIP Credit Agreement and the Interim Order.

| | |
|---|---|
| | seeking the appointment or election of a trustee, a responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business; or (vi) the date of acceleration of all or any portion of the DIP Term Loans and the termination of the commitments in respect thereof upon the occurrence of an Event of Default. |
| | *See* DIP Credit Agreement § 1.1 Definition of "Maturity Date". |
| **Roll Up of Prepetition Obligations**<br><br>Del. Bankr. L.R. 4001-2(a)(i)(O) | The DIP Facility consists of a roll up of $13,805,000 of the Prepetition Secured Note Obligations with $1,175,000 being "rolled up" upon entry of the Interim Order and $12,630,000 of the remaining Prepetition Secured Note Obligations being "rolled up" upon entry of the Final DIP Order.<br><br>*See* DIP Credit Agreement § 2.2.; Interim Order Preamble § (a). |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(E) | **Conditions to Effectiveness and to DIP Term Loans:**<br><br>Receipt of Certain Documents. DIP Lenders shall have received counterparts to the DIP Credit Agreement and the other Loan Documents, each duly executed by an authorized officer of each Debtor party thereto.<br><br>Company Proceedings of Borrower. DIP Lenders shall have received executed copies of the resolutions, in form and substance reasonably satisfactory to DIP Lenders, of the board of directors or other governing body of the Debtors, authorizing the execution, delivery and performance by Debtors of the DIP Credit Agreement and the other Loan Documents, and ratifying all previous actions taken by the Debtors in connection with the DIP Credit Agreement and other Loan Documents.<br><br>No Defaults. No Default or Event of Default shall then exist.<br><br>Approved Budget. DIP Lenders shall have received a copy of the Borrower's proposed budget and such budget shall have become the Approved Budget.<br><br>Interim Order. The Interim Order shall have been entered by the Bankruptcy Court not later than three (3) calendar days following the Petition Date, and the Interim Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to the DIP Lenders and shall not be subject to a stay.<br><br>First Day Orders. The "first day orders" sought by the Borrower shall be reasonably satisfactory in form and substance to the DIP Lenders.<br><br>Other. All corporate action and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated by the DIP Credit Agreement shall be satisfactory in form and substance to DIP Lenders. |

| | |
|---|---|
| | Conditions for Subsequent Borrower. In addition to satisfaction of the above conditions, with respect to each Loan subsequent to the Initial Borrowing, the following conditions must also be satisfied or validly waived by DIP Lenders:<br><br>No Defaults. No Default or Event of Default shall then exist.<br><br>DIP Commitment. The aggregate amount of the DIP Term Loans shall not exceed the DIP Commitment.<br><br>Final Order. The Final Order shall have been entered into by the Bankruptcy Court.<br><br>*See* DIP Credit Agreement § 5. |
| **Interest Rates and Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(B) | Interest Rate: The DIP Obligations shall bear interest at a rate of twelve percent (12%) per annum.<br><br>Fees and Expenses:  The Debtors shall pay the following fees, all of which are non-refundable:<br><br> Agent Fee.  On the Closing Date, the Debtors shall pay to the DIP Agent, for its own account, an upfront agent fee of $25,000 (the "Agent Fee"), which shall be fully earned and payable in kind as part of the Initial Borrowing on the Closing Date, subject to the entry of the Interim Order.<br><br>Commitment Fee.  On the Closing Date, the Debtors shall pay to the DIP Lenders, on a pro rata basis in accordance with their respective DIP Commitments, a commitment fee (the "Commitment Fee") equal to $90,000.00, which shall be fully earned and payable in kind as part of the Initial Borrowing on the Closing Date, subject to the entry of the Interim Order.<br><br>Exit Fee.  On the Maturity Date, the Debtors shall pay to the DIP Lenders, on a pro rata basis in accordance with their respective DIP Commitments as of the Closing Date, an exit fee (the "Exit Fee") equal to $90,000.00, which shall be fully earned on the Closing Date and payable in cash on the Maturity Date.<br><br>*See* DIP Credit Agreement § 3.1; 8.12. |

| | |
|---|---|
| **Repayment Features/Provisions Limiting Repayment** Bankruptcy Rule 4001(b)(1)(B) Del. Bankr. L.R. 4001-2(a)(i)(I) | <u>Mandatory Prepayments</u>. The Debtors shall pay or prepay the Loans (together with a cash reserve established by the DIP Term Loans to cover asserted contingent and indemnity obligations) until all Obligations thereunder are paid in full immediately as follows:<br><br>(a) One hundred percent (100%) of the net cash proceeds of any sale or disposition of all or substantially all of Debtors' assets pursuant to section 363 of the Bankruptcy Code (other than a sale to the Stalking Horse Purchaser pursuant to the Stalking Horse Purchase Agreement) simultaneous with the consummation thereof, after funding the Carve-Out and reserving proceeds sufficient to pay accrued, unpaid and allowed administrative expenses (as of the closing of such sale) to the extent set forth in the Approved Budget;<br><br>(b) One hundred percent (100%) of the net cash proceeds of any other sale or other disposition by any Debtor of any assets, in a single transaction or series of related transactions (except for the (a) de minimis asset sales approved by an order of the Bankruptcy Court that is in form and substance acceptable to the Required DIP Lenders or (b) sale of goods or services in the ordinary course of business), after funding the Carve-Out and reserving proceeds sufficient to pay accrued, unpaid and allowed administrative expenses (as of the closing of such sale) to the extent set forth in the Approved Budget; and<br><br>(c) One hundred percent 100% of the net cash proceeds of Extraordinary Receipts by any Debtor, after funding the Carve-Out and reserving proceeds sufficient to pay accrued, unpaid and allowed administrative expenses (as of the closing of such sale) to the extent set forth in the Approved Budget.<br><br>Any amounts so paid or prepaid may not be reborrowed.  No reinvestment of the proceeds of any extraordinary receipts, asset sales or other proceeds described above shall be permitted without the prior written consent of the DIP Lenders.<br><br>*See* DIP Credit Agreement § 4.2 |
| **Approved Budget** Bankruptcy Rule 4001(c)(1)(B) Del. Bankr. L.R. 4001-2(a)(i)(E) | Approved Budget shall mean initially, the Initial Budget attached to the Interim Order as Exhibit 2, and, thereafter, the most recent Updated Budget accepted (or deemed accepted) by the Lenders in accordance with Section 8.9 of the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement § 8.9; Interim Order Exhibit 2. |
| **Variance Covenant** Bankruptcy Rule 4001(c)(1)(B) Del. Bankr. L.R. 4001-2(a)(i)(E) | By not later than 5:00 PM ET on Thursday after the second full week following the Petition Date (the "<u>First Testing Date</u>"), and no later than 5:00 PM ET on each Thursday thereafter (together with the First Testing Date, each a "<u>Testing Date</u>"), the Debtors shall deliver to the DIP Agent a variance report in form and detail acceptable to the DIP Agent (an "<u>Approved Variance Report</u>") showing comparisons of (a) actual cash receipts of the Debtors compared to the projected cash receipts of the Debtors as set forth in the Approved Budget, in each case, for the Applicable Period and (b) actual cash disbursements on a line by line basis (excluding professional fees) of the Debtors compared to the projected cash disbursements on a line by line basis (excluding professional fees) as set forth in |

the Approved Budget, in each case, for the Applicable Period. Each Approved Variance Report shall indicate whether there are any adverse variances that exceed the Permitted Variances (as defined below) and shall provide a written explanation for such variances. "Permitted Variances" shall mean, as of any Testing Date: (i) the aggregate actual cumulative cash receipts of the Debtors for the applicable Testing Period do not vary negatively from the cumulative cash receipts of the Debtors set forth in the Approved Budget for such Testing Period by more than fifteen percent (15%) for such Testing Period, for the avoidance of doubt, with negative variance meaning that actual receipts are less than projected receipts (the "Receipts Variance"); and (ii) the Debtors' aggregate actual cash operating disbursements (excluding professional fees) for the applicable Testing Period may not vary negatively from the Approved Budget by more than fifteen percent (15%) for each Testing Period, for the avoidance of doubt, with negative variance meaning that actual disbursements are greater than the projected disbursements (the "Disbursements Variance"), *provided* that, during any Testing Period, (i) any positive Receipts Variance may be used to offset any negative Disbursements Variance for such Testing Period and (ii) any positive Disbursements Variance may be used to offset any negative Receipts Variance for such Testing Period (such limitations in clauses 1 and 2 above, the "DIP Budget Covenant").

*See* DIP Credit Agreement § 8.9

| Termination Events/Events of Default Bankruptcy Rules 4001(c)(1)(B) Del. Bankr. L.R. 4001-2(a)(i)(M) | <u>Events of Default</u>. The occurrence of one or more of the following events shall constitute an "<u>Event of Default</u>":<br><br>(a) the entry of an Interim Order or Final Order in form or substance that is not acceptable to the DIP Agent in its sole discretion;<br><br>(b) failure by any Debtor to be in compliance in all respects with provisions of the DIP Facility and/or the Orders;<br><br>(c) any request made by the Debtors for, or the reversal, modification, amendment, stay, reconsideration or vacatur of an Order, as entered by the Bankruptcy Court, without the prior written consent of the DIP Agent and each DIP Lender;<br><br>(d) failure of any of the Case Milestones to be satisfied by the Specified Deadline (as such Specified Deadlines may be modified to accommodate the calendar of the Bankruptcy Court or extended by the DIP Agent);<br><br>(e) failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by materiality, in all respects) when made;<br><br>(f) the filing of any application by the Debtors (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Term Loans in full upon entry of the order approving such financing) for the approval of (or an order is entered by the Court approving) any claim arising under section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in the Chapter 11 Case which is *pari passu* with or senior to the DIP Liens, excluding liens arising under the Orders, or pursuant to any other financing agreement made with the prior written consent of the DIP Agent and each DIP Lender;<br><br>(g) the commencement of any action by the Debtors or other authorized person (other than an action permitted by the Orders) against any of the DIP Agent or any DIP Lender or any of their agents and employees, to subordinate or avoid any liens made in connection with the Orders or to investigate or challenge the validity, perfection, priority, extent, or enforceability of the liens under the Prepetition Secured Notes;<br><br>(h) (1) any Debtor files a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify any Order or this Agreement, or the disallow the Loans, in whole or in part, or (2) any material provision of the Orders or this Agreement, or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral (as defined in the Orders), shall for any reason cease to be valid and binding (without the prior written consent of the DIP Agent and each DIP Lender);<br><br>(i) the filing with the Bankruptcy Court of a motion seeking approval of a sale under Section 363 (other than approval of a sale pursuant to the terms of |

17

the Stalking Horse Purchase Agreement) or a plan of reorganization or liquidation in the Chapter 11 Case that, in either case, does not provide for indefeasible payment in full in cash to the DIP Agent and the DIP Lenders of Loans and all other amounts outstanding under this Agreement or the Orders on closing of such sale or the effective date of such plan;

(j)   the appointment in the Chapter 11 Case of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code);

(k)   the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Case with respect to any portion of the DIP Collateral exceeding $150,000 in value in the aggregate;

(l)   failure to pay principal, interest or other any other obligation in respect of the Loans in full when due, including without limitation, on the Maturity Date;

(m) (i) if the Chief Restructuring Officer is terminated or disqualified for any reason and Borrower has not appointed a replacement Chief Restructuring Officer acceptable to Prepetition Collateral Agent within five (5) Business Days thereafter, (ii) the terms of the Chief Restructuring Officer's engagement by the Borrower are modified in any manner not acceptable to Prepetition Collateral Agent, (iii) the Chief Restructuring Officer is instructed to cease working, (iv) the Chief Restructuring Officer's engagement by the Borrower, or any of the responsibilities, authority, powers, or duties of the Chief Restructuring Officer, is terminated, suspended, or restricted in any respect, or (v) the Chief Restructuring Officer resigns and Borrower has not engaged a replacement Chief Restructuring Officer acceptable to the Prepetition Collateral Agent within five (5) Business Days thereafter; and

(n)   (i) if an independent director is terminated or disqualified for any reason and Borrower has not appointed a replacement independent director acceptable to Prepetition Collateral Agent within five (5) Business Days thereafter, (ii) the terms of the independent director's engagement by Borrower are modified in any manner not acceptable to Prepetition Collateral Agent, (iii) the independent director is instructed to cease working, (iv) the independent director's engagement by Borrower, or any of the responsibilities, authority, powers, or duties of independent director, is terminated, suspended, or restricted in any respect, or (v) the independent director resigns and Borrower has not engaged a replacement independent director acceptable to the Prepetition Collateral Agent within five (5) Business Days thereafter.

*See* DIP Credit Agreement § 9.1.

| | |
|---|---|
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Credit Agreement and the Interim Order contain provisions indemnifying the DIP Secured Parties and their affiliates, agents, and representatives, and such |

| | |
|---|---|
| | other terms and conditions as are typically included in debtor-in-possession facilities.<br><br>*See* DIP Credit Agreement § 11.1; Interim Order ¶ 20. |
| **Adequate Protection**<br>Bankruptcy Rule 4001(c)(1)(B)(ii) | *Adequate Protection of Prepetition Secured Parties.*  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral (including Cash Collateral) in an amount equal to the aggregate diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date (with, upon the assertion of any Adequate Protection Claims (as defined below), the presumption being that diminution in value has occurred and the burden being on any party opposing the assertion of any Adequate Protection Claims to show that such diminution has not occurred), for any reason provided for under the Bankruptcy Code, including, without limitation, any diminution resulting from the sale, lease or use by the Debtors of the Prepetition Collateral, the priming of the Prepetition Secured Note Liens by the DIP Liens pursuant to the DIP Documents and the Interim Order, the grant of any other lien under section 364 of the Bankruptcy Code or the stay of the Prepetition Secured Parties' rights under the Prepetition Secured Notes, the payment of any amounts under the Carve-Out or pursuant to the Interim Order, the Final Order or any other order of the Court or provision of the Bankruptcy Code or otherwise, and the imposition of the Automatic Stay (the "<u>Adequate Protection Claims</u>").  In consideration of the foregoing, the Prepetition Secured Parties are hereby granted the following as Adequate Protection for, and to secure repayment of an amount equal to such Adequate Protection Claims, and as an inducement to the Prepetition Secured Parties to consent to the priming of the Prepetition Secured Note Liens and use of the Prepetition Collateral (including Cash Collateral) (collectively, the "<u>Adequate Protection Obligations</u>"): |

(i)      *Prepetition Adequate Protection Liens*.  The Prepetition Collateral Agent, for itself and for the benefit of the other Prepetition Secured Parties is hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements) in the amount of the Prepetition Secured Parties' Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral (the "Adequate Protection Liens"), in each case senior to all other liens but subject and subordinate only to (A) the DIP Liens, and (B) the Carve-Out.

(ii)     *Section 507(b) Claims*.  The Prepetition Secured Parties are hereby granted, subject to the Carve-Out, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases as provided for in section 507(b) of the Bankruptcy Code in the amount of the Adequate Protection Claims, with, to the fullest extent permitted under the Bankruptcy Code, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "507(b) Claims"), which 507(b) Claims shall be payable from all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions, but including, subject to entry of the Final Order, Avoidance Proceeds).  The 507(b) Claims shall be subject and subordinate only to the Carve-Out and the DIP Superpriority Claims.  Except to the extent expressly set forth in the Interim Order, the Final Order or the DIP Documents, the Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have indefeasibly been paid in cash in full and all DIP Commitments have been terminated.

(iii)    *Prepetition Secured Parties Fees and Expenses*.  The Debtors shall provide the Prepetition Secured Parties cash payments of all reasonable and documented prepetition and postpetition fees and expenses, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses relating to the exercise of remedies in connection with the Prepetition Secured Note Obligations and incurred by primary, special and local counsel (in each applicable jurisdiction) and financial advisors to the Prepetition Secured Parties, including without limitation Proskauer Rose LLP, Morris, Nichols, Arsht & Tunnell LLP and any other advisor retained by or on behalf of the Prepetition Secured Parties (the "Adequate Protection Fees and Expenses") (and such counsel and advisors, the "Prepetition Secured Parties Advisors"), subject to the review procedures set forth in paragraph 17 of the Interim Order.  Upon entry of the Interim Order, as provided in the Interim DIP Budget, the Debtors are authorized to use proceeds of the DIP Loans to pay the Adequate Protection Fees and Expenses, including but not limited to making payments to the Prepetition Secured Parties Advisors.

(iv)    *Prepetition Secured Parties Payments*.  To the extent allowed pursuant to section 506(b) of the Bankruptcy Code, interest shall continue to accrue on the Prepetition Secured Loans at the applicable default rate of interest under the Prepetition Secured Note Documents, paid in kind by capitalizing such interest and adding it to the outstanding principal balance of the Prepetition Secured Notes in accordance with the Prepetition Secured Note Documents.

(v)     *Milestones*.   Until indefeasible payment in full of all DIP Obligations and termination of all DIP Commitments, the Prepetition Secured Parties are hereby entitled to performance of those certain case milestones set forth in Section 8.10 of the DIP Loan Agreement (for such purposes, the "<u>Adequate Protection Milestones</u>").

(vi)     *Budget and Financial Covenants*.   Until indefeasible payment in full of all DIP Obligations and all other obligations under the DIP Facility, (i) the Approved Budget shall continue to be updated in accordance with the terms and conditions of the DIP Loan Agreement (for such purposes, the "<u>Adequate Protection Budget Requirement</u>") and (ii) the Prepetition Secured Parties are hereby entitled to performance of those certain financial and other covenants set forth in Sections 8.9 and 8.12 of the DIP Loan Agreement (for such purposes, the "<u>Adequate Protection Covenants</u>").

(vii)     *Prepetition Secured Parties' Adequate Protection Information Rights*.   Unless otherwise agreed by the Prepetition Secured Parties, the Debtors shall promptly provide the Prepetition Secured Parties and, to the extent applicable, counsel to such party (and subject to applicable confidentiality restrictions contained in any of the Prepetition Secured Note Documents), with all required written financial reporting and other periodic reporting that is required to be provided to the DIP Agent or the DIP Secured Parties under the DIP Documents, including without limitation the reporting required under Section 8.6 of the DIP Loan Agreement (the "<u>Adequate Protection Reporting Requirements</u>").   Until indefeasible payment in full of all DIP Obligations and termination of all DIP Commitments, the Prepetition Secured Parties shall continue to be entitled hereby to satisfaction of the Adequate Protection Reporting Requirement.

(viii)     *Maintenance of Collateral*.   The Debtors shall continue to maintain and insure the Prepetition Collateral and DIP Collateral in amounts and for the risks, and by the entities, as required under the Prepetition Secured Note Documents and the DIP Documents.

*Adequate Protection of the Subordinated Note Parties*.  Solely to the extent the Subordinated Note Parties have valid, enforceable and perfected Subordinated Note Liens, the Subordinated Note Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in any Subordinated Note Collateral (including Cash Collateral) securing the Subordinated Note Liens in an amount equal to the aggregate diminution in the value of the Subordinated Note Parties' interests in the Subordinated Note Collateral (including Cash Collateral) from and after the Petition Date, for any reason provided for under the Bankruptcy Code, including, without limitation, any diminution resulting from the sale, lease or use by the Debtors of the Subordinated Note Collateral, the priming of the Subordinated Note Liens by the DIP Liens pursuant to the DIP Documents and the Interim Order, the grant of any other lien under section 364 of the Bankruptcy Code or the stay of the Subordinated Note Parties' rights under the Subordinated Notes, the payment of any amounts under the Carve-Out or pursuant to the Interim Order, the Final Order or any other order of the Court or provision of the Bankruptcy Code or otherwise, and the imposition of the Automatic Stay (the "<u>Subordinated Adequate Protection Claims</u>").  In consideration of the foregoing, and solely to the extent the Subordinated Note

| | |
|---|---|
| | Parties have valid, enforceable and perfected Subordinated Note Liens, the Subordinated Note Parties are hereby granted the following as Adequate Protection for, and to secure repayment of an amount equal to such Subordinated Adequate Protection Claims, and as an inducement to the Subordinated Note Parties to consent to the priming of the Subordinated Note Liens and use of the Subordinated Note Collateral (including Cash Collateral) (collectively, the "<u>Subordinated Adequate Protection Obligations</u>"): |
| | (i)    *Subordinated Adequate Protection Liens*.  The Subordinated Note Collateral Agent, for itself and for the benefit of the other Subordinated Note Parties, is hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements) in the amount of the Subordinated Note Parties' Subordinated Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the Subordinated Note Collateral (the "Subordinated <u>Adequate Protection Liens</u>"), in each case senior to all other liens but subject and subordinate only to (A) the DIP Liens, (B) the Carve-Out, (C) the Adequate Protection Liens, and (D) the Prepetition Secured Note Liens of the Prepetition Secured Parties.  For the avoidance of doubt, the Subordinated Adequate Protection Liens shall not extend to Avoidance Actions or Avoidance Action Proceeds. |
| | (ii)    *Subordinated Section 507(b) Claims*.  Solely to the extent the Subordinated Note Parties have valid, enforceable and perfected Subordinated Note Liens and subject to the payment in full of the Prepetition Secured Note Obligations and DIP Obligations, the Subordinated Note Parties are hereby granted, subject to the Carve-Out, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases as provided for in section 507(b) of the Bankruptcy Code in the amount of the Adequate Protection Claims, with, to the fullest extent permitted under the Bankruptcy Code, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "<u>Subordinated 507(b) Claims</u>"), which Subordinated 507(b) Claims shall be payable from all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Proceeds).  Pursuant to the Intercreditor Agreement, the Subordinated Note Parties shall not receive or retain any payments, property or other amounts in respect of the Subordinated 507(b) Claims unless and until the DIP Obligations and Prepetition Secured Note Obligations have indefeasibly been paid in cash in full and all DIP Commitments have been terminated. |
| | (iii)    Notwithstanding anything to the contrary in the Interim Order, the Subordinated Note Parties and the Subordinated Notes and Subordinated Note Liens shall remain bound by and subject to the Intercreditor Agreement, the provisions of which shall remain in full force and effect.  Nothing in the Interim Order shall constitute a finding, stipulation, admission, or other legal determination of the existence, validity, priority, or perfection of any Subordinated Note Liens. |
| | *See* Interim Order ¶ 13. |
| **Carveout**<br>Bankruptcy Rule<br>4001(c)(1)(B) | "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate pursuant to 31 U.S.C. § 3717, (ii) reasonable fees and expenses incurred by a |

| | |
|---|---|
| Del. Bankr. L.R. 4001-2(a)(i)(F) | trustee and payable under section 726(b) of the Bankruptcy Code (without regard to the Carve-Out Trigger Notice (as defined below)) in an aggregate amount not to exceed $25,000, (iii) to the extent allowed at any time, whether by interim order, final order, or other order, all accrued but unpaid fees and expenses (excluding any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code and any Creditors' Committee (the "Estate Professionals") at any time on or before the date of delivery by the DIP Agent (acting at the direction of the DIP Lender) of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice up to the amounts for the Estate Professionals included in the DIP Budget (whether to be actually paid or to be accrued) through the date of the Carve-Out Trigger Notice (the amounts set forth in the foregoing clauses (i), (ii) and (iii), the "Pre-Carve-Out Trigger Notice Amount"); and (iv) Allowed Professional Fees of the Estate Professionals incurred after the date of delivery by the DIP Lender or the Prepetition Secured Parties, as applicable, of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, final order or other court order, in an aggregate amount not to exceed $75,000 for the Debtors' professionals and $25,000 for professionals of the Creditors' Committee (the amount set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap"). <br><br> *See* Interim Order ¶ 4(a). |
| **Challenge Period** Bankruptcy Rule 4001(c)(1)(B) <br><br> Del. Bankr. L.R. 4001-2(a)(i)(Q) | The Challenge Period shall be the earlier of (x) the consummation of a sale of all or substantially all of the Debtors' assets and (y) 75 calendar days after entry of the Interim Order; (ii) any such later date agreed to in writing by the applicable Prepetition Secured Party; and (iii) any such later date as has been ordered by the Court for cause upon a motion timely filed and served within any applicable period. <br><br> *See* Interim Order ¶ 18. |
| **Liens and Priorities** Bankruptcy Rule 4001(c)(1)(B)(i), (ii) <br><br> Del. Bankr. L.R. 4001-2(a)(i)(G) | The DIP Secured Parties are granted post-petition first priority security interests and liens (all security interests and liens granted to the DIP Agent, for its benefit and for the benefit of the DIP Secured Parties, pursuant to the Interim Order and the DIP Documents, the "DIP Liens") on all property identified in clauses (a) through (c) below (collectively referred to as the "DIP Collateral"). The DIP Liens shall (i) be subject and junior to the Carve-Out and Stalking Horse Payments (as defined in the DIP Loan Agreement), (ii) prime and be senior to the Prepetition Secured Note Liens and the Subordinated Note Liens, and (iii) be senior to the Adequate Protection Liens. Notwithstanding the foregoing, the DIP Liens shall not extend to, and the DIP Collateral shall not consist of assets, contracts, leases and other licenses solely to the extent a DIP Lien is not permitted by law to attach to such property, in which case the proceeds of such assets, contracts, leases and other licenses shall be DIP Collateral. Subject to entry of the Final Order, DIP Collateral shall include Avoidance Actions and Avoidance Proceeds. |

23

(a)      *Liens on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, including, without limitation, any and all unencumbered cash of the Debtors and any investment of cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, goodwill, causes of action, insurance policies and rights, claims and proceeds from insurance, commercial tort claims and claims that may constitute commercial tort claims (known and unknown), chattel paper (including electronic chattel paper and tangible chattel paper), interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, equity interests of subsidiaries, joint ventures and other entities, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise (the "<u>Unencumbered Property</u>"), in each case other than the Avoidance Actions and Avoidance Proceeds, provided that upon entry of the Final Order, "Unencumbered Property" shall include Avoidance Actions and Avoidance Proceeds.

(b)      *Liens Priming Certain Prepetition Secured Parties' Liens and Subordinated Note Liens*.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtors subject to the Prepetition Secured Note Liens and Subordinated Note Liens (if any), regardless of where located, regardless whether or not any liens on such assets are voided, avoided, invalidated, lapsed or unperfected (the "<u>Priming Liens</u>"), which Priming Liens shall prime in all respects the interests of the Prepetition Secured Parties and Subordinated Note Parties arising from the current and future liens of the Prepetition Secured Parties and Subordinated Note Parties (including, without limitation, the Adequate Protection Liens granted to the Prepetition Secured Parties and the Subordinated Note Parties) (the "<u>Primed Liens</u>").

(c)      *Liens Junior to Certain Other Liens*.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of each of the Debtors that is subject to (i) valid, perfected and non-avoidable senior liens in existence immediately prior to the Petition Date (other than the Primed Liens) and permitted by the terms of the Prepetition Secured Note Documents, (ii) valid and non-avoidable senior liens (other than the Primed Liens) in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date, as permitted by section 546(b) of the Bankruptcy Code and the terms of the Prepetition Secured Note Documents, which shall be immediately junior and subordinate to (x) any valid, perfected and non-avoidable liens (other than the Primed Liens) in existence immediately prior to the

| | |
|---|---|
| | Petition Date, and (y) any such valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code; *provided* that nothing in the foregoing clauses (i) and (ii) shall limit the rights of the DIP Secured Parties under the DIP Documents to the extent such liens are not permitted thereunder.<br><br>*See* Interim Order ¶ 6. |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(iv)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(H) | The Debtors shall comply with the following milestones (each, a "<u>Case Milestone</u>") by the dates set forth below (each, a "<u>Specified Deadline</u>") unless modified by the Orders and with the express written consent of the Required DIP Lenders:<br><br>(a)    no later than three (3) calendar days after the Petition Date, the Interim Order approving the DIP Facility shall be entered by the Bankruptcy Court;<br><br>(b)    no later than ten (10) calendar days following the Petition Date, the Company shall have executed an asset purchase agreement, in form and substance satisfactory to the DIP Lenders, pursuant to which a newly formed entity controlled by the DIP Lenders (or Affiliates or designees thereof) (the "<u>Stalking Horse Purchaser</u>") will purchase by credit bid substantially all assets of the Debtors that are used or useful in the operation of their business free and clear of all liens, claims, interests and encumbrances, subject only to higher or otherwise better offers (the "<u>Stalking Horse Purchase Agreement</u>");<br><br>(c)    no later than ten (10) calendar days after the Petition Date, the Debtors shall file with the Bankruptcy Court one or more motions, each in form and substance reasonably satisfactory to the Required DIP Lenders, seeking approval of the Stalking Horse Purchase Agreement (the "<u>Sale Motion</u>" and, the transaction in respect thereof, the "<u>Sale Transaction</u>") and (ii) bidding procedures in connection with approval of the Sale Transaction (the "<u>Bid Procedures Motion</u>");<br><br>(d)    no later than thirty-one (31) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order establishing bidding procedures consistent with the Bidding Procedures Motion (such order, the "<u>Bidding Procedures Order</u>"), which order shall be reasonably satisfactory to the Required DIP Lenders;<br><br>(e)    no later than thirty-one (31) calendar days after the Petition Date, the Final Order approving the DIP Facility shall be entered by the Bankruptcy Court;<br><br>(f)    no later than forty-four (44) calendar days after the Petition Date, unless the DIP Agent otherwise agrees, submission of qualified bids in respect of the Sale Transaction;<br><br>(g)    no later than forty-six (46) calendar days after the Petition Date, the Borrower shall have held an auction in connection with the Sale Transaction;<br><br>(h)    no later than fifty-two (52) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Sale Transaction (the "<u>Sale Order</u>"), which order shall be satisfactory to the Required DIP Lenders; and |

|  |  |
|---|---|
|  | (i) no later than fifty-five (55) calendar days after the Petition Date, the Borrower shall have consummated the Sale Transaction in accordance with the Sale Order.<br><br>*See* DIP Credit Agreement § 8.10. |
| **Prohibiting Investigation**<br>Del. Bankr. L.R. 4001-2(a)(i)(L) | No DIP Loans, DIP Collateral, Prepetition Collateral (including Cash Collateral) or any portion of the Carve-Out, may be used directly or indirectly, including without limitation through reimbursement of professional fees of any non-Debtor party: (a) in connection with the investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the DIP Secured Parties, the Prepetition Secured Parties, or their respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, in each case in their respective capacity as such, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens, DIP Superpriority Claims, Prepetition Secured Notes, and/or the Adequate Protection Obligations and Adequate Protection Liens granted to the Prepetition Secured Parties, as applicable, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to the DIP Obligations, the Prepetition Secured Notes and/or the liens, claims, rights, or security interests securing or supporting the DIP Obligations granted under the Interim Order, the Final Order, the DIP Documents or Prepetition Secured Note Documents in respect of the Prepetition Secured Notes. However, the proceeds of the DIP Loans and/or DIP Collateral (including Cash Collateral) may be used by the Creditors' Committee to investigate (but not to prosecute or initiate the prosecution of, including the preparation of any complaint or motion on account of) (A) the claims and liens (including the validity and priority thereof whether by legal, equitable or other means) of the Prepetition Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties, up to an aggregate cap of no more than $20,000.<br><br>*See* DIP Credit Agreement § 2.2.3; Interim Order ¶ 19. |
| **506(c) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B)(x) | Subject to entry of the Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (including Cash Collateral) or Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent or the Prepetition Secured Parties, as applicable, and no consent shall be implied from any other action, inaction or acquiescence by the DIP Secured Parties or the Prepetition Secured Parties, and nothing contained in the Interim Order shall be deemed to be a consent by the DIP Secured Parties or the Prepetition Secured Parties to any charge, lien, assessment or claims against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.<br><br>*See* Interim Order ¶ 8. |

**BASIS FOR RELIEF**

I.      **The Requested Relief Should Be Granted Pursuant to Sections 364(c) and 364(d)(1) of the Bankruptcy Code.**

30.      As set forth above, the Debtors' ability to maximize the value of their estates and successfully complete their going-concern sale process hinges upon their being able to access postpetition financing. Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business, and (c) obtaining credit with specialized priority or on a secured basis. Pursuant to section 364(c) of the Bankruptcy Code, if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to superpriority administrative expense status, secured by a senior lien on unencumbered property or secured by a junior lien on encumbered property. *See* 11 U.S.C. § 364(c). Under section 364(d) of the Bankruptcy Code, courts also may authorize postpetition credit secured by a senior or equal lien on encumbered property if the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. *See* 11 U.S.C. § 364(d)(1).

A.      **The Debtors Have Exercised Their Business Judgment in Entering into the DIP Facility.**

31.      The Court should authorize the Debtors to enter into the DIP Documents as a sound exercise of their business judgment. A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See In re Ames Dept. Stores,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."); *see also In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr.

W.D. Mo. 2003) (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment."); *TWA v. Travelers Int'l AG. (In re TWA)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment . . . [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors.").

32.     Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money. *See*, *e.g.*, *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court"). Further, one court has noted that "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

33.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *See In re Curlew Valley Assocs.*, 14 B.R. 506, 511–13 (Bankr. D. Utah 1981); *see TWA*, 163 B.R. at 974 (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor). Bankruptcy courts generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *In re Curlew Valley Assoc.'s,* 14 B.R. 506, 513–14 (Bankr. D. Utah 1981)

34.     Entry into the DIP Documents is a sound exercise of the Debtors' business judgment and the Debtors have satisfied the legal prerequisites to incur debt on the terms and

conditions of the DIP Facility. The Debtors require access to the DIP Facility because the proceeds thereof will permit the Debtors to continue to operate their businesses, navigate the sale process in these Chapter 11 Cases to maximize value for all of their stakeholders, and to reassure their customers, employees, and other stakeholders that the Debtors have adequate liquidity to continue their operations without disruption in these Chapter 11 Cases. The terms of the DIP Facility were thoroughly negotiated in good faith and at arm's length. Moreover, the Debtors have sought but not received any proposals for post-petition financing from any other party. Absent the DIP Facility, the Debtors would be forced to wind-down their business operations, which would eviscerate the going-concern value of the business and result in irreparable harm to the Debtors' estates. Accordingly, the Court should authorize the Debtors' entry into the DIP Facility as a sound exercise of the Debtors' business judgment.

### B.    The DIP Facility Represents the Best Financing Available.

35.    A debtor seeking financing under section 364 of the Bankruptcy Code must make a reasonable effort to seek other sources of unsecured credit, but is granted deference in acting in accordance with its business judgment and, indeed, is not required to seek credit from every possible source. *See*, *e.g.*, *In re Ames Dept. Stores*, 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable").

36.    Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive

search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dept. Stores*, 115 B.R. at 37–40 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

37.     The Debtors and their advisors, CR3, conducted a marketing process prepetition to solicit financing proposals. The Debtors contacted more than thirteen (13) existing investors in the company in the few months prior to the Petition Date, and none were willing to provide debtor in possession financing. Additionally, CR3 solicited alternative proposals for post-petition financing on terms similar to or better than those offered by the DIP Lender. CR3 contacted ten (10) well-established and experienced financial institutions as well as Oaktree Capital Management, LP, one of the Debtors' investors and claimants under the Prepetition Subordinated Debt.  However, due to the Debtors' existing obligations under the Prepetition Secured Notes and Subordinated Notes, and current dire financial position, no lender was willing to provide postpetition financing on an unsecured or junior priority basis.  Ultimately, none of the parties contacted by CR3 expressed any willingness to provide debtor-in-possession financing. The only proposal received by the Debtors was a DIP Financing proposal by the DIP Lender.

38.     Although the Debtors did not receive any other proposals, the terms of the DIP Facility are the product of arm's-length negotiations, are fair and reasonable, and are customary in this District. In considering whether the terms of postpetition financing are fair and reasonable, courts

consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also In re Ellingsen MacLean Oil Co.*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

39.     The Debtors are unable to obtain postpetition financing that they need on terms more favorable than those provided by the DIP Facility. Accordingly, the Debtors' efforts to obtain postpetition financing satisfy the statutory requirements of sections 364(c) and (d) of the Bankruptcy Code.

**C.     Section 364(e) Protections Should Apply to the DIP Facility.**

40.     As described above, the terms and conditions of the DIP Facility are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arm's length. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of Bankruptcy Code section 364(e) and is entitled to all of the protections afforded by that section.

**III.     The Debtors' Request for Use of Cash Collateral and the Proposed Adequate Protection Is Appropriate.**

41.     The Debtors' use of property of the estates is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

42.     Pursuant to section 363(c)(2) of the Bankruptcy Code, the Court may authorize the Debtors to use cash collateral as long as the applicable secured creditors consent or

are adequately protected. *See In re McCormick*, 354 B.R. 246, 251 (Bankr. C D. Ill. 2006) (to use the cash collateral of a secured creditor, the debtor must have the consent of the secured creditor or must establish to the Court that the secured creditor's interest in the cash collateral is adequately protected). "Cash Collateral" is defined as, "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest." 11 U.S.C. § 363(a).

43.     As described in the First Day Declaration, the Debtors have an urgent need for the immediate use of the Cash Collateral pending the Final Hearing on this Motion and seek to use Cash Collateral existing on or after the Petition Date in exchange for the adequate protection set forth in the Interim Order and DIP Credit Agreement. The Debtors require the use of the Cash Collateral in order to effect the orderly continuation of the operation of their businesses, maintain business relationships with customers, make payroll, administer these Chapter 11 Cases, and to satisfy other working capital and operational needs.

A.     **The Terms of the DIP Facility and the Proposed Adequate Protection Are Fair, Reasonable, and Adequate Under the Circumstances**

44.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.,* 294 B.R. at 886; *see also In re Ellingsen MacLean Oil Co.,* 65 B.R. at 365 n.7 (a debtor may have to enter into hard bargains to acquire funds). The appropriateness of a proposed financing facility should also be considered in light of current market conditions. *See Transcript of Record* at 740: 4-6, *In re Lyondell Chem. Co.,* No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [debtor-in-possession financing] pricing terms are, I find the provisions [of the financing] reasonable here and now.").

45.    As set forth in the First Day Declaration, the Debtors believe that the fees to be paid under the DIP Facility are appropriate, particularly in light of the circumstances of the Chapter 11 Cases and market practice for debtor-in-possession financings of this size and type.  The terms of the DIP Facility were extensively negotiated by the Debtors and their advisors to ensure that the terms were as favorable to the Debtors as possible under the circumstances, and the Debtors believe that such terms represent fair consideration for the critical financing being provided by the DIP Lender. Accordingly, the fees provided for under the DIP Facility are reasonable and within market practice for debtor-in-possession financings of this size and type, and the Court should authorize the Debtors to pay the fees provided under the DIP Loan Documents in connection with the DIP Facility.

46.    When priming of liens is sought under section 364(d) of the Bankruptcy Code, the courts also examine whether the prepetition secured creditors are being provided adequate protection for the value of their liens. *See In re Utah 7000, L.L. C.,* No. 08-21869 (JAB), 2008 WL 2654919, at *3 (Bankr. D. Utah July 3, 2008); *In re Beker Indus. Corp.,* 58 B.R. 725, 736-737 (Bankr. S.D.N.Y. 1986). Although the Bankruptcy Code does not define "adequate protection," section 361 of the Bankruptcy Code delineates a non-exhaustive list of the available types of adequate protection, including: periodic cash payments, additional liens, replacement liens, and the "indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361. The focus of the requirement is to protect a secured creditor from the diminution in the value of its interest in the particular collateral during the period of use. *See Resolution Trust Corp. v. Swedeland Dev. Group (In re Swedeland Dev. Group),* 16 F.3d 552, 564 (3d Cir. 1994) ("[T]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.").

47. The Debtors propose to provide adequate protection to protect the interests of the Prepetition Secured Parties and the Subordinated Note Parties in the Debtors' property from any diminution in value of the Prepetition Collateral (including Cash Collateral) resulting from the (a) use of Cash Collateral by the Debtors and (b) the imposition of the automatic stay (in each case, subject to the Carve-Out and the liens and claims of the DIP Lender). This includes security interests in, and liens on the DIP Collateral, as applicable and certain allowed superpriority administrative expense claims against the Debtors' estates under section 507(b) of the Bankruptcy Code.

48. In addition to the proposed Adequate Protection, the critical liquidity provided by the proposed DIP Facility permits the Debtors to avoid a disorderly chapter 7 liquidation and instead to conduct the plan and sale process in a way that will maximize the value of the Prepetition Collateral for the benefit of all parties in interest. Courts have held enhancement of collateral is a critical component of adequate protection and have considered "whether the value of the debtor's property will increase as a result of the . . . proposed financing." *In re 495 Cent. Park Ave. Corp.,* 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (finding that improvements to collateral financed by postpetition financing proceeds would improve collateral value in excess of loans and, therefore, provided adequate protection); *In re Sky Valley, Inc.,* 100 B.R. at 114 ("an increase in the value of the collateral . . . resulting from superpriority financing could result in adequate protection."), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989); *see In re Hubbard Power & Light,* 202 B.R. 680 (Bankr. E.D.N.Y. 1996) (approving postpetition financing to be used, in part, to fund cleanup costs of encumbered property anticipated to improve the value of the collateral, thereby serving the goal of adequate protection). The Debtors,

therefore, further submit that the adequate protection as described herein is fair and reasonable and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

**B.      The Debtors Should Be Authorized to Use Cash Collateral**

49.     The Debtors should be permitted to use Cash Collateral pursuant to section 363(c)(2) of the Bankruptcy Code, which provides, in relevant part, that a debtor "may not use, sell, or lease cash collateral . . . unless: (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Section 363(e) of the Bankruptcy Code further provides that "on request of an entity that has an interest in property . . . to be used, sole, or leased, by the trustee, the court . . . shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." *Id. § 363(e).*

50.     The Adequate Protection Liens, Subordinated Adequate Protection Liens, 507(b) Claims and Subordinated 507(b) Claims described above, are intended to protect the Prepetition Secured Parties and Subordinated Note Parties from any diminution in the value of their interests in the Prepetition Collateral resulting from the Debtors' use thereof during the pendency of the Chapter 11 Cases.

51.     While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes adequate protection on a case-by-case basis. *See, e.g., In re Swedeland Dev. Grp., Inc.,* 16 F.3d at 564 ("[A] determination of whether there is adequate protection is made on a case by case basis."); *In re Martin,* 761 F.2d 472, 474 (8th Cir. 1985) ("[S]uch matters are to be left to case-by-case interpretation and development." (cleaned up)); *In re Satcon Tech. Corp.,* No. 1212869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same). The adequate protection offered here

is traditional, appropriate, and routinely granted—including in this district. *See, e.g., In re MD Helicopters, Inc., et al.,* No. 22-10263 (KBO) (Bankr. D. Del. Apr. 26, 2022) [D.I. 205] (granting prepetition secured parties adequate protection liens, including liens on a depositary account funded postpetition, superpriority claims subject to a Carve-Out, fees, and expenses, and requiring that the debtors deliver certain financial reports and budget compliance documents). In light of the foregoing, the Debtors further submit that the proposed Adequate Protection Liens, Subordinated Adequate Protection Liens, 507(b) Claims and Subordinated 507(b) Claims to be provided for the benefit of the Prepetition Secured Parties and Subordinated Note Parties, are fair and appropriate under the circumstances and will ensure that the Debtors are able to continue using the Cash Collateral, subject to the terms and conditions set forth in the Interim Order, for the benefit of all parties in interest and the Debtors' estates.

### III.    The Roll Up of the Prepetition Secured Note Obligations is Appropriate

52.    The proposed roll up of the Prepetition Secured Note Obligations into the DIP Facility is also an exercise of the Debtors' sound business judgment. The DIP Facility consists of a roll up of $13,805,000 of the Prepetition Secured Note Obligations with $1,175,000 being "rolled up" upon entry of the Interim Order and $12,630,000 of the remaining Prepetition Secured Note Obligations being "rolled up" upon entry of the Final DIP Order. The proposed interim roll up of $1,175,000 is on account of money actually advanced to the Debtors prior to the Petition Date to pay essential operating expenses including payroll and to bridge the Debtors to the filing of these bankruptcy cases. The Debtors submit that the Roll Up Loan is appropriate and reasonable given the facts and circumstances.

53.    Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval. It is well settled in the

Third Circuit that such transactions should be approved when they are supported by a sound business purpose. The business judgment rule shields a debtor's management from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986).

      54.    Repaying prepetition debt (often referred to as a "roll-up") is a common feature in debtor-in-possession financing arrangements. The importance of "roll-up" features in DIP facilities has been repeatedly recognized by courts in this district and others, and such courts have granted relief similar to the relief requested herein. *See, e.g., In re Omega Therapeutics, Inc.,* No. 25-10211 (BLS) (Bankr. Feb. 11, 2025) [D.I. 44] (approving a roll-up of $1.6 million and a new money loan of $3.9 million on an interim basis); *In re IM3NY LLC,* No. 25-10131 (BLS) (Bankr. D. Del. Jan. 29, 2025) [D.I. 31] (approving a roll-up on an interim basis with a $15 million roll-up and $2.5 million provided in a new money facility post-petition); *In re Mondee Holdings, Inc.,* No. 25-10047 (JKS) (Bankr. D. Del. Jan. 16, 2025) [D.I. 62] (approving a roll-up where the rolled-up amount was 300% of the new money amount); *In re American Tire Distributors, Inc.,* No. 24-12391 (CTG) (Bankr. D. Del. Oct. 25, 2024) [D.I. 90] (authorizing a DIP facility with a roll-up on a three-to-one basis upon entry of the interim order); *In re Never Slip Holdings, Inc.,* No. 24-10663 (LSS) (Bankr. D. Del. Apr. 26, 2024) [D.I. 133] (authorizing $120.8 million DIP facility comprised of $30.8 million of new money and a $90 million roll-up); *In re Sientra, Inc.,* No. 24-10245 (JTD) (Bankr. D. Del. Mar. 11, 2024) [D.I. 168] (authorizing $90 million DIP facility comprised of $22.5 million of new money and a $67.5 million roll-up); *In re Phoenix Servs. Topco LLC,* Case No. 22-10906 (MFW) (Bankr. D. Del. Sept. 29, 2022) [D.I. 237] (authorizing $100 million DIP facility comprised of $25 million of new money and a $75 million roll-up); *In re Nine Point Energy Holdings, Inc.,* No. 21-10570 (MFW) (Bankr. D. Del. March 17, 2021) [D.I. 240] (authorizing $13 million of new money and a roll-up of $39 million pursuant to interim order); *In re Remington Outdoor Co., Inc.,* No. 18-

10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) [D.I. 177] (authorizing approximately $338 million DIP and a roll-up of approximately $150 million, including a full ABL roll-up of $114 million, pursuant to interim order); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) [D.I. 352] (authorizing full roll-up of all $489 million outstanding prepetition revolving obligations pursuant to interim order); *In re Real Indus. Inc.*, No. 17-12464 (KJC) (Bankr. D. Del. Nov. 20, 2017) [D.I. 348] (authorizing approximately $365 million DIP facility that included a creeping roll-up pursuant to interim order and a full rollup pursuant to entry of a final order of approximately $266 million prepetition debt).

55.     As set forth in the First Day Declaration, the proposed roll up of the Prepetition Secured Note Obligations owed to the DIP Lender are justified under the circumstances and an indispensable part of the DIP Facility. The DIP Lender specifically negotiated for the Roll Up Loan in the context of their commitment to provide the DIP Facility on the terms described. The Debtors, on the one hand, and the DIP Lender, on the other, engaged in arms' length negotiations and ultimately agreed to the Roll Up Loan as consideration for, among other things, the DIP Lender making available $4 million in new money to fund the Chapter 11 Cases. Indeed, without the Roll-Up Loans, the DIP Lender has indicated that it would not have agreed to provide the DIP Facility, which is critical to the Debtors' ongoing ordinary course operations, the success of these Chapter 11 Cases, and maximizing the value of the bankruptcy estates for the benefit of the creditors and all parties in interest.

56.     Additionally, the Debtors have an immediate need to obtain the DIP Facility and use Cash Collateral and are unable to obtain financing on more favorable terms from sources other than the DIP Lender. As such, the partial refinancing of the Prepetition Secured Note Obligations as part of the DIP Facility is critical to the Debtors' obtaining access to the liquidity

necessary to preserve and maximize the value of their estates. The Roll Up Loan benefits the Debtors' estates by allowing the Debtors to run a robust sale process as well fund the administration of these Chapter 11 Cases.

57.     Given the circumstances, the Debtors' agreement to the Roll Up Loan under the DIP Facility represents an exercise of the Debtors' sound business judgment and should be approved.

**IV.     Modification of the Automatic Stay on a Limited Basis is Warranted.**

58.     The relief requested herein contemplates a modification of the automatic stay pursuant to Bankruptcy Code section 362 to the extent necessary and applicable, to perform all acts and to make, execute, and deliver all instruments and documents (including, without limitation, the DIP Credit Agreement and other DIP Documents contemplated thereby), and to pay all fees, expenses and other amounts contemplated thereby or that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facility.

59.     Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Loan Documents and the proposed DIP Orders.

**V.     Interim Approval And Scheduling Of Final Hearing is Warranted.**

60.     As set forth above, Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code or to obtain credit under section 364 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the use of

cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

61.     Absent relief on an interim basis pursuant to the Interim Order, the Debtors will be unable to satisfy their immediate and projected payment obligations, including payroll and other operating expenses. Given the immediate and irreparable harm that the Debtors would suffer absent interim relief, the Debtors respectfully request that the Court schedule and conduct an interim hearing on the DIP Motion and (a) authorize the Debtors, from the entry of the Interim Order until the Final Hearing, to obtain credit under the terms contained in the DIP Credit Agreement and to utilize Cash Collateral, and (b) schedule the Final Hearing.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND (h)

62.     The Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rules 4001(a)(3) and 6004(h). As explained above and in the supporting declarations, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rules 4001(a)(3) and 6004(h), to the extent such stay applies.

## NOTICE

63.     Notice of this Motion will be provided to: (a) the Office of the United States Trustee; (b) counsel to the Debtors' proposed debtor-in-possession financing lender; (c) the Internal Revenue Service; (d) Securities and Exchange Commission; (e) Delaware State Treasury; (f) Delaware Secretary of State; (g) the parties included on the Debtors' consolidated list of their 30 largest unsecured creditors; (h) the United States Attorney for the District of Delaware; (i) the state

attorneys general in states where the Debtors are authorized to do business; (j) the Subordinated Note

Parties;  and (k) all parties entitled to notice pursuant to Bankruptcy Rule 2002.  As this Motion is

seeking first-day relief, the Debtors will serve copies of this Motion and any order entered in respect

of this Motion as required by Local Rule 9013-1(m). The Debtors respectfully submit that no further

notice of the Motion is required under the circumstances.

## **CONCLUSION**

WHEREFORE, the Debtors request entry of the Interim Order and Final Order, granting

the relief requested herein and such other and further relief as is just and proper.

Dated: March 31, 2025                    **WHITEFORD, TAYLOR & PRESTON LLC**[6]
      Wilmington, Delaware

                                           */s/ William F. Taylor, Jr.*
                                           William F. Taylor, Jr. (DE No. 2936)
600 North King Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 353-4144
Email:  wtaylor@whitefordlaw.com

**WHITEFORD, TAYLOR & PRESTON LLP**
David W. Gaffey (*pro hac vice* pending)
Brandy M. Rapp (*pro hac vice* pending)
J. Daniel Vorsteg (*pro hac vice* pending)
Joshua D. Stiff (*pro hac vice* pending)
Alexandra G. DeSimone (*pro hac vice* pending)
3190 Fairview Park Drive, Suite 800
Falls Church, VA 22042-4510
Telephone: (703) 280-9260
Email: dgaffey@whitefordlaw.com
        brapp@whitefordlaw.com
        jdvorsteg@whitefordlaw.com
        jstiff@whitefordlaw.com
        adesimone@whitefordlaw.com

*Proposed Counsel to the Debtors and Debtors in*
*Possession*

---

[6]    Whiteford, Taylor & Preston LLP operates as Whiteford, Taylor & Preston LLC in Delaware.