# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CTN HOLDINGS, INC.,[1] | Case No. 25-10603(TMH) |
| Debtors. | (Joint Administration Requested) |
| | **Re: D.I. __** |

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "DIP Motion")[2] of CTN Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession (the "Debtors") in the above-captioned cases (the "Chapter 11 Cases"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b), 4001-2, 9006-1, and 9013 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking entry of this interim order (this "Interim Order") among other things:

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are CTN Holdings, Inc. (9122), CTN SPV Holdings, LLC (8689), Make Earth Green Again, LLC (4441), Aspiration QFZ, LLC (1532), Aspiration Fund Adviser, LLC (4214), Catona Climate Solutions, LLC (3375) and Zero Carbon Holdings, LLC (1679).  The mailing address for the Debtors is 548 Market Street, PMB 72015, San Francisco, CA 94101-5401.

[2]  Capitalized terms used but not defined herein are given the meanings ascribed to such terms in the DIP Loan Agreement (as defined herein) or the DIP Motion, as applicable.

(a)     authorizing CTN Holdings, Inc. (the "<u>DIP Borrower</u>") to obtain postpetition financing ("<u>DIP Financing</u>") pursuant to a priming senior secured superpriority debtor-in-possession term loan credit facility (the "<u>DIP Facility</u>") subject to the terms and conditions set forth in that certain Superpriority Senior Secured Debtor-in-Possession Loan and Security Agreement and Guaranty attached hereto as **Exhibit 1** (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>DIP Loan Agreement</u>"), by and among the DIP Borrower, the DIP Guarantors (as defined below), Inherent Aspiration, LLC (the "<u>DIP Lender</u>") and Inherent Group, LP, as administrative agent (the "<u>DIP Agent</u>" and, collectively with the DIP Lender, the "<u>DIP Secured Parties</u>"), in an aggregate principal amount not to exceed $18,015,000.00 (the commitments in respect thereof, the "<u>DIP Commitments</u>"), in the form of delayed-draw term loans (the "<u>DIP Term Loans</u>") (i) in a new-money aggregate principal amount not to exceed $4,210,000.00, of which (x) up to $2,210,000.00 of the new-money DIP Commitment will be made available upon entry of this Interim Order and (y) the full remaining amount of the new-money DIP Commitment will be made available upon entry of the final order approving the DIP Facility (the "<u>Final Order</u>" and together with the Interim Order, the "<u>DIP Orders</u>") and (ii) (x) upon entry of this Interim Order a deemed term loan "roll up" of $1,175,000 of the Prepetition Secured Note Obligations held by the DIP Lender (or its affiliates) (the "<u>Interim Roll-Up</u>"), which amount equals the sum of certain protective advances made prior to the Petition Date, to be deemed incurred as of the date of the entry of the Interim Order, and (y) upon entry of the Final Order a deemed term loan "roll up" of $12,630,000.00 of the Prepetition Secured Note Obligations held by the DIP Lender (or its affiliates) (the "<u>Final Roll-Up</u>" and, together with the Interim Roll-Up, the "<u>Roll-Up Loan</u>" and the Roll-Up Loan with the DIP Term Loans, the "<u>DIP Loans</u>"), to be deemed incurred as of the date of the entry of the Final Order, in accordance with the terms and conditions set forth in the DIP Loan Agreement;

(b)     authorizing Make Earth Green Again, LLC, Aspiration QFZ, LLC, Carbon Sequestration I, LLC, Carbon Sequestration III, LLC, Carbon Sequestration III, LLC, Reforestation Initiatives I, LLC, Reforestation Initiatives II, LLC, Zero Carbon Holdings, LLC, and Catona Climate Solutions, LLC (the "<u>DIP Guarantors</u>") to jointly and severally guarantee the DIP Loans and the other DIP Obligations (as defined below);

(c)     authorizing the Debtors to execute, deliver and perform under the DIP Loan Agreement and all other loan documentation related to the DIP Facility, including, without limitation, as applicable, security agreements, pledge agreements, control agreements, mortgages, deeds, charges, guarantees, promissory notes, intercompany notes, certificates, instruments, intellectual property security agreements, notes, and such other documents that may be reasonably requested by the DIP Agent and the DIP Lender, in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Loan Agreement and any other Loan Documents (as defined in the DIP Loan Agreement), the "<u>DIP Documents</u>");

(d)     authorizing the Debtors to incur loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees (including, without limitation, commitment fees and any other fees payable pursuant to the DIP Documents), costs, expenses and other liabilities, and all other obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the DIP Documents (collectively, the "DIP Obligations"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(e)     subject to the Carve-Out (as defined herein), granting to the DIP Agent, for itself and for the benefit of the DIP Secured Parties, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations of the Debtors, which shall be payable from Avoidance Proceeds (as defined herein) only upon entry of the Final Order;

(f)     granting to the DIP Agent, for itself and for the benefit of the DIP Secured Parties, valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all prepetition and postpetition property of the Debtors' estates (other than certain excluded property as provided in the DIP Documents (the "Excluded Assets")) and all proceeds thereof, including, subject only to and effective upon entry of the Final Order, any Avoidance Actions and Avoidance Proceeds (each as defined herein), in each case subject to the Carve-Out;

(g)     authorizing the DIP Agent, acting at the direction of the DIP Lender, and the Prepetition Secured Parties (as defined herein), to take all commercially reasonable actions to implement and effectuate the terms of this Interim Order;

(h)     authorizing the Debtors to waive, subject to entry of the Final Order, (a) their right to surcharge the Prepetition Collateral (as defined herein) and the DIP Collateral (as defined herein) (together, the "Collateral") pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(i)     subject to entry of the Final Order, waiving the equitable doctrine of "marshaling" and other similar doctrines (i) with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (ii) with respect to any of the Prepetition Collateral (including the Cash Collateral (as defined herein)) for the benefit of any party other than the Prepetition Secured Parties;

(j)     authorizing the Debtors to use proceeds of the DIP Facility solely in accordance with this Interim Order and the DIP Documents;

(k)     authorizing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

(l)     subject to the restrictions set forth in the DIP Documents and this Interim Order, authorizing the Debtors to use the Prepetition Collateral, including Cash Collateral of the Prepetition Secured Parties under the Prepetition Secured Note Documents (as defined herein), and the Subordinated Note Collateral (as defined herein) of the Subordinated Note Parties under the Subordinated Note Documents, and provide adequate protection to the Prepetition Secured Parties and the Subordinated Note Parties for any diminution in value of their respective interests in the applicable Prepetition Collateral and Subordinated Note Collateral (including Cash Collateral), including, without limitation, any diminution in value resulting from the imposition of the automatic stay under section 362 of the Bankruptcy Code (the "Automatic Stay"), the Debtors' use, sale, or lease of the Prepetition Collateral and Subordinated Note Collateral (including Cash Collateral), and the priming of their interests in the Prepetition Collateral and Subordinated Note Collateral (including Cash Collateral);

(m)     vacating and modifying the Automatic Stay to the extent set forth herein to the extent necessary to permit the Debtors and their affiliates, the DIP Secured Parties and the Prepetition Secured Parties to implement and effectuate the terms and provisions of this Interim Order, the DIP Documents and, upon entry, the Final Order and to deliver any notices of termination described below and as further set forth herein;

(n)     waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order and, upon entry, the Final Order; and

(o)     scheduling a final hearing (the "Final Hearing") to consider final approval of the DIP Facility and use of Cash Collateral pursuant to the Final Order, as set forth in the DIP Motion and the DIP Documents filed with this Court.

The Court having considered the interim relief requested in the DIP Motion, the exhibits attached thereto, the *Declaration of Miles Staglik in Support of Debtors' First Day Motions and Applications* (the "First Day Declaration"), the available DIP Documents, and the evidence submitted and arguments made at the interim hearing held on [•], 2025 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors

and their estates pending the Final Hearing, otherwise is fair and reasonable and in the best interests

of the Debtors and their estates, and is essential for the continued operation of the Debtors'

businesses and the preservation of the value of the Debtors' assets; and it appearing that the

Debtors' entry into the DIP Documents is a sound and prudent exercise of the Debtors' business

judgment; and after due deliberation and consideration, and good and sufficient cause appearing

therefor.

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING**,

**THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS**

**OF LAW:**[3]

A.    *Petition Date*.   On [•], 2025 (the "<u>Petition Date</u>"), each of the Debtors filed a

voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States

Bankruptcy Court for the District of Delaware (the "<u>Court</u>").   On [•], 2025, this Court entered an

order approving the joint administration of the Chapter 11 Cases.

B.    *Debtors in Possession*.   The Debtors have continued in the management and

operation of their businesses and properties as debtors in possession pursuant to sections 1107 and

1108 of the Bankruptcy Code.

C.    *Jurisdiction and Venue*.   This Court has core jurisdiction over the Chapter 11 Cases,

the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)–(b)

and 1334 and the *Amended Standing Order of Reference from the United States District Court for*

*the District of Delaware*, dated February 29, 2012.   Consideration of the DIP Motion constitutes a

core proceeding pursuant to 28 U.S.C. § 157(b)(2).   The Court may enter a final order consistent

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law
pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.   To
the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.   To
the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

with Article III of the United States Constitution. Venue for the Chapter 11 Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D. *Committee Formation*. As of the date hereof, the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Creditors' Committee").

E. *Notice*. The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). Notice of the Interim Hearing and the DIP Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and no other or further notice of the Interim Hearing was required.

F. *Cash Collateral*. As used herein, the term "Cash Collateral" shall mean all of the Debtors' cash except for cash that is an Excluded Asset, wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" of the Prepetition Secured Parties, DIP Secured Parties and the Subordinated Note Parties within the meaning of section 363(a) of the Bankruptcy Code.

G. *Debtors' Stipulations*. Subject only to the limitations contained in paragraph 18 and paragraph G(x) hereof, and after consultation with their attorneys and financial advisors, the Debtors admit, stipulate and agree that:

(i) Prepetition Secured Notes. Pursuant to that certain Third Amended and Restated Senior Secured Promissory Note and Guaranty, dated as of October 30, 2024, as amended by the First Amendment thereto dated as of December 30, 2024, as amended by the Second Amendment thereto dated as of March 11, 2025 and as amended by the Third Amendment thereto dated as of March 24, 2025 (as further amended, restated, supplemented or otherwise modified prior to the

Petition Date, collectively, the "Prepetition Secured Notes", and the obligations thereunder, the "Prepetition Secured Note Obligations"), and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date (collectively, the "Prepetition Secured Note Documents", and the loans issued pursuant thereto, the "Prepetition Secured Loans"), by and among (1) CTN Holdings, Inc., as issuer (the "Prepetition Secured Note Issuer"), (2) Make Earth Green Again, LLC, Aspiration QFZ, LLC, Carbon Sequestration I, LLC, Carbon Sequestration II, LLC, Carbon Sequestration III, LLC, Reforestation Initiatives I, LLC, Reforestation Initiatives II, LLC, Zero Carbon Holdings, LLC, and Catona Climate Solutions, LLC (each, a "Prepetition Secured Note Guarantors" and together with the Prepetition Secured Note Issuer, the "Prepetition Secured Loan Parties"), (3) Inherent Aspiration LLC, AGO Special Situations LP, Zion Consulting and Advisory LLC, and Mark Villanueva, as holders (the "Prepetition Secured Note Holders") and (4) Inherent Group, LP, as collateral agent (in such capacity, the "Prepetition Collateral Agent", together with the Prepetition Secured Note Holders, the "Prepetition Secured Parties"), the Prepetition Secured Parties have extended the Prepetition Secured Loans for the benefit of the Prepetition Secured Loan Parties.

(ii)    Prepetition Secured Note Obligations.  The Prepetition Secured Loan Parties are justly and lawfully indebted and liable to the Prepetition Secured Parties without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount as of the Petition Date of not less than $61,535,712.99 of outstanding Prepetition Secured Loans, which loans were issued pursuant to, and in accordance with the Prepetition Secured Note Documents, plus accrued and unpaid interest thereon, premiums, reimbursement obligations (contingent or otherwise), fees, costs, expenses (including any attorneys', accountants', appraisers',

and financial advisors' fees and expenses), charges, indemnities, and any other amounts, liabilities, or obligations of whatever nature, whenever arising or accruing (whether before or after the Petition Date), that may be due, owing, or chargeable in connection therewith, in each case, as and to the extent provided in the Prepetition Secured Note Documents.

(iii)    _Prepetition Secured Note Liens._  As more fully set forth in the Prepetition Secured Note Documents, prior to the Petition Date, to secure the Prepetition Secured Note Obligations, the Prepetition Secured Loan Parties granted to the Prepetition Collateral Agent for the benefit of the Prepetition Secured Parties, valid, binding, non-avoidable, properly perfected and enforceable first priority continuing liens on and security interests in (the "Prepetition Secured Note Liens") the "Collateral" as defined in the Prepetition Secured Notes, including, for the avoidance of doubt, Cash Collateral (the "Prepetition Collateral").

(iv)    _Prepetition Protective Advances._  Without limiting the foregoing, the Prepetition Secured Loans include certain incremental advances (as referred to in the Prepetition Secured Note Documents, respectively, as the First Amendment Incremental Advance, Second Amendment Incremental Advance, and Third Amendment Incremental Advance), to the DIP Borrower under the Prepetition Secured Loan Documents in an aggregate principal amount of $1,175,000.00 (collectively, including all accrued interest, fees, costs, indemnities and other charges, the "Prepetition Protective Advances").   The Prepetition Protective Advances were negotiated between the Prepetition Secured Parties and Prepetition Secured Loan Parties, in good faith and at arms' length.

(v)    _Validity, Perfection and Priority of Prepetition Secured Note Liens._  The Debtors acknowledge and agree that as of the Petition date (a) the Prepetition Secured Note Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable and properly perfected and

were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Secured Note Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain liens senior by operation of law (solely to the extent any such liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Secured Note Liens and permitted under the Prepetition Secured Note Documents as of the Petition Date, the "Prepetition Permitted Prior Liens"); (c) the Prepetition Secured Notes constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Secured Loan Parties enforceable in accordance with the applicable Prepetition Secured Note Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Secured Note Liens or Prepetition Secured Notes exists, and no portion of the Prepetition Secured Note Liens or Prepetition Secured Notes is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action and/or choses in action, including, without limitation, "lender liability" causes of action, avoidance claims under Chapter 5 of the Bankruptcy Code whether arising under applicable state law or federal law (including, without limitation, any recharacterization, subordination, avoidance, disgorgement, recovery or other claims arising under or pursuant to sections 105, 510, or 542 through 552 of the Bankruptcy Code), against any of the Prepetition Secured Parties or their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to the Prepetition Secured Notes; and (f) the Debtors waive, discharge, and release any right to challenge any of the Prepetition Secured Notes, the priority of

the Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition Secured Note Liens securing the Prepetition Secured Notes.

(vi)    <u>Default by the Debtors</u>.  The Debtors acknowledge and stipulate that they have been and are in default of their obligations under the Prepetition Secured Note Documents, including as a result of commencing the Chapter 11 Cases, and that certain Events of Default (as defined in the Prepetition Secured Note Documents) have occurred thereunder.  As of the Petition Date, therefore, interest is accruing on the Prepetition Secured Note Documents at the default rate.

(vii)    <u>No Control</u>.  None of the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Prepetition Secured Note Documents.

(viii)    <u>No Claims or Causes of Action</u>.  No claims or causes of action held by the Debtors or their estates exist against, or with respect to, the Prepetition Secured Parties (in their capacity as such) under any agreements by and among the Debtors and any Prepetition Secured Parties that are in existence as of the Petition Date.

(ix)    <u>Release</u>.  Effective as of the date of entry of this Interim Order, each of the Debtors and (subject to paragraph 18 and paragraph G(x) hereof) the Debtors' estates, on its and their own behalf and on behalf of its and their respective past, present and future predecessors, heirs, successors, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Prepetition Secured Parties, the DIP Secured Parties, and each of their respective Representatives (as defined herein) (collectively, the "<u>Released Parties</u>"), from any and all (a) obligations and liabilities to the Debtors (and their successors and assigns)

and (b) claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise, in each case arising out of or related to (as applicable) the Prepetition Secured Note Documents, the DIP Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions and agreements reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order.  For the avoidance of doubt, nothing in this release shall relieve the DIP Lender or the Debtors of their Obligations under the DIP Documents from and after the date of this Interim Order.

(x)     Notwithstanding anything to the contrary in this Interim Order, nothing in this paragraph G or elsewhere in this Interim Order shall constitute a finding, stipulation, waiver, release, limitation, or discharge with respect to Joseph Sanberg or any entity controlled at any time by Joseph Sanberg or with any claims or causes of action related thereto.

H.     *The Subordinated Note Liens*.  The Debtors are party to certain Subordinated Secured Convertible Promissory Notes (the "Subordinated Notes") payable to among others, AGO Special Situations Credit, LP, AGO Special Situations II LP, Harmony Holdings, LLC, Lonsdale Group Limited, Long Live Bruce, LLC and OCM Aspiration Holdings, LLC (collectively, the "Subordinated Note Holders"). The Debtors' obligations to the Subordinated Note Holders (the

11

"Subordinated Note Obligations") are  subordinated to the Prepetition Secured Notes Obligations pursuant to that certain Intercreditor and Subordination Agreement (the "Intercreditor Agreement") among Inherent Group, LP in its capacity as Prepetition Collateral Agent and AGO I, GP, LLC in its capacity as the collateral agent with respect to the Subordinated Debt (the "Subordinated Note Collateral Agent" and collectively with the Subordinated Note Holders, the "Subordinated Note Parties"), dated July 12, 2023. The Subordinated Note Parties assert junior liens securing the Subordinated Note Obligations on certain collateral of the Debtors (the "Subordinated Note Collateral").

I.    *Corporate Authority*.  Each Debtor has all requisite corporate power and authority to execute and deliver the DIP Documents to which it is a party and to perform its obligations thereunder.

J.    *Findings Regarding the DIP Financing and Use of Cash Collateral*.

(i)    Good and sufficient cause has been shown for the entry of this Interim Order and for authorization of the Debtors to obtain financing pursuant to the DIP Documents.

(ii)    The Debtors have an immediate and critical need to obtain the DIP Financing and to use the Prepetition Collateral (including Cash Collateral) in order to, among other things (a) administer and preserve the value of their estates; (b) permit the orderly continuation of the operation of their business, (c) maintain business relationships with vendors, suppliers and customers, (d) make payroll, (e) satisfy other working capital and operational needs and (f) fund expenses of the Chapter 11 Cases.  In the absence of the DIP Facility and the use of Cash Collateral, the Debtors' business and estates would suffer immediate and irreparable harm.  The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, the incurrence of new indebtedness under the DIP Documents and other

financial accommodations provided under the DIP Documents are necessary and vital to the preservation and maintenance of the values of the Debtors and to a successful sale of all or substantially all of the Debtors' assets.

(iii)    The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting to the DIP Lender, the DIP Liens and the DIP Superpriority Claims (each as defined herein) and incurring the Adequate Protection Obligations (as defined herein), in each case subject to the Carve-Out to the extent set forth herein, under the terms and conditions set forth in this Interim Order and in the DIP Documents.

(iv)    The Debtors may continue to collect cash, rents, income, offspring, products, proceeds, and profits generated from the Prepetition Collateral and Subordinated Note Collateral and acquire equipment, inventory and other personal property, all of which constitute Prepetition Collateral under the Prepetition Secured Note Documents that are subject to the Prepetition Secured Parties' security interests as set forth in the Prepetition Secured Note Documents, as applicable, and Subordinated Note Collateral under the Subordinated Note Documents that are subject to the Subordinated Note Parties' security interests as set forth in the Subordinated Note Documents, as applicable.

(v)    The Debtors desire to use a portion of the cash, rents, income, offspring, products, proceeds and profits described in the preceding paragraph in their business operations that constitute Cash Collateral of the Prepetition Secured Parties and the Subordinated Note Parties under section 363(a) of the Bankruptcy Code.  Certain prepetition rents, income, offspring,

products, proceeds, and profits, in existence as of the Petition Date, including balances of funds in the Debtors' prepetition and postpetition operating bank accounts, also constitute Cash Collateral.

(vi)     Based on the DIP Motion, the First Day Declaration and the record presented to the Court at the Interim Hearing, the extension of credit under the DIP Financing, the terms of the adequate protection granted to the Prepetition Secured Parties and the Subordinated Note Parties as provided in paragraph 13 of this Interim Order (the "Adequate Protection"), and the terms on which the Debtors may continue to use the Prepetition Collateral (including Cash Collateral) and Subordinated Note Collateral pursuant to this Interim Order and the DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(vii)    The DIP Financing, the Adequate Protection and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties and the Prepetition Secured Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the DIP Documents, including, without limitation: all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents and any DIP Obligations shall be deemed to have been extended by the DIP Secured Parties and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(viii)    The Prepetition Secured Parties have acted in good faith regarding the DIP Financing and the Debtors' continued use of the Prepetition Collateral (including Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses (including the incurrence and payment of and performance under the Adequate Protection Obligations and the granting of the Adequate Protection Liens (as defined herein)), in accordance with the terms hereof, and the Prepetition Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of sections 363(m) and 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(ix)    The Prepetition Secured Parties and the Subordinated Note Parties are entitled to the Adequate Protection provided in this Interim Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the DIP Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral and Subordinated Note Collateral (including Cash Collateral) and are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Collateral and Subordinated Note Collateral, including the Cash Collateral, and the Prepetition Secured Parties and the Subordinated Note Parties have consented or are deemed hereby to have consented to the use of the Prepetition Collateral, including the Cash Collateral, the priming of the lien of the Prepetition Secured Note Liens and the Subordinated Note Liens by the DIP Liens pursuant to the terms set forth in this Interim Order and the DIP Documents; *provided* that nothing in this Interim Order or the DIP Documents shall (x) be construed as the affirmative consent by the Prepetition Secured Parties or the Subordinated Note Parties for the use

of Cash Collateral other than on the terms set forth in this Interim Order and in the context of the DIP Financing authorized by this Interim Order to the extent such consent has been or is deemed to have been given, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) other than as contemplated by the DIP Financing authorized by this Interim Order or (z) prejudice, limit or otherwise impair the rights of the Prepetition Secured Parties or the Subordinated Note Parties to seek new, different or additional adequate protection or assert any rights of the Prepetition Secured Parties or the Subordinated Note Parties, and the rights of any other party in interest, including the Debtors, to object to such relief are hereby preserved.

(x)    The Debtors have prepared and delivered to the advisors to the DIP Secured Parties an initial budget (the "Initial DIP Budget"), attached hereto as Exhibit 2.  The Initial DIP Budget reflects, among other things, the DIP Borrower's and its subsidiaries' anticipated sources and uses of cash for each calendar week, in form and substance satisfactory to the DIP Lender. The Initial DIP Budget may be modified, amended, extended and updated from time to time in accordance with the DIP Loan Agreement, and once approved by the DIP Lender, shall supplement and replace the Initial DIP Budget (the Initial DIP Budget and each subsequent approved budget, shall constitute without duplication, an "Approved Budget").  The Debtors believe that the Initial DIP Budget is reasonable under the facts and circumstances.  The DIP Secured Parties are relying, in part, upon the Debtors' agreement to comply with the Approved Budget (subject only to permitted variances), the other DIP Documents and this Interim Order in determining to enter into the postpetition financing arrangements provided for in this Interim Order.

(xi)    The Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code.  Subject to entry of the Final Order, the

"equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits with respect to any of the Prepetition Collateral.

K.      *Immediate Entry*.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2), (c)(2) and 6003.  Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Financing and the use of Prepetition Collateral (including Cash Collateral), in accordance with this Interim Order and the DIP Documents are therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

L.      *Prepetition Permitted Prior Liens; Continuation of Prepetition Secured Note Liens*. Nothing herein shall constitute a finding or ruling by this Court that any alleged Prepetition Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing herein shall prejudice the rights of any party in interest, including, but not limited to the Debtors, the DIP Secured Parties, or the Prepetition Secured Parties to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Prepetition Permitted Prior Lien and/or security interests.  The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Prepetition Permitted Prior Lien and is expressly subject to the DIP Liens and the Prepetition Secured Note Liens.  The Prepetition Secured Note Liens, and the DIP Liens that prime the Prepetition Secured Note Liens, are continuing liens and the DIP Collateral is and will continue to be encumbered by such liens until indefeasible payment in full of all Prepetition Secured Notes and all DIP Obligations, respectively, in light of the integrated nature of the DIP Facility, the DIP Documents and the Prepetition Secured Note Documents.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.     *Motion Granted.*  The relief sought in the DIP Motion is granted as set forth herein, on an interim basis.  The interim financing described herein is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in the DIP Documents and this Interim Order.  Further, the Interim Roll-Up of the Prepetition Protective Advances is hereby authorized.  All objections to entry of this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.  The rights of all parties in interest to object to the entry of a Final Order on the DIP Motion are fully reserved.

2.     *Authorization of the DIP Financing and the DIP Documents.*

(a)     The Debtors are hereby authorized to execute, deliver, enter into and, as applicable, perform all of their obligations under the DIP Documents and such other and further acts as may be necessary, appropriate or desirable in connection therewith.  The DIP Borrower is hereby authorized to borrow money pursuant to the DIP Loan Agreement and the DIP Guarantors are hereby authorized to provide a guaranty of payment in respect of the DIP Borrower's obligations with respect to such borrowings, subject to any limitations on borrowing under the DIP Documents, which shall be used for all purposes permitted under the DIP Documents (and subject to and in accordance with the Approved Budget) (subject to any permitted variances).  Upon entry of this Interim Order, as provided in the Interim DIP Budget, the Debtors are authorized to use proceeds of the DIP Loans to pay the DIP Fees and Expenses (as defined below).

(b)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized to perform all acts, to make, execute and deliver all instruments, certificates, agreements, charges, deeds and documents (including, without limitation, the execution or recordation of pledge and security agreements, mortgages, financing statements and other similar documents), and to pay all fees, expenses and indemnities in connection with or that may be reasonably required, necessary, or desirable for the Debtors' performance of their obligations under or related to the DIP Financing, including, without limitation:

(i)     the execution and delivery of, and performance under, each of the DIP Documents;

(ii)     the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the Debtors and the DIP Agent (acting in accordance with the terms of the DIP Loan Agreement and at the direction of the DIP Lender) may agree, it being understood that no further approval of this Court shall be required for any authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents (and any fees and other expenses (including attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other like obligations paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments, the fees or the rate of interest payable thereunder; *provided* that, for the avoidance of doubt, updates and supplements to the Approved Budget required to be delivered by the Debtors under the DIP Documents shall not, for purposes of this Interim Order or any Final Order, be considered amendments or modifications to the Approved Budget or the DIP Documents that require further approval of this Court;

(iii)    the non-refundable payment to the DIP Secured Parties of all fees, premiums and rights received as consideration under, or in connection with the DIP Facility, including but not limited to the Agent Fee, Commitment Fee, Exit Fee, indemnities, and professional fees (subject to the terms of paragraph 17 below) (the payment of which fees shall be irrevocable, and shall be, and shall be deemed to have been, approved upon entry of this Interim Order, whether any such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance, disallowance, impairment, or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise by any person or entity) and any amounts due (or that may become due) in respect of any indemnification and expense reimbursement obligations, in each case referred to in the DIP Loan Agreement or DIP Documents (or in any separate letter agreements) and the costs and expenses as may be due from time to time, including, without limitation, the fees and expenses of the professionals retained by, or on behalf of, any of the DIP Agent or DIP Secured Parties (subject to the terms of paragraph 17 below) (including without limitation those of Proskauer Rose LLP, Morris, Nichols, Arsht & Tunnell LLP and any other advisors as are permitted under the applicable DIP Documents), in each case, as provided for in the DIP Documents (collectively, the "DIP Fees and Expenses"), without the need to file retention motions or fee applications; and

(iv)    the performance of all other acts required under or in connection with the DIP Documents, including the granting of the DIP Liens and the DIP Superpriority Claims and perfection of the DIP Liens and DIP Superpriority Claims as permitted herein and therein, and to perform such other and further acts as may be necessary, desirable or

appropriate in connection therewith, in each case in accordance with the terms of the DIP Documents.

3. *DIP Obligations*.  Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute legal, valid, binding and non-avoidable obligations of the Loan Parties, enforceable against each Debtor and its estate in accordance with the terms of the DIP Documents and this Interim Order, and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases").  Upon execution and delivery of the DIP Documents, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to any of the DIP Agent or DIP Secured Parties, in each case, under, or secured by, the DIP Documents or this Interim Order, including all principal, interest, costs, fees, expenses, premiums, indemnities and other amounts under the DIP Documents (including this Interim Order).  The Debtors shall be jointly and severally liable for the DIP Obligations.  Except as permitted hereby, no obligation, payment, transfer, or grant of security hereunder or under the DIP Documents to the DIP Agent and/or the DIP Secured Parties (including their Representatives) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim,

or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

4. *Carve-Out.*

(a) *Carve-Out.* As used in this Interim Order, the term "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate pursuant to 31 U.S.C. § 3717, (ii) reasonable fees and expenses incurred by a trustee and payable under section 726(b) of the Bankruptcy Code (without regard to the Carve-Out Trigger Notice (as defined below)) in an aggregate amount not to exceed $25,000, (iii) to the extent allowed at any time, whether by interim order, final order, or other order, all accrued but unpaid fees and expenses (excluding any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code and any Creditors' Committee (the "Estate Professionals") at any time on or before the date of delivery by the DIP Agent (acting at the direction of the DIP Lender) of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice up to the amounts for the Estate Professionals included in the DIP Budget (whether to be actually paid or to be accrued) through the date of the Carve-Out Trigger Notice (the amounts set forth in the foregoing clauses (i), (ii) and (iii), the "Pre-Carve-Out Trigger Notice Amount"); and (iv) Allowed Professional Fees of the Estate Professionals incurred after the date of delivery by the DIP Lender or the Prepetition Secured Parties, as applicable, of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, final order or other court order, in an aggregate amount not to exceed $75,000 for the Debtors' professionals and $25,000 for professionals of the Creditors' Committee (the

amount set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap").  For purposes of this Interim Order, the "Carve-Out Trigger Notice" shall mean a written notice (which may be via electronic mail) delivered by the DIP Agent (acting at the direction of DIP Lender) to the Debtors and their counsel, Whiteford Taylor & Preston LLP, the Debtors' Chief Restructuring Officer, the U.S. Trustee, and counsel to the any Creditors' Committee, stating that the Post-Carve-Out Trigger Notice Cap has been invoked, which Carve-Out Trigger Notice may, but need not, be included in a Termination Declaration (as defined herein).  Such Carve-Out Trigger Notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in the DIP Loan Agreement).

(b)     *Pre-Carve-Out Trigger Notice.*  Prior to the date on which a Carve-Out Trigger Notice is delivered in accordance with this paragraph 4, (any such date, the "Carve-Out Trigger Date"), the Debtors shall fund on a weekly basis a reserve in an aggregate amount equal to the Pre-Carve-Out Trigger Notice Amount, which shall be earmarked and held in trust to pay unpaid fees and expenses incurred by Estate Professionals, to the extent allowed by the Court at any time, prior to payment of any and all other claims of any kind in the Chapter 11 Cases or upon conversion to cases under chapter 7 of the Bankruptcy Code (the "Carve-Out Reserve"), which funds shall be used to pay the obligations of the Estate Professionals as set forth in the Approved Budget.

(c)     *Post-Carve-Out Trigger Notice.*  On the Carve-Out Trigger Date, the Debtors shall utilize all cash on hand (including from the proceeds of the DIP Financing) to fund the Carve-Out Reserve in an amount equal to the Carve-Out.  All funds in the Carve-Out Reserve shall be used first to pay the obligations set forth in clauses (a)(i)-(iv) in the above definition of "Carve-Out" until paid in full, and second, to pay the DIP Lender until paid in full and, third to

23

pay the Prepetition Secured Parties until paid in full.  Notwithstanding anything to the contrary in this Interim Order or the DIP Documents, the failure of the Carve-Out Reserve to satisfy in full the fees of Estate Professionals shall not affect the priority of the Carve-Out.

(d)    *Payment of Carve-Out on or After the Carve-Out Trigger Date*. Any payment or reimbursement made on or after the occurrence of the Carve-Out Trigger Date in respect of any Allowed Professional Fees incurred after the occurrence of the Carve-Out Trigger Date shall permanently reduce the Carve-Out Amount on a dollar-for-dollar basis.

(e)    *No Direct Obligation to Pay Allowed Professional Fees*. Neither the DIP Lender nor the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Estate Professional incurred in connection with these Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code, regardless of whether such fees or expenses have been allowed by the Court.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lender or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Estate Professionals or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

5.    *DIP Superpriority Claims*.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) with, to the fullest extent permitted under the Bankruptcy Code or other applicable law, priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, including any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a) (other than section

507(a)(1)), 507(b), 1113 or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "DIP Superpriority Claims") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding claims and causes of action under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions") but, subject to the entry of the Final Order, including Avoidance Actions and any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise ("Avoidance Proceeds")) in accordance with the DIP Documents, this Interim Order or the Final Order, subject only to the Carve-Out. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise. The DIP Superpriority Claims shall be *pari passu* in right of payment with one another, senior to the 507(b) Claims (as defined herein), and subordinated to the Carve-Out.

6.      *DIP Liens*. As security for the DIP Obligations, effective and automatically and properly perfected upon the date of this Interim Order and without the necessity of the execution, recordation or filing by the Debtors or any of the DIP Secured Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements, intellectual property filings or other similar documents, notation of certificates of title for titled goods or other similar documents, instruments, deeds, charges or certificates, or the possession or control by the DIP

Agent of, or over, any Collateral, without any further action by the DIP Agent, the DIP Agent for its own benefit and for the benefit of the DIP Secured Parties, is hereby granted, pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, continuing, valid, binding, enforceable, non-avoidable, automatically perfected, post-petition first priority security interests and liens (all security interests and liens granted to the DIP Agent, for its benefit and for the benefit of the DIP Secured Parties, pursuant to this Interim Order and the DIP Documents, the "DIP Liens") on all property identified in clauses (a) through (c) below (collectively referred to as the "DIP Collateral").  The DIP Liens shall (i) be subject and junior to the Carve-Out and Stalking Horse Payments (as defined in the DIP Loan Agreement), (ii) prime and be senior to the Prepetition Secured Note Liens and the Subordinated Note Liens, and (iii) be senior to the Adequate Protection Liens.  Notwithstanding the foregoing, the DIP Liens shall not extend to, and the DIP Collateral shall not consist of assets, contracts, leases and other licenses solely to the extent a DIP Lien is not permitted by law to attach to such property, in which case the proceeds of such assets, contracts, leases and other licenses shall be DIP Collateral.  Subject to entry of the Final Order, DIP Collateral shall include Avoidance Actions and Avoidance Proceeds.

(a)      *Liens on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, including, without limitation, any and all unencumbered cash of the Debtors

and any investment of cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, goodwill, causes of action, insurance policies and rights, claims and proceeds from insurance, commercial tort claims and claims that may constitute commercial tort claims (known and unknown), chattel paper (including electronic chattel paper and tangible chattel paper), interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, equity interests of subsidiaries, joint ventures and other entities, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise (the "Unencumbered Property"), in each case other than the Avoidance Actions and Avoidance Proceeds, *provided* that upon entry of the Final Order, "Unencumbered Property" shall include Avoidance Actions and Avoidance Proceeds.

(b)     *Liens Priming Certain Prepetition Secured Parties' Liens and Subordinated Note Liens*.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtors subject to the Prepetition Secured Note Liens and Subordinated Note Liens, regardless of where located, regardless whether or not any liens on such assets are voided, avoided, invalidated, lapsed or unperfected (the "Priming Liens"), which Priming Liens shall prime in all respects the interests of the Prepetition Secured Parties and Subordinated Note Parties arising from the current and future liens of the Prepetition Secured Parties and Subordinated Note Parties (including, without limitation, the Adequate Protection Liens granted to the Prepetition Secured Parties and the Subordinated Note Parties) (the "Primed Liens").

(c)      *Liens Junior to Certain Other Liens.*  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of each of the Debtors that is subject to (i) valid, perfected and non-avoidable senior liens in existence immediately prior to the Petition Date (other than the Primed Liens) and permitted by the terms of the Prepetition Secured Note Documents, (ii) valid and non-avoidable senior liens (other than the Primed Liens) in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date, as permitted by section 546(b) of the Bankruptcy Code and the terms of the Prepetition Secured Note Documents, which shall be immediately junior and subordinate to (x) any valid, perfected and non-avoidable liens (other than the Primed Liens) in existence immediately prior to the Petition Date, and (y) any such valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code; *provided* that nothing in the foregoing clauses (i) and (ii) shall limit the rights of the DIP Secured Parties under the DIP Documents to the extent such liens are not permitted thereunder; and

(d)      *Liens Senior to Certain Other Liens.*  The DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, or (C) any intercompany or affiliate liens of the Debtors or security interests of the Debtors; or

28

(ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code granted after the date hereof.

7.      *Protection of DIP Lender's and Prepetition Secured Parties' Rights.*

(a)      So long as there are any DIP Obligations outstanding or the DIP Lender has any outstanding DIP Commitments under the DIP Documents, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Secured Note Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against the DIP Collateral, including in connection with the Adequate Protection Liens; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, the DIP Collateral (but not any proceeds of such transfer, disposition or sale to the extent remaining after payment in cash in full of the DIP Obligations and termination of the DIP Commitments), to the extent such transfer, disposition, sale or release is authorized under the DIP Documents; (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral other than as necessary to give effect to this Interim Order other than, (x) solely as to this clause (iii), the DIP Agent filing financing statements or other documents to perfect the liens granted pursuant to this Interim Order, or (y) as may be required by applicable state law or foreign law to complete a previously commenced process of perfection or to continue the perfection of valid and non-avoidable liens or security interests existing as of the Petition Date; and (iv) deliver or cause to be delivered, at the Debtors' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Secured Parties or other documents necessary to effectuate and/or

evidence the release, termination and/or assignment of liens on any portion of the DIP Collateral subject to any sale or disposition permitted by this Interim Order and the other DIP Documents.

(b)   To the extent any Prepetition Secured Party has possession of any Prepetition Collateral or DIP Collateral or has control with respect to any Prepetition Collateral or DIP Collateral, or has been noted as a secured party on any certificate of title for a titled good constituting Prepetition Collateral or DIP Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Secured Parties, and such Prepetition Secured Party shall comply with the instructions of the DIP Agent, acting at the direction of the DIP Lender, with respect to the exercise of such control or possession.

(c)   Any proceeds of Prepetition Collateral received by the Prepetition Secured Parties, whether in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral or otherwise received by a Prepetition Secured Party, shall be segregated and held in trust for the benefit of and forthwith paid over to the DIP Agent for the benefit of the DIP Secured Parties in the same form as received by the Prepetition Secured Parties, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct. The DIP Agent is hereby authorized to make any such endorsements as agent for the Prepetition Secured Parties.  This authorization is coupled with an interest and is irrevocable.

(d)   *Termination Date*.  On the Termination Date (as defined below) (i) all DIP Obligations shall be immediately due and payable and all DIP Commitments will terminate; (ii) the Prepetition Secured Parties may terminate, reduce or restrict the ability of the Debtors to use Cash Collateral; *provided*, *however*, that during the Remedies Notice Period (as defined below), the Debtors may use Cash Collateral solely to fund the Carve-Out and pay payroll and other

expenses critical to the administration of the Debtors' estates strictly in accordance with the Approved Budget; and (iii) the DIP Agent or the DIP Secured Parties shall be otherwise entitled to exercise rights and remedies under the DIP Documents in accordance with this Interim Order.

(e)    *Rights and Remedies Upon Event of Default*.  Upon an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of the DIP Documents and this Interim Order, including the Remedies Notice Period for the exercise of remedies other than the following (i) the DIP Agent or DIP Secured Parties may declare, which declaration shall be in writing and delivered by email or overnight mail to the Debtors, any Creditors' Committee, and the U.S. Trustee (any such declaration shall be referred to herein as a "Termination Declaration") (A) all DIP Loans (including principal of, and accrued interest on, any outstanding DIP Loans) to be immediately due and payable, (B) the termination of any further commitment to lend to the DIP Borrower without affecting any of the DIP Liens or the DIP Obligations, and/or (C)  that any obligations to fund the Carve-Out Reserve shall be triggered, through the delivery of the Carve-Out Trigger Notice to the DIP Borrower; and (ii) subject to paragraph 7(b), the Prepetition Secured Parties may terminate, reduce or restrict the ability of the Debtors to use Cash Collateral (the date on which a Termination Declaration is delivered, the "Termination Date").  The Automatic Stay in the Chapter 11 Cases otherwise applicable to the DIP Agent, the DIP Secured Parties and the Prepetition Secured Parties is hereby modified so that three (3) business days' after the Termination Date (the "Remedies Notice Period"):  (a) the DIP Agent, on behalf of the DIP Secured Parties, shall be entitled to exercise all of its rights and remedies in accordance with the DIP Documents and this Interim Order to satisfy the DIP Obligations, DIP Superiority Claims, and DIP Liens, including (subject to: (i) the funding of the

Carve-Out Reserve in accordance with paragraph 4(c) hereof; and (ii) payment of all accrued but unpaid wages and benefits to the Debtors' employees) (w) freeze or sweep monies or balances in the Debtors' accounts; (x) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Secured Parties against the DIP Obligations; (y) enforce any and all rights against DIP Collateral, including, without limitation, foreclosure on all or any portion of the DIP collateral, occupying the Debtors' premises, sale or disposition of the DIP Collateral; and (z) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Documents or applicable law, and (b) subject to the foregoing clause (a), the Prepetition Secured Parties shall be entitled to exercise their rights and remedies to the extent available in accordance with the applicable Prepetition Secured Note Documents and this Interim Order with respect to the Debtors' use of Cash Collateral. During the Remedies Notice Period, the Debtors shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court for the purpose of determining whether an Event of Default has occurred or is continuing, and with respect to such other matters determined to be relevant by the Court. Unless the Court orders otherwise prior to the expiration of the Remedies Notice Period, the Automatic Stay, as to the DIP Agent, the DIP Secured Parties and the Prepetition Secured Parties shall automatically be terminated at the end of the Remedies Notice Period without further notice or order. Upon expiration of the Remedies Notice Period, absent order of the Court to the contrary, the DIP Agent, the DIP Secured Parties and the Prepetition Secured Parties shall be permitted to exercise all remedies set forth herein, and in the DIP Documents, and as otherwise available at law without further order of or application or motion to this Court consistent with this Interim Order. Notwithstanding the foregoing, if the Debtors request an emergency hearing during the Remedies Notice Period, but such hearing is scheduled for a later date by the Court (not requested by the

Debtors), then the Remedies Notice Period shall be automatically extended to the date of such hearing.

(f)        No rights, protections or remedies of the DIP Secured Parties or the Prepetition Secured Parties granted by the provisions of this Interim Order or the other DIP Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent of any party to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party.

8.        *Limitation on Charging Expenses Against Collateral*.  Subject to entry of the Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (including Cash Collateral) or Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent or the Prepetition Secured Parties, as applicable, and no consent shall be implied from any other action, inaction or acquiescence by the DIP Secured Parties or the Prepetition Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Secured Parties or the Prepetition Secured Parties to any charge, lien, assessment or claims against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.

9.        *No Marshaling*.  Subject to entry of the Final Order, in no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of

"marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Secured Notes, or the Prepetition Collateral. Further, subject to entry of the Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any Prepetition Collateral.

10.     *Payments Free and Clear*.  Any and all payments or proceeds remitted to the DIP Agent by, through or on behalf of the DIP Secured Parties pursuant to the provisions of this Interim Order or the DIP Documents shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, whether asserted or assessed by through or on behalf of the Debtors, subject to the Carve-Out in all respects.

11.     *Use of Cash Collateral*.  The Debtors are hereby authorized, subject to the terms and conditions of this Interim Order, to use all Cash Collateral in accordance with the DIP Documents and the Approved Budget; *provided* that (a) the Prepetition Secured Parties are granted the Adequate Protection as hereinafter set forth and (b) except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any times using the Cash Collateral absent further order of the Court.

12.     *Disposition of DIP Collateral*.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as otherwise provided for in the DIP Documents or an order of the Court.

13.     *Adequate Protection*

(a)     *Adequate Protection of Prepetition Secured Parties*.  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral (including

Cash Collateral) in an amount equal to the aggregate diminution in the value of the Prepetition

Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after

the Petition Date (with, upon the assertion of any Adequate Protection Claims (as defined below),

the presumption being that diminution in value has occurred and the burden being on any party

opposing the assertion of any Adequate Protection Claims to show that such diminution has not

occurred), for any reason provided for under the Bankruptcy Code, including, without limitation,

any diminution resulting from the sale, lease or use by the Debtors of the Prepetition Collateral,

the priming of the Prepetition Secured Note Liens by the DIP Liens pursuant to the DIP Documents

and this Interim Order, the grant of any other lien under section 364 of the Bankruptcy Code or

the stay of the Prepetition Secured Parties' rights under the Prepetition Secured Notes, the payment

of any amounts under the Carve-Out or pursuant to this Interim Order, the Final Order or any other

order of the Court or provision of the Bankruptcy Code or otherwise, and the imposition of the

Automatic Stay (the "Adequate Protection Claims").   In consideration of the foregoing, the

Prepetition Secured Parties are hereby granted the following as Adequate Protection for, and to

secure repayment of an amount equal to such Adequate Protection Claims, and as an inducement

to the Prepetition Secured Parties to consent to the priming of the Prepetition Secured Note Liens

and use of the Prepetition Collateral (including Cash Collateral) (collectively, the "Adequate

Protection Obligations"):

> (i)    *Prepetition Adequate Protection Liens*.  The Prepetition Collateral

Agent, for itself and for the benefit of the other Prepetition Secured Parties is hereby granted

(effective and perfected upon the date of this Interim Order and without the necessity of the

execution of any mortgages, security agreements, pledge agreements, financing statements or other

agreements) in the amount of the Prepetition Secured Parties' Adequate Protection Claims, a valid,

perfected replacement security interest in and lien upon all of the DIP Collateral (the "Adequate Protection Liens"), in each case senior to all other liens but subject and subordinate only to (A) the DIP Liens, and (B) the Carve-Out.

(ii)     *Section 507(b) Claims*.  The Prepetition Secured Parties are hereby granted, subject to the Carve-Out, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases as provided for in section 507(b) of the Bankruptcy Code in the amount of the Adequate Protection Claims, with, to the fullest extent permitted under the Bankruptcy Code, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "507(b) Claims"), which 507(b) Claims shall be payable from all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions, but including, subject to entry of the Final Order, Avoidance Proceeds).  The 507(b) Claims shall be subject and subordinate only to the Carve-Out and the DIP Superpriority Claims.  Except to the extent expressly set forth in this Interim Order, the Final Order or the DIP Documents, the Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have indefeasibly been paid in cash in full and all DIP Commitments have been terminated.

(iii)     *Prepetition Secured Parties Fees and Expenses*.  The Debtors shall provide the Prepetition Secured Parties cash payments of all reasonable and documented prepetition and postpetition fees and expenses, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses relating to the exercise of remedies in connection with the Prepetition Secured Note Obligations and incurred by primary, special and local counsel

(in each applicable jurisdiction) and financial advisors to the Prepetition Secured Parties, including without limitation Proskauer Rose LLP, Morris, Nichols, Arsht & Tunnell LLP and any other advisor retained by or on behalf of the Prepetition Secured Parties (the "Adequate Protection Fees and Expenses") (and such counsel and advisors, the "Prepetition Secured Parties Advisors"), subject to the review procedures set forth in paragraph 17 of this Interim Order.  Upon entry of this Interim Order, as provided in the Interim DIP Budget, the Debtors are authorized to use proceeds of the DIP Loans to pay the Adequate Protection Fees and Expenses, including but not limited to making payments to the Prepetition Secured Parties Advisors.

(iv)    *Prepetition Secured Parties Payments*.    To the extent allowed pursuant to section 506(b) of the Bankruptcy Code, interest shall continue to accrue on the Prepetition Secured Loans at the applicable default rate of interest under the Prepetition Secured Note Documents, paid in kind by capitalizing such interest and adding it to the outstanding principal balance of the Prepetition Secured Notes in accordance with the Prepetition Secured Note Documents.

(v)    *Milestones*.    Until indefeasible payment in full of all DIP Obligations and termination of all DIP Commitments, the Prepetition Secured Parties are hereby entitled to performance of those certain case milestones set forth in Section 8.10 of the DIP Loan Agreement (for such purposes, the "Adequate Protection Milestones").

(vi)    *Budget and Financial Covenants*.    Until indefeasible payment in full of all DIP Obligations and all other obligations under the DIP Facility, (i) the Approved Budget shall continue to be updated in accordance with the terms and conditions of the DIP Loan Agreement (for such purposes, the "Adequate Protection Budget Requirement") and (ii) the Prepetition Secured Parties are hereby entitled to performance of those certain financial and other

covenants set forth in Sections 8.9 and 8.12 of the DIP Loan Agreement (for such purposes, the "Adequate Protection Covenants").

(vii)    *Prepetition Secured Parties' Adequate Protection Information Rights*.  Unless otherwise agreed by the Prepetition Secured Parties, the Debtors shall promptly provide the Prepetition Secured Parties and, to the extent applicable, counsel to such party (and subject to applicable confidentiality restrictions contained in any of the Prepetition Secured Note Documents), with all required written financial reporting and other periodic reporting that is required to be provided to the DIP Agent or the DIP Secured Parties under the DIP Documents, including without limitation the reporting required under Section 8.6 of the DIP Loan Agreement (the "Adequate Protection Reporting Requirements").  Until indefeasible payment in full of all DIP Obligations and termination of all DIP Commitments, the Prepetition Secured Parties shall continue to be entitled hereby to satisfaction of the Adequate Protection Reporting Requirement.

(viii)    *Maintenance of Collateral*.  The Debtors shall continue to maintain and insure the Prepetition Collateral and DIP Collateral in amounts and for the risks, and by the entities, as required under the Prepetition Secured Note Documents and the DIP Documents.

(b)    *Adequate Protection of the Subordinated Note Parties*. Solely to the extent the Subordinated Note Parties have valid, enforceable and perfected Subordinated Note Liens, the Subordinated Note Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in any Subordinated Note Collateral (including Cash Collateral) securing the Subordinated Note Liens in an amount equal to the aggregate diminution in the value of the Subordinated Note Parties' interests in the Subordinated Note Collateral (including Cash Collateral) from and after the Petition Date, for any reason provided for under the Bankruptcy Code, including, without limitation, any diminution

resulting from the sale, lease or use by the Debtors of the Subordinated Note Collateral, the priming of the Subordinated Note Liens by the DIP Liens pursuant to the DIP Documents and this Interim Order, the grant of any other lien under section 364 of the Bankruptcy Code or the stay of the Subordinated Note Parties' rights under the Subordinated Notes, the payment of any amounts under the Carve-Out or pursuant to this Interim Order, the Final Order or any other order of the Court or provision of the Bankruptcy Code or otherwise, and the imposition of the Automatic Stay (the "Subordinated Adequate Protection Claims"). In consideration of the foregoing, and solely to the extent the Subordinated Note Parties have valid, enforceable and perfected Subordinated Note Liens, the Subordinated Note Parties are hereby granted the following as Adequate Protection for, and to secure repayment of an amount equal to such Subordinated Adequate Protection Claims, and as an inducement to the Subordinated Note Parties to consent to the priming of the Subordinated Note Liens and use of the Subordinated Note Collateral (including Cash Collateral) (collectively, the "Subordinated Adequate Protection Obligations"):

(i)  *Subordinated Adequate Protection Liens*.  The Subordinated Note Collateral Agent, for itself and for the benefit of the other Subordinated Note Parties, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements) in the amount of the Subordinated Note Parties' Subordinated Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the Subordinated Note Collateral (the "Subordinated Adequate Protection Liens"), in each case senior to all other liens but subject and subordinate only to (A) the DIP Liens, (B) the Carve-Out, (C) the Adequate Protection Liens, and (D) the Prepetition Secured Note Liens of the Prepetition Secured

Parties.  For the avoidance of doubt, the Subordinated Adequate Protection Liens shall not extend to Avoidance Actions or Avoidance Action Proceeds.

(ii)    *Subordinated Section 507(b) Claims*.    Solely to the extent the Subordinated Note Parties have valid, enforceable and perfected Subordinated Note Liens and subject to the payment in full of the Prepetition Secured Note Obligations and DIP Obligations, the Subordinated Note Parties are hereby granted, subject to the Carve-Out, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases as provided for in section 507(b) of the Bankruptcy Code in the amount of the Adequate Protection Claims, with, to the fullest extent permitted under the Bankruptcy Code, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "Subordinated 507(b) Claims"), which Subordinated 507(b) Claims shall be payable from all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Proceeds).  Pursuant to the Intercreditor Agreement, the Subordinated Note Parties shall not receive or retain any payments, property or other amounts in respect of the Subordinated 507(b) Claims unless and until the DIP Obligations and Prepetition Secured Note Obligations have indefeasibly been paid in cash in full and all DIP Commitments have been terminated.

(iii)    Notwithstanding anything to the contrary in this Interim Order, the Subordinated Note Parties and the Subordinated Notes and Subordinated Note Liens shall remain bound by and subject to the Intercreditor Agreement, the provisions of which shall remain in full force and effect.  Nothing in this Interim Order shall constitute a finding, stipulation, admission, or other legal determination of the existence, validity, priority, or perfection of any Subordinated Note Liens.

40

14.     *Reservation of Rights of Prepetition Secured Parties.*  Under the circumstances and given that the above-described Adequate Protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the Adequate Protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties and any other parties' holding interests that are secured by liens primed by the DIP Financing.

15.     *Perfection of DIP Liens and Adequate Protection Liens.*

(a)     Without in any way limiting the automatic validity and effective perfection of the DIP Liens granted pursuant to paragraph 6 hereof and the Adequate Protection Liens granted pursuant to paragraph 13 hereof, the DIP Secured Parties and the Prepetition Secured Parties are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors and the Prepetition Secured Parties (as applicable), as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, including as may be reasonably required or deemed appropriate by the DIP Agent, acting at the direction of the DIP Lender, or take possession of or control over cash or securities, or to amend or modify security documents, or enter into, amend or modify intercreditor agreements, or to subordinate existing liens and any other similar action or action in connection therewith or take any other action in order to document, validate and perfect the liens and security interests granted to them hereunder the ("Perfection Actions").  Whether or not the DIP Agent, on behalf of the DIP Secured Parties and acting at the direction of the DIP Lender, or the Prepetition Secured Parties shall take such Perfection Actions, the liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Order.  Upon the request of DIP Agent, acting at the

41

direction of the DIP Lender, the Prepetition Secured Parties and the Debtors, without any further consent of any party, and at the sole cost of the Debtors as set forth herein, are authorized, and such direction is hereby deemed to constitute required direction under the applicable DIP Documents or Prepetition Secured Note Documents, to take, execute, deliver and file such actions, instruments and agreements (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens in all jurisdictions required under the DIP Loan Agreement, including all local law documentation therefor determined to be reasonably necessary by the DIP Agent, acting at the direction of the DIP Lender; *provided*, *however*, that no action need be taken in a foreign jurisdiction that would jeopardize the validity and enforceability of the Prepetition Secured Note Liens.   All such documents will be deemed to have been recorded and filed as of the Petition Date.   To the extent necessary to effectuate the terms of this Interim Order and the DIP Documents, each of the DIP Agent and the Prepetition Secured Parties hereby is deemed to appoint the other (and deemed to have accepted such appointment) to act as its agent with respect to the Collateral (as defined in the DIP Documents) and under the Security Documents (as defined in the DIP Documents) to which they are a party in such capacity, with such powers as are expressly delegated thereto under the DIP Documents and Prepetition Secured Note Documents, (and even if it involves self-contracting and multiple representation to the extent legally possible), together with such other powers as are reasonably incidental thereto.

(b)     A certified copy of this Interim Order may, in the discretion of the DIP Agent or the Prepetition Secured Parties, in each case, acting at the direction of the DIP Lender, as applicable be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are

hereby authorized to accept a certified copy of this Interim Order for filing and/or recording, as applicable. The Automatic Stay shall be modified to the extent necessary to permit the DIP Agent and the Prepetition Secured Parties to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

16.    *Preservation of Rights Granted Under this Interim Order.*

(a)    Other than the Carve-Out and other claims and liens expressly granted by this Interim Order, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Secured Parties or the Prepetition Secured Parties shall be permitted while any of the DIP Obligations or the Adequate Protection Obligations remain outstanding, and, except as otherwise expressly provided in or permitted under this Interim Order, the DIP Liens and the Adequate Protection Liens shall not be: (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors; or (iv) subject or junior to any intercompany or affiliate liens or security interests of the Debtors.

(b)    Unless the DIP Agent (at the direction of the DIP Lender) shall have provided its prior written consent, or all DIP Obligations and all Prepetition Secured Notes (excluding contingent indemnification obligations for which no claim has been asserted) have been indefeasibly paid in full and the DIP Commitments have terminated, there shall not be

entered in these Chapter 11 Cases or any potential successor case any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the DIP Collateral or Prepetition Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Prepetition Secured Note Liens, the Adequate Protection Liens, and/or the Adequate Protection Claims; (ii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Interim Order; (iii) the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of the Debtors or any creditor's taking any setoff or recoupment against any of its prepetition indebtedness based upon any such return of goods pursuant to section 553 of the Bankruptcy Code or otherwise; or (iv) any modification of any of the DIP Secured Parties' or the Prepetition Secured Parties' rights under this Interim Order, the DIP Documents or the Prepetition Secured Note Documents, as applicable, with respect any DIP Obligations or Prepetition Secured Note Obligations.

(c)      Upon the occurrence of any Event of Default, interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Loan Agreement. Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code:  (i) the DIP Superpriority Claims, the 507(b) Claims, Subordinated 507(b) Claims, the DIP Liens,  the Adequate Protection Liens and the Subordinated Adequate Protection Liens, and any claims related to the foregoing, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations shall have been paid in full (and that such DIP

Superpriority Claims, 507(b) Claims, Subordinated 507(b) Claims, DIP Liens, Adequate Protection Liens and Subordinated Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this Interim Order, including with respect to the Carve-Out, shall not be affected and (iii) this Court shall, to the fullest extent permitted under applicable law, retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

(d)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect: (i) the validity, priority or enforceability of any DIP Obligations, Adequate Protection Obligations or Subordinated Adequate Protection Obligations incurred prior to the DIP Agent's or the Prepetition Secured Parties', as applicable, actual receipt of written notice of the effective date of such reversal, modification, vacatur or stay; or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens (with such protections applying as and to the extent afforded in accordance with and consistent with sections 364(e) and 363(m) of the Bankruptcy Code (as applicable)).  Notwithstanding any such reversal, modification, vacatur or stay of any use of Cash Collateral, any DIP Obligations, DIP Liens, Adequate Protection Claims, Subordinated Adequate Protection Claims, Adequate Protection Liens, Subordinated Adequate Protection Liens or other Adequate Protection Obligations incurred by the Debtors and granted to the DIP Secured Parties or the Prepetition Secured Parties, as the case may be, prior to the DIP Agent's or the Prepetition Secured Parties', as applicable, actual receipt of written notice of the effective date of such reversal, modification, vacatur or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Secured Parties, the Prepetition Secured

Parties and Subordinated Note Parties shall be entitled to, and are hereby granted, all the rights, remedies, privileges and benefits arising under sections 364(e) and 363(m) of the Bankruptcy Code, this Interim Order and the other DIP Documents with respect to all uses of Cash Collateral, DIP Obligations, Adequate Protection Obligations and Subordinated Adequate Protection Obligations.

(e)    Except as expressly provided in this Interim Order or in the DIP Documents, (x) the DIP Liens, the DIP Superiority Claims, the Adequate Protection Liens, Subordinated Adequate Protection Liens, the Adequate Protection Obligations, Subordinated Adequate Protection Obligations, the 507(b) Claims, the Subordinated 507(b) Claims and all other rights and remedies of the DIP Secured Parties, the Prepetition Secured Parties and the Subordinated Note Parties granted by the provisions of this Interim Order and the DIP Documents and (y) the Carve-Out shall survive, and shall not be modified, impaired or discharged by: (i)  the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases or terminating the joint administration of the Chapter 11 Cases or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations, Adequate Protection Obligations or Subordinated Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Documents shall continue in the Chapter 11 Cases, in any Successor Cases if these Chapter 11 Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection

Liens, the Subordinated Adequate Protection Liens, the Adequate Protection Obligations, the Subordinated Adequate Protection Obligations, and all other rights and remedies of the DIP Secured Parties, the Prepetition Secured Parties and the Subordinated Note Parties granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until the DIP Obligations and Subordinated Adequate Protection Obligations are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the DIP Commitments have been terminated (and in the case of rights and remedies of the Prepetition Secured Parties, shall remain in full force and effect thereafter, subject to the terms of this Interim Order), and the Carve-Out shall continue in full force and effect.

17.    *Payment of Fees and Expenses*.  The Debtors are authorized to and shall pay the DIP Fees and Expenses and the Adequate Protection Fees and Expenses, which shall be added to the outstanding principal balance of the DIP Obligations or Prepetition Secured Notes as applicable. Subject to the review procedures set forth in this paragraph 17, payment of all DIP Fees and Expenses and Adequate Protection Fees and Expenses shall not be subject to allowance or review by the Court.  Professionals for the DIP Secured Parties and the Prepetition Secured Parties shall not be required to comply with the U.S. Trustee fee guidelines nor to submit invoices in any particular format, however, any time that such professionals seek payment of fees and expenses from the Debtors prior to the effective date of a chapter 11 plan, each professional shall provide summary copies of its invoices with aggregate amounts of fees and expenses and total time on a per-professional basis (which shall include a general description of the nature of the matters worked on, but shall not be required to contain time detail and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the

provision of such invoices shall not constitute any waiver of attorney-client privilege or of any benefits of the attorney work product doctrine or any other evidentiary privilege or protection recognized under applicable law)  to the Debtors, the U.S. Trustee, and counsel to any statutory committee appointed in the Chapter 11 Cases (together, the "Review Parties").  Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) calendar days after the receipt of any such invoice by the Review Parties (the "Review Period").  If no written objection is received by 12:00 p.m. prevailing Eastern Time on the end date of the Review Period, the Debtors shall promptly pay such invoices within five (5) calendar days.  If an objection to a professional's invoice is received within the Review Period, the Debtors shall promptly pay the undisputed amount of the invoice (without further order of, or application to, the Court or notice to any other party) and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the closing date of the DIP Facility, the DIP Fees and Expenses and Adequate Protection Fees and Expenses incurred on or prior to such date without the need for any professional engaged by, or on behalf of, the DIP Secured Parties or the Prepetition Secured Parties to first deliver a copy of its invoice or other supporting documentation to the Review Parties (other than the Debtors).  No attorney or advisor to the DIP Secured Parties or the Prepetition Secured Parties shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.  Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to the (i) the DIP Secured Parties in connection with or with respect to the DIP Facility and (ii) the Prepetition Secured Parties in connection with or with respect to these matters, shall not be subject to

recharacterization, avoidance, subordination, disgorgement or any similar form of recovery by the Debtors or any other person.

18.     *Effect of Stipulations on Third Parties.*  The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors) in all circumstances and for all purposes.  The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates in all circumstances and for all purposes unless (a) such committee or any other party in interest with requisite standing (in each case, to the extent requisite standing is obtained pursuant to an order of this Court entered prior to the expiration of the Challenge Period (as defined herein) has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in this paragraph) by no later than (i) the earlier of (x) the consummation of a sale of all or substantially all of the Debtors' assets and (y) 75 calendar days after entry of this Interim Order; (ii) any such later date agreed to in writing by the applicable Prepetition Secured Party; and (iii) any such later date as has been ordered by the Court for cause upon a motion timely filed and served within any applicable period (the time period established by the foregoing clauses (i)-(iii), the "Challenge Period"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Notes or the Prepetition Secured Note Liens, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses

(collectively, the "Challenges") against the Prepetition Secured Parties or their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (each, a "Representative" and, collectively, the "Representatives") in connection with matters related to the Prepetition Secured Note Documents, the Prepetition Secured Notes, the Prepetition Secured Note Liens and the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim, and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred, including any amended or additional claims that may or could have been asserted thereafter through an amended complaint under Fed. R. Civ. P. 15 or otherwise.  In the event that a chapter 7 or chapter 11 trustee is appointed prior to the end of the Challenge Period, the Challenge Period solely for such chapter 7 or chapter 11 trustee shall be extended (unless and until an order confirming a plan is entered by the Court) to the longer of (A) the remaining Challenge Period or (B) the date that is twenty-one (21) calendar days following the appointment of such trustee.  If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then: (1) the Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding on all parties in interest; (2) the obligations of the Debtors under the Prepetition Secured Note Documents, including the Prepetition Secured Notes, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination (whether equitable,

50

contractual, or otherwise), disallowance, recoupment, offset or avoidance, for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 case(s); (3) the Prepetition Secured Note Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected, security interests and liens, not subject to recharacterization, subordination (whether equitable, contractual or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, avoidance or other defense; and (4) the Prepetition Secured Notes and the Prepetition Secured Note Liens on the Prepetition Collateral shall not be subject to any other or further claim or challenge by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defenses, claims, causes of action, counterclaims and offsets by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against the Prepetition Secured Parties and their Representatives arising out of or relating to any of the Prepetition Secured Note Documents, the Prepetition Secured Notes, the Prepetition Secured Note Liens and the Prepetition Collateral shall be deemed forever waived, released and barred.  If any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any statutory or nonstatutory committee appointed or formed in the Chapter 11 Cases and on any other person or entity, except

to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.  Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Secured Note Documents, the Prepetition Secured Notes or the Prepetition Secured Note Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay the Chapter 11 Cases, confirmation of any plan of reorganization or consummation of any sale of all or substantially all assets of the Debtors.  For the avoidance of doubt, any chapter 11 or chapter 7 trustee appointed or elected in these cases, until the expiration of the Challenge Period, and thereafter for the duration of any adversary proceeding or contested matter commenced pursuant to this paragraph (whether commenced by such trustee or commenced by any other party in interest on behalf of the Debtors' estates), shall be bound by the acknowledgements, admissions, confirmations and stipulations of the Debtors in paragraph G of this Interim Order.

19.    *Limitation on Use of DIP Financing Proceeds and Collateral*.  Notwithstanding any other provision of this Interim Order or any other order entered by the Court, no DIP Loans, DIP Collateral, Prepetition Collateral (including Cash Collateral) or any portion of the Carve-Out, may be used directly or indirectly, including without limitation through reimbursement of professional fees of any non-Debtor party: (a) in connection with the investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the DIP Secured Parties, the Prepetition Secured Parties, or their respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, in each case in

their respective capacity as such, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens, DIP Superpriority Claims, Prepetition Secured Notes, and/or the Adequate Protection Obligations and Adequate Protection Liens granted to the Prepetition Secured Parties, as applicable, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to the DIP Obligations, the Prepetition Secured Notes and/or the liens, claims, rights, or security interests securing or supporting the DIP Obligations granted under this Interim Order, the Final Order, the DIP Documents or Prepetition Secured Note Documents in respect of the Prepetition Secured Notes, including, in the case of each (i) and (ii), without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise (*provided that*, notwithstanding anything to the contrary herein, the proceeds of the DIP Loans and/or DIP Collateral (including Cash Collateral) may be used by the Creditors' Committee to investigate (but not to prosecute or initiate the prosecution of, including the preparation of any complaint or motion on account of) (A) the claims and liens (including the validity and priority thereof whether by legal, equitable or other means) of the Prepetition Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties, up to an aggregate cap of no more than $20,000); (b) to prevent, hinder, or otherwise delay or otherwise delay or interfere with the Prepetition Secured Parties' or the DIP Secured Parties', as applicable, enforcement or realization on the Prepetition Secured Notes, Prepetition Collateral, DIP Obligations, DIP Collateral, and the liens, claims and rights granted to such parties under the Interim Order or Final Order, as applicable, each in accordance with the DIP Documents, the Prepetition Secured Note Documents or this Interim Order; (c) to seek to modify any of the rights and remedies granted to the Prepetition Secured Parties or the DIP Secured Parties under this

Interim Order, the Prepetition Secured Note Documents or the DIP Documents, as applicable; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and 507(b) Claims granted to the Prepetition Secured Parties; or (e) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved or authorized by the Court, agreed to in writing by the DIP Lender, expressly permitted under this Interim Order or permitted under the DIP Documents (including the Approved Budget, subject to permitted variances), in each case unless all DIP Obligations, Prepetition Secured Notes, Adequate Protection Obligations, and claims granted to the DIP Secured Parties and Prepetition Secured Parties under this Interim Order have been refinanced or paid in full in cash (including the cash collateralization of any letters of credit).  For the avoidance of doubt, this paragraph 19 shall not limit the Debtors' right to use DIP Collateral to contest whether an Event of Default has occurred hereunder pursuant to and consistent with paragraph 7 of this Interim Order.

20. *Indemnification*.  The Prepetition Secured Parties and the DIP Secured Parties have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, the DIP Documents, and all other documents related to and all transactions contemplated by the foregoing. Accordingly, without limitation to any other right to indemnification, the Prepetition Secured

Parties and the DIP Secured Parties shall be and hereby are indemnified (as applicable) as provided in the Prepetition Secured Note Documents and DIP Documents, as applicable, including, without limitation, Section 10.1 of the DIP Loan Agreement, subject only to the Carve-Out. The Debtors agree that no exception or defense in contract, law, or equity exists as of the date of this Interim Order to any obligation set forth, as the case may be, in this paragraph 20 or otherwise in the DIP Documents or in the Prepetition Secured Note Documents to indemnify and/or hold harmless the DIP Secured Parties or any Prepetition Secured Parties, as the case may be, and any such defenses that may be in existence as of the date of this Interim Order are hereby waived.

21.      *Interim Order Governs*.  In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents (including, but not limited to, with respect to the Adequate Protection Obligations) or any other order entered by this Court, the provisions of this Interim Order shall govern.  Notwithstanding the relief granted in any other order by this Court, (a) all payments and actions by any of the Debtors pursuant to the authority granted therein shall be subject to this Interim Order, including compliance with the Approved Budget (subject to permitted variances) and all other terms and conditions hereof, and (b) to the extent there is any inconsistency between the terms of such other order and this Interim Order, this Interim Order shall control, in each case, except to the extent expressly provided otherwise in such other order.

22.      *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner

appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties, the Prepetition Secured Parties and the Debtors and their respective successors and assigns; *provided* that the DIP Secured Parties and the Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

23.   *Limitation on Liability.*   Nothing in this Interim Order, the DIP Documents, the Prepetition Secured Note Documents or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or the Prepetition Secured Parties any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.  The DIP Secured Parties and Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral or Prepetition Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person and all risk of loss, damage or destruction of the DIP Collateral or Prepetition Collateral shall be borne by the Debtors. By virtue of making any loan or other extension of credit under the DIP Documents, to permit the use of the DIP Collateral or Prepetition Collateral (including Cash Collateral) or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents or Prepetition Secured Note Documents, none of the DIP Secured Parties or the Prepetition Secured Parties shall (a) have any liability to any third party or be deemed to be in "control" of the

operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" or "managing agent" with respect to the operation or management of any of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, as amended, or any other federal or state statute, including the Internal Revenue Code). Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

24.     *Master Proof of Claim.* The Prepetition Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases or any Successor Case in order to assert claims on behalf of themselves for payment of the Prepetition Secured Notes arising under the Prepetition Secured Note Documents, including, without limitation, any principal, unpaid interest, fees, expenses and other amounts under the Prepetition Secured Note Documents. The statements of claim in respect of such indebtedness set forth in this Interim Order is deemed sufficient to and shall hereby constitute proofs of claim in respect of such debt and such secured status. Any order entered by this Court in relation to the establishment of a bar date for any claim (including, without limitation, administrative claims) in any of the Chapter 11 Cases or any Successor Cases shall not apply to the Prepetition Secured Parties with respect to the Prepetition Secured Notes (or with respect to the Adequate Protection Obligations). However, in order to facilitate the processing of claims, the Prepetition Secured Parties are authorized, but not directed or required, to file in the Debtors' lead chapter 11 case, Case No. 25-[•], a single master proof of claim on account of any and all of their

respective claims against any of the Debtors arising under the applicable Prepetition Secured Note Documents and hereunder (each, a "Master Proof of Claim").  Upon the filing of a Master Proof of Claim by the Prepetition Secured Parties, it shall be deemed to have filed a proof of claim in the amount set forth therein in respect of its claims against each of the Debtors of any type or nature whatsoever with respect to the applicable Prepetition Secured Note Documents, and the claim of each applicable Prepetition Secured Party (and each of its respective successors and assigns) specified in a Master Proof of Claim shall be treated as if it had filed a separate proof of claim in each of these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to identify whether any Prepetition Secured Party acquired its claim from another party or the identity of any such party or to be amended to reflect a change in the holders of the claims set forth therein or a reallocation among the holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.  The provisions of this paragraph 24 and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed in these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the applicable Prepetition Secured Parties.  The DIP Secured Parties shall similarly not be required to file proofs of claim with respect to their DIP Obligations under the DIP Documents, and the evidence presented with the DIP Motion and the record established at the Interim Hearing are deemed sufficient to, and do, constitute proofs of claim with respect to their obligations, secured status, and priority.

25.  *Insurance*.  To the extent that the Prepetition Secured Parties is listed as loss payee under the DIP Borrower's or DIP Guarantors' insurance policies, the DIP Agent is also deemed to be the loss payee under the insurance policies (in any such case with the same priority of liens and claims thereunder relative to the priority of the Prepetition Secured Note Liens and Adequate Protection Liens as set forth herein), and shall act in that capacity and distribute any proceeds recovered or received in respect of the insurance policies, to the indefeasible payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and termination of the DIP Commitments, and to the payment of the applicable Prepetition Secured Notes.

26.  *Credit Bidding*. (a) The DIP Agent (acting at the direction of the DIP Lender) shall be permitted to credit bid in accordance with the DIP Documents, pursuant and subject to section 363(k) of the Bankruptcy Code or applicable law, up to the full amount of the DIP Obligations in connection with any sale of the DIP Collateral (or any portion thereof) and (b) subject to the entry of the Final Order, the Prepetition Secured Parties shall have the right, consistent with the Prepetition Secured Note Documents (and providing for the DIP Obligations to be indefeasibly repaid in full in cash and the termination of the DIP Commitments), to credit bid up to the full amount of the Prepetition Secured Loans (including any Adequate Protection Obligations) in each case including any accrued interest, fees, and expenses in the sale of the Prepetition Collateral (or any portion thereof), in each case (i) without the need for further Court order authorizing the same, (ii) subject, as applicable to section 363(k) of the Bankruptcy Code, and (iii) whether any such sale is effectuated through section 363(k), 1123 or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.  No Debtor shall object to any DIP Secured Party or any Prepetition Secured Party credit bidding up to the full amount of the

applicable outstanding DIP Obligations or Prepetition Secured Note Obligations (including any DIP Superpriority Claims and Adequate Protection Obligations), in each case including any accrued interest, fees, and expenses, in any sale of any DIP Collateral or Prepetition Collateral, as applicable, whether such sale is effectuated through sections 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

27.     *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

28.     *Modification of DIP Documents and Approved Budget*.  The Debtors are hereby authorized, without further order of this Court, to enter into agreements with the DIP Secured Parties (or the Prepetition Secured Parties after the indefeasible payment in full of the DIP Obligations and termination of the DIP Commitments) providing for any consensual non-material modifications to the Approved Budget or the DIP Documents, or of any other modifications to the DIP Documents necessary to conform the terms of the DIP Documents to this Interim Order, in each case consistent with the amendment provisions of the DIP Documents; *provided*, *however*, that notice of any material modification or amendment to the DIP Documents shall be filed on the docket and also provided to the U.S. Trustee, any statutory committee, and parties in interest requesting notice pursuant to Rule 2002, which shall have three (3) business days from the date of receipt of such notice within which to object, in writing, to the modification or amendment.  If the

U.S. Trustee, any statutory committee, or any party in interest timely objects to any material modification or amendment to the DIP Documents, the modification or amendment shall only be permitted pursuant to an order of the Court. The foregoing shall be without prejudice to the Debtors' right to seek approval from the Court of a material modification on an expedited basis.

29.     *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

30.     *Payments Held in Trust*.  Except as expressly permitted in this Interim Order or the DIP Documents and except with respect to the Debtors, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations and termination of all DIP Commitments, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Secured Parties and shall immediately turn over the proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Interim Order.

31.     *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

32.     *No Third-Party Rights*.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

33.     *Necessary Action*.  The Debtors, the DIP Secured Parties and the Prepetition Secured Parties are authorized to take all actions as are necessary or appropriate to implement the

terms of this Interim Order.  In addition, the Automatic Stay is modified to permit affiliates of the Debtors who are not debtors in the Chapter 11 Cases to take all actions as are necessary or appropriate to implement the terms of this Interim Order.

34.     *Retention of Jurisdiction*.  The Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

35.     *Final Hearing*.  A final hearing to consider the relief requested in the DIP Motion shall be held on [•], 2025 at [•] [p.m./a.m.] (prevailing Eastern Time).  Any objections or responses to the DIP Motion shall be filed on or prior to [•], 2025 at [•] [p.m./a.m.] (prevailing Eastern Time) and served on the following parties: (a) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn. [•]; (b) the Debtors, [•], Attn: [•], Attn: General Counsel, (c) proposed counsel to the Debtors, Whiteford, Taylor & Preston LLP, 3190 Fairview Park Dr, #800, Falls Church, VA 22042, Attn: David W. Gaffey (dgaffey@whitefordlaw.com) and Brandy Rapp (brapp@whitefordlaw.com); (d) counsel to the DIP Secured Parties, Proskauer Rose LLP, Eleven Times Square, New York, NY 10036-8299, Attn: Vincent Indelicato (vindelicato@proskauer.com) and One International Place, Boston, MA 02110, Attn: Charles A. Dale (cdale@proskauer.com) and Morris, Nichols, Arsht & Tunnell LLP, 1201 N Market St # 1600, Wilmington, DE 19801, Attn: Robert J. Dehney Sr. (rdehney@morrisnichols.com), Matthew B. Harvey (mharvey@morrisnichols.com), and Brenna A. Dolphin (bdolphin@morrisnichols.com); (e) counsel to any committee appointed in these Chapter 11 Cases; (f) the Securities and Exchange Commission; (g) the U.S. Attorney's Office for the District of Delaware; and (h) Delaware Attorney General.

## Exhibit 1

**DIP Loan Agreement**

*Execution Version*

# SUPERPRIORITY SENIOR SECURED

## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT AND GUARANTY

THIS SUPERPRIORITY SENIOR SECURED DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT (as may be supplemented, amended or restated, this "Agreement") is made this 30th day of March, 2025 by and between (i) CTN Holdings, Inc., a Delaware corporation (the "Borrower"); and (ii)(1) Make Earth Green Again, LLC, a Delaware limited liability company, Aspiration QFZ, LLC, a Delaware limited liability company, Zero Carbon Holdings, LLC, a Wyoming limited liability company, and Catona Climate Solutions, LLC, a Delaware limited liability company (the "Debtor Guarantors"), and (2) Carbon Sequestration I, LLC, a Delaware limited liability company, Carbon Sequestration II, LLC, a Delaware limited liability company, Carbon Sequestration III, LLC, a Delaware limited liability company, Reforestation Initiatives I, LLC, a Delaware limited liability company, and Reforestation Initiatives II, LLC, a Delaware limited liability company (the "Non-Debtor Guarantors") (collectively, the "Guarantors" and each, individually, a "Guarantor" and together with the Borrower, the "Debtors" and each, individually, a "Debtor"), the Debtor and Debtor Guarantors each being a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, on the one hand; and (iii) Inherent Aspiration, LLC, a Delaware limited liability company ( the "Lender"), on the other hand.

WHEREAS, on March 30, 2025 (the "Petition Date"), the Borrower filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Case") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and are continuing to operate their business and manage their properties as debtors and debtors in possession under sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested that the Lender enter into this Agreement to provide the Borrower with a superpriority senior secured debtor-in-possession credit facility in the principal amount of up to $18,015,000.00 (exclusive of capitalized Commitment Fees and inclusive of Roll-Up, the "DIP Commitment"), and the Lender has agreed to provide such credit facility to the Borrower subject to, and on the terms and conditions of, (i) this Agreement, (ii) the Orders, when entered, and (iii) sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1) and 364(e) of the Bankruptcy Code; and

WHEREAS, the Debtors are party to that certain Third Amended and Restated Senior Secured Promissory Note and Guaranty dated as of October 25, 2024, as amended by the First Amendment thereto dated as of December 30, 2024, the Second Amendment thereto dated as of March 11, 2025 and the Third Amendment thereto dated as of March 24, 2025 (as further amended, restated, supplemented or otherwise modified prior to the Petition Date, collectively, the "Prepetition Secured Notes", and the obligations thereunder, the "Prepetition Secured Note Obligations"), by and among the Debtors, on the one hand, and each of Inherent Aspiration, LLC, AGO Special Situations LP, Zion Consulting and Advisory LLC, and Mark Villanueva, as a holder on the other hand (the "Prepetition Secured Note Holders") and Inherent Group, LP, as collateral agent (in such capacity, the "Prepetition Collateral Agent", together with the Prepetition Secured Note Holders, the "Prepetition Secured Note Parties").

NOW THEREFORE, in consideration of the mutual promises set forth herein and for other valuable consideration, the parties agree as follows:

## SECTION 1.  DEFINED TERMS

1.1      Defined Terms. As used in this Agreement, the following terms shall have the following meanings:

"<u>Affiliate</u>" means, as to any specified Person, any other Person that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified Person. As used in this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person (whether through ownership of Capital Stock of that Person, by contract or otherwise). Notwithstanding anything to the contrary herein, in no event shall any DIP Lender be considered an "Affiliate" of Borrower.

"<u>Agent Fee</u>" shall have the meaning set forth in Section 8.12.1.

"<u>Agreement</u>" shall have the meaning given in the preamble hereto.

"<u>Applicable Law</u>" means any applicable (i) law (including common law), statute or ordinance of any nation or state; (ii) regulation, policy, protocol, proclamation or executive order promulgated by any Governmental Authority; (iii) rule or regulation of any self-regulatory organization such as a securities exchange; or (iv) judgment, order, decree or decision of any court or other Governmental Authority having the effect of law in any such jurisdiction.

"<u>Applicable Period</u>" means, (I) with respect to the first Approved Variance Report, the two-week period ending on the Sunday immediately preceding the First Testing Date, (ii) with respect to the second Approved Variance Report, the three-week period ending on the Sunday immediately preceding the second Testing Date, and (iii) with respect to the third Approved Variance Report, and each Approved Variance Report thereafter, the four-week period ending on the Sunday immediately preceding the applicable Testing Date.

"<u>Approved Budget</u>" shall have the meaning set forth in Section 8.9.

"<u>Approved Variance Report</u>" shall have the meaning set forth in Section 8.9.

"<u>Availability Period</u>" means the period from the Interim Closing Date to the earliest of (i) the Maturity Date and (ii) the date of termination of the DIP Facility pursuant to the terms hereof or of the Orders.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code.

"<u>Bankruptcy Court</u>" shall have the meaning set forth in the preamble hereto.

"<u>Bid Procedures Motion</u>" shall have the meaning set forth in Section 8.10(c).

"<u>Bidding Procedures Order</u>" shall have the meaning set forth in Section 8.10(d).

"Borrower" shall have the meaning set forth in the preamble hereto.

"Business Day" means any day, other than a Saturday, a Sunday or any other day on which banks located in New York, New York are closed for business as a result of federal, state or local holiday and any other reference to "day" means a calendar day.

"Capital Stock" means, with respect to: (i) any corporation, any share, or any depositary receipt or other certificate representing any share, of an equity ownership interest in that corporation or other equivalent and (ii) any other Person, any share, membership, partnership or other percentage interest, unit of participation or other equivalent (however designated) of an equity interest in such Person.

"Carve Out" shall have the meaning given to such term in the Interim Order or the Final Order, as applicable.

"Case Milestone" shall have the meaning set forth in Section 8.10.

"Chapter 11 Case" shall have the meaning set forth in the preamble hereto.

"Closing Conditions" means the conditions precedent set forth in Section 5 that must be satisfied prior to entering the DIP Facility and the making of each DIP Term Loan.

"Closing Date" means the date on which the Closing Conditions have been satisfied or waived.

"Commitment Fee" shall have the meaning set forth in Section 8.12.2.

"Debtor" or "Debtors" shall have the meaning set forth in the preamble hereto.

"Default" means an event or condition the occurrence of which would, with the lapse of time or the giving of notice, or both, become an Event of Default.

"Default Rate" shall have the meaning set forth in Section 3.1.2.

"DIP Agent" means Inherent Group, LP.

"DIP Budget Covenant" shall have the meaning set forth in Section 8.9.

"DIP Collateral" means all of each Debtor's rights, title and interests in and to all assets of such Debtor, including, without limitation, the following categories of property (each as defined or as used in the UCC):

(a)    All Accounts;

(b)    All Chattel paper;

(c)    All Commercial tort claims;

(d)    All Deposit accounts;

    (e)    All Documents and Records;

    (f)    All Equipment;

    (g)    All Fixtures;

    (h)    All General Intangibles, including, without limitation, intellectual property, Payment intangibles, copyrights, patents, trademarks, licenses, designs, drawings, technical information, marketing plans, customer lists, trade secrets, proprietary or confidential information, inventions (whether or not patentable), procedures, know-how, models and data;

    (i)    All Goods;

    (j)    All Instruments, including, without limitation, Promissory notes;

    (k)    All Inventory;

    (l)    All Investment property;

    (m)    All Letter-of-credit rights;

    (n)    All Supporting obligations;

    (o)    Any real property.

"DIP Commitment" shall have the meaning set forth in the preamble hereto.

"DIP Facility" means the DIP Term Loans contemplated by this Agreement.

"DIP Lender" or "DIP Lenders" means Inherent Aspiration, LLC and, in its sole discretion, any other Prepetition Secured Note Holders who elect to be a DIP Lender hereunder.

"DIP Liens" shall have the meaning set forth in Section 6.2.

"DIP Secured Parties" means the DIP Agent together with the DIP Lenders.

"DIP Term Loans" shall have the meaning set forth in Section 2.1.

"Disbursements Variance" shall have the meaning set forth in Section 8.9.

"Event of Default" shall have the meaning set forth in Section 9.1.

"Exit Fee" shall have the meaning set forth in Section 8.12.3.

"Extraordinary Receipts" means any cash payments received by any Debtor not in the ordinary course of business, including without limitation, cash proceeds of judgments, cash proceeds of settlements, or other cash consideration of any kind received in connection with any cause of action or claim, tax refunds, indemnity payments and insurance proceeds not included as

proceeds of asset dispositions but excluding sales tax receipts contemplated to be received by any of the Debtors as set forth in the Approved Budget.

"Final Order" means a final order of the Bankruptcy Court in substantially the form of the Interim Order (or such other form acceptable to the DIP Lenders) authorizing the DIP Term Loans.

"Final Roll-Up" shall have the meaning assigned to such term in Section 2.2.2.

"Final Roll-Up Date" shall have the meaning assigned to such term in Section 2.2.2.

 "Final Roll-Up Loans" shall have the meaning assigned to such term in Section 2.2.2.

"First Testing Date" shall have the meaning set forth in Section 8.9.

"Governmental Authority" means any national, regional or local body of state power, any ministry or department thereof, and any Person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government (including any independent regulator) or any other governmental entity, instrumentality, agency, authority, court, corporation, committee or commission under the direct or indirect control of a government.

"Guaranteed Obligations" shall have the meaning set forth in Section 10.1.

"Guarantor" or "Guarantors" shall have the meaning set forth in the preamble hereto.

"Guaranty" shall have the meaning set forth in Section 10.1.

"Indemnitee" shall have the meaning set forth in Section 11.1.

"Initial Borrowing" shall have the meaning set forth in Section 2.1.

"Interim Closing Date" means the date of entry of the Interim Order.

"Interim Order" means an interim order of the Bankruptcy Court (as the same may be amended, supplemented or modified from time to time after entry thereof in accordance with the terms thereof) in the form set forth as **Exhibit A**, with changes to such form as are satisfactory to the DIP Lenders, approving the Loan Documents and authorizing the Loan in such amounts are as are contemplated by this Agreement.

"Interim Roll-Up" shall have the meaning assigned to such term in Section 2.2.1.

"Interim Roll-Up Date" shall have the meaning assigned to such term in Section 2.2.1.

"Interim Roll-Up Loans" shall have the meaning assigned to such term in Section 2.2.1.

"Lender" shall have the meaning set forth in the preamble hereto.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any

asset of any kind or nature whatsoever including any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code as adopted in the State of Delaware from time to time or comparable law of any jurisdiction.

"Loan Documents" means, collectively, this Agreement, the Note, and each other agreement, certificate, document or instrument executed or delivered in connection with any of the foregoing, whether or not specifically mentioned herein or therein.

"Loans" means the DIP Term Loans and the Roll-Up Loans.

"Material Adverse Effect" means the effect of any event or condition which, alone or when taken together with other events or conditions occurring or existing concurrently therewith, in the opinion of DIP Lenders (i) has or may be reasonably expected to have a material adverse effect upon the business, operations, properties, condition (financial or otherwise) or prospects of Borrower; (ii) has or may be reasonably expected to have any adverse effect whatsoever upon the validity or enforceability of the Obligations, Agreement or any of the other Loan Documents; or (iii) materially impairs the ability of Borrower to perform its obligations under this Agreement or any of the other Loan Documents or of DIP Lenders to enforce or collect the Obligations in accordance with the Loan Documents and Applicable Law.

"Maturity Date" means the date that the DIP Term Loans shall mature and be due and payable on the earliest to occur of the following: (i) the seventy-fifth (75th) day following the Petition Date; (ii) the consummation of a sale of all or substantially all of the assets of the Debtors; (iii) the termination of the Stalking Horse Purchase Agreement for any reason without the prior written consent of the DIP Lenders and the Stalking Horse Purchaser; (iv) the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Case that is confirmed pursuant to an order entered by the Bankruptcy Court; (v) entry of an order by the Bankruptcy Court approving (A) a motion seeking conversion or dismissal of any or all of the Chapter 11 Case or (B) a motion seeking the appointment or election of a trustee, a responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business; or (vi) the date of acceleration of all or any portion of the DIP Term Loans and the termination of the commitments in respect thereof upon the occurrence of an Event of Default.

"Obligations" means all liabilities and obligations of every nature of the Borrower from time to time owed to DIP Lenders under this Agreement and the other Loan Documents, whether for principal, interest at the non-default and default rates, fees, expenses, indemnification, liquidated damages or otherwise (including all fees, costs and expenses of enforcement) and whether primary, secondary, direct, indirect, contingent, fixed or otherwise (including obligations of performance), including all obligations.

"Orders" means collectively, the Interim Order and the Final Order.

"Permitted Liens" shall have the meaning set forth in Section 8.2.

"Permitted Variances" shall have the meaning set forth in Section 8.9.

6

"Person" means an individual, partnership, corporation, limited liability company, joint stock company, land trust, business trust, unincorporated organization, or a government or agency or political subdivision thereof.

"Petition Date" shall have the meaning set forth in the preamble hereto.

"Prepetition Collateral Agent" shall have the meaning set forth in the preamble hereto.

"Prepetition Secured Notes" shall have the meaning set forth in the preamble hereto.

"Prepetition Secured Note Holders" shall have the meaning set forth in the preamble hereto.

"Prepetition Secured Note Obligations" shall have the meaning set forth in the preamble hereto.

"Prepetition Secured Note Parties" shall have the meaning set forth in the preamble hereto.

"Proceeding" means any action, arbitration, audit, examination, investigation, hearing, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, and whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Receipts Variance" shall have the meaning set forth in Section 8.9.

"Required DIP Lenders" means the DIP Lenders holding more than fifty percent (50%) of the then outstanding principal amount of the DIP Term Loans.

"Roll-Up" shall have the meaning set forth in Section 2.2.2.

"Roll-Up Loans" shall have the meaning set forth in Section 2.2.2.

"Sale Motion" shall have the meaning set forth in Section 8.10(c).

"Sale Order" shall have the meaning set forth in Section 8.10(h).

"Sale Transaction" shall have the meaning set forth in Section 8.10(c).

"Specified Deadline" shall have the meaning set forth in Section 8.10.

"Stalking Horse Payments" mean bid protections to a potential purchaser serving as a stalking horse, which will include (i) a break-up fee and expense reimbursement and (ii) other appropriate and customary protections, the Debtors may provide, subject to Bankruptcy Court approval and the reasonable consent of the DIP Agent, in the event of a Sale Transaction.

"Stalking Horse Purchase Agreement" shall have the meaning set forth in Section 8.10(b).

"Stalking Horse Purchaser" shall have the meaning set forth in Section 8.10(b).

"<u>Superpriority Claims</u>" shall have the meaning set forth in Section 6.3.

"<u>Tax</u>" or "<u>Taxes</u>" means any tax (including any income tax, capital gains tax, value- added tax, sales tax, use tax, payroll tax, withholding tax, property tax, gift tax or estate tax), levy, assessment, tariff, duty (including any customs duty), deficiency or other fee, any related charge or amount (including any fine, penalty, interest or addition to tax), imposed, assessed or collected by or under the authority of any Governmental Authority or payable pursuant to any tax-sharing agreement or any other contract relating to the sharing or payment of any such tax, levy, assessment, tariff, duty, deficiency or fee.

"<u>Testing Date</u>" shall have the meaning set forth in Section 8.9.

"<u>Testing Period</u>" means the period beginning on the Petition Date and ending on the Sunday immediately prior to the applicable Testing Date.

"<u>UCC</u>" means the official committee of unsecured creditors appointed in the Chapter 11 Case.

1.2    <u>Accounting Terms</u>. Unless otherwise specified herein, all terms of an accounting character used in the Agreement shall be interpreted, all accounting determinations in the Agreement shall be made, and all financial statements required to be delivered under the Agreement shall be prepared in accordance with generally accepted accounting principles and practices in the United States as in effect from time to time.

## SECTION 2.    TERM LOAN, ROLL-UP AND CLOSING PROCEDURE

2.1    <u>Term Loan</u>. Subject to the terms and conditions set forth herein and the Orders, DIP Lenders agree, severally and not jointly, to make superpriority senior secured debtor-in-possession term loans (the "<u>DIP Term Loans</u>") to the Borrower during the Availability Period up to the DIP Commitment as follows: (i) $3,385,000.00 of the DIP Commitment shall be made to Borrower upon entry of Interim Order (the "<u>Initial Borrowing</u>"), and (ii) the remaining amount of the DIP Commitment shall be made to Borrower up entry of the Final Order.  The proceeds of the DIP Term Loans shall be funded by the DIP Lenders into a deposit account of the Borrower as selected by the Borrower with the consent of the DIP Lenders.  Such account shall be subject to the DIP Liens in favor of the DIP Agent for the benefit of the DIP Secured Parties, which shall be perfected pursuant to the Orders and shall be subject to an account control agreement reasonably satisfactory to the DIP Agent; provided, that any existing deposit account control agreement in respect of the Prepetition Secured Notes shall be deemed satisfactory to the DIP Agent so long as it and the Orders are together effective to perfect the DIP Agent's DIP Liens in such account.  For the avoidance of doubt, the Initial Borrowing amount as set forth above includes the Interim Roll-Up. As set forth in the Approved Budget, the Borrower hereby agrees that any and all attorneys' fees of the DIP Agent incurred in connection with this Agreement shall be paid immediately upon receipt of Borrower of the Initial Borrowing.

2.2    <u>Roll-Up</u>.

2.2.1    Subject to the terms and conditions set forth herein and in consideration for providing the DIP Term Loans, subject to entry of the Interim Order, on the entry date of the

Interim Order, the Prepetition Secured Note Obligations under the Prepetition Secured Notes in the aggregate principal amount of $1,175,000.00, equaling the amount of protective advances made by the Prepetition Secured Note Holders prior to the Petition Date, held by the Prepetition Secured Note Holders shall be automatically substituted and exchanged for (on a cashless basis by) loans hereunder (the "Interim Roll-Up Loans"), which Interim Roll-Up Loans shall constitute and be deemed DIP Term Loans outstanding hereunder on the Closing Date (the "Interim Roll-Up Date")) (the foregoing substitution and exchange of Prepetition Secured Notes into Interim Roll-Up Loans shall be referred to herein, generally, as the "Interim Roll-Up").  Amounts borrowed, deemed borrowed or exchanged under this Section 2.2.1 and, following the Interim Roll-Up, repaid or prepaid, may not be reborrowed.

2.2.2    Subject to the terms and conditions set forth herein and in consideration for providing the DIP Term Loans, subject to entry of the Final Order, on the entry date of the Final Order, the Prepetition Secured Note Obligations under the Prepetition Secured Notes in an aggregate principal amount of $12,630,000.00 held by the Prepetition Secured Note Holders shall be automatically substituted and exchanged for (on a cashless basis by) loans hereunder (the "Final Roll-Up Loans" and, together with the Interim Roll-Up Loans, the "Roll-Up Loans"), which Final Roll-Up Loans shall constitute and be deemed DIP Term Loans outstanding hereunder on the entry date of the Final Order (the "Final Roll-Up Date") (the foregoing substitution and exchange of Prepetition Secured Notes into Final Roll-Up Loans shall be referred to herein, generally, as the "Final Roll-Up" and, together with the Interim Roll-Up, the "Roll-Up").  Amounts borrowed, deemed borrowed or exchanged under this Section 2.2.2 and, following the Final Roll-Up, repaid or prepaid, may not be reborrowed.

2.3    Use of Proceeds of Loans.

2.3.1    Subject to the Orders and the terms thereof, the Borrower shall use the proceeds of the DIP Term Loans solely in accordance with and as provided in the Approved Budget (subject to Permitted Variances).

2.3.2    The deemed proceeds of the Roll-Up Loans shall be used to refinance an equal amount of the Prepetition Secured Note Obligations, reducing the amount of the "Obligations" (as defined under the Prepetition Secured Notes) by such amount.

2.3.3    No more than $20,000.00 of the DIP Loans or of the Approved Budget shall be used by any committee appointed in the Bankruptcy Case to fund any investigation of claims or actions against the DIP Agent or the DIP Lenders.  Subject to the foregoing, no portion of the DIP Term Loans shall be used (i) for any purposes that are prohibited under the Bankruptcy Code or the Orders, (ii) to finance in any way any adversary action, contested matter, suit, claims or causes of action, investigation by a committee, arbitration or other proceeding of any type adverse to the interests of the DIP Agent or DIP Lenders, or any other action which with the giving of notice or passing of time would result in an Event of Default, (iii) to make any distribution to equity owners of the Borrower, (iv) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Lenders or (v) for any purposes or in any manner not approved in the Approved Budget or by the DIP Lenders.

**SECTION 3.  INTEREST AND EXPENSES**

3.1     Interest.

3.1.1     DIP Term Loan Rate of Interest. Subject to the provisions of Section 3.1.2, the unpaid principal amount of the DIP Term Loans outstanding until all Obligations are repaid in full (whether at stated maturity, on acceleration or otherwise), shall bear interest at a rate per annum equal to of twelve percent (12%).

3.1.2     DIP Term Loan Default Rate of Interest. During the existence of an Event of Default, the principal amount of the DIP Term Loans then outstanding (and, to the greatest extent permitted by Applicable Law, all accrued but unpaid interest and all other outstanding Obligations) shall bear interest at a rate per annum equal to fourteen percent (14%) (the "Default Rate").

3.1.3     Roll-Up Loans Rate of Interest.  The unpaid principal amount of the Roll-Up Loans outstanding until all Obligations are repaid in full (whether at stated maturity, on acceleration or otherwise), shall bear interest at the pre-default interest rate in respect of the Prepetition Secured Notes as in effect on the Petition Date.

3.1.4     Payment of Interest. Interest on the unpaid principal amount of the Loans outstanding from time to time shall be calculated daily on the basis of a 365/366-day year for the actual number of days elapsed.  Interest shall be due and payable in arrears on the last Business Day of each calendar month following the Initial Borrowing (or, in respect to the Roll-Up Loans, following the Interim Roll-Up Date and Final Roll-Up Date, as applicable).  Interest shall be paid-in-kind and capitalized (and thereby added to principal, which shall thereafter accrue interest) on the last day of each calendar month following the Initial Borrowing (or, in respect to the Roll-Up Loans, following the Interim Roll-Up Date and Final Roll-Up Date, as applicable), or on the Maturity Date to the extent not already capitalized.  In addition, all accrued and unpaid interest (to the extent not capitalized) shall be payable on the Maturity Date, whether by acceleration or otherwise, and, with respect to Default Interest, from time to time and at any time upon demand.

**SECTION 4.  PAYMENTS**

4.1     Payment Provisions. All payments of the principal of, and interest on, the Loans and all of the other Obligations that are payable to DIP Lenders shall be made to DIP Lenders in United States dollars without any offset or counterclaim and free and clear of (and without deduction for) any present or future Taxes, and in immediately available funds no later than noon, Eastern time, on the Maturity Date (and payment made after such time, on the due date shall be deemed to have been made on the next succeeding Business Day).  If any payment under this Agreement or the other Loan Documents shall be specified to be made upon a day which is not a Business Day, it shall be made on the next succeeding day that is a Business Day, and such extension of time shall in such case be included in computing interest and fees, if any, in connection with such payment. All sums payable hereunder and under the other Loan Documents shall be paid free and clear of, and without any deduction or withholding on account of, any Tax imposed, levied, collected, withheld or assessed from or through which a payment is made by or on behalf of the Borrower. If the Borrower or any other Person are required by law to make any

deduction or withholding on account of any Tax from any sum paid or payable, the Borrower shall pay any such Tax before the date on which penalties attach thereto, and the sum payable in respect of which the relevant deduction, withholding or payment, is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment of all Taxes (other than any Tax on the overall net income of DIP Lenders), DIP Lenders receive on the due date and retains a net sum equal to what it would have received and retained had no such deduction, withholding or payment been required or made.

4.2    <u>Mandatory Prepayments</u>. The Debtors shall pay or prepay the Loans (together with a cash reserve established by the DIP Term Loans to cover asserted contingent and indemnity obligations) until all Obligations thereunder are paid in full immediately as follows:

(a)    One hundred percent (100%) of the net cash proceeds of any sale or disposition of all or substantially all of Debtors' assets pursuant to section 363 of the Bankruptcy Code (other than a sale to the Stalking Horse Purchaser pursuant to the Stalking Horse Purchase Agreement) simultaneous with the consummation thereof, after funding the Carve-Out and reserving proceeds sufficient to pay accrued, unpaid and allowed administrative expenses (as of the closing of such sale) to the extent set forth in the Approved Budget;

(b)    One hundred percent (100%) of the net cash proceeds of any other sale or other disposition by any Debtor of any assets, in a single transaction or series of related transactions (except for the (a) de minimis asset sales approved by an order of the Bankruptcy Court that is in form and substance acceptable to the Required DIP Lenders or (b) sale of goods or services in the ordinary course of business), after funding the Carve-Out and reserving proceeds sufficient to pay accrued, unpaid and allowed administrative expenses (as of the closing of such sale) to the extent set forth in the Approved Budget; and

(c)    One hundred percent 100% of the net cash proceeds of Extraordinary Receipts by any Debtor, after funding the Carve-Out and reserving proceeds sufficient to pay accrued, unpaid and allowed administrative expenses (as of the closing of such sale) to the extent set forth in the Approved Budget.

Any amounts so paid or prepaid may not be reborrowed.  No reinvestment of the proceeds of any extraordinary receipts, asset sales or other proceeds described above shall be permitted without the prior written consent of the DIP Lenders.

4.3    <u>Payments Order of Priority</u>. Mandatory payments or prepayments and proceeds of DIP Collateral received by the Debtors outside the ordinary course of business will be applied in the following order of priority (unless otherwise determined by the DIP Lenders in their sole discretion), after giving effect to the Carve-Out and any other payments required pursuant to the Orders:

(a)    <u>first</u>, to pay all documented out-of-pocket expenses payable to the DIP Lenders and the DIP Agent (including, without limitation, fees and expenses of counsel and external advisors);

(b)    <u>second</u>, to pay an amount equal to all accrued and unpaid interest on the Loans owing to the DIP Lenders, *pro rata* in respect to the Loans;

(c)      third, to repay any principal amounts outstanding in respect of the Loans (including any amounts, other interest, that have been added to the principal balance), *pro rata* in respect to the Loans;

(d)      fourth, all other amounts owing to the DIP Lenders and the DIP Agent, *pro rata* in respect to the Loans; and

(e)      last, the balance, if any, after all of the Loans have been paid in full, to the Borrower subject in all respects to the rights, liens and claims of the Prepetition Collateral Agent for the benefit of the Prepetition Secured Note Holders.

For the avoidance of doubt, payments that are required to be made to the DIP Secured Parties as specified above, shall be apportioned to each DIP Secured Party ratably based upon such DIP Secured Party's ratable share of the sum of the aggregate Loans outstanding at such time and the aggregate DIP Commitment outstanding at such time.

## SECTION 5.  CONDITIONS PRECEDENT

5.1      Conditions to Effectiveness and to DIP Term Loans. This Agreement shall become binding on the parties hereto upon the satisfaction of the following conditions precedent.  The delivery by DIP Lenders to the Borrower of their signature pages to this Agreement shall evidence DIP Lenders' acknowledgement that the conditions set forth in this Section 5.1 have been satisfied, unless otherwise waived in writing by DIP Lenders:

5.1.1    Receipt of Certain Documents. DIP Lenders shall have received counterparts to this Agreement and the other Loan Documents, each duly executed by an authorized officer of each Debtor party thereto.

5.1.2    Company Proceedings of Borrower. DIP Lenders shall have received executed copies of the resolutions, in form and substance reasonably satisfactory to DIP Lenders, of the board of directors or other governing body of the Debtors, authorizing the execution, delivery and performance by Debtors of this Agreement and the other Loan Documents, and ratifying all previous actions taken by the Debtors in connection with this Agreement and other Loan Documents.

5.1.3    No Defaults. No Default or Event of Default shall then exist.

5.1.4    Approved Budget. DIP Lenders shall have received a copy of the Borrower's proposed budget and such budget shall have become the Approved Budget.

5.1.5    Interim Order. The Interim Order shall have been entered by the Bankruptcy Court not later than three (3) calendar days following the Petition Date, and the Interim Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to the DIP Lenders and shall not be subject to a stay.

5.1.6    First Day Orders. The "first day orders" sought by the Borrower shall be reasonably satisfactory in form and substance to the DIP Lenders.

5.1.7   <u>Other</u>. All corporate action and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated by this Agreement shall be satisfactory in form and substance to DIP Lenders.

5.2   <u>Conditions for Subsequent Borrower</u>. In addition to satisfaction of the above conditions, with respect to each Loan subsequent to the Initial Borrowing, the following conditions must also be satisfied or validly waived by DIP Lenders:

5.2.1   <u>No Defaults</u>. No Default or Event of Default shall then exist.

5.2.2   <u>DIP Commitment</u>. The aggregate amount of the DIP Term Loans shall not exceed the DIP Commitment.

5.2.3   <u>Final Order</u>. The Final Order shall have been entered into by the Bankruptcy Court.

## SECTION 6.   CREATION OF SECURITY INTEREST

6.1   <u>Grant of Security Interest</u>.  The Debtors, and each of them individually, hereby grant the DIP Agent, on behalf of the DIP Secured Parties, to secure the prompt payment and performance in full of all of the Obligations, a continuing first priority, fully perfected, security interest in, and pledges to the DIP Agent, the Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof.

6.2   <u>Nature of Security Interest</u>. The DIP Agent, for the benefit of the DIP Secured Parties, shall be granted, pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected, post-petition first priority security interests and liens (the "<u>DIP Liens</u>") on all tangible and intangible real and personal property of the Debtors (including without limitation, all prepetition and post-petition property and assets of the Debtors and all equity interests owned by the Debtors), and all other property of the Debtors of whatever kind, nature or description, whether acquired or created prepetition or post-petition to secure the Loans, and the proceeds of each of the foregoing (the "<u>DIP Collateral</u>"). The DIP Liens shall be subject only to any validly perfected and non-avoidable liens, which as of the Petition Date were senior to liens securing obligations under the Prepetition Secured Notes.  For the avoidance of doubt, the DIP Liens shall prime and be senior to the lien of the Prepetition Collateral Agent, for the benefit of the Prepetition Secured Parties. Notwithstanding the foregoing, the DIP Liens shall not extend to, and the DIP Collateral shall not consist of, (i) assets, contracts, leases and other licenses solely to the extent a DIP Lien is not permitted by law to attach to such property, in which case the proceeds of such assets, contracts, leases and other licenses shall be DIP Collateral, and (ii) avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents; *provided* that subject to entry of the Final Order, DIP Collateral shall include the proceeds therefrom.

6.3   <u>Superpriority Claims</u>.  DIP Term Loans shall constitute allowed superpriority administrative expense claims (the "<u>Superpriority Claims</u>") in the Chapter 11 Case and shall have priority over all other claims and administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, provided that Superpriority Claims shall be payable from

proceeds of avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents only upon entry of the Final Order.

      6.4    <u>Priority of Security Interest</u>. Each Debtor represents, warrants, and covenants that the security interest granted herein is and shall at all times continue to be a first priority fully perfected security interest in the DIP Collateral (subject only to DIP Lenders taking whatever actions are required under applicable law to perfect and maintain such security interest). Each Debtor agrees that the Obligations are entitled to "superpriority claim" status in the Chapter 11 Case pursuant to section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expense claims, whether heretofore or hereafter incurred, subject only to the Carve Out and Stalking Horse Payments.

      6.5    <u>Perfection</u>. All of the liens described herein with respect to the assets of the Debtors shall be effective and perfected by the Interim Order and the Final Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements. Notwithstanding the foregoing, the Debtors shall take all action that may be reasonably necessary or desirable, or that the DIP Lenders or the DIP Agent may reasonably request, to at all times maintain the validity, perfection, enforceability and priority of the security interest and liens of the DIP Agent, on behalf of the DIP Secured Parties, in the DIP Collateral, or to enable the DIP Agent to protect, exercise or enforce its rights hereunder, under the Orders and in the DIP Collateral.

      6.6    <u>Authorization to File Financing Statements</u>. Each Debtor hereby authorizes DIP Lenders to file financing statements and all other instruments, without notice to such Debtor or any further approvals or signatures of each Debtor, with all appropriate jurisdictions and agencies to perfect or protect DIP Lenders' Lien and interest or rights under the Loan Documents. Such financing statements and other instruments may specify the DIP Collateral as "all assets of the Debtor" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in DIP Lenders' discretion.

## SECTION 7. REPRESENTATIONS AND WARRANTIES

      7.1    <u>Representations and Warranties</u>. To induce DIP Lenders to enter into this Agreement, the Debtors represent and warrant, jointly and severally, to DIP Lenders as of the date of this Agreement and the date of each Loan made by DIP Lenders to Borrower:

      7.1.1    <u>Company Matters</u>. (a) each Debtor is duly incorporated or formed and validly existing and in good standing under the laws of its state of organization; (b) each Debtor has the full power and authority to execute, deliver and perform the Loan Documents and to carry out the transactions contemplated by the Loan Documents; (c) the execution and delivery of the Loan Documents by each Debtor and the carrying out by each Debtor of the transactions contemplated by the Loan Documents have been duly authorized by all requisite corporate action, and the Loan Documents have been duly executed and delivered by each Debtor and constitute the legal, valid and binding obligation of each Debtor, enforceable against each Debtor in accordance with the their terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles regardless of whether enforcement is sought in equity or at law; and (e) none of the execution, delivery and performance by any Debtor of the Loan

Documents conflicts with or will result in a material breach or violation of any Applicable Law or of any material contract to which such Debtor is a party or is bound.

7.1.2   <u>Further Assurances</u>. Upon request by DIP Lenders, or any of them, the Debtors shall make, execute and deliver or cause to be made, executed and delivered to DIP Lenders and, where appropriate, cause to be recorded or filed, as applicable, and from time to time thereafter to be re-recorded or refiled, as applicable, at such time and in such offices and places as shall be deemed necessary or desirable by DIP Lenders, any and all such instruments of further assurance, certificates and other documents as may, in the opinion of DIP Lenders, be necessary or desirable to effectuate, complete, or perfect, or to continue and preserve, the operation and effect of this Agreement and the other Loan Documents.

7.1.3   <u>DIP Collateral</u>. Each Debtor has good title to, rights in, and the power to transfer each item of its DIP Collateral upon which it is granting a Lien hereunder, free and clear of any and all Liens except with respect to the Permitted Liens.  The Debtors have no DIP Collateral accounts at or with any bank or financial institution except for the DIP Collateral accounts identified and delivered to DIP Lenders in connection herewith and which the Debtors have taken such actions as are necessary to give DIP Lenders a perfected security interest therein. The DIP Collateral is not in the possession of any third party bailee (such as a warehouse).

7.1.4   <u>Consents</u>. All approvals, licenses, consents and filings necessary to permit the transactions contemplated by this Agreement and the other Loan Documents have been obtained and made.

7.1.5   <u>No Defaults</u>. No Default, Event of Default or similar event shall occur with respect to any contracts or agreements to which any Debtor is a party from the incurring of any Obligations by such Borrower.

7.2   <u>Survival of Representations and Warranties</u>. All representations and warranties of the Debtors contained in this Agreement or any of the other Loan Documents shall survive the execution, delivery and acceptance thereof by DIP Lenders and the closing of the transactions contemplated by this Agreement.

## SECTION 8.  COVENANTS

Until the payment in full of all Obligations (excluding contingent indemnification Obligations to the extent no unsatisfied claim giving rise thereto has been asserted) and termination of this Agreement or the occurrence of the Maturity Date, as applicable, the Debtors shall, unless otherwise agreed upon between Debtors and DIP Lenders:

8.1   <u>Indebtedness</u>. Not create, incur, assume, or suffer to exist any indebtedness for borrowed money except (i) indebtedness of the Debtors outstanding as of the date of this Agreement, and (ii) Obligations owing to DIP Lenders.

8.2   <u>Liens</u>. Not create, incur, assume, or suffer to exist any Lien or transfer upon or against any of their property or assets now owned or hereafter acquired, except for the following "<u>Permitted Liens</u>":

(a)     Liens pursuant to, associated with or related to the Carve-Out;

(b)     Any valid, perfected and unavoidable interests of other parties arising out of Liens, if any, on such property existing prior to the Petition Date, including any Liens existing in respect to loans made by DIP Lenders to Borrower prior to the Petition Date; and

(c)     Any non-consensual statutory Liens as described in section 546 of the Bankruptcy Code.

8.3     <u>Distributions</u>. Not declare, pay or make any distribution on any Capital Stock of any Debtor or apply any of its funds, property or assets to the purchase, redemption or other retirement of any of its Capital Stock or of any options to purchase or acquire any Capital Stock of such Borrower.

8.4     <u>Fundamental Changes</u>. Not (i) enter into any merger, consolidation or other reorganization with or into any other Person or acquire all or a substantial portion of the assets or Capital Stock of any Person or permit any other Person to consolidate with or merge with them, or (ii) sell, lease, transfer or otherwise dispose of any of their properties or assets other than in the ordinary course of business.

8.5     <u>Preservation of Existence; Maintenance of Properties</u>. Preserve, renew and maintain in full force and effect their legal existence and good standing under the laws of their organizations and maintain, preserve and protect all of their properties and equipment necessary to the operation of their businesses in good working order and condition, ordinary wear and tear permitted.

8.6     <u>Information: Notices: Inspection</u>. Promptly (i) upon (but no later than three (3) Business Days after) request therefor by DIP Lenders, deliver such information regarding the business or the financial or corporate affairs of the Debtors or the compliance by the Debtors with the terms of the Loan Documents as DIP Lender, or any of them, may from time to time reasonably request; (ii) upon any officer of the Debtors becoming aware thereof, notify DIP Lenders in writing of (a) the occurrence of any Default, and (b) any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect; and (iii) upon (but no later than three (3) Business Days after) request therefor by DIP Lender, or any of them, permit DIP Lenders to visit and inspect any of the Debtors' properties and to have full access to and the right to audit, check, inspect and make abstracts and copies from each Borrower's books, records, audits, correspondence and all other papers relating to the operation of such Borrower's business.

8.7     <u>Bankruptcy Filings</u>. Not less than two (2) Business Days prior to filing any motion requesting approval for debtor-in-possession financing, and use of cash collateral, Debtors shall send copies of such motions to DIP Lenders, and all such motions shall be satisfactory to DIP Lenders in their reasonable discretion.  The foregoing notice period shall not apply to any such motions filed contemporaneously with the Debtors' chapter 11 bankruptcy petitions.

8.8     <u>Debtor-in-Possession Obligations</u>. Comply in a timely manner with its obligations and responsibilities as a debtor-in-possession under the Bankruptcy Code, the rules of procedure of the Bankruptcy Court, and any order of the Bankruptcy Court.

8.9     Budget Covenant and Compliance.  The Debtors shall prepare and deliver to the DIP Agent a budget beginning with the week which includes the Petition Date through the thirteenth week thereafter showing anticipated cash receipts and cash disbursements which budget shall be approved by the Required DIP Lenders on or prior to the date of this Agreement (the "Approved Budget").  By not later than 5:00 PM ET on Thursday after the second full week following the Petition Date (the "First Testing Date"), and no later than 5:00 PM ET on each Thursday thereafter (together with the First Testing Date, each a "Testing Date"), the Debtors shall deliver to the DIP Agent a variance report in form and detail acceptable to the DIP Agent (an "Approved Variance Report") showing comparisons of (a) actual cash receipts of the Debtors compared to the projected cash receipts of the Debtors as set forth in the Approved Budget, in each case, for the Applicable Period and (b) actual cash disbursements on a line by line basis (excluding professional fees) of the Debtors compared to the projected cash disbursements on a line by line basis (excluding professional fees) as set forth in the Approved Budget, in each case, for the Applicable Period.  Each Approved Variance Report shall indicate whether there are any adverse variances that exceed the Permitted Variances (as defined below) and shall provide a written explanation for such variances. "Permitted Variances" shall mean, as of any Testing Date: (i) the aggregate actual cumulative cash receipts of the Debtors for the applicable Testing Period do not vary negatively from the cumulative cash receipts of the Debtors set forth in the Approved Budget for such Testing Period by more than fifteen percent (15%) for such Testing Period, for the avoidance of doubt, with negative variance meaning that actual receipts are less than projected receipts (the "Receipts Variance"); and (ii) the Debtors' aggregate actual cash operating disbursements (excluding professional fees) for the applicable Testing Period may not vary negatively from the Approved Budget by more than fifteen percent (15%) for each Testing Period, for the avoidance of doubt, with negative variance meaning that actual disbursements are greater than the projected disbursements (the "Disbursements Variance"), *provided* that, during any Testing Period, (i) any positive Receipts Variance may be used to offset any negative Disbursements Variance for such Testing Period and (ii) any positive Disbursements Variance may be used to offset any negative Receipts Variance for such Testing Period (such limitations in clauses 1 and 2 above, the "DIP Budget Covenant").

8.10     Milestones. The Debtors shall comply with the following milestones (each, a "Case Milestone") by the dates set forth below (each, a "Specified Deadline") unless modified by the Orders and with the express written consent of the Required DIP Lenders:

(a)     no later than three (3) calendar days after the Petition Date, the Interim Order approving the DIP Facility shall be entered by the Bankruptcy Court;

(b)     no later than ten (10) calendar days following the Petition Date, the Company shall have executed an asset purchase agreement, in form and substance satisfactory to the DIP Lenders, pursuant to which a newly formed entity controlled by the DIP Lenders (or Affiliates or designees thereof) (the "Stalking Horse Purchaser") will purchase by credit bid substantially all assets of the Debtors that are used or useful in the operation of their business free and clear of all liens, claims, interests and encumbrances, subject only to higher or otherwise better offers (the "Stalking Horse Purchase Agreement");

(c)     no later than ten (10)calendar days after the Petition Date, the Debtors shall file with the Bankruptcy Court one or more motions, each in form and substance reasonably

17

satisfactory to the Required DIP Lenders, seeking approval of the Stalking Horse Purchase Agreement (the "Sale Motion" and, the transaction in respect thereof, the "Sale Transaction") and (ii) bidding procedures in connection with approval of the Sale Transaction (the "Bid Procedures Motion");

        (d)    no later than thirty-one (31) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order establishing bidding procedures consistent with the Bidding Procedures Motion (such order, the "Bidding Procedures Order"), which order shall be reasonably satisfactory to the Required DIP Lenders;

        (e)    no later than thirty-one (31) calendar days after the Petition Date, the Final Order approving the DIP Facility shall be entered by the Bankruptcy Court;

        (f)    no later than forty-four (44) calendar days after the Petition Date, unless the DIP Agent otherwise agrees, submission of qualified bids in respect of the Sale Transaction;

        (g)    no later than forty-six (46) calendar days after the Petition Date, the Borrower shall have held an auction in connection with the Sale Transaction;

        (h)    no later than fifty-two (52) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Sale Transaction (the "Sale Order"), which order shall be satisfactory to the Required DIP Lenders; and

        (i)    no later than fifty-five (55) calendar days after the Petition Date, the Borrower shall have consummated the Sale Transaction in accordance with the Sale Order.

Any Milestone falling on a day that is not a Business Day shall automatically extend to the next Business Day.

    8.11    Chief Restructuring Officer.  On or prior to the Petition Date, Debtors shall retain a Chief Restructuring Officer approved by the DIP Agent, having such duties and authority as may be acceptable to the DIP Agent including, without limitation, the broadest possible authority consistent with that of a chief executive officer to direct and control the business and affairs of the Debtors.  Debtors shall retain such a Chief Restructuring Officer for the entirety of the Chapter 11 Case.

    8.12    Fees and Expenses.  The Debtors shall pay the following fees and expenses, all of which are non-refundable:

    8.12.1    Agent Fee.  On the Closing Date, the Debtors shall pay to the DIP Agent, for its own account, an upfront agent fee of $25,000 (the "Agent Fee"), which shall be fully earned and payable in kind as part of the Initial Borrowing on the Closing Date, subject to the entry of the Interim Order.

    8.12.2    Commitment Fee.  On the Closing Date, the Debtors shall pay to the DIP Lenders, on a pro rata basis in accordance with their respective DIP Commitments, a commitment fee (the "Commitment Fee") equal to $90,000.00, which shall be fully earned and payable in kind as part of the Initial Borrowing on the Closing Date, subject to the entry of the Interim Order.

8.12.3   <u>Exit Fee</u>.  On the Maturity Date, the Debtors shall pay to the DIP Lenders, on a pro rata basis in accordance with their respective DIP Commitments as of the Closing Date, an exit fee (the "<u>Exit Fee</u>") equal to $90,000.00, which shall be fully earned on the Closing Date and payable in cash on the Maturity Date.

8.12.4   <u>Other Expenses</u>.  The Debtors shall reimburse the DIP Agent and the DIP Lenders for all reasonable and documented out-of-pocket costs and expenses, including the reasonable fees and disbursements of one lead outside counsel and one local outside counsel for each applicable jurisdiction to the DIP Secured Parties (including the fees and disbursements of advisors to counsel, but no more than one financial advisor), and other similar fees, costs and expenses incurred by the DIP Secured Parties in connection with the DIP Facility and the Bankruptcy Cases.

## SECTION 9.  EVENTS OF DEFAULT; RIGHTS AND REMEDIES ON DEFAULT

9.1   <u>Events of Default</u>. The occurrence of one or more of the following events shall constitute an "<u>Event of Default</u>":

(a)   the entry of an Interim Order or Final Order in form or substance that is not acceptable to the DIP Agent in its sole discretion;

(b)   failure by any Debtor to be in compliance in all respects with provisions of the DIP Facility and/or the Orders;

(c)   any request made by the Debtors for, or the reversal, modification, amendment, stay, reconsideration or vacatur of an Order, as entered by the Bankruptcy Court, without the prior written consent of the DIP Agent and each DIP Lender;

(d)   failure of any of the Case Milestones to be satisfied by the Specified Deadline (as such Specified Deadlines may be modified to accommodate the calendar of the Bankruptcy Court or extended by the DIP Agent);

(e)   failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by materiality, in all respects) when made;

(f)   the filing of any application by the Debtors (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Term Loans in full upon entry of the order approving such financing) for the approval of (or an order is entered by the Court approving) any claim arising under section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in the Chapter 11 Case which is pari passu with or senior to the DIP Liens, excluding liens arising under the Orders, or pursuant to any other financing agreement made with the prior written consent of the DIP Agent and each DIP Lender;

(g)   the commencement of any action by the Debtors or other authorized person (other than an action permitted by the Orders) against any of the DIP Agent or any DIP Lender or any of their agents and employees, to subordinate or avoid any liens made in connection with the Orders or to investigate or challenge the validity, perfection, priority, extent, or enforceability of the liens under the Prepetition Secured Notes;

(h)        (1) any Debtor files a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify any Order or this Agreement, or the disallow the Loans, in whole or in part, or (2) any material provision of the Orders or this Agreement, or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral (as defined in the Orders), shall for any reason cease to be valid and binding (without the prior written consent of the DIP Agent and each DIP Lender);

(i)        the filing with the Bankruptcy Court of a motion seeking approval of a sale under Section 363 (other than approval of a sale pursuant to the terms of the Stalking Horse Purchase Agreement) or a plan of reorganization or liquidation in the Chapter 11 Case that, in either case, does not provide for indefeasible payment in full in cash to the DIP Agent and the DIP Lenders of Loans and all other amounts outstanding under this Agreement or the Orders on closing of such sale or the effective date of such plan;

(j)        the appointment in the Chapter 11 Case of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code);

(k)        the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Case with respect to any portion of the DIP Collateral exceeding $150,000 in value in the aggregate;

(l)        failure to pay principal, interest or other any other obligation in respect of the Loans in full when due, including without limitation, on the Maturity Date;

(m)        (i) if the Chief Restructuring Officer is terminated or disqualified for any reason and Borrower has not appointed a replacement Chief Restructuring Officer acceptable to Prepetition Collateral Agent within five (5) Business Days thereafter, (ii) the terms of the Chief Restructuring Officer's engagement by the Borrower are modified in any manner not acceptable to Prepetition Collateral Agent, (iii) the Chief Restructuring Officer is instructed to cease working, (iv) the Chief Restructuring Officer's engagement by the Borrower, or any of the responsibilities, authority, powers, or duties of the Chief Restructuring Officer, is terminated, suspended, or restricted in any respect, or (v) the Chief Restructuring Officer resigns and Borrower has not engaged a replacement Chief Restructuring Officer acceptable to the Prepetition Collateral Agent within five (5) Business Days thereafter; and

(n)        (i) if an independent director is terminated or disqualified for any reason and Borrower has not appointed a replacement independent director acceptable to Prepetition Collateral Agent within five (5) Business Days thereafter, (ii) the terms of the independent director's engagement by Borrower are modified in any manner not acceptable to Prepetition Collateral Agent, (iii) the independent director is instructed to cease working, (iv) the independent director's engagement by Borrower, or any of the responsibilities, authority, powers, or duties of independent director, is terminated, suspended, or restricted in any respect, or (v) the independent director resigns and Borrower has not engaged a replacement independent director acceptable to the Prepetition Collateral Agent within five (5) Business Days thereafter.

9.2    Remedies Upon Event of Default.  Upon an Event of Default, the Debtors agree to use their best efforts to request to have an emergency hearing in the Borrower's Case within three (3) business days of receipt of written notice from the DIP Lenders of such Event of Default (the "Remedies Period").  Subject to the terms of the Orders, in the absence of the entry of an order by

the Bankruptcy Court during the Remedies Period, and provided that if the Debtors request an emergency hearing be held during such Remedies Period but such hearing is scheduled for a later date by the Court then the Remedies Period shall be automatically extended to the date of such hearing, then the DIP Agent may (and at the direction of the DIP Lenders, shall) take all or any actions permitted under applicable law, including the following actions without further order of or application to the Bankruptcy Court, and notwithstanding the automatic stay:

(a)    declare all Loans (including principal of, and accrued interest on, any outstanding Loans) to be immediately due and payable;

(b)    terminate any further commitment to lend to the Borrower without affecting any of the DIP Liens or DIP Obligations;

(c)    deliver a Carve-Out Trigger Notice (as defined in the Interim Order) to the Borrower; and/or

(d)    exercise rights and remedies pursuant to the terms of the Orders, or applicable law (including, without limitation, direct any or all of the Debtors (or file a motion in the name of the Debtors)), (i) to enforce the terms and provisions of this Agreement, (ii) to collect accounts receivable, without setoff by any account debtor, including direct the Debtors to collect such account receivables, (iii) to sell or otherwise dispose of any all of the DIP Collateral on terms and conditions reasonably acceptable to the DIP Agent and the DIP Lenders pursuant to sections 363, 365 and other applicable provisions of the Bankruptcy Code (and without limiting the foregoing, direct the Debtors (or file a motion in the name of the Debtors) to assume and assign any lease or executory contract included in the DIP Collateral to the DIP Agent's designees in accordance with and subject to section 365 of the Bankruptcy Code) and (iv) enter into the premises of any Debtor in connection with the orderly sale or disposition of the DIP Collateral (including, without limitation, complete any work in process); *provided* that, subject to the Orders, the Debtors shall take all action that is reasonably necessary to cooperate with the DIP Agent in the DIP Agent's exercise of its rights and remedies and facilitate the realization upon the DIP Collateral by the DIP Agent.

Subject to the terms of the Orders, in the absence of the entry of an order by the Bankruptcy Court within ten (10) days of receipt of written notice from the DIP Lenders of an Event of Default, the Prepetition Secured Note Parties may take all or any actions permitted under applicable law, including the following without further order of or application to the Bankruptcy Court, notwithstanding the automatic stay: terminate, reduce or restrict the ability of the Debtors to use Cash Collateral.

9.3    Power of Attorney. Each Debtor hereby irrevocably appoints each DIP Lender as its lawful attorney-in-fact, exercisable upon the occurrence and during the continuance of an Event of Default, to: (a) execute, acknowledge, and deliver all such deeds, assignments, consequences, powers of attorney and other instruments and papers as may be required to perfect the interest of such DIP Lender in and to the Intellectual Property included as part of the DIP Collateral; and (b) only upon three (3) days advance written notice (with electronic mail being sufficient) to the Debtors, transfer the DIP Collateral into the name of a DIP Lender or a third party to the fullest extent permitted by the Uniform Commercial Code.

9.4    No Waiver; Remedies Cumulative. DIP Lenders' failure, at any time or times, to require strict performance by the Debtors of any provision of this Agreement or any other Loan

Document shall not waive, affect, or diminish any right of DIP Lenders thereafter to demand strict performance and compliance herewith or therewith. No waiver hereunder shall be effective unless signed by the party granting the waiver and then is only effective for the specific instance and purpose for which it is given. DIP Lenders' rights and remedies under this Agreement and the other Loan Documents are cumulative. DIP Lenders have all rights and remedies provided under the Uniform Commercial Code, by law, or in equity. DIP Lenders' exercise of one right or remedy is not an election and shall not preclude DIP Lenders from exercising any other remedy under this Agreement or other remedy available at law or in equity, and DIP Lenders' waiver of any Event of Default is not a continuing waiver. DIP Lenders' delay in exercising any remedy is not a waiver, election, or acquiescence.

**SECTION 10.          GUARANTY**

10.1    Each Guarantor hereby, jointly and severally, absolutely and unconditionally guarantees (the "<u>Guaranty</u>"), to the DIP Agent and the DIP Lenders and their respective successors and assigns, the full and prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of, all Obligations owed or hereafter owing to the DIP Agent and the DIP Lenders by the Borrower and each other Guarantor (the "<u>Guaranteed Obligations</u>"). Each Guarantor agrees that its guaranty obligation hereunder is a continuing guaranty of payment and performance and not of collection, is a primary obligation of each Guarantor and not merely a contract of surety, and that its obligations under this Section 10.1 shall be absolute and unconditional, irrespective of, and unaffected by:

10.1.1 the genuineness, validity, regularity, enforceability or any future amendment of, or change in, Agreement, any other Loan Document or any other agreement, document or instrument to which the Borrower or any Guarantor is or may become a party;

10.1.2 the absence of any action to enforce this Agreement or the waiver or consent by the DIP Agent or the DIP Lenders with respect to any of the provisions thereof;

10.1.3 the insolvency of the Borrower or any Guarantor; or

10.1.4 any other action or circumstances which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being agreed by each Guarantor that its obligations under this Section 10 shall not be discharged until the payment and performance, in full, in cash of the Obligations has occurred.

10.2    Each Guarantor shall be regarded, and shall be in the same position, as principal debtors with respect to the Obligations guaranteed hereunder. The DIP Agent and the DIP Lenders may enforce this Guaranty upon the occurrence and during the continuance of an Event of Default notwithstanding the existence of any dispute between the Borrower and the DIP Agent or the DIP Lenders with respect to the existence of such Event of Default. The obligations of each Guarantor hereunder are independent of the obligations of the Borrower and the obligations of any other Guarantor of the obligations of the Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor to enforce this Guaranty whether or not any action is brought against the Borrower or any of such other guarantors and whether or not the Borrower is joined in any such action or actions.

10.3    Each Guarantor acknowledges its grant of a security interest in its Collateral as provided in Section 6 above in connection with the Guaranty.

## SECTION 11.    MISCELLANEOUS

11.1    <u>Indemnity</u>. The Borrower shall defend, indemnify, pay and hold harmless, DIP Lenders, their respective Affiliates and their respective members, shareholders, partners, officers, managers, directors, trustees, employees, representatives and agents (each, an "<u>Indemnitee</u>"), from and against (i) any Taxes (other than any Tax on the overall net income of DIP Lenders) paid or incurred by such Indemnitee relating to, arising out of, or in connection with any Loan Document, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority, and (ii) any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations, on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of this Agreement or any Loan Document or the transactions contemplated hereby or thereby (including DIP Lenders' agreement to make a Loan or the use or intended use of the proceeds thereof, or any enforcement of any of the Loan Documents); provided, that the Borrower shall have no obligation to any Indemnitee hereunder with respect to the foregoing to the extent arising from the gross negligence or willful misconduct of that Indemnitee.  Notwithstanding any contrary provision in this Agreement, the obligation of the Borrower with respect to each indemnity given by it in this Agreement or any of the other Loan Documents shall survive the payment in full of the Obligations and the termination of this Agreement.  Notwithstanding the foregoing, in no event shall an Indemnitee hereunder be considered to include Joseph Sanberg or any entity he currently controls or previously controlled in respect to any and all actions prior to the date of this Agreement.

11.2    <u>Modification of Agreement.</u> This Agreement may not be modified, altered or amended, except by an agreement in writing signed by the Borrower and DIP Lenders.

11.3    <u>DIP Lenders</u>. Except as expressly provided otherwise hereunder, the DIP Lenders shall be jointly and severally liable for their obligations hereunder, including the making of the DIP Term Loans.  Borrower shall have the right to rely on any action, request or notice from any DIP Lender without any duty to inquire about such DIP Lender's authority therefor, and he act of any DIP Lender shall bind the DIP Lenders collectively.

11.4    <u>Severability</u>. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any provision of this Agreement shall be prohibited by or invalid under Applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

11.5     Successors and Assigns. The Borrower shall not sell, assign or transfer any interest in this Agreement, any of the other Loan Documents, or any of the Obligations, or any portion thereof, including Borrower's rights, title, interests, remedies, powers, and duties hereunder or thereunder, without DIP Lenders' prior written consent.  DIP Lenders shall be free to sell, assign or transfer any interest in this Agreement, any of the other Loan Documents or any of the Obligations, or any portion thereof, and to syndicate the Loan (or any portion thereof), to any Person or Persons selected by DIP Lenders in their sole discretion without Borrower's consent. Subject to the foregoing, this Agreement and the Loan Documents shall be binding upon and inure to the benefit of the successors and permitted assigns of the Borrower and DIP Lenders.

11.6     Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.

11.7     Notice. All notices, requests and other communications to any party hereunder shall be in writing (including electronic mail) and shall be given,

> if to the Borrowers:
>
> > 548 Market Street
> > PMB 72015
> > San Francisco, CA 94101-5401
> > Attention: Robert Z. Lee
> > Email: rob@catona.com
>
> with copies to:
>
> > Miles Staglik
> > Chief Restructuring Officer
> > 13355 Noel Road, Suite 2005
> > Dallas, TX 75240
> > CTN Holdings, Inc.
> > Email: miles.staglik@cr3partners.com
>
> > and
>
> > David W. Gaffey, Esq.
> > Whiteford, Taylor & Preston, LLP
> > 3190 Fairview Park Drive, Suite 800
> > Falls Church, VA | 22042
> > Email: dgaffey@whitefordlaw.com

if to Lender:

> Inherent Group, LP
> 450 Lexington Avenue, #4503
> New York, NY 10163
> Attention: Michael Ellis
> Email: admin@inherentgroup.com

with copies (which shall not constitute notice) to:

> Robert J. Dehney, Esquire
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 North Market Street, 16th Flr.
> P.O. Box 1347
> Wilmington, DE  19899-1347
> Email: RDehney@morrisnichols.com

or to such other address or email and with such other copies, as such party may hereafter specify for such purpose by notice to the other party.  Each such notice, request or other communication shall be effective (a) on the day delivered (or if that day is not a Business Day, or if delivered after 11:59 p.m., U.S. Eastern Time, on a Business Day, on the first following day that is a Business Day) when (i) delivered personally against receipt or (ii) sent by overnight courier, (b) on the day sent if sent by email with delivery confirmation or no receipt of delivery failure and (c) if given by any other means, upon delivery or refusal of delivery at the address specified in this Section 11.8.

11.8    <u>DIP Lenders' Consent</u>. Whenever DIP Lenders' consent is required to be obtained under this Agreement or any of the Loan Documents as a condition to any action, inaction, condition or event, DIP Lenders shall be authorized to give or withhold such consent in their sole and absolute discretion and to condition its consent upon the giving of collateral security for the Obligations, the payment of money or any other matter, and to provide such consent by electronic mail.

11.9    <u>Entire Agreement</u>. This Agreement, together with all other instruments, agreements and certificates executed by the parties in connection therewith or with reference thereto, embody the entire understanding and agreement between the parties hereto and thereto with respect to the subject matter hereof and thereof and supersede all prior agreements, understandings and inducements, whether express or implied, oral or written.  This Agreement may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties.  There are no oral agreements between the parties.  Each of the exhibits and schedules attached hereto are incorporated into this Agreement and by this reference made a part hereof.

**11.10   GOVERNING LAW; SUBMISSION TO JURISDICTION.  THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK (WITHOUT REGARD TO THE CHOICE OF LAW PROVISIONS THEREOF), EXCEPT AS GOVERNED BY THE BANKRUPTCY CODE. ANY PROCEEDING SEEKING TO ENFORCE ANY PROVISION OF, OR BASED ON ANY MATTER ARISING OUT OF OR IN**

**CONNECTION WITH, THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT AND EACH OF THE PARTIES HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT (AND OF THE APPROPRIATE APPELLATE COURTS) IN ANY SUCH PROCEEDING AND WAIVES ANY OBJECTION TO VENUE LAID THEREIN. PROCESS IN ANY SUCH PROCEEDING MAY BE SERVED ON ANY PARTY ANYWHERE IN THE WORLD, WHETHER WITHIN OR WITHOUT THE STATE OF NEW YORK. WITHOUT LIMITING THE FOREGOING, BORROWER AND DIP LENDERS AGREE THAT SERVICE OF PROCESS UPON SUCH PARTY AT THE ADDRESS REFERRED TO IN SECTION 11.8, TOGETHER WITH WRITTEN NOTICE OF SUCH SERVICE TO SUCH PARTY, SHALL BE DEEMED EFFECTIVE SERVICE OF PROCESS UPON SUCH PARTY. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING (INCLUDING ANY COUNTERCLAIM) ARISING OUT OF OR BASED UPON THIS AGREEMENT. NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT.**

**11.11** **WAIVERS BY BORROWER.** **THE BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES (i) TO THE FULLEST EXTENT PROVIDED BY APPLICABLE LAW, THE RIGHT TO TRIAL BY JURY (WHICH DIP LENDERS HEREBY ALSO WAIVES) IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM OF ANY KIND ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE OBLIGATIONS; (ii) THE BENEFIT OF ALL VALUATION, APPRAISEMENT AND EXEMPTION LAWS; AND (iii) NOTICE OF ACCEPTANCE HEREOF. THE BORROWER ACKNOWLEDGES THAT THE FOREGOING WAIVERS ARE A MATERIAL INDUCEMENT TO DIP LENDERS' ENTERING INTO THIS AGREEMENT AND THAT DIP LENDERS ARE RELYING UPON THE FOREGOING WAIVERS IN ITS FUTURE DEALINGS WITH BORROWER.**

11.12   Certain Matters of Construction. The headings of each Loan Document are inserted for convenience only and shall not affect the meaning or interpretation of such Loan Document or any provisions thereof.  The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision.  Any pronoun used shall be deemed to cover all genders.  The section titles, table of contents and list of exhibits appear as a matter of convenience only and shall not affect the interpretation of the Agreement.  All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations.  All references to any of the Loan Documents shall include any and all modifications thereto and any and all extensions or renewals thereof.  All references to any Person shall mean and include successors and permitted assigns of such Person.  All references to "including" and "include" shall be understood to mean "including, without limitation".  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  References herein to

any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided.

[Signature Page Follows]

IN WITNESS WHEREOF, this Agreement has been duly executed on the date first set forth above.

BORROWER:

**CTN HOLDINGS, INC.**, a Delaware corporation


By:_____
Name: Miles Staglik
Title: Chief Restructuring Officer

GUARANTORS:

**MAKE EARTH GREEN AGAIN, LLC**, a Delaware limited liability company

By: CTN Holdings, Inc., its Managing Member

By:_____
Name: Miles Staglik
Title: Chief Restructuring Officer

**ASPIRATION QFZ, LLC**, a Delaware limited liability company


By: CTN Holdings, Inc., its Managing Member

By:_____
Name: Miles Staglik
Title: Chief Restructuring Officer

**CARBON SEQUESTRATION III, LLC**, a Delaware limited liability company


By: Make Earth Green Again, its Sole Member

By:_____
Name: Miles Staglik
Title: Chief Restructuring Officer

**CARBON SEQUESTRATION I, LLC**, a Delaware limited liability company

By: Make Earth Green Again, its Sole Member

By:_____
Name: Miles Staglik
Title: Chief Restructuring Officer

**CARBON SEQUESTRATION II, LLC**, a Delaware limited liability company

By: CTN Holdings, Inc., its Managing Member

By:_____
Name: Miles Staglik
Title: Chief Restructuring Officer

**REFORESTATION INITIATIVES I, LLC**, a Delaware limited liability company

By: Make Earth Green Again, its Sole Member

By:_____
Name: Miles Staglik
Title: Chief Restructuring Officer

**REFORESTATION INITIATIVES II, LLC**, a Delaware limited liability company

By: Make Earth Green Again, its Sole Member

By:_____
Name: Miles Staglik
Title: Chief Restructuring Officer

29

**ZERO CARBON HOLDINGS, LLC**, a
Wyoming limited liability company


By: CTN Holdings, Inc., its Managing
Member

By:‎_____
Name: Miles Staglik
Title: Chief Restructuring Officer

**CATONA CLIMATE SOLUTIONS,
LLC**, a Delaware limited liability company


By: CTN Holdings, Inc., its Managing
Member

By:‎_____
Name: Miles Staglik
Title: Chief Restructuring Officer



Address for Notices of the Debtors:


13355 Noel Road, Suite 2005
Dallas, Texas 75240
Attention: Miles Staglik, Chief
Restructuring Officer
Email: miles.staglik@cr3partners.com

ACCEPTED AND AGREED:
LENDER:

INHERENT ASPIRATION, LLC

By: Inherent Aspiration MM, LLC, its Managing Member
By: Inherent Group, LP, its Managing Member
By: Inherent Group GP, LLC, its general partner


By: _____
Name:  Michael Ellis
Title:   Chief Operating Officer

Address for Notices:

Inherent Group, LP
450 Lexington Avenue, #4503
New York, NY 10163
Attention: Michael Ellis
Email: admin@inherentgroup.com




DIP AGENT:

INHERENT GROUP, LP

By: Inherent Group GP, LLC, its general partner


By: _____
Name:  Michael Ellis
Title:   Chief Operating Officer

Address for Notices:

Inherent Group, LP
450 Lexington Avenue, #4503
New York, NY 10163
Attention: Michael Ellis
Email: admin@inherentgroup.com


18814507.8

**EXHIBIT A**

Form of Note

[See attached.]

# SECURED PROMISSORY NOTE

$4,210,000.00                                                                                                    March 30, 2025

FOR VALUE RECEIVED, the undersigned, CTN Holdings, Inc., a Delaware corporation (the "Borrower"), promises to pay to the order of  Inherent Aspiration, LLC, a Delaware limited liability company, or its assigns (the "Holder"), the principal sum of four million two hundred ten thousand ($4,210,000.00) DOLLARS, together with interest from March 30, 2025, at the fixed rate of twelve percent (12%) per annum (unless the Default Rate applies), pursuant to the provisions of (a) this Secured Promissory Note (this "Note") and (b) that certain Superpriority Senior Secured Debtor-in-Possession Loan and Security Agreement dated as of March 30, 2025 (the "Agreement") between the Borrower, Holder and Guarantors. Capitalized terms that are not otherwise defined herein have the meanings given to such terms in the Agreement.

Pursuant to this Note, Borrower acknowledges receipt of the full amount of the DIP Term Loans from Holder. Borrower promises to pay the principal amount of the Loan then outstanding, interest thereon, and all other Obligations, as follows:

All payments hereunder shall be applied first on account of late charges, then on account of the interest then due at the applicable interest rate of this Note on the unpaid balance of the DIP Term Loans, then on account of reimbursement for advances or other Obligations made by or owed to Holder pursuant to this Note, the Agreement or any other Loan Document, and the remainder thereof shall be applied on account of the principal outstanding amount of the DIP Term Loans until all Obligations are paid in full.

The entire balance of principal and interest on the DIP Term Loans and all other Obligations shall be paid as set forth herein not later than the Maturity Date, or at any time prior thereto, immediately and without notice upon the occurrence and continuation of an Event of Default.

Borrower waives, to the greatest extent permitted by law, diligence, demand, presentment for payment, notice of nonpayment, protest and notice of protest, and notice of any renewals or extensions of this Note, and all rights under any statues of limitations, and agree that the time for payment of this Note may be changed or extended without affecting or impairing their own liability hereunder or under any other Loan Document, and further consents to release, settlement or subordination of all or any part of the DIP Collateral for the payment of the Obligations, or the release of any other Party liable for any or all of the Obligations without affecting or impairing their own liability, hereunder or under any other Loan Document.

Notwithstanding anything herein to the contrary, the total interest charged on the principal amount owing hereunder from time to time shall never exceed the maximum amount allowed by law, and Borrower shall not be bound or obligated to pay any interest hereunder in excess of such amount.  If and to the extent the interest on the DIP Term Loans or any other payment required hereunder would exceed the maximum interest for such loans, then to such extent, the payment(s) shall be deemed a partial prepayment of principal.

Borrower warrants and represents that the purpose of the DIP Term Loans evidenced by this Note is a business purpose, and that the purpose of the loan evidenced by this Note is not a personal, household or other consumer purpose.

Holder may assign any or all of its rights and obligations hereunder to any other Person. Borrower is prohibited from assigning any or all of its rights and obligations hereunder to any other Person without the prior written consent of Holder.  Wherever the context shall so require, the singular and plural shall mean each other and the masculine, feminine and neutral genders shall mean each other.  This Note and the Obligations shall be governed in all respects by the laws of the State of New York and Borrower submits to the exclusive jurisdiction of the federal and state courts located in New York with respect to all matters concerning this Note, the DIP Term Loans, the other Obligations and the other Loan Documents.

[Signature Page Follows]

IN WITNESS WHEREOF, this Note has been executed and delivered by Borrower's duly authorized representative as of the date first written above.

<u>BORROWER</u>:

**CTN HOLDINGS, INC.**, a Delaware corporation


By:_____
Name: Miles Staglik
Title: Chief Restructuring Officer

## **Exhibit 2**

**Initial DIP Budget**

**CTN Holdings, Inc.**
**Debtor In Possession Budget**
*($000s)*

| Forecast Week<br>Week Ending | 1<br>4/4/25<br>Forecast | 2<br>4/11/25<br>Forecast | 3<br>4/18/25<br>Forecast | 4<br>4/25/25<br>Forecast | 5<br>5/2/25<br>Forecast | 6<br>5/9/25<br>Forecast | 7<br>5/16/25<br>Forecast | 8<br>5/23/25<br>Forecast | 9<br>5/30/25<br>Forecast | *Sale*<br>10<br>6/6/25<br>Forecast | *Sale*<br>10 Weeks<br>6/6/25<br>Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | |
| *Operating Disbursements* | | | | | | | | | | | |
| Payroll & Employee Benefits | - | 245 | 17 | 246 | 45 | 161 | 17 | 183 | 45 | 373 | 1,333 |
| Opex | 120 | 155 | 10 | 20 | 29 | 10 | 30 | 31 | 88 | 10 | 503 |
| Project Payments | - | - | - | - | - | - | - | - | - | - | - |
| Insurance | 1 | 35 | 8 | - | - | - | - | - | - | - | 44 |
| Taxes | 75 | 30 | - | - | - | - | - | - | - | - | 105 |
| Total Operating Disbursements | 196 | 465 | 35 | 266 | 74 | 171 | 47 | 214 | 133 | 383 | 1,985 |
| **Operating Cash Flow** | **$ (196)** | **$ (465)** | **$ (35)** | **$ (266)** | **$ (74)** | **$ (171)** | **$ (47)** | **$ (214)** | **$ (133)** | **$ (383)** | **$ (1,985)** |
| | | | | | | | | | | | |
| *Non-Operating Disbursements* | | | | | | | | | | | |
| DIP Cash Interest and Fees | - | - | - | - | - | - | - | - | - | - | - |
| Debtor Professional Fees | 146 | 168 | 136 | 131 | 126 | 123 | 123 | 126 | 129 | 128 | 1,335 |
| DIP Lender Professional Fees | - | 210 | - | - | - | - | - | - | - | - | 210 |
| Investment Banker | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 120 |
| UCC FA & Counsel | - | - | - | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 267 |
| Claims Agent - Verita | - | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 117 |
| Accounting/NOLs | - | - | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 48 |
| Independent Director | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 58 |
| UST Fees | - | - | 19 | - | - | - | - | - | - | 28 | 47 |
| Total Non-Operating Disbursements | 164 | 409 | 192 | 206 | 201 | 198 | 198 | 201 | 204 | 231 | 2,201 |
| | | | | | | | | | | | |
| **Net Cash Flow** | **$ (360)** | **$ (874)** | **$ (227)** | **$ (472)** | **$ (275)** | **$ (369)** | **$ (245)** | **$ (414)** | **$ (337)** | **$ (614)** | **$ (4,187)** |
| *Cumulative Net Cash Flow* | *$ (360)* | *$ (1,233)* | *$ (1,460)* | *$ (1,932)* | *$ (2,207)* | *$ (2,576)* | *$ (2,821)* | *$ (3,236)* | *$ (3,573)* | *$ (4,187)* | *$ (4,187)* |
| | | | | | | | | | | | |
| Beginning Book Cash Balance | $ 8 | $ 1,859 | $ 985 | $ 758 | $ 286 | $ 11 | $ 1,642 | $ 1,397 | $ 982 | $ 645 | $ 8 |
| Net Cash Flow | (360) | (874) | (227) | (472) | (275) | (369) | (245) | (414) | (337) | (614) | (4,187) |
| Draw from DIP Financing | 2,210 | - | - | - | - | 2,000 | - | - | - | - | 4,210 |
| **Ending Book Cash Balance** | **$ 1,859** | **$ 985** | **$ 758** | **$ 286** | **$ 11** | **$ 1,642** | **$ 1,397** | **$ 982** | **$ 645** | **$ 32** | **$ 32** |