# EXHIBIT B

*Execution Version*

### SUPERPRIORITY SENIOR SECURED

### DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT AND GUARANTY

THIS SUPERPRIORITY SENIOR SECURED DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT (as may be supplemented, amended or restated, this "Agreement") is made this 30th day of March, 2025 by and between (i) CTN Holdings, Inc., a Delaware corporation (the "Borrower"); and (ii)(1) Make Earth Green Again, LLC, a Delaware limited liability company, Aspiration QFZ, LLC, a Delaware limited liability company, Zero Carbon Holdings, LLC, a Wyoming limited liability company, and Catona Climate Solutions, LLC, a Delaware limited liability company (the "Debtor Guarantors"), and (2) Carbon Sequestration I, LLC, a Delaware limited liability company, Carbon Sequestration II, LLC, a Delaware limited liability company, Carbon Sequestration III, LLC, a Delaware limited liability company, Reforestation Initiatives I, LLC, a Delaware limited liability company, and Reforestation Initiatives II, LLC, a Delaware limited liability company (the "Non-Debtor Guarantors") (collectively, the "Guarantors" and each, individually, a "Guarantor" and together with the Borrower, the "Debtors" and each, individually, a "Debtor"), the Debtor and Debtor Guarantors each being a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, on the one hand; and (iii) Inherent Aspiration, LLC, a Delaware limited liability company ( the "Lender"), on the other hand.

WHEREAS, on March 30, 2025 (the "Petition Date"), the Borrower filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Case") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and are continuing to operate their business and manage their properties as debtors and debtors in possession under sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested that the Lender enter into this Agreement to provide the Borrower with a superpriority senior secured debtor-in-possession credit facility in the principal amount of up to $18,015,000.00 (exclusive of capitalized Commitment Fees and inclusive of Roll-Up, the "DIP Commitment"), and the Lender has agreed to provide such credit facility to the Borrower subject to, and on the terms and conditions of, (i) this Agreement, (ii) the Orders, when entered, and (iii) sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1) and 364(e) of the Bankruptcy Code; and

WHEREAS, the Debtors are party to that certain Third Amended and Restated Senior Secured Promissory Note and Guaranty dated as of October 25, 2024, as amended by the First Amendment thereto dated as of December 30, 2024, the Second Amendment thereto dated as of March 11, 2025 and the Third Amendment thereto dated as of March 24, 2025 (as further amended, restated, supplemented or otherwise modified prior to the Petition Date, collectively, the "Prepetition Secured Notes", and the obligations thereunder, the "Prepetition Secured Note Obligations"), by and among the Debtors, on the one hand, and each of Inherent Aspiration, LLC, AGO Special Situations LP, Zion Consulting and Advisory LLC, and Mark Villanueva, as a holder on the other hand (the "Prepetition Secured Note Holders") and Inherent Group, LP, as collateral agent (in such capacity, the "Prepetition Collateral Agent", together with the Prepetition Secured Note Holders, the "Prepetition Secured Note Parties").

NOW THEREFORE, in consideration of the mutual promises set forth herein and for other valuable consideration, the parties agree as follows:

## SECTION 1.  DEFINED TERMS

1.1     Defined Terms. As used in this Agreement, the following terms shall have the following meanings:

"Affiliate" means, as to any specified Person, any other Person that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified Person. As used in this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person (whether through ownership of Capital Stock of that Person, by contract or otherwise). Notwithstanding anything to the contrary herein, in no event shall any DIP Lender be considered an "Affiliate" of Borrower.

"Agent Fee" shall have the meaning set forth in Section 8.12.1.

"Agreement" shall have the meaning given in the preamble hereto.

"Applicable Law" means any applicable (i) law (including common law), statute or ordinance of any nation or state; (ii) regulation, policy, protocol, proclamation or executive order promulgated by any Governmental Authority; (iii) rule or regulation of any self-regulatory organization such as a securities exchange; or (iv) judgment, order, decree or decision of any court or other Governmental Authority having the effect of law in any such jurisdiction.

"Applicable Period" means, (I) with respect to the first Approved Variance Report, the two-week period ending on the Sunday immediately preceding the First Testing Date, (ii) with respect to the second Approved Variance Report, the three-week period ending on the Sunday immediately preceding the second Testing Date, and (iii) with respect to the third Approved Variance Report, and each Approved Variance Report thereafter, the four-week period ending on the Sunday immediately preceding the applicable Testing Date.

"Approved Budget" shall have the meaning set forth in Section 8.9.

"Approved Variance Report" shall have the meaning set forth in Section 8.9.

"Availability Period" means the period from the Interim Closing Date to the earliest of (i) the Maturity Date and (ii) the date of termination of the DIP Facility pursuant to the terms hereof or of the Orders.

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Court" shall have the meaning set forth in the preamble hereto.

"Bid Procedures Motion" shall have the meaning set forth in Section 8.10(c).

"Bidding Procedures Order" shall have the meaning set forth in Section 8.10(d).

"<u>Borrower</u>" shall have the meaning set forth in the preamble hereto.

"<u>Business Day</u>" means any day, other than a Saturday, a Sunday or any other day on which banks located in New York, New York are closed for business as a result of federal, state or local holiday and any other reference to "day" means a calendar day.

"<u>Capital Stock</u>" means, with respect to: (i) any corporation, any share, or any depositary receipt or other certificate representing any share, of an equity ownership interest in that corporation or other equivalent and (ii) any other Person, any share, membership, partnership or other percentage interest, unit of participation or other equivalent (however designated) of an equity interest in such Person.

"<u>Carve Out</u>" shall have the meaning given to such term in the Interim Order or the Final Order, as applicable.

"<u>Case Milestone</u>" shall have the meaning set forth in Section 8.10.

"<u>Chapter 11 Case</u>" shall have the meaning set forth in the preamble hereto.

"<u>Closing Conditions</u>" means the conditions precedent set forth in Section 5 that must be satisfied prior to entering the DIP Facility and the making of each DIP Term Loan.

"<u>Closing Date</u>" means the date on which the Closing Conditions have been satisfied or waived.

"<u>Commitment Fee</u>" shall have the meaning set forth in Section 8.12.2.

"<u>Debtor</u>" or "<u>Debtors</u>" shall have the meaning set forth in the preamble hereto.

"<u>Default</u>" means an event or condition the occurrence of which would, with the lapse of time or the giving of notice, or both, become an Event of Default.

"<u>Default Rate</u>" shall have the meaning set forth in Section 3.1.2.

"<u>DIP Agent</u>" means Inherent Group, LP.

"<u>DIP Budget Covenant</u>" shall have the meaning set forth in Section 8.9.

"<u>DIP Collateral</u>" means all of each Debtor's rights, title and interests in and to all assets of such Debtor, including, without limitation, the following categories of property (each as defined or as used in the UCC):

    (a)     All Accounts;

    (b)     All Chattel paper;

    (c)     All Commercial tort claims;

    (d)     All Deposit accounts;

(e)    All Documents and Records;

(f)    All Equipment;

(g)    All Fixtures;

(h)    All General Intangibles, including, without limitation, intellectual property, Payment intangibles, copyrights, patents, trademarks, licenses, designs, drawings, technical information, marketing plans, customer lists, trade secrets, proprietary or confidential information, inventions (whether or not patentable), procedures, know-how, models and data;

(i)    All Goods;

(j)    All Instruments, including, without limitation, Promissory notes;

(k)    All Inventory;

(l)    All Investment property;

(m)    All Letter-of-credit rights;

(n)    All Supporting obligations;

(o)    Any real property.

"DIP Commitment" shall have the meaning set forth in the preamble hereto.

"DIP Facility" means the DIP Term Loans contemplated by this Agreement.

"DIP Lender" or "DIP Lenders" means Inherent Aspiration, LLC and, in its sole discretion, any other Prepetition Secured Note Holders who elect to be a DIP Lender hereunder.

"DIP Liens" shall have the meaning set forth in Section 6.2.

"DIP Secured Parties" means the DIP Agent together with the DIP Lenders.

"DIP Term Loans" shall have the meaning set forth in Section 2.1.

"Disbursements Variance" shall have the meaning set forth in Section 8.9.

"Event of Default" shall have the meaning set forth in Section 9.1.

"Exit Fee" shall have the meaning set forth in Section 8.12.3.

"Extraordinary Receipts" means any cash payments received by any Debtor not in the ordinary course of business, including without limitation, cash proceeds of judgments, cash proceeds of settlements, or other cash consideration of any kind received in connection with any cause of action or claim, tax refunds, indemnity payments and insurance proceeds not included as

4

proceeds of asset dispositions but excluding sales tax receipts contemplated to be received by any of the Debtors as set forth in the Approved Budget.

"<u>Final Order</u>" means a final order of the Bankruptcy Court in substantially the form of the Interim Order (or such other form acceptable to the DIP Lenders) authorizing the DIP Term Loans.

"<u>Final Roll-Up</u>" shall have the meaning assigned to such term in Section 2.2.2.

"<u>Final Roll-Up Date</u>" shall have the meaning assigned to such term in Section 2.2.2.

"<u>Final Roll-Up Loans</u>" shall have the meaning assigned to such term in Section 2.2.2.

"<u>First Testing Date</u>" shall have the meaning set forth in Section 8.9.

"<u>Governmental Authority</u>" means any national, regional or local body of state power, any ministry or department thereof, and any Person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government (including any independent regulator) or any other governmental entity, instrumentality, agency, authority, court, corporation, committee or commission under the direct or indirect control of a government.

"<u>Guaranteed Obligations</u>" shall have the meaning set forth in Section 10.1.

"<u>Guarantor</u>" or "<u>Guarantors</u>" shall have the meaning set forth in the preamble hereto.

"<u>Guaranty</u>" shall have the meaning set forth in Section 10.1.

"<u>Indemnitee</u>" shall have the meaning set forth in Section 11.1.

"<u>Initial Borrowing</u>" shall have the meaning set forth in Section 2.1.

"<u>Interim Closing Date</u>" means the date of entry of the Interim Order.

"<u>Interim Order</u>" means an interim order of the Bankruptcy Court (as the same may be amended, supplemented or modified from time to time after entry thereof in accordance with the terms thereof) in the form set forth as **<u>Exhibit A</u>**, with changes to such form as are satisfactory to the DIP Lenders, approving the Loan Documents and authorizing the Loan in such amounts are as are contemplated by this Agreement.

"<u>Interim Roll-Up</u>" shall have the meaning assigned to such term in Section 2.2.1.

"<u>Interim Roll-Up Date</u>" shall have the meaning assigned to such term in Section 2.2.1.

"<u>Interim Roll-Up Loans</u>" shall have the meaning assigned to such term in Section 2.2.1.

"<u>Lender</u>" shall have the meaning set forth in the preamble hereto.

"<u>Lien</u>" means any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any

asset of any kind or nature whatsoever including any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code as adopted in the State of Delaware from time to time or comparable law of any jurisdiction.

"Loan Documents" means, collectively, this Agreement, the Note, and each other agreement, certificate, document or instrument executed or delivered in connection with any of the foregoing, whether or not specifically mentioned herein or therein.

"Loans" means the DIP Term Loans and the Roll-Up Loans.

"Material Adverse Effect" means the effect of any event or condition which, alone or when taken together with other events or conditions occurring or existing concurrently therewith, in the opinion of DIP Lenders (i) has or may be reasonably expected to have a material adverse effect upon the business, operations, properties, condition (financial or otherwise) or prospects of Borrower; (ii) has or may be reasonably expected to have any adverse effect whatsoever upon the validity or enforceability of the Obligations, Agreement or any of the other Loan Documents; or (iii) materially impairs the ability of Borrower to perform its obligations under this Agreement or any of the other Loan Documents or of DIP Lenders to enforce or collect the Obligations in accordance with the Loan Documents and Applicable Law.

"Maturity Date" means the date that the DIP Term Loans shall mature and be due and payable on the earliest to occur of the following: (i) the seventy-fifth (75th) day following the Petition Date; (ii) the consummation of a sale of all or substantially all of the assets of the Debtors; (iii) the termination of the Stalking Horse Purchase Agreement for any reason without the prior written consent of the DIP Lenders and the Stalking Horse Purchaser; (iv) the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Case that is confirmed pursuant to an order entered by the Bankruptcy Court; (v) entry of an order by the Bankruptcy Court approving (A) a motion seeking conversion or dismissal of any or all of the Chapter 11 Case or (B) a motion seeking the appointment or election of a trustee, a responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business; or (vi) the date of acceleration of all or any portion of the DIP Term Loans and the termination of the commitments in respect thereof upon the occurrence of an Event of Default.

"Obligations" means all liabilities and obligations of every nature of the Borrower from time to time owed to DIP Lenders under this Agreement and the other Loan Documents, whether for principal, interest at the non-default and default rates, fees, expenses, indemnification, liquidated damages or otherwise (including all fees, costs and expenses of enforcement) and whether primary, secondary, direct, indirect, contingent, fixed or otherwise (including obligations of performance), including all obligations.

"Orders" means collectively, the Interim Order and the Final Order.

"Permitted Liens" shall have the meaning set forth in Section 8.2.

"Permitted Variances" shall have the meaning set forth in Section 8.9.

6

"<u>Person</u>" means an individual, partnership, corporation, limited liability company, joint stock company, land trust, business trust, unincorporated organization, or a government or agency or political subdivision thereof.

"<u>Petition Date</u>" shall have the meaning set forth in the preamble hereto.

"<u>Prepetition Collateral Agent</u>" shall have the meaning set forth in the preamble hereto.

"<u>Prepetition Secured Notes</u>" shall have the meaning set forth in the preamble hereto.

"<u>Prepetition Secured Note Holders</u>" shall have the meaning set forth in the preamble hereto.

"<u>Prepetition Secured Note Obligations</u>" shall have the meaning set forth in the preamble hereto.

"<u>Prepetition Secured Note Parties</u>" shall have the meaning set forth in the preamble hereto.

"<u>Proceeding</u>" means any action, arbitration, audit, examination, investigation, hearing, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, and whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"<u>Receipts Variance</u>" shall have the meaning set forth in Section 8.9.

"<u>Required DIP Lenders</u>" means the DIP Lenders holding more than fifty percent (50%) of the then outstanding principal amount of the DIP Term Loans.

"<u>Roll-Up</u>" shall have the meaning set forth in Section 2.2.2.

"<u>Roll-Up Loans</u>" shall have the meaning set forth in Section 2.2.2.

"<u>Sale Motion</u>" shall have the meaning set forth in Section 8.10(c).

"<u>Sale Order</u>" shall have the meaning set forth in Section 8.10(h).

"<u>Sale Transaction</u>" shall have the meaning set forth in Section 8.10(c).

"<u>Specified Deadline</u>" shall have the meaning set forth in Section 8.10.

"<u>Stalking Horse Payments</u>" mean bid protections to a potential purchaser serving as a stalking horse, which will include (i) a break-up fee and expense reimbursement and (ii) other appropriate and customary protections, the Debtors may provide, subject to Bankruptcy Court approval and the reasonable consent of the DIP Agent, in the event of a Sale Transaction.

"<u>Stalking Horse Purchase Agreement</u>" shall have the meaning set forth in Section 8.10(b).

"<u>Stalking Horse Purchaser</u>" shall have the meaning set forth in Section 8.10(b).

"Superpriority Claims" shall have the meaning set forth in Section 6.3.

"Tax" or "Taxes" means any tax (including any income tax, capital gains tax, value- added tax, sales tax, use tax, payroll tax, withholding tax, property tax, gift tax or estate tax), levy, assessment, tariff, duty (including any customs duty), deficiency or other fee, any related charge or amount (including any fine, penalty, interest or addition to tax), imposed, assessed or collected by or under the authority of any Governmental Authority or payable pursuant to any tax-sharing agreement or any other contract relating to the sharing or payment of any such tax, levy, assessment, tariff, duty, deficiency or fee.

"Testing Date" shall have the meaning set forth in Section 8.9.

"Testing Period" means the period beginning on the Petition Date and ending on the Sunday immediately prior to the applicable Testing Date.

"UCC" means the official committee of unsecured creditors appointed in the Chapter 11 Case.

1.2    Accounting Terms. Unless otherwise specified herein, all terms of an accounting character used in the Agreement shall be interpreted, all accounting determinations in the Agreement shall be made, and all financial statements required to be delivered under the Agreement shall be prepared in accordance with generally accepted accounting principles and practices in the United States as in effect from time to time.

## SECTION 2.  TERM LOAN, ROLL-UP AND CLOSING PROCEDURE

2.1    Term Loan. Subject to the terms and conditions set forth herein and the Orders, DIP Lenders agree, severally and not jointly, to make superpriority senior secured debtor-in-possession term loans (the "DIP Term Loans") to the Borrower during the Availability Period up to the DIP Commitment as follows: (i) $3,385,000.00 of the DIP Commitment shall be made to Borrower upon entry of Interim Order (the "Initial Borrowing"), and (ii) the remaining amount of the DIP Commitment shall be made to Borrower up entry of the Final Order.  The proceeds of the DIP Term Loans shall be funded by the DIP Lenders into a deposit account of the Borrower as selected by the Borrower with the consent of the DIP Lenders.  Such account shall be subject to the DIP Liens in favor of the DIP Agent for the benefit of the DIP Secured Parties, which shall be perfected pursuant to the Orders and shall be subject to an account control agreement reasonably satisfactory to the DIP Agent; provided, that any existing deposit account control agreement in respect of the Prepetition Secured Notes shall be deemed satisfactory to the DIP Agent so long as it and the Orders are together effective to perfect the DIP Agent's DIP Liens in such account.  For the avoidance of doubt, the Initial Borrowing amount as set forth above includes the Interim Roll-Up. As set forth in the Approved Budget, the Borrower hereby agrees that any and all attorneys' fees of the DIP Agent incurred in connection with this Agreement shall be paid immediately upon receipt of Borrower of the Initial Borrowing.

2.2    Roll-Up.

2.2.1    Subject to the terms and conditions set forth herein and in consideration for providing the DIP Term Loans, subject to entry of the Interim Order, on the entry date of the

Interim Order, the Prepetition Secured Note Obligations under the Prepetition Secured Notes in the aggregate principal amount of $1,175,000.00, equaling the amount of protective advances made by the Prepetition Secured Note Holders prior to the Petition Date, held by the Prepetition Secured Note Holders shall be automatically substituted and exchanged for (on a cashless basis by) loans hereunder (the "<u>Interim Roll-Up Loans</u>"), which Interim Roll-Up Loans shall constitute and be deemed DIP Term Loans outstanding hereunder on the Closing Date (the "<u>Interim Roll-Up Date</u>")) (the foregoing substitution and exchange of Prepetition Secured Notes into Interim Roll-Up Loans shall be referred to herein, generally, as the "<u>Interim Roll-Up</u>").  Amounts borrowed, deemed borrowed or exchanged under this Section 2.2.1 and, following the Interim Roll-Up, repaid or prepaid, may not be reborrowed.

2.2.2   Subject to the terms and conditions set forth herein and in consideration for providing the DIP Term Loans, subject to entry of the Final Order, on the entry date of the Final Order, the Prepetition Secured Note Obligations under the Prepetition Secured Notes in an aggregate principal amount of $12,630,000.00 held by the Prepetition Secured Note Holders shall be automatically substituted and exchanged for (on a cashless basis by) loans hereunder (the "<u>Final Roll-Up Loans</u>" and, together with the Interim Roll-Up Loans, the "<u>Roll-Up Loans</u>"), which Final Roll-Up Loans shall constitute and be deemed DIP Term Loans outstanding hereunder on the entry date of the Final Order (the "<u>Final Roll-Up Date</u>") (the foregoing substitution and exchange of Prepetition Secured Notes into Final Roll-Up Loans shall be referred to herein, generally, as the "<u>Final Roll-Up</u>" and, together with the Interim Roll-Up, the "<u>Roll-Up</u>").  Amounts borrowed, deemed borrowed or exchanged under this Section 2.2.2 and, following the Final Roll-Up, repaid or prepaid, may not be reborrowed.

2.3   <u>Use of Proceeds of Loans</u>.

2.3.1   Subject to the Orders and the terms thereof, the Borrower shall use the proceeds of the DIP Term Loans solely in accordance with and as provided in the Approved Budget (subject to Permitted Variances).

2.3.2   The deemed proceeds of the Roll-Up Loans shall be used to refinance an equal amount of the Prepetition Secured Note Obligations, reducing the amount of the "Obligations" (as defined under the Prepetition Secured Notes) by such amount.

2.3.3   No more than $20,000.00 of the DIP Loans or of the Approved Budget shall be used by any committee appointed in the Bankruptcy Case to fund any investigation of claims or actions against the DIP Agent or the DIP Lenders.  Subject to the foregoing, no portion of the DIP Term Loans shall be used (i) for any purposes that are prohibited under the Bankruptcy Code or the Orders, (ii) to finance in any way any adversary action, contested matter, suit, claims or causes of action, investigation by a committee, arbitration or other proceeding of any type adverse to the interests of the DIP Agent or DIP Lenders, or any other action which with the giving of notice or passing of time would result in an Event of Default, (iii) to make any distribution to equity owners of the Borrower, (iv) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Lenders or (v) for any purposes or in any manner not approved in the Approved Budget or by the DIP Lenders.

**SECTION 3.  INTEREST AND EXPENSES**

    3.1    <u>Interest</u>.

        3.1.1    <u>DIP Term Loan Rate of Interest</u>. Subject to the provisions of Section 3.1.2, the unpaid principal amount of the DIP Term Loans outstanding until all Obligations are repaid in full (whether at stated maturity, on acceleration or otherwise), shall bear interest at a rate per annum equal to of twelve percent (12%).

        3.1.2    <u>DIP Term Loan Default Rate of Interest</u>. During the existence of an Event of Default, the principal amount of the DIP Term Loans then outstanding (and, to the greatest extent permitted by Applicable Law, all accrued but unpaid interest and all other outstanding Obligations) shall bear interest at a rate per annum equal to fourteen percent (14%) (the "<u>Default Rate</u>").

        3.1.3    <u>Roll-Up Loans Rate of Interest</u>.  The unpaid principal amount of the Roll-Up Loans outstanding until all Obligations are repaid in full (whether at stated maturity, on acceleration or otherwise), shall bear interest at the pre-default interest rate in respect of the Prepetition Secured Notes as in effect on the Petition Date.

        3.1.4    <u>Payment of Interest</u>. Interest on the unpaid principal amount of the Loans outstanding from time to time shall be calculated daily on the basis of a 365/366-day year for the actual number of days elapsed.  Interest shall be due and payable in arrears on the last Business Day of each calendar month following the Initial Borrowing (or, in respect to the Roll-Up Loans, following the Interim Roll-Up Date and Final Roll-Up Date, as applicable).  Interest shall be paid-in-kind and capitalized (and thereby added to principal, which shall thereafter accrue interest) on the last day of each calendar month following the Initial Borrowing (or, in respect to the Roll-Up Loans, following the Interim Roll-Up Date and Final Roll-Up Date, as applicable), or on the Maturity Date to the extent not already capitalized.  In addition, all accrued and unpaid interest (to the extent not capitalized) shall be payable on the Maturity Date, whether by acceleration or otherwise, and, with respect to Default Interest, from time to time and at any time upon demand.

**SECTION 4.  PAYMENTS**

    4.1    <u>Payment Provisions</u>. All payments of the principal of, and interest on, the Loans and all of the other Obligations that are payable to DIP Lenders shall be made to DIP Lenders in United States dollars without any offset or counterclaim and free and clear of (and without deduction for) any present or future Taxes, and in immediately available funds no later than noon, Eastern time, on the Maturity Date (and payment made after such time, on the due date shall be deemed to have been made on the next succeeding Business Day).  If any payment under this Agreement or the other Loan Documents shall be specified to be made upon a day which is not a Business Day, it shall be made on the next succeeding day that is a Business Day, and such extension of time shall in such case be included in computing interest and fees, if any, in connection with such payment. All sums payable hereunder and under the other Loan Documents shall be paid free and clear of, and without any deduction or withholding on account of, any Tax imposed, levied, collected, withheld or assessed from or through which a payment is made by or on behalf of the Borrower. If the Borrower or any other Person are required by law to make any

deduction or withholding on account of any Tax from any sum paid or payable, the Borrower shall pay any such Tax before the date on which penalties attach thereto, and the sum payable in respect of which the relevant deduction, withholding or payment, is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment of all Taxes (other than any Tax on the overall net income of DIP Lenders), DIP Lenders receive on the due date and retains a net sum equal to what it would have received and retained had no such deduction, withholding or payment been required or made.

4.2     <u>Mandatory Prepayments</u>.  The Debtors shall pay or prepay the Loans (together with a cash reserve established by the DIP Term Loans to cover asserted contingent and indemnity obligations) until all Obligations thereunder are paid in full immediately as follows:

(a)     One hundred percent (100%) of the net cash proceeds of any sale or disposition of all or substantially all of Debtors' assets pursuant to section 363 of the Bankruptcy Code (other than a sale to the Stalking Horse Purchaser pursuant to the Stalking Horse Purchase Agreement) simultaneous with the consummation thereof, after funding the Carve-Out and reserving proceeds sufficient to pay accrued, unpaid and allowed administrative expenses (as of the closing of such sale) to the extent set forth in the Approved Budget;

(b)     One hundred percent (100%) of the net cash proceeds of any other sale or other disposition by any Debtor of any assets, in a single transaction or series of related transactions (except for the (a) de minimis asset sales approved by an order of the Bankruptcy Court that is in form and substance acceptable to the Required DIP Lenders or (b) sale of goods or services in the ordinary course of business), after funding the Carve-Out and reserving proceeds sufficient to pay accrued, unpaid and allowed administrative expenses (as of the closing of such sale) to the extent set forth in the Approved Budget; and

(c)     One hundred percent 100% of the net cash proceeds of Extraordinary Receipts by any Debtor, after funding the Carve-Out and reserving proceeds sufficient to pay accrued, unpaid and allowed administrative expenses (as of the closing of such sale) to the extent set forth in the Approved Budget.

Any amounts so paid or prepaid may not be reborrowed.  No reinvestment of the proceeds of any extraordinary receipts, asset sales or other proceeds described above shall be permitted without the prior written consent of the DIP Lenders.

4.3     <u>Payments Order of Priority</u>.  Mandatory payments or prepayments and proceeds of DIP Collateral received by the Debtors outside the ordinary course of business will be applied in the following order of priority (unless otherwise determined by the DIP Lenders in their sole discretion), after giving effect to the Carve-Out and any other payments required pursuant to the Orders:

(a)     <u>first</u>, to pay all documented out-of-pocket expenses payable to the DIP Lenders and the DIP Agent (including, without limitation, fees and expenses of counsel and external advisors);

(b)     <u>second</u>, to pay an amount equal to all accrued and unpaid interest on the Loans owing to the DIP Lenders, *pro rata* in respect to the Loans;

11

(c)     third, to repay any principal amounts outstanding in respect of the Loans (including any amounts, other interest, that have been added to the principal balance), *pro rata* in respect to the Loans;

(d)     fourth, all other amounts owing to the DIP Lenders and the DIP Agent, *pro rata* in respect to the Loans; and

(e)     last, the balance, if any, after all of the Loans have been paid in full, to the Borrower subject in all respects to the rights, liens and claims of the Prepetition Collateral Agent for the benefit of the Prepetition Secured Note Holders.

For the avoidance of doubt, payments that are required to be made to the DIP Secured Parties as specified above, shall be apportioned to each DIP Secured Party ratably based upon such DIP Secured Party's ratable share of the sum of the aggregate Loans outstanding at such time and the aggregate DIP Commitment outstanding at such time.

## SECTION 5.  CONDITIONS PRECEDENT

5.1     Conditions to Effectiveness and to DIP Term Loans. This Agreement shall become binding on the parties hereto upon the satisfaction of the following conditions precedent.  The delivery by DIP Lenders to the Borrower of their signature pages to this Agreement shall evidence DIP Lenders' acknowledgement that the conditions set forth in this Section 5.1 have been satisfied, unless otherwise waived in writing by DIP Lenders:

5.1.1   Receipt of Certain Documents. DIP Lenders shall have received counterparts to this Agreement and the other Loan Documents, each duly executed by an authorized officer of each Debtor party thereto.

5.1.2   Company Proceedings of Borrower. DIP Lenders shall have received executed copies of the resolutions, in form and substance reasonably satisfactory to DIP Lenders, of the board of directors or other governing body of the Debtors, authorizing the execution, delivery and performance by Debtors of this Agreement and the other Loan Documents, and ratifying all previous actions taken by the Debtors in connection with this Agreement and other Loan Documents.

5.1.3   No Defaults. No Default or Event of Default shall then exist.

5.1.4   Approved Budget. DIP Lenders shall have received a copy of the Borrower's proposed budget and such budget shall have become the Approved Budget.

5.1.5   Interim Order. The Interim Order shall have been entered by the Bankruptcy Court not later than three (3) calendar days following the Petition Date, and the Interim Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to the DIP Lenders and shall not be subject to a stay.

5.1.6   First Day Orders. The "first day orders" sought by the Borrower shall be reasonably satisfactory in form and substance to the DIP Lenders.

5.1.7    <u>Other</u>. All corporate action and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated by this Agreement shall be satisfactory in form and substance to DIP Lenders.

5.2    <u>Conditions for Subsequent Borrower</u>. In addition to satisfaction of the above conditions, with respect to each Loan subsequent to the Initial Borrowing, the following conditions must also be satisfied or validly waived by DIP Lenders:

5.2.1    <u>No Defaults</u>. No Default or Event of Default shall then exist.

5.2.2    <u>DIP Commitment</u>. The aggregate amount of the DIP Term Loans shall not exceed the DIP Commitment.

5.2.3    <u>Final Order</u>. The Final Order shall have been entered into by the Bankruptcy Court.

## SECTION 6.  CREATION OF SECURITY INTEREST

6.1    <u>Grant of Security Interest</u>.  The Debtors, and each of them individually, hereby grant the DIP Agent, on behalf of the DIP Secured Parties, to secure the prompt payment and performance in full of all of the Obligations, a continuing first priority, fully perfected, security interest in, and pledges to the DIP Agent, the Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof.

6.2    <u>Nature of Security Interest</u>. The DIP Agent, for the benefit of the DIP Secured Parties, shall be granted, pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected, post-petition first priority security interests and liens (the "<u>DIP Liens</u>") on all tangible and intangible real and personal property of the Debtors (including without limitation, all prepetition and post-petition property and assets of the Debtors and all equity interests owned by the Debtors), and all other property of the Debtors of whatever kind, nature or description, whether acquired or created prepetition or post-petition to secure the Loans, and the proceeds of each of the foregoing (the "<u>DIP Collateral</u>"). The DIP Liens shall be subject only to any validly perfected and non-avoidable liens, which as of the Petition Date were senior to liens securing obligations under the Prepetition Secured Notes.  For the avoidance of doubt, the DIP Liens shall prime and be senior to the lien of the Prepetition Collateral Agent, for the benefit of the Prepetition Secured Parties. Notwithstanding the foregoing, the DIP Liens shall not extend to, and the DIP Collateral shall not consist of, (i) assets, contracts, leases and other licenses solely to the extent a DIP Lien is not permitted by law to attach to such property, in which case the proceeds of such assets, contracts, leases and other licenses shall be DIP Collateral, and (ii) avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents; *provided* that subject to entry of the Final Order, DIP Collateral shall include the proceeds therefrom.

6.3    <u>Superpriority Claims</u>.  DIP Term Loans shall constitute allowed superpriority administrative expense claims (the "<u>Superpriority Claims</u>") in the Chapter 11 Case and shall have priority over all other claims and administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, provided that Superpriority Claims shall be payable from

proceeds of avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents only upon entry of the Final Order.

6.4     <u>Priority of Security Interest</u>. Each Debtor represents, warrants, and covenants that the security interest granted herein is and shall at all times continue to be a first priority fully perfected security interest in the DIP Collateral (subject only to DIP Lenders taking whatever actions are required under applicable law to perfect and maintain such security interest).  Each Debtor agrees that the Obligations are entitled to "superpriority claim" status in the Chapter 11 Case pursuant to section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expense claims, whether heretofore or hereafter incurred, subject only to the Carve Out and Stalking Horse Payments.

6.5     <u>Perfection</u>.  All of the liens described herein with respect to the assets of the Debtors shall be effective and perfected by the Interim Order and the Final Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements.  Notwithstanding the foregoing, the Debtors shall take all action that may be reasonably necessary or desirable, or that the DIP Lenders or the DIP Agent may reasonably request, to at all times maintain the validity, perfection, enforceability and priority of the security interest and liens of the DIP Agent, on behalf of the DIP Secured Parties, in the DIP Collateral, or to enable the DIP Agent to protect, exercise or enforce its rights hereunder, under the Orders and in the DIP Collateral.

6.6     <u>Authorization to File Financing Statements</u>. Each Debtor hereby authorizes DIP Lenders to file financing statements and all other instruments, without notice to such Debtor or any further approvals or signatures of each Debtor, with all appropriate jurisdictions and agencies to perfect or protect DIP Lenders' Lien and interest or rights under the Loan Documents. Such financing statements and other instruments may specify the DIP Collateral as "all assets of the Debtor" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in DIP Lenders' discretion.

## SECTION 7.  REPRESENTATIONS AND WARRANTIES

7.1     <u>Representations and Warranties</u>. To induce DIP Lenders to enter into this Agreement, the Debtors represent and warrant, jointly and severally, to DIP Lenders as of the date of this Agreement and the date of each Loan made by DIP Lenders to Borrower:

7.1.1     <u>Company Matters</u>. (a) each Debtor is duly incorporated or formed and validly existing and in good standing under the laws of its state of organization; (b) each Debtor has the full power and authority to execute, deliver and perform the Loan Documents and to carry out the transactions contemplated by the Loan Documents; (c) the execution and delivery of the Loan Documents by each Debtor and the carrying out by each Debtor of the transactions contemplated by the Loan Documents have been duly authorized by all requisite corporate action, and the Loan Documents have been duly executed and delivered by each Debtor and constitute the legal, valid and binding obligation of each Debtor, enforceable against each Debtor in accordance with the their terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles regardless of whether enforcement is sought in equity or at law; and (e) none of the execution, delivery and performance by any Debtor of the Loan

Documents conflicts with or will result in a material breach or violation of any Applicable Law or of any material contract to which such Debtor is a party or is bound.

7.1.2    <u>Further Assurances</u>. Upon request by DIP Lenders, or any of them, the Debtors shall make, execute and deliver or cause to be made, executed and delivered to DIP Lenders and, where appropriate, cause to be recorded or filed, as applicable, and from time to time thereafter to be re-recorded or refiled, as applicable, at such time and in such offices and places as shall be deemed necessary or desirable by DIP Lenders, any and all such instruments of further assurance, certificates and other documents as may, in the opinion of DIP Lenders, be necessary or desirable to effectuate, complete, or perfect, or to continue and preserve, the operation and effect of this Agreement and the other Loan Documents.

7.1.3    <u>DIP Collateral</u>. Each Debtor has good title to, rights in, and the power to transfer each item of its DIP Collateral upon which it is granting a Lien hereunder, free and clear of any and all Liens except with respect to the Permitted Liens.  The Debtors have no DIP Collateral accounts at or with any bank or financial institution except for the DIP Collateral accounts identified and delivered to DIP Lenders in connection herewith and which the Debtors have taken such actions as are necessary to give DIP Lenders a perfected security interest therein. The DIP Collateral is not in the possession of any third party bailee (such as a warehouse).

7.1.4    <u>Consents</u>. All approvals, licenses, consents and filings necessary to permit the transactions contemplated by this Agreement and the other Loan Documents have been obtained and made.

7.1.5    <u>No Defaults</u>. No Default, Event of Default or similar event shall occur with respect to any contracts or agreements to which any Debtor is a party from the incurring of any Obligations by such Borrower.

7.2    <u>Survival of Representations and Warranties</u>. All representations and warranties of the Debtors contained in this Agreement or any of the other Loan Documents shall survive the execution, delivery and acceptance thereof by DIP Lenders and the closing of the transactions contemplated by this Agreement.

## SECTION 8.  COVENANTS

Until the payment in full of all Obligations (excluding contingent indemnification Obligations to the extent no unsatisfied claim giving rise thereto has been asserted) and termination of this Agreement or the occurrence of the Maturity Date, as applicable, the Debtors shall, unless otherwise agreed upon between Debtors and DIP Lenders:

8.1    <u>Indebtedness</u>. Not create, incur, assume, or suffer to exist any indebtedness for borrowed money except (i) indebtedness of the Debtors outstanding as of the date of this Agreement, and (ii) Obligations owing to DIP Lenders.

8.2    <u>Liens</u>. Not create, incur, assume, or suffer to exist any Lien or transfer upon or against any of their property or assets now owned or hereafter acquired, except for the following "<u>Permitted Liens</u>":

(a)    Liens pursuant to, associated with or related to the Carve-Out;

(b)    Any valid, perfected and unavoidable interests of other parties arising out of Liens, if any, on such property existing prior to the Petition Date, including any Liens existing in respect to loans made by DIP Lenders to Borrower prior to the Petition Date; and

(c)    Any non-consensual statutory Liens as described in section 546 of the Bankruptcy Code.

8.3    <u>Distributions</u>. Not declare, pay or make any distribution on any Capital Stock of any Debtor or apply any of its funds, property or assets to the purchase, redemption or other retirement of any of its Capital Stock or of any options to purchase or acquire any Capital Stock of such Borrower.

8.4    <u>Fundamental Changes</u>. Not (i) enter into any merger, consolidation or other reorganization with or into any other Person or acquire all or a substantial portion of the assets or Capital Stock of any Person or permit any other Person to consolidate with or merge with them, or (ii) sell, lease, transfer or otherwise dispose of any of their properties or assets other than in the ordinary course of business.

8.5    <u>Preservation of Existence; Maintenance of Properties</u>. Preserve, renew and maintain in full force and effect their legal existence and good standing under the laws of their organizations and maintain, preserve and protect all of their properties and equipment necessary to the operation of their businesses in good working order and condition, ordinary wear and tear permitted.

8.6    <u>Information: Notices: Inspection</u>. Promptly (i) upon (but no later than three (3) Business Days after) request therefor by DIP Lenders, deliver such information regarding the business or the financial or corporate affairs of the Debtors or the compliance by the Debtors with the terms of the Loan Documents as DIP Lender, or any of them, may from time to time reasonably request; (ii) upon any officer of the Debtors becoming aware thereof, notify DIP Lenders in writing of (a) the occurrence of any Default, and (b) any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect; and (iii) upon (but no later than three (3) Business Days after) request therefor by DIP Lender, or any of them, permit DIP Lenders to visit and inspect any of the Debtors' properties and to have full access to and the right to audit, check, inspect and make abstracts and copies from each Borrower's books, records, audits, correspondence and all other papers relating to the operation of such Borrower's business.

8.7    <u>Bankruptcy Filings</u>. Not less than two (2) Business Days prior to filing any motion requesting approval for debtor-in-possession financing, and use of cash collateral, Debtors shall send copies of such motions to DIP Lenders, and all such motions shall be satisfactory to DIP Lenders in their reasonable discretion.  The foregoing notice period shall not apply to any such motions filed contemporaneously with the Debtors' chapter 11 bankruptcy petitions.

8.8    <u>Debtor-in-Possession Obligations</u>. Comply in a timely manner with its obligations and responsibilities as a debtor-in-possession under the Bankruptcy Code, the rules of procedure of the Bankruptcy Court, and any order of the Bankruptcy Court.

8.9     Budget Covenant and Compliance.  The Debtors shall prepare and deliver to the DIP Agent a budget beginning with the week which includes the Petition Date through the thirteenth week thereafter showing anticipated cash receipts and cash disbursements which budget shall be approved by the Required DIP Lenders on or prior to the date of this Agreement (the "Approved Budget").  By not later than 5:00 PM ET on Thursday after the second full week following the Petition Date (the "First Testing Date"), and no later than 5:00 PM ET on each Thursday thereafter (together with the First Testing Date, each a "Testing Date"), the Debtors shall deliver to the DIP Agent a variance report in form and detail acceptable to the DIP Agent (an "Approved Variance Report") showing comparisons of (a) actual cash receipts of the Debtors compared to the projected cash receipts of the Debtors as set forth in the Approved Budget, in each case, for the Applicable Period and (b) actual cash disbursements on a line by line basis (excluding professional fees) of the Debtors compared to the projected cash disbursements on a line by line basis (excluding professional fees) as set forth in the Approved Budget, in each case, for the Applicable Period. Each Approved Variance Report shall indicate whether there are any adverse variances that exceed the Permitted Variances (as defined below) and shall provide a written explanation for such variances. "Permitted Variances" shall mean, as of any Testing Date: (i) the aggregate actual cumulative cash receipts of the Debtors for the applicable Testing Period do not vary negatively from the cumulative cash receipts of the Debtors set forth in the Approved Budget for such Testing Period by more than fifteen percent (15%) for such Testing Period, for the avoidance of doubt, with negative variance meaning that actual receipts are less than projected receipts (the "Receipts Variance"); and (ii) the Debtors' aggregate actual cash operating disbursements (excluding professional fees) for the applicable Testing Period may not vary negatively from the Approved Budget by more than fifteen percent (15%) for each Testing Period, for the avoidance of doubt, with negative variance meaning that actual disbursements are greater than the projected disbursements (the "Disbursements Variance"), *provided* that, during any Testing Period, (i) any positive Receipts Variance may be used to offset any negative Disbursements Variance for such Testing Period and (ii) any positive Disbursements Variance may be used to offset any negative Receipts Variance for such Testing Period (such limitations in clauses 1 and 2 above, the "DIP Budget Covenant").

8.10    Milestones. The Debtors shall comply with the following milestones (each, a "Case Milestone") by the dates set forth below (each, a "Specified Deadline") unless modified by the Orders and with the express written consent of the Required DIP Lenders:

(a)     no later than three (3) calendar days after the Petition Date, the Interim Order approving the DIP Facility shall be entered by the Bankruptcy Court;

(b)     no later than ten (10) calendar days following the Petition Date, the Company shall have executed an asset purchase agreement, in form and substance satisfactory to the DIP Lenders, pursuant to which a newly formed entity controlled by the DIP Lenders (or Affiliates or designees thereof) (the "Stalking Horse Purchaser") will purchase by credit bid substantially all assets of the Debtors that are used or useful in the operation of their business free and clear of all liens, claims, interests and encumbrances, subject only to higher or otherwise better offers (the "Stalking Horse Purchase Agreement");

(c)     no later than ten (10)calendar days after the Petition Date, the Debtors shall file with the Bankruptcy Court one or more motions, each in form and substance reasonably

satisfactory to the Required DIP Lenders, seeking approval of the Stalking Horse Purchase Agreement (the "<u>Sale Motion</u>" and, the transaction in respect thereof, the "<u>Sale Transaction</u>") and (ii) bidding procedures in connection with approval of the Sale Transaction (the "<u>Bid Procedures Motion</u>");

(d)    no later than thirty-one (31) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order establishing bidding procedures consistent with the Bidding Procedures Motion (such order, the "<u>Bidding Procedures Order</u>"), which order shall be reasonably satisfactory to the Required DIP Lenders;

(e)    no later than thirty-one (31) calendar days after the Petition Date, the Final Order approving the DIP Facility shall be entered by the Bankruptcy Court;

(f)    no later than forty-four (44) calendar days after the Petition Date, unless the DIP Agent otherwise agrees, submission of qualified bids in respect of the Sale Transaction;

(g)    no later than forty-six (46) calendar days after the Petition Date, the Borrower shall have held an auction in connection with the Sale Transaction;

(h)    no later than fifty-two (52) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Sale Transaction (the "<u>Sale Order</u>"), which order shall be satisfactory to the Required DIP Lenders; and

(i)    no later than fifty-five (55) calendar days after the Petition Date, the Borrower shall have consummated the Sale Transaction in accordance with the Sale Order.

Any Milestone falling on a day that is not a Business Day shall automatically extend to the next Business Day.

8.11    <u>Chief Restructuring Officer</u>.  On or prior to the Petition Date, Debtors shall retain a Chief Restructuring Officer approved by the DIP Agent, having such duties and authority as may be acceptable to the DIP Agent including, without limitation, the broadest possible authority consistent with that of a chief executive officer to direct and control the business and affairs of the Debtors.  Debtors shall retain such a Chief Restructuring Officer for the entirety of the Chapter 11 Case.

8.12    <u>Fees and Expenses</u>.  The Debtors shall pay the following fees and expenses, all of which are non-refundable:

8.12.1    <u>Agent Fee</u>.  On the Closing Date, the Debtors shall pay to the DIP Agent, for its own account, an upfront agent fee of $25,000 (the "<u>Agent Fee</u>"), which shall be fully earned and payable in kind as part of the Initial Borrowing on the Closing Date, subject to the entry of the Interim Order.

8.12.2    <u>Commitment Fee</u>.  On the Closing Date, the Debtors shall pay to the DIP Lenders, on a pro rata basis in accordance with their respective DIP Commitments, a commitment fee (the "<u>Commitment Fee</u>") equal to $90,000.00, which shall be fully earned and payable in kind as part of the Initial Borrowing on the Closing Date, subject to the entry of the Interim Order.

8.12.3   <u>Exit Fee</u>.  On the Maturity Date, the Debtors shall pay to the DIP Lenders, on a pro rata basis in accordance with their respective DIP Commitments as of the Closing Date, an exit fee (the "<u>Exit Fee</u>") equal to $90,000.00, which shall be fully earned on the Closing Date and payable in cash on the Maturity Date.

8.12.4   <u>Other Expenses</u>.  The Debtors shall reimburse the DIP Agent and the DIP Lenders for all reasonable and documented out-of-pocket costs and expenses, including the reasonable fees and disbursements of one lead outside counsel and one local outside counsel for each applicable jurisdiction to the DIP Secured Parties (including the fees and disbursements of advisors to counsel, but no more than one financial advisor), and other similar fees, costs and expenses incurred by the DIP Secured Parties in connection with the DIP Facility and the Bankruptcy Cases.

## SECTION 9.  EVENTS OF DEFAULT; RIGHTS AND REMEDIES ON DEFAULT

9.1   <u>Events of Default</u>. The occurrence of one or more of the following events shall constitute an "<u>Event of Default</u>":

(a)   the entry of an Interim Order or Final Order in form or substance that is not acceptable to the DIP Agent in its sole discretion;

(b)   failure by any Debtor to be in compliance in all respects with provisions of the DIP Facility and/or the Orders;

(c)   any request made by the Debtors for, or the reversal, modification, amendment, stay, reconsideration or vacatur of an Order, as entered by the Bankruptcy Court, without the prior written consent of the DIP Agent and each DIP Lender;

(d)   failure of any of the Case Milestones to be satisfied by the Specified Deadline (as such Specified Deadlines may be modified to accommodate the calendar of the Bankruptcy Court or extended by the DIP Agent);

(e)   failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by materiality, in all respects) when made;

(f)   the filing of any application by the Debtors (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Term Loans in full upon entry of the order approving such financing) for the approval of (or an order is entered by the Court approving) any claim arising under section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in the Chapter 11 Case which is pari passu with or senior to the DIP Liens, excluding liens arising under the Orders, or pursuant to any other financing agreement made with the prior written consent of the DIP Agent and each DIP Lender;

(g)   the commencement of any action by the Debtors or other authorized person (other than an action permitted by the Orders) against any of the DIP Agent or any DIP Lender or any of their agents and employees, to subordinate or avoid any liens made in connection with the Orders or to investigate or challenge the validity, perfection, priority, extent, or enforceability of the liens under the Prepetition Secured Notes;

(h)     (1) any Debtor files a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify any Order or this Agreement, or the disallow the Loans, in whole or in part, or (2) any material provision of the Orders or this Agreement, or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral (as defined in the Orders), shall for any reason cease to be valid and binding (without the prior written consent of the DIP Agent and each DIP Lender);

(i)     the filing with the Bankruptcy Court of a motion seeking approval of a sale under Section 363 (other than approval of a sale pursuant to the terms of the Stalking Horse Purchase Agreement) or a plan of reorganization or liquidation in the Chapter 11 Case that, in either case, does not provide for indefeasible payment in full in cash to the DIP Agent and the DIP Lenders of Loans and all other amounts outstanding under this Agreement or the Orders on closing of such sale or the effective date of such plan;

(j)     the appointment in the Chapter 11 Case of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code);

(k)     the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Case with respect to any portion of the DIP Collateral exceeding $150,000 in value in the aggregate;

(l)     failure to pay principal, interest or other any other obligation in respect of the Loans in full when due, including without limitation, on the Maturity Date;

(m)     (i) if the Chief Restructuring Officer is terminated or disqualified for any reason and Borrower has not appointed a replacement Chief Restructuring Officer acceptable to Prepetition Collateral Agent within five (5) Business Days thereafter, (ii) the terms of the Chief Restructuring Officer's engagement by the Borrower are modified in any manner not acceptable to Prepetition Collateral Agent, (iii) the Chief Restructuring Officer is instructed to cease working, (iv) the Chief Restructuring Officer's engagement by the Borrower, or any of the responsibilities, authority, powers, or duties of the Chief Restructuring Officer, is terminated, suspended, or restricted in any respect, or (v) the Chief Restructuring Officer resigns and Borrower has not engaged a replacement Chief Restructuring Officer acceptable to the Prepetition Collateral Agent within five (5) Business Days thereafter; and

(n)     (i) if an independent director is terminated or disqualified for any reason and Borrower has not appointed a replacement independent director acceptable to Prepetition Collateral Agent within five (5) Business Days thereafter, (ii) the terms of the independent director's engagement by Borrower are modified in any manner not acceptable to Prepetition Collateral Agent, (iii) the independent director is instructed to cease working, (iv) the independent director's engagement by Borrower, or any of the responsibilities, authority, powers, or duties of independent director, is terminated, suspended, or restricted in any respect, or (v) the independent director resigns and Borrower has not engaged a replacement independent director acceptable to the Prepetition Collateral Agent within five (5) Business Days thereafter.

9.2    Remedies Upon Event of Default.  Upon an Event of Default, the Debtors agree to use their best efforts to request to have an emergency hearing in the Borrower's Case within three (3) business days of receipt of written notice from the DIP Lenders of such Event of Default (the "Remedies Period").  Subject to the terms of the Orders, in the absence of the entry of an order by

the Bankruptcy Court during the Remedies Period, and provided that if the Debtors request an emergency hearing be held during such Remedies Period but such hearing is scheduled for a later date by the Court then the Remedies Period shall be automatically extended to the date of such hearing, then the DIP Agent may (and at the direction of the DIP Lenders, shall) take all or any actions permitted under applicable law, including the following actions without further order of or application to the Bankruptcy Court, and notwithstanding the automatic stay:

(a)    declare all Loans (including principal of, and accrued interest on, any outstanding Loans) to be immediately due and payable;

(b)    terminate any further commitment to lend to the Borrower without affecting any of the DIP Liens or DIP Obligations;

(c)    deliver a Carve-Out Trigger Notice (as defined in the Interim Order) to the Borrower; and/or

(d)    exercise rights and remedies pursuant to the terms of the Orders, or applicable law (including, without limitation, direct any or all of the Debtors (or file a motion in the name of the Debtors)), (i) to enforce the terms and provisions of this Agreement, (ii) to collect accounts receivable, without setoff by any account debtor, including direct the Debtors to collect such account receivables, (iii) to sell or otherwise dispose of any all of the DIP Collateral on terms and conditions reasonably acceptable to the DIP Agent and the DIP Lenders pursuant to sections 363, 365 and other applicable provisions of the Bankruptcy Code (and without limiting the foregoing, direct the Debtors (or file a motion in the name of the Debtors) to assume and assign any lease or executory contract included in the DIP Collateral to the DIP Agent's designees in accordance with and subject to section 365 of the Bankruptcy Code) and (iv) enter into the premises of any Debtor in connection with the orderly sale or disposition of the DIP Collateral (including, without limitation, complete any work in process); *provided* that, subject to the Orders, the Debtors shall take all action that is reasonably necessary to cooperate with the DIP Agent in the DIP Agent's exercise of its rights and remedies and facilitate the realization upon the DIP Collateral by the DIP Agent.

Subject to the terms of the Orders, in the absence of the entry of an order by the Bankruptcy Court within ten (10) days of receipt of written notice from the DIP Lenders of an Event of Default, the Prepetition Secured Note Parties may take all or any actions permitted under applicable law, including the following without further order of or application to the Bankruptcy Court, notwithstanding the automatic stay: terminate, reduce or restrict the ability of the Debtors to use Cash Collateral.

9.3    Power of Attorney. Each Debtor hereby irrevocably appoints each DIP Lender as its lawful attorney-in-fact, exercisable upon the occurrence and during the continuance of an Event of Default, to: (a) execute, acknowledge, and deliver all such deeds, assignments, consequences, powers of attorney and other instruments and papers as may be required to perfect the interest of such DIP Lender in and to the Intellectual Property included as part of the DIP Collateral; and (b) only upon three (3) days advance written notice (with electronic mail being sufficient) to the Debtors, transfer the DIP Collateral into the name of a DIP Lender or a third party to the fullest extent permitted by the Uniform Commercial Code.

9.4    No Waiver; Remedies Cumulative. DIP Lenders' failure, at any time or times, to require strict performance by the Debtors of any provision of this Agreement or any other Loan

Document shall not waive, affect, or diminish any right of DIP Lenders thereafter to demand strict performance and compliance herewith or therewith.  No waiver hereunder shall be effective unless signed by the party granting the waiver and then is only effective for the specific instance and purpose for which it is given.  DIP Lenders' rights and remedies under this Agreement and the other Loan Documents are cumulative.  DIP Lenders have all rights and remedies provided under the Uniform Commercial Code, by law, or in equity.  DIP Lenders' exercise of one right or remedy is not an election and shall not preclude DIP Lenders from exercising any other remedy under this Agreement or other remedy available at law or in equity, and DIP Lenders' waiver of any Event of Default is not a continuing waiver. DIP Lenders' delay in exercising any remedy is not a waiver, election, or acquiescence.

## SECTION 10.        GUARANTY

10.1    Each Guarantor hereby, jointly and severally, absolutely and unconditionally guarantees (the "Guaranty"), to the DIP Agent and the DIP Lenders and their respective successors and assigns, the full and prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of, all Obligations owed or hereafter owing to the DIP Agent and the DIP Lenders by the Borrower and each other Guarantor (the "Guaranteed Obligations").  Each Guarantor agrees that its guaranty obligation hereunder is a continuing guaranty of payment and performance and not of collection, is a primary obligation of each Guarantor and not merely a contract of surety, and that its obligations under this Section 10.1 shall be absolute and unconditional, irrespective of, and unaffected by:

10.1.1 the genuineness, validity, regularity, enforceability or any future amendment of, or change in, Agreement, any other Loan Document or any other agreement, document or instrument to which the Borrower or any Guarantor is or may become a party;

10.1.2 the absence of any action to enforce this Agreement or the waiver or consent by the DIP Agent or the DIP Lenders with respect to any of the provisions thereof;

10.1.3 the insolvency of the Borrower or any Guarantor; or

10.1.4 any other action or circumstances which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being agreed by each Guarantor that its obligations under this Section 10 shall not be discharged until the payment and performance, in full, in cash of the Obligations has occurred.

10.2    Each Guarantor shall be regarded, and shall be in the same position, as principal debtors with respect to the Obligations guaranteed hereunder.  The DIP Agent and the DIP Lenders may enforce this Guaranty upon the occurrence and during the continuance of an Event of Default notwithstanding the existence of any dispute between the Borrower and the DIP Agent or the DIP Lenders with respect to the existence of such Event of Default.  The obligations of each Guarantor hereunder are independent of the obligations of the Borrower and the obligations of any other Guarantor of the obligations of the Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor to enforce this Guaranty whether or not any action is brought against the Borrower or any of such other guarantors and whether or not the Borrower is joined in any such action or actions.

10.3    Each Guarantor acknowledges its grant of a security interest in its Collateral as provided in Section 6 above in connection with the Guaranty.

## SECTION 11.        MISCELLANEOUS

11.1    <u>Indemnity</u>. The Borrower shall defend, indemnify, pay and hold harmless, DIP Lenders, their respective Affiliates and their respective members, shareholders, partners, officers, managers, directors, trustees, employees, representatives and agents (each, an "<u>Indemnitee</u>"), from and against (i) any Taxes (other than any Tax on the overall net income of DIP Lenders) paid or incurred by such Indemnitee relating to, arising out of, or in connection with any Loan Document, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority, and (ii) any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations, on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of this Agreement or any Loan Document or the transactions contemplated hereby or thereby (including DIP Lenders' agreement to make a Loan or the use or intended use of the proceeds thereof, or any enforcement of any of the Loan Documents); provided, that the Borrower shall have no obligation to any Indemnitee hereunder with respect to the foregoing to the extent arising from the gross negligence or willful misconduct of that Indemnitee.  Notwithstanding any contrary provision in this Agreement, the obligation of the Borrower with respect to each indemnity given by it in this Agreement or any of the other Loan Documents shall survive the payment in full of the Obligations and the termination of this Agreement.  Notwithstanding the foregoing, in no event shall an Indemnitee hereunder be considered to include Joseph Sanberg or any entity he currently controls or previously controlled in respect to any and all actions prior to the date of this Agreement.

11.2    <u>Modification of Agreement.</u> This Agreement may not be modified, altered or amended, except by an agreement in writing signed by the Borrower and DIP Lenders.

11.3    <u>DIP Lenders</u>. Except as expressly provided otherwise hereunder, the DIP Lenders shall be jointly and severally liable for their obligations hereunder, including the making of the DIP Term Loans.  Borrower shall have the right to rely on any action, request or notice from any DIP Lender without any duty to inquire about such DIP Lender's authority therefor, and he act of any DIP Lender shall bind the DIP Lenders collectively.

11.4    <u>Severability</u>. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any provision of this Agreement shall be prohibited by or invalid under Applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

11.5    <u>Successors and Assigns</u>. The Borrower shall not sell, assign or transfer any interest in this Agreement, any of the other Loan Documents, or any of the Obligations, or any portion thereof, including Borrower's rights, title, interests, remedies, powers, and duties hereunder or thereunder, without DIP Lenders' prior written consent.  DIP Lenders shall be free to sell, assign or transfer any interest in this Agreement, any of the other Loan Documents or any of the Obligations, or any portion thereof, and to syndicate the Loan (or any portion thereof), to any Person or Persons selected by DIP Lenders in their sole discretion without Borrower's consent. Subject to the foregoing, this Agreement and the Loan Documents shall be binding upon and inure to the benefit of the successors and permitted assigns of the Borrower and DIP Lenders.

11.6    <u>Execution in Counterparts</u>. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.

11.7    <u>Notice</u>. All notices, requests and other communications to any party hereunder shall be in writing (including electronic mail) and shall be given,

if to the Borrowers:

> 548 Market Street
> PMB 72015
> San Francisco, CA 94101-5401
> Attention: Robert Z. Lee
> Email: rob@catona.com

with copies to:

> Miles Staglik
> Chief Restructuring Officer
> 13355 Noel Road, Suite 2005
> Dallas, TX 75240
> CTN Holdings, Inc.
> Email: miles.staglik@cr3partners.com

and

> David W. Gaffey, Esq.
> Whiteford, Taylor & Preston, LLP
> 3190 Fairview Park Drive, Suite 800
> Falls Church, VA | 22042
> Email: dgaffey@whitefordlaw.com

if to Lender:

> Inherent Group, LP
> 450 Lexington Avenue, #4503
> New York, NY 10163
> Attention: Michael Ellis
> Email: admin@inherentgroup.com

with copies (which shall not constitute notice) to:

> Robert J. Dehney, Esquire
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 North Market Street, 16th Flr.
> P.O. Box 1347
> Wilmington, DE  19899-1347
> Email: RDehney@morrisnichols.com

or to such other address or email and with such other copies, as such party may hereafter specify for such purpose by notice to the other party.  Each such notice, request or other communication shall be effective (a) on the day delivered (or if that day is not a Business Day, or if delivered after 11:59 p.m., U.S. Eastern Time, on a Business Day, on the first following day that is a Business Day) when (i) delivered personally against receipt or (ii) sent by overnight courier, (b) on the day sent if sent by email with delivery confirmation or no receipt of delivery failure and (c) if given by any other means, upon delivery or refusal of delivery at the address specified in this Section 11.8.

11.8    <u>DIP Lenders' Consent</u>. Whenever DIP Lenders' consent is required to be obtained under this Agreement or any of the Loan Documents as a condition to any action, inaction, condition or event, DIP Lenders shall be authorized to give or withhold such consent in their sole and absolute discretion and to condition its consent upon the giving of collateral security for the Obligations, the payment of money or any other matter, and to provide such consent by electronic mail.

11.9    <u>Entire Agreement</u>. This Agreement, together with all other instruments, agreements and certificates executed by the parties in connection therewith or with reference thereto, embody the entire understanding and agreement between the parties hereto and thereto with respect to the subject matter hereof and thereof and supersede all prior agreements, understandings and inducements, whether express or implied, oral or written.  This Agreement may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties.  There are no oral agreements between the parties.  Each of the exhibits and schedules attached hereto are incorporated into this Agreement and by this reference made a part hereof.

**11.10  GOVERNING LAW; SUBMISSION TO JURISDICTION.  THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK (WITHOUT REGARD TO THE CHOICE OF LAW PROVISIONS THEREOF), EXCEPT AS GOVERNED BY THE BANKRUPTCY CODE.  ANY PROCEEDING SEEKING TO ENFORCE ANY PROVISION OF, OR BASED ON ANY MATTER ARISING OUT OF OR IN**

CONNECTION WITH, THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT AND EACH OF THE PARTIES HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT (AND OF THE APPROPRIATE APPELLATE COURTS) IN ANY SUCH PROCEEDING AND WAIVES ANY OBJECTION TO VENUE LAID THEREIN. PROCESS IN ANY SUCH PROCEEDING MAY BE SERVED ON ANY PARTY ANYWHERE IN THE WORLD, WHETHER WITHIN OR WITHOUT THE STATE OF NEW YORK. WITHOUT LIMITING THE FOREGOING, BORROWER AND DIP LENDERS AGREE THAT SERVICE OF PROCESS UPON SUCH PARTY AT THE ADDRESS REFERRED TO IN SECTION 11.8, TOGETHER WITH WRITTEN NOTICE OF SUCH SERVICE TO SUCH PARTY, SHALL BE DEEMED EFFECTIVE SERVICE OF PROCESS UPON SUCH PARTY. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING (INCLUDING ANY COUNTERCLAIM) ARISING OUT OF OR BASED UPON THIS AGREEMENT. NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT.

**11.11** **WAIVERS BY BORROWER**. **THE BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES (i) TO THE FULLEST EXTENT PROVIDED BY APPLICABLE LAW, THE RIGHT TO TRIAL BY JURY (WHICH DIP LENDERS HEREBY ALSO WAIVES) IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM OF ANY KIND ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE OBLIGATIONS; (ii) THE BENEFIT OF ALL VALUATION, APPRAISEMENT AND EXEMPTION LAWS; AND (iii) NOTICE OF ACCEPTANCE HEREOF. THE BORROWER ACKNOWLEDGES THAT THE FOREGOING WAIVERS ARE A MATERIAL INDUCEMENT TO DIP LENDERS' ENTERING INTO THIS AGREEMENT AND THAT DIP LENDERS ARE RELYING UPON THE FOREGOING WAIVERS IN ITS FUTURE DEALINGS WITH BORROWER.**

11.12    Certain Matters of Construction. The headings of each Loan Document are inserted for convenience only and shall not affect the meaning or interpretation of such Loan Document or any provisions thereof. The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. Any pronoun used shall be deemed to cover all genders. The section titles, table of contents and list of exhibits appear as a matter of convenience only and shall not affect the interpretation of the Agreement. All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations. All references to any of the Loan Documents shall include any and all modifications thereto and any and all extensions or renewals thereof. All references to any Person shall mean and include successors and permitted assigns of such Person. All references to "including" and "include" shall be understood to mean "including, without limitation". Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference. References herein to

any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided.

[Signature Page Follows]

IN WITNESS WHEREOF, this Agreement has been duly executed on the date first set forth above.

BORROWER:

**CTN HOLDINGS, INC.**, a Delaware corporation


By:_____
Name: Miles Staglik
Title: Chief Restructuring Officer

GUARANTORS:

**MAKE EARTH GREEN AGAIN, LLC**, a Delaware limited liability company

By: CTN Holdings, Inc., its Managing Member

By:_____
Name: Miles Staglik
Title: Chief Restructuring Officer

**ASPIRATION QFZ, LLC**, a Delaware limited liability company


By: CTN Holdings, Inc., its Managing Member

By:_____
Name: Miles Staglik
Title: Chief Restructuring Officer

**CARBON SEQUESTRATION III, LLC**, a Delaware limited liability company


By: Make Earth Green Again, its Sole Member

By:_____
Name: Miles Staglik
Title: Chief Restructuring Officer

**CARBON SEQUESTRATION I, LLC**, a Delaware limited liability company


By: Make Earth Green Again, its Sole Member

By:_____
Name: Miles Staglik
Title: Chief Restructuring Officer

**CARBON SEQUESTRATION II, LLC**, a Delaware limited liability company


By: CTN Holdings, Inc., its Managing Member

By:_____
Name: Miles Staglik
Title: Chief Restructuring Officer

**REFORESTATION INITIATIVES I, LLC**, a Delaware limited liability company


By: Make Earth Green Again, its Sole Member

By:_____
Name: Miles Staglik
Title: Chief Restructuring Officer


**REFORESTATION INITIATIVES II, LLC**, a Delaware limited liability company


By: Make Earth Green Again, its Sole Member

By:_____
Name: Miles Staglik
Title: Chief Restructuring Officer

**ZERO CARBON HOLDINGS, LLC**, a Wyoming limited liability company


By: CTN Holdings, Inc., its Managing Member

By:_____
Name: Miles Staglik
Title: Chief Restructuring Officer

**CATONA CLIMATE SOLUTIONS, LLC**, a Delaware limited liability company


By: CTN Holdings, Inc., its Managing Member

By:_____
Name: Miles Staglik
Title: Chief Restructuring Officer



Address for Notices of the Debtors:


13355 Noel Road, Suite 2005
Dallas, Texas 75240
Attention: Miles Staglik, Chief
Restructuring Officer
Email: miles.staglik@cr3partners.com

ACCEPTED AND AGREED:
<u>LENDER</u>:

INHERENT ASPIRATION, LLC

By: Inherent Aspiration MM, LLC, its Managing Member
By: Inherent Group, LP, its Managing Member
By: Inherent Group GP, LLC, its general partner


By: _____
Name:  Michael Ellis
Title:   Chief Operating Officer

Address for Notices:

Inherent Group, LP
450 Lexington Avenue, #4503
New York, NY 10163
Attention: Michael Ellis
Email: admin@inherentgroup.com




<u>DIP AGENT</u>:

INHERENT GROUP, LP

By: Inherent Group GP, LLC, its general partner


By: _____
Name:  Michael Ellis
Title:   Chief Operating Officer

Address for Notices:

Inherent Group, LP
450 Lexington Avenue, #4503
New York, NY 10163
Attention: Michael Ellis
Email: admin@inherentgroup.com

18814507.8

**EXHIBIT A**

Form of Note

[See attached.]

## SECURED PROMISSORY NOTE

$4,210,000.00                                                        March 30, 2025

FOR VALUE RECEIVED, the undersigned, CTN Holdings, Inc., a Delaware corporation (the "Borrower"), promises to pay to the order of  Inherent Aspiration, LLC, a Delaware limited liability company, or its assigns (the "Holder"), the principal sum of four million two hundred ten thousand ($4,210,000.00) DOLLARS, together with interest from March 30, 2025, at the fixed rate of twelve percent (12%) per annum (unless the Default Rate applies), pursuant to the provisions of (a) this Secured Promissory Note (this "Note") and (b) that certain Superpriority Senior Secured Debtor-in-Possession Loan and Security Agreement dated as of March 30, 2025 (the "Agreement") between the Borrower, Holder and Guarantors. Capitalized terms that are not otherwise defined herein have the meanings given to such terms in the Agreement.

Pursuant to this Note, Borrower acknowledges receipt of the full amount of the DIP Term Loans from Holder. Borrower promises to pay the principal amount of the Loan then outstanding, interest thereon, and all other Obligations, as follows:

All payments hereunder shall be applied first on account of late charges, then on account of the interest then due at the applicable interest rate of this Note on the unpaid balance of the DIP Term Loans, then on account of reimbursement for advances or other Obligations made by or owed to Holder pursuant to this Note, the Agreement or any other Loan Document, and the remainder thereof shall be applied on account of the principal outstanding amount of the DIP Term Loans until all Obligations are paid in full.

The entire balance of principal and interest on the DIP Term Loans and all other Obligations shall be paid as set forth herein not later than the Maturity Date, or at any time prior thereto, immediately and without notice upon the occurrence and continuation of an Event of Default.

Borrower waives, to the greatest extent permitted by law, diligence, demand, presentment for payment, notice of nonpayment, protest and notice of protest, and notice of any renewals or extensions of this Note, and all rights under any statues of limitations, and agree that the time for payment of this Note may be changed or extended without affecting or impairing their own liability hereunder or under any other Loan Document, and further consents to release, settlement or subordination of all or any part of the DIP Collateral for the payment of the Obligations, or the release of any other Party liable for any or all of the Obligations without affecting or impairing their own liability, hereunder or under any other Loan Document.

Notwithstanding anything herein to the contrary, the total interest charged on the principal amount owing hereunder from time to time shall never exceed the maximum amount allowed by law, and Borrower shall not be bound or obligated to pay any interest hereunder in excess of such amount.  If and to the extent the interest on the DIP Term Loans or any other payment required hereunder would exceed the maximum interest for such loans, then to such extent, the payment(s) shall be deemed a partial prepayment of principal.

Borrower warrants and represents that the purpose of the DIP Term Loans evidenced by this Note is a business purpose, and that the purpose of the loan evidenced by this Note is not a personal, household or other consumer purpose.

Holder may assign any or all of its rights and obligations hereunder to any other Person. Borrower is prohibited from assigning any or all of its rights and obligations hereunder to any other Person without the prior written consent of Holder.  Wherever the context shall so require, the singular and plural shall mean each other and the masculine, feminine and neutral genders shall mean each other.  This Note and the Obligations shall be governed in all respects by the laws of the State of New York and Borrower submits to the exclusive jurisdiction of the federal and state courts located in New York with respect to all matters concerning this Note, the DIP Term Loans, the other Obligations and the other Loan Documents.

[Signature Page Follows]

IN WITNESS WHEREOF, this Note has been executed and delivered by Borrower's duly authorized representative as of the date first written above.

<u>BORROWER</u>:

**CTN HOLDINGS, INC.**, a Delaware corporation

By:_____
Name: Miles Staglik
Title: Chief Restructuring Officer