**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CTN HOLDINGS, INC., *et al.*,[1] | Case No. 25-10603 (TMH) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF MILES STAGLIK**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

I, Miles Staglik, hereby declare under penalty of perjury, the following:

1.      I am a managing director at CR3 Partners ("**CR3**"), and I currently serve as Chief Restructuring Officer of the above-captioned debtors and debtors in possession (together, the "**Debtors**," and each a "**Debtor**").

2.      I have over 15 years of experience in distressed transactions, including in- and out-of-court restructurings, operational turnarounds, balance sheet restructurings, business cost rationalizations, strategic opportunity identification, debt and equity capital raising, mergers and acquisitions, divestitures, and financial modeling and forecasting. I routinely serve as a Chief Restructuring Officer for companies ranging in size from $25 million to $800 million in revenue, assist clients with liquidity solutions, assess business plan viability, structure plans of reorganization, and conduct recapitalization and asset sale processes.

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are CTN Holdings, Inc. (9122), CTN SPV Holdings, LLC (8689), Make Earth Green Again, LLC (4441), Aspiration QFZ, LLC (1532), Aspiration Fund Adviser, LLC (4214), Catona Climate Solutions, LLC (3375) and Zero Carbon Holdings, LLC (1679). The mailing address for the Debtors is 548 Market Street, PMB 72015, San Francisco, CA 94101-5401.

3.        I submit this declaration (the "**Declaration**") in support of the Debtors' chapter 11 petitions and First Day Motions (as defined below) and to provide information to the Court and parties in interest regarding the Debtors.

4.        As a result of my tenure with the Debtors, I am familiar with the day-to-day operations and business and financial affairs of the Debtors. Except as otherwise indicated herein, all statements set forth in this Declaration are based upon my personal knowledge, information supplied to me by the other members of the Debtors' management or the Debtors' professionals, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial conditions and the industry in which the Debtors operate. If called as a witness, I could and would competently testify to the matters set forth in this Declaration.

5.        On March 30, 2025 (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"). The Debtors intend to operate their business and manage their property as debtors in possession.

6.        Part I of this Declaration provides background with respect to the Debtors' business, capital structure, and the events leading to the commencement of these chapter 11 cases (the "**Chapter 11 Cases**"). Part II sets forth the relevant facts in support of the First Day Motions (defined below).

## INTRODUCTION

7.        The Debtors are a climate finance company that delivers high-quality carbon solutions to businesses everywhere, bridging the gap between and connecting companies with robust decarbonization plans to a breadth of carbon removal projects.

8.      Drawing on deep industry expertise and relationships, the Debtors have developed the commercial framework and strategic partnerships to connect carbon supply, enterprise demand and third-party capital, ultimately creating lasting value for their customers. Beyond capital investment, the Debtors provide strategic guidance, operational support, and market insights to help businesses drive and scale positive climate impact around the world. Committed to innovation and operational excellence, the Debtors foster sustainable growth across its portfolio, accelerating the transition to a more resilient future.

9.      The Debtors have filed the Chapter 11 Cases to facilitate a value maximizing sale of their assets under section 363 of the Bankruptcy Code.

10.      The parties expect the sale process (the "**Sale Process**"), for which bidding procedures are forthcoming, providing for the sale of substantially all of the assets of the Debtors that are used or useful in the operation of the Debtors' business.

11.      The current timeline contemplated for the proposed Sale Process is as follows:

| Event | Deadline |
|---|---|
| Deadline for Debtors and DIP Lender to execute Stalking Horse Purchase Agreement | 10 days after the Petition Date |
| Deadline for Debtors to file Bidding Procedures Motion | 10 days after the Petition Date |
| Deadline for entry of Bidding Procedures Order | 31 days after the Petition Date |
| Deadline for submission of Qualified Bids | 44 days after the Petition Date |
| Deadline for Debtors to hold Auction | 46 days after the Petition Date |
| Deadline for entry of Sale Order | 52 days after the Petition Date |
| Deadline to consummate Approved Sale | 55 days after the Petition Date |

12.      To preserve the Debtors' assets and going concern, maintain operations, and facilitate the Sale Process, the Debtors have secured a debtor-in-possession financing facility (the

"**DIP Facility**") from prepetition secured noteholder Inherent Aspiration, LLC (the "**DIP Lender**") with an aggregate "new money" principal commitment of up to $4.21 million.

13.     Funding will be available in two tranches, with $2.21 million available upon entry of the interim order approving the DIP Facility and the balance available upon entry of the final order approving the DIP Facility. The terms of the DIP Facility are further described in the DIP Motion (defined herein) filed contemporaneously with this Declaration.

### I.     BACKGROUND OF DEBTORS AND CERTAIN EVENTS PRECEDING FILING OF CHAPTER 11 CASES

#### A.  General Background

14.     The Debtors' current business, which has existed in various forms since 2022, sources and secures funding for carbon projects and sells the resulting carbon credits to enterprise clients.

15.     The Debtors' clients include large scale enterprise companies, which acquire carbon credits from the Debtors through a variety of offerings.

16.     To ensure a reliable supply of the highest quality carbon credits, the Debtors partner with project developers by providing, without limitation, financial investment, project monitoring, technical assistance and marketing services to these carbon credit generators. The Debtors' project network includes projects located around the globe, including in the United States, Uganda, Argentina, Kenya, Colombia and Brazil. Through their efforts, the Debtors have amassed a carbon credit pipeline volume in excess of 100 million tons of carbon.

#### B.  Events Leading to Bankruptcy

17.     The Chapter 11 Cases and the Sale Process afford the Debtors an opportunity to preserve their carbon credit business while restructuring the debt encumbering the Debtors' going concern. The Debtors' historical business has included lines other than its carbon credit

business. Most of these non-carbon credit business lines have either been closed or spun-off; however, the Debtors still suffer under the weight of legacy liabilities, including substantial shareholder and trade litigation. It is my belief that all stakeholders will benefit from this value maximizing strategy proposed for the Chapter 11 Cases.

18.     In the lead-up to the Petition Date, the Debtors had been utilizing capital infusions from investors, principally from entities[2] related to one of the Debtors' founding investors Joseph Sanberg (the "**Investor**"). The Investor ceased making capital infusions into the Debtors in February 2025.

19.     On February 28, 2025, the Department of Justice filed a criminal complaint against the Investor related to his personal conduct alleged to have occurred between April 2020 and February 2023.[3] Based on my understanding, the allegations do not implicate the Debtors in any criminal activity, and the Debtors' current leadership and employees were unaware of, and the Debtors are themselves victims of, the Investor's alleged conduct. For the avoidance of doubt, the Investor no longer holds any positions or roles with the Debtors and is no longer involved in any capacity with the Debtors' operations. Unfortunately, and notwithstanding the foregoing, the criminal proceeding against the Investor has adversely impacted the Debtors' ability to find replacement capital for immediate operational needs.

20.     On or around March 4, 2025, the Debtors contacted the DIP Lender, which is one of the Debtors' Prepetition Secured Noteholders (defined below), notifying it they lacked

---

[2]     Including, but not limited to, AGO Special Situations Credit, LP

[3]     Related to the same alleged conduct, the Department of Justice charged Ibrahim Ameen Alhusseini with wire fraud, to which Mr. Alhusseini has pled guilty.

Similar to the Investor, Mr. Alhusseini no longer holds any positions or roles with the Debtors and is no longer involved in any capacity with the Debtors' operations.

sufficient funds to cover critical and immediate expenses, including payroll, and no longer had access to funding sources sufficient to cover these needs.

21.     The Debtors requested additional contributions from the DIP Lender to cover these necessary expenses.

22.     On March 11, 2025, the DIP Lender advanced $400,000 to the Debtors to cover payroll, insurance, taxes and other critical items and to allow the Debtors time to obtain other financing.  The Debtors were unable to locate any other financing sufficient to meet their needs.

23.     On March 21, 2025, the DIP Lender advanced an additional $75,000 to the Debtors to retain bankruptcy counsel in preparation of a chapter 11 bankruptcy filing.  On March 25, 2025, the DIP Lender provided a third advance of $700,000 to the Debtors as a further bridge loan to cover payroll, taxes and other operating expenses as well as to fund additional retainers for the Debtors' restructuring professionals. The Debtors and the DIP Lender understood and intended that the total $1.175 million advanced by the DIP Lender to be pre-debtor in possession financing in connection with the Debtors' planned bankruptcy filings (the "**Prepetition Lender Financing**").

24.     In addition to the Prepetition Lender Financing, the DIP Lender has committed to providing the DIP Facility to fund the Debtors' go forward operations in the Chapter 11 Cases and to facilitate the Sale Process.

25.     Since much of the Debtors' revenue is tied to forward-looking contracts, the Debtors are not expecting cash inflows from revenues during the pendency of the Chapter 11 Cases.

26.     Thus, the Debtors are reliant on the funds committed under the DIP Facility to execute on their bankruptcy strategy. In the absence of immediate approval of the DIP Facility on

an interim basis, the Debtors will not have sufficient funds to maintain operations or proceed with the proposed Sale Process.

27.     Prior to the Petition Date, I conducted due diligence concerning other potential sources of debtor in possession financing for the Chapter 11 Cases. My team and I contacted over ten (10) alternative lenders as potential financing sources to determine whether such parties had an interest in providing financing. None of these lenders were interested in providing financing on terms better than the DIP Facility.

28.     We also contacted Oaktree Capital Management, LP, one of the Debtors' investors and claimants under the Prepetition Subordinated Debt, who declined to provide debtor in possession financing to the Debtors.

29.     Additionally, the Debtors, over the prior few months, contacted over thirteen (13) existing investors in the Debtors and none were willing to provide debtor in possession financing.

30.     Consequently, the Debtors have been and continue to be unable to obtain financing on more favorable terms from the financing committed under the DIP Facility.

31.     I further believe that the DIP Facility will provide the Debtors with the liquidity required to administer the Chapter 11 Cases and pursue the Sale Process in a manner that maximizes value for all stakeholders.

32.     To the best of my knowledge, and based on the information provided to me by the Debtors since my engagement on March 10, 2025, I believe that any contracts or potential interests in other ventures of the Debtors likely require, among other things, material capital outlays and long term horizons before any potential value could be realized for creditors.

33.     Further, to the best of my knowledge, the universe of potentially interested parties who may be interested in purchasing the Debtors' assets may be small due to the significant capital outlays and risks associated with the business, as well as the long-time horizon for realizing a return for creditors and other parties in interest. An expedited marketing period targeted to these potential buyers, like the proposed Sale Process, strikes an appropriate balance between the Debtors' current cash situation and the need to test the market for the Debtors' assets.

### C. Prepetition Capital Structure

34.     As of the Petition Date, the Debtors estimate that they have, in the aggregate, approximately $170 million in debt obligations.

35.     *Prepetition Secured Notes*. The Debtors are party, as set forth in more detail below, to that certain *Third Amended and Restated Senior Secured Promissory Note and Guaranty*, dated as of October 30, 2024, as amended by the *First Amendment* thereto dated as of December 30, 2024, as amended by the *Second Amendment* thereto dated as of March 11, 2025, and as amended by the *Third Amendment* thereto dated as of March 24, 2025 (as further amended, restated, supplemented or otherwise modified prior to the Petition Date, collectively, the "**Prepetition Secured Notes**", and the obligations thereunder, the "**Prepetition Secured Note Obligations**"), and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date (collectively, the "**Prepetition Secured Note Documents**", and the loans issued pursuant thereto, the "**Prepetition Secured Loans**"), by and among (1) CTN Holdings, Inc., as issuer (the "**Prepetition Secured Note Issuer**"), (2) Make Earth Green Again, LLC, Aspiration QFZ,

LLC, Carbon Sequestration I, LLC, Carbon Sequestration II, LLC, Carbon Sequestration III, LLC, Reforestation Initiatives I, LLC, Reforestation Initiatives II, LLC, Zero Carbon Holdings, LLC, and Catona Climate Solutions, LLC (each, a "**Prepetition Secured Note Guarantors**" and together with the Prepetition Secured Note Issuer, the "**Prepetition Secured Loan Parties**"), (3) Inherent Aspiration LLC, AGO Special Situations LP, Zion Consulting and Advisory LLC, and Mark Villanueva, as holders (the "**Prepetition Secured Note Holders**") and (4) Inherent Group, LP, as collateral agent (in such capacity, the "**Prepetition Collateral Agent**", together with the Prepetition Secured Note Holders, the "**Prepetition Secured Parties**").

36.     The Debtors estimate that, as of the Petition Date, the aggregate amount owed under the Prepetition Secured Note Obligations totals approximately $61.5 million.

37.     Prepetition Secured Note Holder Inherent Aspiration, LLC has valid perfected and unavoidable liens on substantially all of the Debtors' assets.

38.     *Prepetition Subordinated Debt*. The Debtors are purportedly party to certain secured indebtedness subordinated to the Prepetition Secured Notes Obligations (the "**Prepetition Subordinated Debt**"), which is asserted by, among others, AGO Special Situations Credit, LP, AGO Special Situations II LP, Harmony Holdings, LLC, Lonsdale Group Limited, Long Live Bruce, LLC and OCM Aspiration Holdings, LLC. The Debtors estimate that, as of the Petition Date, the aggregate amount purportedly owed on the Prepetition Subordinated Debt totals approximately $49.8 million.

39.     *Unsecured Claims*. The Debtors estimate that, as of the Petition Date, they have approximately $55.6 million in vendor and other unsecured obligations.

40.     *Equity*. Debtor CTN Holdings, Inc., which is the Debtors' holding company, is a private company that, as of March 12, 2025, has the following stock issued and outstanding: (a)

45,498,680 shares of common stock; and (b) 73,769,834 shares of preferred stock of varying classes. Debtor CTN Holdings, Inc. also has 22,625,741 in various stock warrants, options and restricted stock units issued and outstanding.

**D. Debtors' Prepetition Corporate Structure**

41.     Debtor CTN Holdings, Inc. owns one hundred percent (100%) of the remaining Debtor entities. It is also the sole member of a 501(c)(3) organization that has not filed for bankruptcy. Debtor Make Earth Green Again, LLC owns one hundred percent (100%) of multiple non-debtor special purposes entities, which have not filed for bankruptcy. The chart attached hereto as **Exhibit A** depicts the relationship between the Debtors and their non-Debtor affiliates.

**II.     FACTS IN SUPPORT OF FIRST DAY MOTIONS**

42.     Concurrently with this Declaration, the Debtors have filed various motions and applications seeking immediate or expedited relief (collectively, the "**First Day Motions**") to minimize the adverse effects of the Debtors' filing for chapter 11 protection, and to enhance the Debtors' ability to maximize value for the benefit of their estates and creditors through the contemplated Sale Process.

43.     The First Day Motions include the following pleadings:

a.     *Debtor's Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases* (the "**Joint Administration Motion**");

b.     *Debtors' Application for Appointment of Kurtzman Carson Consultants, LLC dba Verita Global as Claims and Noticing Agent Effective as of the Petition Date* (the "**Claims and Noticing Agent Retention Application**");

c.     *Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Operate Their Existing Cash Management System, (B) Pay or Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Their Bank Accounts, Existing Business Forms and Corporate Card Program, and (D) Implement Changes to the Existing*

*Cash Management System as Necessary, (II) Waiving Deposit and Investment Requirements, (III) Allowing Intercompany Transactions and Affording Administrative Expense Priority to Postpetition Intercompany Claims, and (IV) Granting Related Relief* (the "**Cash Management Motion**");

d.   *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Maintain Employee Benefits Programs and (II) Granting Related Relief* (the "**Wages Motion**");

e.   *Debtors' Motion for Entry of an Order Authorizing the Debtors to Reject an Unexpired Lease of Nonresidential Real Property and Abandon Personal Property Effective as of the Petition Date* (the "**Lease Rejection Motion**");

f.   *Debtors' Motion for Entry of Interim and Final Orders Establishing Notification and Hearing Procedures for, and Approving Restrictions on, Certain Acquisitions or Transfers of, and Declarations of Worthlessness with Respect to, Interests in the Debtors' Estates* (the "**Tax Attributes Motion**");

g.   *Debtors' Motion for Entry of an Order (I) Authorizing Debtors to Seal Certain Personally Identifiable Information for Individuals and (II) Granting Related Relief* ("**Seal Motion**"); and

h.   *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Term Loan Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Hearing and (VI) Granting Related Relief* (the "**DIP Motion**").

44.    I am familiar with the contents of each First Day Motion (including the exhibits to such motions), and, if called as a witness, I could and would competently testify to the contents set forth therein.

45.    I believe that the relief sought in each motion: (a) will enable the Debtors to continue their operations and preserve the value of their assets; (b) is critical to the Debtors' chapter 11 efforts; (c) best serves the interests of the Debtors' estates and creditors; and (d) with

respect to each First Day Motion, is necessary to avoid immediate and irreparable harm for the reasons described therein.

46.     Further, it is my belief that the relief sought in the motions is in each case narrowly tailored and necessary to achieve the goals identified above.

47.     Each of the motions are summarized below.

**A.  *Joint Administration Motion***

48.     Pursuant to the Joint Administration Motion, the Debtors seek the joint administration of the Chapter 11 Cases for procedural purposes only. The Debtors are each affiliates of each other.  I understand that it would be far more efficient for the administration of the Chapter 11 Cases if the Court were to authorize their joint administration. I understand that many of the motions, hearings, and other matters involved in the Chapter 11 Cases will affect multiple and/or all of the Debtors. I understand that joint administration will reduce costs and facilitate the administrative process by avoiding the need for duplicative hearings, notices, applications and orders. I understand that the relief sought is solely procedural and is not intended to affect substantive rights.

**B.  *Claims and Noticing Agent Retention Application***

49.     Pursuant to the Claims and Noticing Agent Retention Application, the Debtors seek appointment of Kurtzman Carson Consultants, LLC, d/b/a Verita Global ("**Verita**"), to assume full responsibility for, among other things, the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Chapter 11 Cases. I understand that Verita is a data-processing firm with extensive experience in noticing, claims processing, and other administrative tasks in chapter 11 cases. The Debtors' selection of Verita satisfies the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C.*

12

*§ 156(c),* in that the Debtors have obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process. Moreover, I believe, based on all engagement proposals obtained and reviewed, that Verita's rates are competitive and reasonable given Verita's quality of services and expertise.

50.     By separate application, the Debtors will seek authorization to retain and employ Verita as administrative agent in the Chapter 11 Cases pursuant to section 327(a) of the Bankruptcy Code because the administration of these chapter 11 cases will require Verita to perform duties outside the scope of 28 U.S.C. § 156(c).

### C. *Cash Management Motion*

51.     The Debtors have filed the Cash Management Motion[4] seeking authorization to: (i) continue to operate the Cash Management System, (ii) pay or honor Prepetition Bank Fees, (iii) maintain existing Bank Accounts, existing Business Forms and the existing Corporate Card Program, (iv) implement changes to the Cash Management System as necessary, (v) waive the requirements of section 345(b) of the Bankruptcy Code, Local Rule 2015-2, and section 2 of the U.S. Trustee Guidelines with respect to certain Bank Accounts, (vi) allow the Debtors to continue to enter into and perform Intercompany Transactions and afford post-petition Intercompany Claims administrative expense priority treatment under sections 503(b)(1) and 364(a) of the Bankruptcy Code, and (vii) granting certain related relief.

52.     The Debtors' Cash Management System is centrally managed by the Debtors and all funds are in U.S. dollars. The Debtors maintain daily oversight of the Cash Management System and implement cash management controls for entering, processing and releasing funds.

---

[4]     Each defined term in this section not otherwise defined in the Declaration shall have the meaning ascribed thereto in the Cash Management Motion.

Additionally, the Debtors regularly reconcile books and records to ensure that all transfers are accounted for properly.

53.     The Debtors' Cash Management System is generally operated through accounts with Burke & Herbet Bank ("**B&H**") and Silicon Valley Bank, a division of First-Citizens Bank & Trust Company ("**SVB**").

54.     The Debtors also maintain accounts with Coastal Community Bank ("**CCB**" and together with B&H and SVB, the "**Banks**").

55.     This system comprises eight (8) total Bank Accounts. Four (4) of the Bank Accounts are either not actively used or are used rarely, while two (2) of the Bank Accounts are generally used for collecting and disbursing the Debtors' funds. The remaining two (2) Bank Accounts are: (a) a money market Bank Account with SVB that supports a letter of credit; and (b) a Bank Account with CCB created as a reserve for funding certain expenses.

56.     Disbursements made by check are controlled by a single employee. Certain disbursements from the Bank Accounts made by wire transfer and ACH require dual approval, although the Debtors have established certain automated ACH transfers and scheduled bill payments that do not require dual approval. Disbursements are generally made from the B&H Bank Account, although the Debtors make international wire transfers through their SVB Bank Accounts.

57.     The Debtors also utilize Rippling, the Debtors' online workforce management system, to facilitate certain ACH transfers and other disbursements.

58.     As part of their Cash Management System, the Debtors have checks, preprinted business forms including business letterhead, purchase orders, invoices, envelopes, promotional

materials and other business forms and correspondence in the ordinary course of business (collectively, the "**Business Forms**").

59.     As part of the Cash Management System, in the ordinary course of business, the Debtors maintain certain virtual corporate credit cards (the "**Corporate Cards**") that are used to pay for certain work-related expenses (collectively, the "**Corporate Card Program**"), including general corporate purchases and payments, travel expenses, vendor expenses and online domain and hosting expenses. The Corporate Cards are paid off on a bi-weekly basis through automatically scheduled ACH transfers facilitated by Rippling. As of the Petition Date, the Debtors estimate that approximately $2,500 will be outstanding and due under the Corporate Card Program.

60.     In the ordinary course of business, the Debtors and certain non-Debtor affiliates have historically engaged in routine business relationships with each other (collectively, the "**Intercompany Transactions**"), resulting in intercompany receivables and payables. The Debtors operate on a consolidated basis, each of the Debtors are a disregarded entity for tax purposes, and the Debtors maintain their accounting books and records on a consolidated basis. Nevertheless, the Debtors otherwise maintain accounting and other records to account for the Intercompany Transactions and any claims that may arise as a result of the Intercompany Transactions (collectively, the "**Intercompany Claims**").

61.     In the ordinary course of business, the Banks charge, and the Debtors pay, honor or allow to be deducted from the applicable Bank Account, certain service charges and other fees, costs and expenses charged by the Banks for maintaining the Bank Accounts in accordance with applicable agreements or schedules of fees governing the Bank Accounts (collectively, the "**Bank Fees**").

62.     The Debtor's Bank Fees average approximately $607 per month in the aggregate. While the Debtors do not expect accrued but unpaid Bank Fees to be outstanding as of the Petition Date (collectively, the "**Prepetition Bank Fees**"), to protect and preserve their relationship with the Banks, the Debtors request authority, but not direction, to honor and pay any Prepetition Bank Fees that may arise in an amount not to exceed $1,000.

63.     The Debtors' Cash Management System facilitates the timely and efficient collection, management, and disbursement of funds. The Debtors intend to utilize their existing Cash Management System throughout the Chapter 11 Cases in the ordinary course of business and in accordance with historical practices. Maintaining the prepetition Cash Management System, Business Forms, the Corporate Card Program and Intercompany Transactions, as well as permitting payment of any Prepetition Bank Fees and prepetition amounts due under the Corporate Card Programs, are critical to the Debtors' ability to continue operations and preserve the value of their businesses.

64.     Requiring the Debtors to dismantle the foregoing and adopt a new cash management system would, among other things, impair the Debtors' day-to-day operations. Adopting a new cash management system would also result in the Debtors incurring material expenses, create unnecessary burdens on their employees and disrupt relationships with their key customers and vendors.

65.     In contrast, maintaining the Cash Management System, the Business Forms, the Corporate Card Program and Intercompany Transactions, as well as permitting payment of any Prepetition Bank Fees and prepetition amounts due under the Corporate Card Programs will facilitate the Debtors' reorganization efforts by preserving a "business as usual" atmosphere and avoiding the costly delays, distraction and unnecessary confusion. Maintaining the foregoing

16

would also facilitate the Debtors' transition into chapter 11 by, among other things, minimizing delays in making postpetition payments, eliminating administrative inefficiencies and allowing the Debtors' employees to focus on their day-to-day responsibilities.

66.     Further, payment of the Prepetition Bank Fees, including any amounts owed under the Corporate Card Program, represents a sound exercise of the Debtors' business judgment and is necessary for the preservation of the Debtors' operations and going concern value of their estates. Payment of the Prepetition Bank Fees, and any amounts owed under the Corporate Card Program, is necessary to maintain the Cash Management System and avoid any disruption in the administration of the Bank Accounts and the Debtors' business.

67.     Lastly, to ensure that each entity using funds that flow through the Cash Management System will continue to bear ultimate repayment responsibility for such ordinary course transactions, thereby protecting the interests of the Debtors' creditors, I believe it is necessary to accord Intercompany Claims administrative expense priority status.

68.     I believe that allowing the Debtors to maintain their Cash Management System and proceed under the other relief requested in the Cash Management Motion would be in the best interests of the Debtors' estates, creditors, and other parties-in-interest.

### D.  *Wages Motion*

69.     Pursuant to the Employee Wages Motion, the Debtors seek authorization to pay (i) all prepetition wages, salaries, other compensation and reimbursable expenses incurred prepetition and (ii) all obligations arising under the employee benefit plans (the "**Employee Compensation and Benefits Programs**").

70.     Currently, the Debtors have approximately 25 full-time employees (collectively, the "**Employees**") who are considered "active" by company standards.

71.     The Employees perform a variety of functions critical to the preservation of value and the administration of the Debtors' estates. The Employees include personnel who are intimately familiar with the Debtors' businesses, processes, and systems, and who cannot be easily replaced. Without the continued, uninterrupted services of the Employees, the ability of the Debtors to maximize the value of their estates will be materially impaired.

72.     The Debtors' ability to run their business efficiently to maximize value for their estates depends on the expertise and continued support and service of their Employees.

73.     Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, the Debtors believe that the continuity and competence of their workforce would be jeopardized if the relief requested herein is not granted. Moreover, if the Debtors fail to pay the prepetition employee obligations described herein in the ordinary course of business, their workforce will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses. This would have a significant negative effect on workforce morale and productivity and would risk immediate and irreparable harm to the Debtors' operations.

74.     In the ordinary course, the Employees are paid their gross wages, salaries, overtime, commissions, and other obligations described herein (collectively, the "**Employee Compensation**") bi-weekly for U.S. and Canadian employees and monthly at the end of each month for United Kingdom employees. In addition to Wages, the Debtors offer eligible Employees a large portfolio of benefits in a number of insurance and benefits programs, including, among other programs, medical, dental, vision, life, and disability insurance, workers' compensation, employee retirement plans, and other employee benefit plans, all of which are described in greater detail in the Wages Motion. The Debtors further offer their Employees unlimited paid time off ("**PTO**").

75.     By this Motion, the Debtors seek authority to make the following payments related to prepetition amounts owed on account of the Employee Compensation and Benefits (the "**Prepetition Employee Obligations**"):

| Employee Obligation | Interim Amount | Final Amount |
|---|---|---|
| Employee Compensation | $150,000 | $150,000 |
| Withholding Obligations | $21,220 | $21,220 |
| Payroll Processing Fees | 0 | 0 |
| Reimbursable Expenses | $5,000 | $5,000 |
| Employee Benefits Programs | $270 | $270 |
| **Total** | **$176,490** | **$176,490** |

76.     In addition to their ongoing employment-related tax obligations, the Debtors owe certain past-due obligations to federal and state employment taxing authorities (the "**Pre-Petition Employment Tax Obligations**"). The Debtors estimate that the total amount of Pre-Petition Employment Tax Obligations outstanding as of the Petition Date is approximately $100,958.55, including $75,197.52 on account of federal withholding tax obligations, and $25,761.03 on account of employment-related taxes assessed by various states where the Debtors are authorized to do business. The Debtors believe that some or all of the Pre-Petition Employment Tax Obligations represent trust-fund taxes, which are not property of the estate, and for which certain of the Debtors' executives, including the recently-retained chief restructuring officer, may have personal liability.

77.     The Debtors' officers and directors are not comfortable serving in these roles during these Chapter 11 Cases with the risk that certain taxing authorities could seek payment of the Pre-Petition Employment Tax Obligations from them personally due to their service as directors and/or officers of the Debtors. The Debtors therefore believe that payment of the Pre-

Petition Employment Tax Obligations is necessary to retain these officers and directors who the Debtors believe are necessary to effect a successful reorganization.

78.     Additionally, payment of the Pre-Petition Employment Tax Obligations upon entry of the Interim Order is a sound exercise of the Debtors' business judgment because certain of the Debtors' officers and directors, including the recently retained chief restructuring officer, may have personal liability for such obligations in the event the Debtors do not remit payment. The Debtors' officers and directors may choose to not continue their service to the Debtors during the Chapter 11 Cases if they run the risk that taxing authorities may seek to collect the Pre-Petition Employment Tax Obligations from them personally as a result of their service as officers and/or directors of the Debtors. The participation of the Debtors' officers and directors is necessary to a successful reorganization.

79.     For the foregoing reasons, I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses during the Chapter 11 Cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Wages Motion should be granted.

**E.  *Lease Rejection Motion***

80.     Debtor CTN Holdings, Inc. and LPF Marina Park Venture, LLC, as successor in interest to AB/SW Marina Owner, LLC (the "**Landlord**"), are parties to: (1) certain Office Lease (as amended, the "**Lease**") dated as of March 6, 2017, for the premises located at 4551 Glencoe Avenue, Suite 300, Marina Del Rey, California 90292 (the "**Premises**"); (2) that certain First Amendment to Lease dated as of June 26, 2017; (3) that certain Second Amendment to Lease dated as of September 1, 2020; (4) that certain Third Amendment to Lease dated as of November

9, 2021; and (5) that certain Fourth Amendment to Lease dated as of May 10, 2022. Pursuant to the Lease and amendments, the term of the Lease commenced on or about July 1, 2017, and expires on May 31, 2034.

81.     The Debtors no longer require use of the Premises to conduct their business.

82.     As of the Petition Date, the Debtors' employees work remotely, and the Debtors have surrendered possession of the Premises to the Landlord.

83.     As a result, the Debtors believe that rejection of the Lease as of the Petition Date is in the best interest of the Debtors, the estate, and their creditors in order to avoid the postpetition accrual of rent and other charges under the Lease.

84.     Additionally, the Debtors have determined that any personal property remaining at the Property as of the Petition Date, including, but not limited to, certain furniture and office equipment is of no material value to the Debtors or their estates and should be abandoned as of the Petition Date.

### F.  *Tax Attributes Motion*

85.     The Debtors estimate based on current calculations that, as of December 31, 2023, and without limitation, they have at least a net operating loss ("**NOL**") carryforward for U.S. federal income tax purposes of approximately $580.3 million and NOL carryforwards for state and local income tax purposes of approximately $251.2 million (collectively, the "**Tax Attributes**").

86.     The Debtors further expect that they may generate additional NOLs and other Tax Attributes for 2024 and 2025 (and potentially other years) and during the pendency of the Chapter 11 Cases.  I believe that the Debtors' NOL carryforwards and other Tax Attributes are valuable assets of their estates. The above amounts are merely estimates, remain subject to

change, and the Debtors reserves all rights to all NOLs and Tax Attributes (including, without limitation, tax credits).

87.     Accordingly, pursuant to the Tax Attributes Motion, the Debtors seek entry of interim and final orders establishing certain procedures that would preserve the value of the Tax Attributes for the benefit of the Debtors' estates.

88.     Specifically, the Debtors are seeking to establish procedures with respect to (i) acquisition or transfer of stock in Debtor CTN Holdings, Inc. or any beneficial interests therein and (ii) restricting the ability of shareholders that are, or were, or become 50% Shareholders to claim a deduction for the worthlessness of the Debtors' stock for any tax year ending before the Debtors' emergence from chapter 11 protection.

89.     I believe that implementation of the proposed procedures is necessary to avoid an irrevocable loss or reduction in the availability of the Tax Attributes and the irreparable harm which could be caused by unrestricted trading or transactions involving the Debtors' stock, or claims against the Debtors, and the Debtors' resulting inability to offset taxable income with the Tax Attributes. Accordingly, I believe that the relief requested is in the best interests of the Debtors' estates and creditors, and on behalf of the Debtors, I respectfully submit that the Tax Attributes Motion should be approved.

### G. *Motion to Seal*

90.     The Debtors have filed the Seal Motion seeking to seal and redact certain personally identifiable information of individuals, including any of the Debtors' creditors, employees, former employees, equity holders, and parties in interest, that is included in the consolidated creditor matrix (the "**Creditor Matrix**"), any other filings with the Court (together

with the Creditor Matrix, the "**Sealed Filings**") and the claims register maintained by the Debtors' claims and noticing agent.

91.     I believe this relief is necessary to protect information that could be used to, among other things, perpetrate identity theft or locate survivors of domestic violence or stalking who have otherwise taken steps to conceal their whereabouts. The Debtors' investors also include public figures who may be unduly burdened if their address or contact information is published.  It is further my belief that, absent this relief, the Debtors would unnecessarily render individuals more susceptible to identity theft and could jeopardize the safety of individuals by publishing their addresses without any advance notice or opportunity to opt out or take protective measures.

92.     The Debtors propose to provide an unredacted version of any Sealed Filings to (i) the Court, (ii) the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"), (iii) any official committee appointed in these cases, (iv) other parties in interest upon execution of an acceptable non-disclosure agreement and (v) as otherwise required by Court order.

93.     I believe that the relief requested in the Seal Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and I respectfully submit that the Seal Motion should be granted.

### H. *DIP Motion*

94.     The DIP Facility provides the Debtors with the liquidity necessary to continue their operations without disruption and to implement their value maximizing Sale Process for the benefit of the Debtors, their estates, and all stakeholders. The DIP Facility was the product of arms'-length negotiations and I believe includes terms that are customary in this District. And,

given the Debtors' prepetition capital structure and their efforts to solicit debtor-in-possession financing, I do not believe that better financing would be available with more time.

95.     I believe that the DIP Facility provides a crucial lifeline to the Debtors and is reasonable and fair.

96.     I believe that the liquidity made available under the DIP Facility, coupled with the Debtors' access to cash collateral, signals to the Debtors' vendors, suppliers, customers, and employees that the Debtors have the liquidity necessary to continuing operating while they complete a successful going concern sale of their assets.

97.     Without the DIP Financing, I expect that the value of the Debtors' business and assets would quickly deteriorate, materially and irreparably harming the Debtors' estates.

98.     Therefore, relief requested by the motion is a necessary step to both preserving the Debtors' operations as well as bridging to a sale transaction that maximizes value for the Debtors' estates and their stakeholders.

99.     Additionally, I believe the DIP Facility is in the best interest of the Debtors' estates because it is the Debtors' best financing option and will allow the Debtors to maximize value for their estates. I understand that, if the Debtors are unable to gain access to the DIP Facility, the proposed path to a successful going concern sale of the Debtors' assets would be blocked, and the Debtors' value as a whole would be materially and irreparably harmed.

100.     Absent the liquidity provided by the DIP Financing and use of cash collateral, the Debtors would, among other things, be unable to pay vendors and suppliers resulting in a cessation of their business operations. Accordingly, I believe the relief requested in the motion is a necessary step to both preserving the Debtors' operations as well as a bridge to a sale transaction that maximizes value for the Debtors' estates and all of their stakeholders

\* \* \*

101.    In conclusion, for the reasons stated herein and in each of the foregoing motions, I respectfully request that each of the motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: March 31, 2025                    _/s/ Miles Staglik_____
                                          Miles Staglik, Chief Restructuring Officer
                                          CTN Holdings, Inc.
                                          CTN SPV Holdings, LLC
                                          Make Earth Green Again, LLC
                                          Aspiration QFZ, LLC
                                          Aspiration Fund Adviser, LLC
                                          Catona Climate Solutions, LLC
                                          Zero Carbon Holdings, LLC