**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>CTN HOLDINGS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br>Case No. 25-10603 (TMH)<br>(Jointly Administered) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING
(I)(A) THE DEBTORS' ENTRY INTO STALKING HORSE AGREEMENT AND
RELATED EXPENSE REIMBURSEMENT AND BREAK-UP FEE; (B) THE BIDDING
PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF
THE DEBTORS' ASSETS, (C) THE PROCEDURES FOR THE ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) THE
FORM AND MANNER OF NOTICE OF THE SALE HEARING, ASSUMPTION
PROCEDURES, AND AUCTION RESULTS, AND (E) DATES FOR AN AUCTION AND
SALE HEARING; (II)(A) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS'
ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, LIABILITIES, RIGHTS,
INTERESTS, AND ENCUMBRANCES AND (B) THE DEBTORS' ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES; AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion (the "Motion"):

**RELIEF REQUESTED**

1.      The Debtors seek entry of an order, substantially in the form attached hereto

as **Exhibit A** (the "Bidding Procedures Order") (a) authorizing the Debtors to enter into and

perform under an asset purchase agreement attached hereto as **Exhibit B** (the "Stalking Horse

Agreement") between the Debtors and Inherent Aspiration, LLC (or its designee, successor,

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are CTN Holdings, Inc. (9122), CTN SPV Holdings, LLC (8689), Make Earth Green Again, LLC (4441), Aspiration QFZ, LLC (1532), Aspiration Fund Adviser, LLC (4214), Catona Climate Solutions, LLC (3375) and Zero Carbon Holdings, LLC (1679). The mailing address for the Debtors is 548 Market Street, PMB 72015, San Francisco, CA 94101-5401.

transferee, or assignee) (the "Stalking Horse Bidder"), subject to the solicitation of higher or otherwise better offers for the Debtors' assets (the "Assets"); (b) approving the Expense Reimbursement (defined below) and Break-Up Fee (defined below) granted to the Stalking Horse Bidder; (c) approving the proposed bidding procedures attached as **Exhibit 1** to the Bidding Procedures Order (the "Bidding Procedures"); (d) approving procedures for assuming and assigning executory contracts and unexpired leases and certain related notices, including notice of proposed cure amounts; (e) approving the form and manner of (1) notice of the Designation Procedures (the "Cure Notice"), attached as **Exhibit 2** to the Bidding Procedures Order and (2) notice of the Auction (defined below) and Sale Hearing (the "Sale Notice"), attached as **Exhibit 3** to the Bidding Procedures Order; (f) establishing dates and deadlines in connection with the sale of substantially all of the Debtors' Assets (the "Sale"), including the Bid Deadline (as defined in the Bidding Procedures), and the dates of the auction for the Assets (the "Auction"), if needed, and the hearing with respect to the approval of the sale (the "Sale Hearing"); and (g) granting related relief.

2.      The Debtors request that the Bidding Procedures Order establish the following dates and deadlines, subject to extension and other modifications by the Debtors:

(i)      **Sale Objection Deadline**: **May 9, 2025 at 4:00 p.m. (prevailing Eastern Time)** as the deadline (the "Sale Objection Deadline") to (i) object to the Sale, including the sale of any Assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code and/or (ii) except as otherwise set forth in the Designation Procedures (defined below), object to the potential assumption or assumption and assignment of the Debtors' executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code (all such contracts and leases capable of being assumed or assumed and assigned under section 365 of the Bankruptcy Code, the "Assigned Contracts") and cure amounts related thereto, *provided* that, notwithstanding the foregoing, any (x) objections to the conduct of the Auction or designation of the Successful Bid or Back-Up Bid, or (y) Non-Stalking Horse Adequate Assurance Objections (defined below) in the event the Successful Bidder (defined

below) is not the Stalking Horse Bidder may be filed by **May 19, 2025, at 4:00 p.m. (prevailing Eastern Time);**

(ii)    **Bid Deadline**: **May 13, 2025, at 4:00 p.m. (prevailing Eastern Time)**, as the deadline by which all Qualified Bids must be actually received pursuant to the Bidding Procedures (the "Bid Deadline");

(iii)    **Auction**: **May 15, 2025, at 10:00 a.m. (prevailing Eastern Time),** as the date and time of the Auction, if one becomes necessary, which will be held at the offices of the proposed counsel to the Debtors, Whiteford, Taylor & Preston LLC, telephonically, or by video via Zoom, or such later time or other place as the Debtors will timely notify all other Qualified Bidders;

(iv)    **Auction Objection Deadline**: **May 19, 2025, at 4:00 p.m. (prevailing Eastern Time)**, as the deadline to object to the conduct of the Auction, the choice of Successful Bidder and/or Back-Up Bidder and Non-Stalking Horse Adequate Assurance Objections (as defined below) with respect to a Successful Bidder and/or Back-Up Bidder other than the Stalking Horse Bidder; and

(v)    **Sale Hearing**: Subject to the Court's availability, **May 20 or 21, 2025 (or such other date and time as may be convenient for the Court)**, at the United States Bankruptcy Court for the District of Delaware, at District of Delaware, at 824 Market Street North, Wilmington, Delaware 19801.

3.    In addition, by this Motion, the Debtors seek, following the conclusion of the Sale Hearing, entry of an order (the "Sale Order")[2]: (a) authorizing (1) the sale of the Assets free and clear of all claims, liens, liabilities, rights, interests and encumbrances and (2) the assumption and assignment of certain executory contracts and unexpired leases; and (b) granting related relief.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b), and, under Rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for

---

[2] The proposed Bidding Procedures provide that the Successful Bidder may elect, in its sole discretion, to consummate the Sale via entry of an Order (i) approving the Successful Bid pursuant to sections 105, 363 and 365 of the Bankruptcy Code or (ii) confirming a chapter 11 plan of reorganization/liquidation pursuant to sections 1123(a)(5)(D) and 1141(c) of the Bankruptcy Code.

the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

5.     The statutory bases for the relief requested herein are sections 105, 363, 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1, 6004-1 and 9006-1.

## BACKGROUND

6.     On March 30 and 31, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief in this Court, commencing cases (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code. The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been requested in the Chapter 11 Cases, and no committees have been appointed.

7.     The Debtors are a climate finance company that sells carbon credits to enterprise clients sourced from the Debtors' diverse project developer network. To ensure a reliable supply of the highest quality carbon, the Debtors partner with project developers by providing financial investment, project monitoring, technical assistance and marketing services to carbon credit generators. These partnerships in turn yield high-quality carbon credits made available to the Debtors' customers through a variety of offered products.

8.     Additional details regarding the Debtors, their business, the events leading to the commencement of these cases, and the facts and circumstances supporting the relief requested herein is set forth in the *Declaration of Miles Staglik in Support of Chapter 11 Petitions and First*

*Day Relief* (the "<u>First Day Declaration</u>"), filed on March 31, 2025 [D.I. 22] and incorporated herein by reference.[3]

9.      On March 31, 2025, the Debtors filed a motion [D.I. 21] seeking entry of interim and final orders (together, the "<u>DIP Orders</u>") authorizing the Debtors' entry into that certain Superpriority Senior Secured Debtor-in-Possession Loan and Security Agreement and Guaranty (the "<u>DIP Credit Agreement</u>") and other documents related to debtor-in-possession financing, (the "<u>DIP Documents</u>") with Inherent Aspiration, LLC, as lender (the "<u>DIP Lender</u>") and Inherent Group, LP, as administrative agent (the "<u>DIP Agent</u>" and, collectively with the DIP Lender, the "<u>DIP Secured Parties</u>") to provide a superpriority, senior secured and priming debtor-in-possession financing (the "<u>DIP Credit Facility</u>"). The DIP Credit Facility is secured by substantially all property of the Debtors as set forth in the DIP Orders (the "<u>DIP Collateral</u>").

10.     On April 3, 2025, the Court entered the *Interim Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expenses Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* [D.I. 45] (the "<u>Interim DIP Order</u>").

11.     As set forth in the DIP Credit Agreement and approved by the Interim DIP Order, the Debtors shall comply with the following milestones by the dates set forth below:

(i)      no later than thirty-one (31) calendar days after the Petition Date, April 30, 2025, the Bankruptcy Court shall have entered the Bidding Procedures Order;

(ii)     no later than forty-four (44) calendar days after the Petition Date, May 13, 2025, unless the DIP Agent otherwise agrees, shall be the Bid Deadline;

---

[3]      The First Day Declaration and other relevant case information is available from (a) the Court's website, www.deb.uscourts.gov, and (b) the website maintained by the Debtors' proposed claims and noticing agent, https://www.veritaglobal.net/CTNHoldings .

5

(iii)     no later than forty-six (46) calendar days after the Petition Date, May 15, 2025, the Borrower shall have held the Auction;

(iv)     no later than fifty-two (52) calendar days after the Petition Date, May 21, 2025, the Bankruptcy Court shall have entered the Sale Order; and

(v)      no later than fifty-five (55) calendar days after the Petition Date, May 24, 2025, the Borrower shall have consummated the Sale in accordance with the Sale Order.

12.     The Debtors have filed the Chapter 11 Cases to facilitate a value maximizing sale of their assets under section 363 of the Bankruptcy Code.

13.     The Chapter 11 Cases and the contemplated sale process afford the Debtors an opportunity to preserve their carbon credit business while restructuring the debt encumbering the Debtors' going concern.

14.     The Stalking Horse Bid submitted by the Stalking Horse Bidder will serve the critical function of setting a "floor" for further competitive bidding. Moreover, the terms of the Stalking Horse Bid are reasonable and were the product of good faith, arm's length negotiations among the Debtors and the Stalking Horse Bidder.

15.     The anticipated timeline for the bidding process ensures that the assets will be comprehensively marketed without unduly prolonging the Debtors' stay in bankruptcy. Hilco Corporate Finance, LLC ("Hilco"), the Debtors' proposed investment banker, will market the Debtors' assets postpetition in furtherance of maximizing the value of the Debtors' estates. The process contemplated by the Bidding Procedures will leave no doubt that, at the conclusion of that process, the Debtors will have explored all available alternatives and identified the highest or otherwise best offer for their assets.

16.     Therefore, the timeline provides the Debtors with the best chance of success, maximizes value, and is in the best interest of the Debtors and their estates. Accordingly, the Court should grant the relief requested herein.

## THE PROPOSED SALE AND BIDDING PROCEDURES

**I.      Summary of Key Terms of the Stalking Horse Bid.**

17.     By this Motion, the Debtors are requesting approval of the designation of the Stalking Horse Bidder and Stalking Horse Bid on the terms provided in the Stalking Horse Agreement as well as approval of reasonable and customary Expense Reimbursement and Break-Up Fee.  Specifically, the Expense Reimbursement of reasonable and documented out-of-pocket fees  and the Break-Up Fee will be payable from the proceeds of a Sale to a higher or better bidder (if any), in the event that the Stalking Horse Bid is not selected as the winning bidder. Given the Debtors' need to maximize the value of the Assets through a timely and efficient marketing and sale process, the ability to designate a Stalking Horse Bid and offer the Expense Reimbursement and Break-Up Fee is justified, appropriate and essential.

18.     Recognizing the Stalking Horse Bidder's expenditure of time, energy and resources in connection with the proposed transaction set forth in the Stalking Horse Agreement, and the benefit that those efforts will provide to the Debtors, their estates and creditors, and all other parties in interest, the Debtors have agreed to provide the following bid protections to the Stalking Horse Bidder, payable if the Successful Bidder is not the Stalking Horse Bidder: (a) payment of a break-up fee in an amount equal to $600,000.00 (the "Break-Up Fee") and (b) reimbursement of the reasonable and documented fees and out-of-pocket expenses actually incurred by the Stalking Horse Bidder in an amount not to exceed $400,000.00 (the "Expense Reimbursement"); provided

that the payment of any Break-Up Fee and/or Expense Reimbursement shall be subject to the terms and conditions of the Stalking Horse Agreement and the DIP Orders.

19.     In accordance with Local Rule 6004-1(b), the pertinent terms of the Stalking Horse Agreement are summarized in the following table.[4] The Debtors respectfully submit that all terms of the Stalking Horse Agreement, including those required to be highlighted under Local Rule 6004-1(b), are fair, reasonable, and appropriate under the circumstances in light of the parties' good faith, arm's-length negotiation of the Stalking Horse Bid and the substantial benefits the Debtors and their estates will realize as a result thereof, including the establishment of a baseline price for the Debtors' assets.

| SUMMARY OF STALKING HORSE AGREEMENT[5] | |
| --- | --- |
| **Parties** | <u>Sellers</u>:  CTN Holdings, Inc., Make Earth Green Again, LLC, Aspiration QFZ, LLC, Carbon Sequestration III, LLC, Carbon Sequestration I, LLC, Carbon Sequestration II, LLC, Reforestation Initiatives I, LLC, Reforestation Initiatives II, LLC, Zero Carbon Holdings, LLC, Catona Climate Solutions, LLC, CTN SPV Holdings, LLC, and Aspiration Fund Adviser, LLC.<br><br><u>Stalking Horse Bidder</u>:  Inherent Aspiration, LLC or one or more of its designees, successors, transferees, or assignees.<br><br>*See* Stalking Horse Agreement at Preamble. |

---

[4]      This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Stalking Horse Agreement, the latter governs in all respects. Capitalized terms not used but not otherwise defined in this summary shall have the meanings set forth in the Stalking Horse Agreement.
[5]      Defined terms in this table not otherwise defined in the Motion shall have the meanings ascribed thereto in the Stalking Horse Agreement.

| SUMMARY OF STALKING HORSE AGREEMENT[5] | |
|---|---|
| **Purchase Price** | The aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (1) a credit bid of amounts owed pursuant to the Prepetition Secured Loan Facility and/or pursuant to the DIP Credit Facility (the "Credit Bid") pursuant to Section 363(k) of the Bankruptcy Code in an amount equal to $20,000,000.00 (the "Credit Bid Amount"), which shall be allocated in the Purchaser's sole discretion as a dollar-for-dollar credit against the amount of all of the outstanding obligations under  Prepetition Secured Loan Facility and/or DIP Credit Facility as of the Closing Date,   (2) the assumption of Assumed Liabilities, and (3) payment in full of the Cure Payments.<br><br>*See Stalking Horse Agreement at § 2.1.* |
| **Acquired Assets** | On the terms and subject to the conditions set forth in the Stalking Horse Agreement and in the Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "Acquired Assets" means all of each Seller's right, properties, title and interest in and to, as of the Closing, all assets relating to the Business, including, solely to the extent relating to the Business, the assets expressly listed in Section 1.1 of the Stalking Horse Agreement, but excluding in all cases the Excluded Assets. The Acquired Assets include, among other assets, certain contracts and leases, intellectual property, inventory, goodwill and intangible assets, permits, accounts receivable, cash, tangible personal property and owned vehicles, as further set forth in Section 1.1 of the Staking Horse Agreement.<br><br>*See Stalking Horse Agreement at § 1.1.* |

| **SUMMARY OF STALKING HORSE AGREEMENT[5]** | |
|---|---|
| **Excluded Assets** | Notwithstanding anything to the contrary in the Stalking Horse Agreement, in no event shall any Seller be deemed to sell, transfer, assign, convey or deliver, and each such Seller shall retain all right, title and interest to, in and under any properties, rights interests or other assets of such Seller other than the Acquired Assets (collectively, the "Excluded Assets"). Without limiting the foregoing, "Excluded Assets" means all of each Seller's right, properties, title and interest in and to the assets listed in Section 1.2 of the Stalking Horse Agreement. The Excluded Assets include, among other assets, contracts and leases that are not Assigned Contracts or Assumed Leases, benefit plans, and all current directors and officers insurance policies of the Debtors, as further set forth in Section 1.2 of the Staking Horse Agreement. <br><br> *See Stalking Horse Agreement at § 1.2.* |
| **Assumed Liabilities** | On the terms and subject to the conditions set forth in the Stalking Horse Agreement and in the Sale Order, effective as of the Closing, Purchaser shall irrevocably assume from each Seller (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and such Seller shall irrevocably transfer, assign, convey, and deliver to Purchaser, only the Liabilities, without duplication, listed in Section 1.3 of the Stalking Horse Agreement (collectively, the "Assumed Liabilities"). <br><br> The Assumed Liabilities expressly include: (a) all Liabilities (other than any Liability for Taxes) arising out of or relating to the ownership and operation of the Acquired Assets or Assigned Contracts arising at or after the Closing that become due and payable after the Closing (including, for the avoidance of doubt, accounts payable for services performed or goods purchased after the Closing); (b) all Liabilities in respect of Transferred Employees arising from and after the Closing (other than with respect to Seller Benefit Plans); and (c) all cure costs required to be paid as determined by the Bankruptcy Court or agreed to by Purchaser and the non-debtor counterparty to the applicable Assigned Contract pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "Cure Costs"). <br><br> *See Stalking Horse Agreement at § 1.3.* |

| SUMMARY OF STALKING HORSE AGREEMENT[5] | |
|---|---|
| **Excluded Liabilities** | Except for the Assumed Liabilities, Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, any of the Sellers of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing before or on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing (collectively, the "Excluded Liabilities").<br><br>*See Stalking Horse Agreement at § 1.4.* |
| **Conditions to Closing** | The obligations of the Parties to consummate the Closing shall be subject to satisfaction of the conditions precedent set forth in Article VI of the Stalking Horse Agreement, which conditions precedent are usual and customary for transactions of this type, including, but not limited to, a requirement that the Court shall have entered an order approving the Sale and such order shall not have been stayed or modified or subject to appeal.<br><br>*See Stalking Horse Agreement at §§ 6.1, 6.2, 6.3, 6.4.* |
| **"Insider" Status of Stalking Horse Bidder**<br>Local Rule 6004-1(b)(iv)(A) | The Purchaser is not an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code. |

| SUMMARY OF STALKING HORSE AGREEMENT[5] | |
|---|---|
| **Agreements with Management or Key Employees**<br>Local Rule 6004-1(b)(iv)(B) | The Stalking Horse Agreement contemplates that, prior to Closing, Sellers shall make available to Purchaser for interviews certain employees as requested by Purchaser. Purchaser may extend to any employee employed by the applicable Seller or Subsidiary thereof a written offer of employment, for employment effective as of the Closing Date, in Purchaser's sole discretion ("<u>Transfer Offer</u>"). Employees who accept such Transfer Offers and begin employment with Purchaser or an Affiliate of Purchaser shall be collectively referred to herein as "<u>Transferred Employees</u>." For any employee of a Seller that Purchaser makes an offer of employment prior to Closing, Purchaser shall notify such Seller (i) with respect to: each employee to whom it made a Transfer Offer (no later than five Business Days after making such Transfer Offer), and (ii) in a reasonable timeframe (but in any event within five Business Days of receiving a response from the applicable Transferred Employee and no later than immediately prior to the Closing) with respect to whether each such offer has been accepted or rejected.<br><br>As of the filing of this Motion, the Purchaser has not commenced the foregoing process contemplated under the Stalking Horse Agreement and has not otherwise discussed or entered into any agreements with management or key employees regarding compensation or future employment.<br><br>***See Stalking Horse Agreement at § 5.6(a)*** |
| **Releases**<br>Local Rule 6004-1(b)(iv)(C) | The Stalking Horse Agreement does not contemplate releases other than the following requirements of the Sale Order, which must, among other terms: find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, and find that Purchaser is not a successor to any Seller, and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code; find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity; and find that Purchaser shall have no Liability for any Excluded Liabilities.<br><br>Purchaser and/or any affiliate of Purchaser, in its capacity as an agent under the DIP Facility, shall obtain a release of any potential claims against it as provided in the DIP Order.<br><br>***See Stalking Horse Agreement at §§ 6.1, 6.2, 9.1*** |

| SUMMARY OF STALKING HORSE AGREEMENT[5] | |
|---|---|
| **Private Sale/No Competitive Bidding**<br>Local Rule 6004-1(b)(iv)(D) | The Stalking Horse Agreement contemplates that the Sale shall be implemented pursuant to a bid and auction process.<br><br>***See Stalking Horse Agreement at Preamble, §§ 1.5(a),(f), 5.3, 7.3.*** |
| **Closing and Other Deadlines**<br>Local Rule 6004-1(b)(iv)(E) | The closing of the Sale must occur by May 24, 2025.<br><br>***See Stalking Horse Agreement at §§ 2.2, 6.1(b); DIP Credit Agreement at § 8.10(i).*** |
| **Good Faith Deposit**<br>Local Rule 6004-1(b)(iv)(F) | The Stalking Horse Bidder is credit bidding pursuant to section 363(k) of the Bankruptcy Code and is not required to make a Good Faith Deposit with the Debtors. Potential Bidders other than the Stalking Horse Bidder will be required to submit a 10% Good Faith Deposit with their Bids. |
| **Interim Arrangements with Stalking Horse Bidder**<br>Local Rule 6004-1(b)(iv)(G) | N/A |
| **Use of Proceeds**<br>Local Rule 6004-1(b)(iv)(H) | The Purchase Price shall be allocated to the Acquired Assets (the "Asset Amount"). The Asset Amount shall be allocated consistent with the methodology set forth on Section 1060 of the Tax Code and applicable Treasury Regulations. Purchaser shall prepare a statement setting forth such allocation of the Asset Amount (the "Purchase Price Allocation Statement"). Purchaser shall deliver the Purchase Price Allocation Statement to Seller within forty-five (45) days after the Closing Date (or such longer period as they may agree to in writing). The Sellers shall have thirty (30) days after receipt of the Purchase Price Allocation Statement within which to review and comment on the Purchase Price Allocation Statement, and Purchaser shall consider in good faith any reasonable comments made by the Sellers. The Purchase Price Allocation shall be binding upon the Parties to the Stalking Horse Agreement for all Tax purposes unless otherwise required by applicable Law.<br><br>***See Stalking Horse Agreement at § 5.9(b)*** |
| **Tax Exemption**<br>Local Rule 6004-1(b)(iv)(I) | N/A |

| SUMMARY OF STALKING HORSE AGREEMENT[5] | |
|---|---|
| **Record Retention**<br>Local Rule 6004-1(b)(iv)(J) | The Stalking Horse Agreement provides that the Purchaser shall (a) grant the Sellers and their respective representatives reasonable access to the books and records transferred to Purchaser for one (1) year following the Closing Date, and (b) make one or more Transferred Employees available to Seller to assist in Sellers' wind-down. The Parties have further agreed to make available such records and information reasonably requested in connection with tax matters related to the Business.<br><br>***See Stalking Horse Agreement at §§ 5.5(b), 5.9(c)*** |
| **Sale of Avoidance Actions**<br>Local Rule 6004-1(b)(iv)(K) | Acquired Assets include all rights, claims, accounts and causes of action of such Seller or any of its respective Subsidiaries, including all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, against any Person other than any other Seller that is a party to or related to any Assigned Contract or Assumed Liability to the extent that such Persons do not assert or maintain any rights, claims or causes of action against Sellers. Excluded Assets include, on the other hand, all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code and any analogous state law claims, including any proceeds of the foregoing, other than those specified as Acquired Assets.<br><br>***See Stalking Horse Agreement at §§ 1.1(s), 1.2(j).*** |
| **Successor Liability**<br>Local Rule 6004-1(b)(iv)(L) | The Debtors expect the proposed Sale Order to include customary findings protecting the Stalking Horse Bidder from successor liability.<br><br>***See Stalking Horse Agreement at §§ 6.1(c), 6.2(a), 9.1.*** |
| **Sale Free and Clear of Unexpired Leases**<br>Local Rule. 6004-1(b)(iv)(M) | N/A |

| SUMMARY OF STALKING HORSE AGREEMENT[5] | |
|---|---|
| **Credit Bid**<br>Local Rule 6004-1(b)(iv)(N) | The Stalking Horse Agreement seeks to permit the Purchaser to credit bid, of amounts owed pursuant to the Prepetition Secured Loan Facility and/or pursuant to the DIP Facility pursuant to Section 363(k) of the Bankruptcy Code in an amount equal to $20,000,000.00, which shall be allocated in the Purchaser's sole discretion as dollar-for-dollar credit against the amounts of all of the outstanding obligations under the Prepetition Secured Loan Facility and/or DIP Credit Facility as of the Closing Date.<br><br>***See Stalking Horse Agreement at §§ 2.1, 2.2, 6.1(c), 6.3(b), 9.1.*** |
| **Relief from Bankruptcy Rule 6004(h)**<br>Local Rule 6004-1(b)(iv)(O) | The Debtors are seeking a waiver of the Bankruptcy Rules 6004(a) and 6004(h), as described in more detail below. |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**<br>Local Rule 6004-1(c)(i)(C) | <u>Break-up fee</u>: Payment of a break-up fee in an amount equal to $600,000.<br><br><u>Expense Reimbursement</u>: Reimbursement of the reasonable and documented fees and out-of-pocket expenses actually incurred by the Stalking Horse Bidder, in an amount up to $400,000.<br><br>***See Stalking Horse Agreement at § 7.3.*** |

## II.    The Bidding Procedures.

20.    The Bidding Procedures are designed to facilitate a fair, robust and competitive sale process to ensure that the value of the Assets is maximized. The Bidding Procedures allow the Debtors to solicit and evaluate bids from potential bidders and determine the highest or otherwise best offer for their Assets on a reasonable timeline. As set forth in the First Day Declaration, the Debtors believe the timeframe contemplated by the Bidding Procedures will be sufficient to allow potential bidders to conduct diligence and formulate competing bids. As described, the Debtors, with the assistance of their proposed investment banker, Hilco, are marketing the Debtors' assets.

21.     Pursuant to Local Rule 6004-1(c), certain of the key terms of the Bidding

Procedures are highlighted in the chart below:[6]

| MATERIALS TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| **Provisions Governing Qualification of Bidders and Qualified Bids** Local Rule 6004-1(c)(i)(A)-(B) | **A.  Bid Deadline.**  The Bid Deadline to submit a binding and irrevocable offer to acquire the Assets is **May 13, 2025 at 4:00 p.m. (ET)**.<br><br>*See* **Bidding Procedures at § E.**<br><br>**B.      Potential Bidder Requirements.** To participate in the formal bidding process or otherwise be considered for any purpose under the Bidding Procedures, a person (other than the Stalking Horse Bidder) interested in submitting a bid (an "<u>Interested Party</u>") must deliver to the Debtors, counsel to the Debtors and Hilco an executed confidentiality agreement substantially in the form previously sent to Agents' counsel on April 9, 2025 (each, a "<u>Confidentiality Agreement</u>"). Such person or entity that has delivered an executed Confidentiality Agreement shall be considered a potential bidder (a "<u>Potential Bidder</u>")<br><br>**C.  Diligence Access Requirements.** The Debtors will provide to each Potential Bidder reasonable due diligence information, as requested, as soon as reasonably practicable after such request, provided that if any Potential Bidder is (or is affiliated with) a competitor of the Debtors, the Debtors will not be required to disclose to such Potential Bidder any trade secrets, proprietary information, or other commercially sensitive information unless, under the Debtors' business judgment in consultation with the Consultation Parties, the Confidentiality Agreement executed by such Potential Bidder (i) sufficiently protects the Debtors' estates, and (ii) contains appropriate provisions to ensure that such trade secrets or proprietary information will not be used by such Potential Bidder or its Affiliates for an improper purpose or to gain an unfair competitive advantage.  Each Potential Bidder will comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Potential Bidder and its contemplated transaction.  If the Debtors, after consultation with the Consultation Parties, determine at any time in their reasonable discretion that a Potential Bidder is not reasonably likely to be a Qualified Bidder (as defined below), then the Debtors' obligation to provide due diligence information to such Potential Bidder will terminate and all information provided by the Debtors prior to such time |

---

[6]      This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Bidding Procedures, the Bidding Procedures govern in all respects.  Capitalized terms used but not otherwise defined in this summary shall have the meanings set forth in the Bidding Procedures.

| MATERIALS TERMS OF THE BIDDING PROCEDURES |
|---|

shall be returned to the Debtors or destroyed in accordance with the terms of the applicable Confidentiality Agreement.

*See* **Bidding Procedures at § D**

**D.  Bid Requirements.** To be eligible to participate in the Auction, each Potential Bidder must submit a Bid, which Bid must be received by the Debtors' advisors no later  than the Bid Deadline, and which Bid must satisfy each of the following conditions (together, the "Bid Requirements"):

(1)  state that the applicable Potential Bidder offers to purchase the Acquired Assets upon terms and conditions no less favorable to the Debtors' estates as the Debtors, in consultation with the Consultation Parties, may reasonably determine, than the transactions contemplated in the Stalking Horse Agreement;

(2)  be accompanied by a deposit (each, a "Good Faith Deposit") in the form of a wire transfer or certified check or such other form acceptable to the Debtors in their sole discretion, payable to the order of Kurtzman Carson Consultants, LLC dba Verita Global (the "Escrow Agent"), in an amount equal to 10% of the cash portion of the Purchase Price being bid;

(3)  specify the amount of cash or other consideration offered by the Potential Bidder (the "Purchase Price"), which Purchase Price must: (a) exceed the aggregate sum of (i) the aggregate consideration set forth in the Stalking Horse Agreement; (ii) the Assumed Liabilities set forth in the Stalking Horse Agreement; (iii) the Expense Reimbursement and Break-Up Fee, and (iv) the minimum bid increment of $250,000; and (b) include an amount of cash consideration at closing that exceeds the aggregate sum of (i), (iii) and (iv) (such aggregate sum specified in (a) and (b), the "Minimum Purchase Price");

(4)  include an executed asset purchase agreement, together with all exhibits and schedules thereto, pursuant to which the Potential Bidder proposes to effectuate a proposed transaction at the Purchase Price (the "Transaction Documents"), which Transaction Documents must include a copy of the proposed asset purchase agreement marked against the Stalking Horse Agreement to show all changes requested by the Potential Bidder including, but not limited

| MATERIALS TERMS OF THE BIDDING PROCEDURES | | |
|---|---|---|
| | | to, treatment of any assumed liabilities; |
| | (5) | be irrevocable by the Potential Bidder until the selection of the Successful Bid in accordance with the terms of these Bidding Procedures; *provided* that if such Potential Bidder is selected as the Successful Bidder or Back-Up Bidder and is required to be a Back-Up Bidder hereunder, its Bid must remain irrevocable until the Debtors' consummation of a sale with the Successful Bidder; |
| | (6) | include a list which specifies in detail which of the Debtors' unexpired leases and executory contracts are to be assumed by the Debtors and assigned to the Potential Bidder in connection with the consummation of the proposed transaction and an agreement that the Potential Bidder will pay any related cure costs; |
| | (7) | contain a description of how the Potential Bidder intends to treat the Debtors' current employees; |
| | (8) | provide a commitment to close by May 24, 2025; |
| | (9) | not be conditioned on any contingency, including unperformed due diligence, obtaining financing, obtaining third-party consents, or any internal approval; |
| | (10) | include an acknowledgement that the sale or transfer of the Acquired Assets will be on an "as is, where is" basis and without representations or warranties of any kind by Debtors or their agents other than as set forth in the Stalking Horse Agreement; |
| | (11) | include a description of all governmental, licensing, regulatory or other filings, approvals or consents, that are required to be made or obtained to close the proposed transaction, together with evidence of the ability to make any applicable filings or submissions within three (3) business days of being declared the Successful Bidder; |
| | (12) | contain written evidence of a commitment for financing or other evidence of the ability to consummate a proposed transaction at the Purchase Price (including sufficient financial or other information to establish adequate assurance of future performance pursuant to section 365(f)(2) of the Bankruptcy Code and, if applicable, section 365(b)(3) of the |

**MATERIALS TERMS OF THE BIDDING PROCEDURES**

|  |  |
|---|---|
|  | Bankruptcy Code to the non-Debtor counterparties to any executory contracts and unexpired leases to be assumed by the Debtors and assigned to the Potential Bidder in connection with the proposed transaction), satisfactory to the Debtors in their reasonable discretion with appropriate contact information for such financing sources; |
|  | (13) contain written evidence satisfactory to the Debtors, after consultation with the Consultation Parties, of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and consummation of such Bid and the transaction(s) contemplated therein and any Overbid(s) (as defined below), and related Transaction Documents; |
|  | (14) not request or entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment (except to the extent consented to in writing by Debtors after consultation with Agents); |
|  | (15) fully disclose the identity of each entity that will be bidding for the Acquired Assets or otherwise sponsoring, financing (including through the issuance of debt in connection with such Bid), participating in or benefiting from (including through license or similar arrangement with respect to the assets to be acquired in connection with such Bid) such Bid (a "Participating Party"), and the complete terms of any such sponsorship, participation, financing or benefit; |
|  | (16) constitute a good faith, bona fide offer to effectuate the proposed transaction; |
|  | (17) include a written acknowledgement by such Potential Bidder that it agrees to all of the terms for sale set forth in these Bidding Procedures; |
|  | (18) include an agreement to provide any other information reasonably requested by the Debtors; and |
|  | (19) be received by the Bid Deadline. |
|  | *See* **Bidding Procedures at § E**. |

| MATERIALS TERMS OF THE BIDDING PROCEDURES |
|---|

**E. Designation of Qualified Bidder.** A qualified bidder ("Qualified Bidder") is a Potential Bidder that, in the Debtors' reasonable determination, after consultation with the Consultation Parties, (i) has timely submitted a Bid that satisfies each of the Bid Requirements listed above and (ii) is able to consummate the proposed transaction within the required timeframe if selected as the Successful Bidder (such Bid submitted by a Qualified Bidder, a "Qualified Bid"); *provided* that the Debtors reserve the right to work with any Potential Bidder to cure any deficiencies in a Bid that is not initially deemed a Qualified Bid. Within two (2) business days after a Potential Bidder delivers all of the documents described above, the Debtors will determine in their reasonable discretion, after consultation with the Consultation Parties, whether such Potential Bidder is a Qualified Bidder, and notify the Potential Bidder of such determination. For the avoidance of doubt, (i) the Stalking Horse Bidder is a Qualified Bidder, (ii) the Stalking Horse Agreement is a Qualified Bid, and (iii) the Stalking Horse Bidder is authorized to submit any Overbids (as defined below) during the Auction, in each instance without further qualification required of the Stalking Horse Bidder.

Notwithstanding anything in the Bidding Procedures to the contrary, without any further action of any kind: (a) each Agent (and any designee of each Agent, including, without limitation, any entity that may be formed by or on behalf of any of the DIP Lender (and any designee of the DIP Lender) may submit a Bid and, in connection with any such Bid, is, and will be deemed to be, a Qualified Bidder for all purposes under and in connection with these Bidding Procedures and may credit bid all or any portion of the Prepetition Secured Note Obligations and the DIP Obligations (each as defined in the DIP Orders) in accordance with applicable law, including, without limitation, at any Auction; (b) any credit bid made by any Agent or any DIP Lender (or such designee) is, and will be deemed to be, a Qualified Bid in each instance and for all purposes under and in connection with the Bidding Procedures and will be deemed to be, and will be evaluated by the Debtors, and the Consultation Parties as, a cash Qualified Bid; and (c) subject to the proviso at the end of this sentence, Agents, DIP Lender and such designees will not be subject to the terms and conditions of the section entitled "Bid Requirements": clauses (2), (3), (9), (11), (12), (13), and (18), of the Bidding Procedures; *provided*, however, that (x) such Agent or the DIP Lender (or any designee thereof) submitting a credit bid will provide a Good Faith Deposit, provided that such Good Faith Deposit shall consist of a reduction in the applicable secured claim of such Agent or such DIP Lender in the Cases and will not be payable in cash notwithstanding anything to the contrary in these Bidding Procedures and (y) any such bid must provide for the payment in full in cash of the

| MATERIALS TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | Expense Reimbursement and Break-Up Fee. These Bidding Procedures are subject to the terms and provisions of the DIP Orders.<br><br>In the event that any Agent or DIP Lender (or such designee) submits a Bid and is still participating in the Auction process, the Agents and the DIP Lender (or such designee) shall no longer be considered a Consultation Party with respect to the assets for which it has submitted a Bid; provided, that if any such party irrevocably indicates in writing that it is no longer a bidder for such assets, such party shall thereafter be considered a Consultation Party.<br><br>*See* **Bidding Procedures at § Section F**. |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder** Local Rule 6004-1(c)(i)(C) | The Stalking Horse Agreement provides for payment of bid protections in the form of a break-up fee in the amount of $600,000.00 (the "Break-Up Fee") and a reimbursement of the Stalking Horse Bidder's actual, reasonable, documented out-of-pocket expenses up to an amount not to exceed $400,000.00 (the "Expense Reimbursement").<br><br>*See* **Bidding Procedures at Preamble**. |
| **Modification of Bidding and Auction Procedures** Local Rule 6004-1(c)(i)(D) | The Debtors, in their discretion, and in consultation with the Consultation Parties, shall have the right to hold the Auction at another place or virtually, with instructions for Qualified Bidders to participate to be provided prior to the Auction, with notice to all Qualified Bidders and any other invitees.<br><br>*See* **Bidding Procedures at § H(2)**.<br><br>The Debtors, in their reasonable discretion, after consultation with the Consultation Parties, reserve the right to conduct the Auction in a manner designed to maximize value based upon the nature and extent of the Qualified Bids received.<br><br>*See* **Bidding Procedures at § H(5)**.<br><br>The Sale Hearing may be adjourned or rescheduled by the Debtors to a time and date consistent with the Court's calendar, as set forth in notice on the docket of the Cases, a notice of agenda or stated orally on the record at a hearing before the Court.<br><br>*See* **Bidding Procedures at § J**. |

| MATERIALS TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | The Debtors reserve the right in consultation with the Consultation Parties, in their reasonable discretion and subject to the exercise of their business judgment, to alter or modify any of the rules or procedures set forth in the Bidding Procedures, to waive terms and conditions set forth in the Bidding Procedures with respect to all potential bidders, extend the deadlines set forth in the Bidding Procedures, alter the assumptions set forth herein, and/or to terminate discussions with any and all prospective acquirers and investors at any time and without specifying the reasons therefor, in each case to the extent not materially inconsistent with the Bidding Procedures Order or the Stalking Horse Agreement; *provided*, however, that the Debtors shall not waive the requirement to make a Good Faith Deposit.<br><br>*See* **Bidding Procedures at § M**.<br><br>Nothing in the Bidding Procedures shall require the Debtors to take any action, or to refrain from taking any action to the extent the Debtors determine that refraining from taking such action or taking such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.<br><br>*See* **Bidding Procedures at § M**.<br><br>The Stalking Horse Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, solely in accordance with the terms thereof, without further order of the Court.<br><br>*See* **Proposed Bidding Procedures Order at ¶ 14**. |
| **Closing with Alternative Back-Up Bidder(s)** Local Rule 604-1(c)(i)(E) | **Selection of Successful Bid and Back-Up Bid(s).** At the conclusion of the Auction, the Debtors, in the exercise of their reasonable business judgment, in consultation with the Consultation Parties, will select (i) the highest acceptable Bid (the "<u>Successful Bid</u>") or collection of Bids (the "<u>Successful Bids</u>") submitted by a Qualified Bidder during the Auction that the Debtors believe is most beneficial to the Debtors and their estates, and (ii) at the Debtors' discretion, the next highest acceptable Bid (the "<u>Back-Up Bid</u>") or collection of Bids (the "<u>Back-Up Bids</u>") after the Successful Bid(s). In selecting the Successful Bid(s) and the Back-Up Bid(s), if any, the Debtors, in consultation with the Consultation Parties, shall take into account the projected percentage recovery to general unsecured creditors and the certainty of such recovery and whether all administrative, priority and secured claims will be paid in full and may also consider, among other things: (i) the number, |

| **MATERIALS TERMS OF THE BIDDING PROCEDURES** ||
|---|---|
| | type and nature of any changes to the Stalking Horse Agreement which may delay closing of the contemplated transaction and the cost to the Debtors of such modifications or delay; (ii) the liabilities being assumed; (iii) the likelihood of the Qualified Bidder's ability to close its proposed transaction and the timing thereof; (iv) the expected net benefit of the transaction to the Debtors' estates and (v) any other factors the Debtors may reasonably deem relevant.  The Qualified Bidder that submits a Successful Bid will be deemed a "<u>Successful Bidder</u>," and the Qualified Bidder that submits a Back-Up Bid, if any, will be deemed a "<u>Back-Up Bidder</u>."  The Successful Bidder(s) and Back-Up Bidder(s), following the completion of the Auction, must increase their Good Faith Deposits so that they equal 10% of such Successful Bid or Back-Up Bid, as applicable. |
| | The Auction will close when the Debtors announce that a Successful Bid(s) and, to the extent the Debtors determine, in consultation with the Consultation Parties, a Back-Up Bid(s), have been selected. Notwithstanding anything herein to the contrary, the Debtors are authorized, but not required, to select a Back-Up Bidder and a Back-Up Bid.  For the avoidance of doubt, the Debtors will not consider or support any Bid for any of the Acquired Assets (whether or not such bid is made by a Qualified Bidder) received after the close of the Auction. |
| | Upon declaration of the Successful Bid, the Successful Bidder shall, in its sole discretion, elect to consummate the Sale via entry of the Sale Order (i) granting the  Motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code or (ii) confirming a plan of reorganization/liquidation pursuant to sections 1123(a)(5)(D) and 1141(c) of the Bankruptcy Code.[7] |
| | The Back-Up Bid(s), if any, will remain open and binding on the Back-Up Bidder(s) until consummation of the Successful Bid(s) with the Successful Bidder(s). If a Successful Bidder fails to consummate a Successful Bid within the time set forth therein, the Debtors will be authorized, but not required, to select a Back-Up Bidder, if any, as the new Successful Bidder, and shall proceed to consummate the Successful Bid of the new Successful Bidder. |
| | *See* **Bidding Procedures at § I**. |

---

[7] In the event the Successful Bidder elects to consummate the Sale through the confirmation of a chapter 11 plan of reorganization/liquidation, the DIP Credit Agreement shall be deemed amended to extend the deadline to have consummated the Sale through and including forty five (45) days from the conclusion of the Sale Hearing, or such other date as the Successful Bidder and DIP Lender agree, to permit the Successful Bidder to propose and obtain confirmation of such chapter 11 plan.

| MATERIALS TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| **Provisions Governing the Auction** Local Rule 6004-1(c)(ii) | **A.    Auction**. If the Debtors receive two or more Qualified Bids (including the Stalking Horse Bid), the Debtors may hold an Auction, which Auction shall be conducted openly; *provided* that the Debtors in their discretion and with the prior written consent of the Agents (acting at the direction of the Prepetition Secured Parties or DIP Lender (as defined in the DIP Orders) may elect to forego an Auction and select a Qualified Bid as the Successful Bid. If no Qualified Bids (other than the Stalking Horse Bid) are received by the Bid Deadline, then the Auction shall be cancelled, the Stalking Horse Bidder will be deemed the Successful Bidder, the Stalking Horse Agreement will be the Successful Bid, and, at the Sale Hearing, the Debtors will seek final Court approval of the sale of the Acquired Assets to the Stalking Horse Bidder in accordance with the terms of the Stalking Horse Agreement. <br><br> *See* **Bidding Procedures at § H(1)**. <br><br> **B.  Auction Date and Location**. If an Auction is held**,** it will commence **on or before May 15, 2025, at 10:00 a.m. (Prevailing Eastern Time) at the offices of Whiteford, Taylor & Preston, LLC, 600 North King Street, Suite 300, Wilmington, DE 19801**, telephonically or by video via Zoom or such later time or other place, in consultation with the Consultation Parties; ; *provided, however*, that the Debtors, in their discretion, and in consultation with the Consultation Parties, shall have the right to hold the Auction at another place or virtually, with instructions for Qualified Bidders to participate to be provided prior to the Auction, with notice to all Qualified Bidders and any other invitees. The Auction will be transcribed to ensure an accurate recording of the bidding at the Auction. <br><br> *See* **Bidding Procedures at § H(2)**. <br><br> **C.  Baseline Bid**. No later than one (1) day prior to the commencement of the Auction, the Debtors will provide all Notice Parties and Consultation Parties with complete copies of all Transaction Documents and all other bid materials submitted by each other Qualified Bidder, subject to exclusion of any confidential financial information as determined by the Debtors in their reasonable discretion or which has been so designated by the applicable Qualified Bidder.  At the commencement of the Auction, the Debtors will notify all Qualified Bidders, Notice Parties and Consultation Parties of the highest acceptable Qualified Bid, as determined by the Debtors in their reasonable discretion after consultation with the Consultation Parties (the "Baseline Bid"). The Debtors' determination of which Qualified Bid constitutes the Baseline Bid, in consultation with the Consultation Parties, shall take into account factors such as the potential recovery to |

| MATERIALS TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | general unsecured creditors, if any, pursuant to such Qualified Bid and the certainty of such recovery, whether all administrative, priority and secured claims will be paid in full under such Qualified Bid and any other factors the Debtors, in consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid to the estates. No later than the day prior to the commencement of the Auction, each Qualified Bidder that has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction; *provided* that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid will nevertheless remain fully enforceable against such Qualified Bidder. <br><br> *See* **Bidding Procedures at § H(3)** <br><br> **D.     Participation Requirements**. Only a Qualified Bidder that has submitted a Qualified Bid will be eligible to participate at the Auction. The authorized representatives of each of the Qualified Bidders (including the Stalking Horse Bidder), the Debtors, the Agent, and the Committee will be permitted to attend the Auction.  In addition, pursuant to Local Rule 6004-1, all creditors of the Debtors who have not submitted Bids may attend the Auction as observers, *provided* that they send an email to Debtors' counsel indicating that they intend to attend the Auction no less than one (1) Business Day prior to the Auction, *provided further* that the Debtors' right to object on an emergency basis to any such creditor's proposed attendance at the Auction is reserved. <br><br> *See* **Bidding Procedures at § H(4)** <br><br> **E.  Auction Procedures**. The Debtors and their professionals will direct and preside over the Auction.  At the start of the Auction, the Debtors will describe the terms of the Baseline Bid.  All Bids made thereafter must be Overbids (as defined below) and will be made and received on an open or closed basis, as determined by Debtors in consultation with the Consultation Parties, and all material terms of each Bid will be fully disclosed to all other Qualified Bidders. The Debtors will maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, the Successful Bid and the Back-Up Bid. Each Qualified Bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the sale of the Acquired Assets. The Debtors, in their reasonable discretion, after consultation with the Consultation Parties, reserve the right to conduct the Auction in a manner designed to maximize value based upon the nature and extent of the Qualified Bids received. The Debtors and their professionals will consult in good faith with the Consultation Parties throughout the Auction process. |

| MATERIALS TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | During the Auction, bidding will begin initially with the Baseline Bid and subsequently continue in minimum increments of at least $250,000 (each, an "Overbid"). The Debtors will announce at the Auction the material terms of each Overbid, value each Overbid in accordance with these Bidding Procedures and provide each Qualified Bidder with an opportunity to make a subsequent Overbid (except in the event of a round of closed, final bidding). Additional consideration in excess of the amount set forth in the Baseline Bid may include cash and/or other consideration acceptable to the Debtors in accordance with these Bidding Procedures; *provided*, however, that no portion of the consideration may include non-cash consideration other than in the form of the assumption of Assumed Liabilities without the prior written consent of Agents (acting at the direction of the Prepetition Secured Parties pursuant to the Prepetition Secured Note Documents and DIP Documents (each as defined in the DIP Orders)). Qualified Bidders must submit a Bid in each round of bidding that is higher or otherwise better than the highest or otherwise best Bid submitted by a Qualified Bidder in the prior round of bidding in order to remain eligible to participate in future rounds of bidding in the Auction. To the extent that a Qualified Bidder fails to submit a Bid in a round of bidding that is higher or otherwise better than the highest or otherwise best Bid submitted by a Qualified Bidder in the prior round of bidding, such Qualified Bidder shall be disqualified from continuing to participate in the Auction. When bidding at the Auction, the Stalking Horse Bidder will receive a cash credit in the amount of the Expense Reimbursement and Break-Up Fee and will be allowed to bid the Expense Reimbursement and Break-Up Fee.

To the extent that an Overbid has been accepted entirely or in part because of the addition, deletion, or modification of a provision or provisions in the applicable Transaction Documents or the Stalking Horse Agreement, the Debtors, after consultation with the Consultation Parties, will provide notice to each participant of the value ascribed by the Debtors to any such added, deleted, or modified provision or provisions, with such value being determined by the Debtors in their reasonable discretion, after consultation with the Consultation Parties.

Any Overbid made from time to time by a Qualified Bidder must remain open and binding on the Qualified Bidder unless and until (i) the Debtors accept a higher and otherwise better bid submitted by another Qualified Bidder during the Auction as an Overbid and (ii) such Overbid is not selected as the Back-Up Bid (as defined below). To the extent not previously provided (which will be determined by the Debtors), a Qualified Bidder submitting an Overbid must submit at the Debtors' request, as part of its Overbid, written evidence (in the form of financial |

| MATERIALS TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors (in consultation with the Consultation Parties)) demonstrating such Qualified Bidder's ability to close the transaction at the purchase price contemplated by such Overbid.<br><br>*See* **Bidding Procedures at § H(5)** |

### III.      Form and Manner of Sale Notice.

22.      As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice, the Bidding Procedures Order, and the Bidding Procedures upon the following parties or their respective counsel, if known (collectively, the "Notice Parties"): (a) the U.S. Trustee for the District of Delaware; (b) counsel to the Stalking Horse Bidder; (c) counsel any committee appointed in these Chapter 11 Case; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the attorneys general for the states in which the Debtors operate; (g) any parties known or reasonably believed to have expressed an interest in the Debtors' assets; (h) all entities known or reasonably believed to have asserted a lien, encumbrance, claim, or other interest in any of the Debtors' assets; (i) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (j) all known creditors of the Debtors.

23.      Additionally, as soon as practicable after entry of the Bidding Procedures Order, the Debtors shall publish a notice, substantially in the form of the Sale Notice, on one occasion, in *The New York Times National Edition*. This publication notice will provide notice of the sale to any other interested parties whose identities are unknown to the Debtors.

24.      The Debtors submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed sale, including: (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures and the dates and deadlines related thereto; (c) the dates and deadlines related to the Sale Hearing; and (d) instructions for

promptly obtaining a copy of the Stalking Horse Agreement. Accordingly, the Debtors request that the form and manner of the Sale Notice be approved and that the Court determine that no other or further notice of the Auction or Sale Hearing is required.

**IV.     Designation Procedures/Post Auction Notice.**

25.     To facilitate the Sale, the Debtors seek authority to assume and assign the Assigned Contracts designated by the Successful Bidder to the Successful Bidder. The Debtors seek authority to assume and assign the Assigned Contracts to the Successful Bidder in accordance with the assumption and assignment procedures set forth below (the "Designation Procedures"), to govern the assumption and assignment of all of the Debtors' executory contracts and unexpired leases to be assumed and assigned in connection with the Sale, subject to the payment of any payments necessary to cure any defaults arising under any Assigned Contract (the "Cure Payments"). The Designation Procedures are as follows:

a.      **Stalking Horse Bidder Adequate Assurance Information**. On or prior to **May 2, 2025**, the Stalking Horse Bidder shall provide to the Debtors sufficient and adequate financial and other information to demonstrate that the Stalking Horse Bidder (a) has the financial wherewithal and ability to consummate the acquisition of the Assets as provided in the Stalking Horse Bid, and (b) can provide adequate assurance of future performance in satisfaction of the requirements under section 365(f)(2)(B) of the Bankruptcy Code, and the Stalking Horse's willingness to perform, under any contracts that are proposed to be assumed and assigned to the Stalking Horse Bidder.

b.      **Cure Notice.** On or prior to **May 2 2025** (the "Cure Notice Deadline"), the Debtors shall file with the Court and serve a notice of contract assumption (the "Cure Notice"), in substantially the form attached hereto as **Exhibit 3**, by email, where available, or overnight delivery on all counterparties to all potential Assigned Contracts (each, a "Counterparty" and, collectively, the "Counterparties"). The Cure Notice shall include, without limitation, a list of Assigned Contracts (the "Assigned Contract List") that may be assumed and assigned in connection with the Sale and the Cure Payment, if any, that the Debtors believe is required to be paid to the applicable Counterparty under Bankruptcy Code sections 365(b)(1)(A) and (B) for each of the Assigned Contracts. If no Cure Payment is listed on the Assigned Contracts List for a particular

Assigned Contract, the Debtors' asserted Cure Payment for such Assigned Contract shall be deemed to be $0.00. The Assigned Contracts List shall identify each of the potential Assigned Contracts by the name or appropriate description and date of such potential Assigned Contract (if available), the Counterparties and the address of such Counterparties for notice purposes. Service of an Cure Notice does not constitute an admission that such contract is an executory contract or unexpired lease or that such stated Cure Payment constitutes a claim against the Debtors or a right against the Successful Bidder (all rights with respect thereto being expressly reserved). Further, the inclusion of a contract or lease on the Cure Notice is not a guarantee that such contract will ultimately be assumed and assigned.

c.    **Cure Payments**. The payment of the applicable Cure Payments specified in the Cure Notice by the Successful Bidder after the expiration of the applicable objection period and the failure of any applicable Counterparty to timely and properly object to the proposed Cure Payment or to the assumption or assignment of its executory contract or unexpired lease, shall (i) effect a cure of all defaults existing thereunder as of the filing of the Cure Notice, and (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default.

d.    **Contract Objections**. Objections, if any, to the proposed assumption and assignment of a contract or lease, including objections to Cure Payments (each, as defined above, a "Contract Objection"), must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules, and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Payment, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served, so as to be actually received by, the Objection Notice Parties before the Sale Objection Deadline, except as otherwise set forth below with respect to Subsequently Designated Assigned Contracts.

e.    **Changes to Assigned Contract List and Cure Payments.** At the election of the Successful Bidder, up until two (2) business days prior to the closing of any Sale, the Debtors may file and serve supplements or amendments to the Assigned Contracts List (each, a "Supplemental Cure Notice") to (i) add previously omitted Assigned Contracts to the Assigned Contracts List as contracts that may be assumed and assigned to a Successful Bidder in accordance with the definitive agreement for the Sale by filing a supplement to the Assigned Contracts List or (ii) modify the Cure Payment for any Assigned Contract (together, "Subsequently Designated Assigned Contracts"). Contract Objections with respect to Subsequently Designated Assigned Contracts shall be filed no later than ten (10) days from service of a Supplemental Cure Notice identifying the Subsequently Designated Assigned Contracts and served on the Objection Notice Parties (the "Subsequently Designated Assigned Contracts Deadline"). Such objections must (a) be in writing, (b) comply with the applicable provisions of the Bankruptcy Rules, and the Local Rules, (c) state, with specificity, the legal and factual bases thereof, and (d) be filed with the Court and served so as to be actually received by the Objection Notice Parties. Any party

or entity who fails to timely and properly make an objection with respect to the Subsequently Designated Assigned Contracts on or before the Subsequently Designated Assigned Contracts Deadline shall be forever barred from asserting any objection with respect to the Subsequently Designated Assigned Contracts.

f.     **Removal of Contracts from Assigned Contract List.** Up until two (2) business days prior to Closing, the Debtors are authorized, but not directed, if the Successful Bidder so requests, to remove an Assigned Contract from the Assigned Contract List that a successful bidder proposes be assumed and assigned in connection with the Sale.

g.     **Notice of Successful Bidder/Non-Stalking Horse Adequate Assurance Objections.** As soon as practicable after the Auction and in no event later than 24 hours after the Auction, the Debtors shall file with the Court and post on the case website, https://www.veritaglobal.net/CTNHoldings, a notice identifying any Successful Bidder and Back-Up Bidder (the "Notice of Successful Bidder"), together with a copy of the Successful Bidder's proposed purchase agreement and financial and other information regarding adequate assurance of future performance of the Assigned Contracts, and serve the Notice of Successful Bidder on the Counterparties by email, where available, or overnight delivery, and the Counterparties shall file any Contract Objections solely on the basis of adequate assurance of future performance by the Successful Bidder other than the Stalking Horse Bidder (each, an "Non-Stalking Horse Adequate Assurance Objection") not later than the Auction Objection Deadline.

h.     **Assigned Contracts.** At the Sale Hearing, the Debtors will seek Court approval of the assumption and assignment to the Successful Bidder of the Assigned Contracts, subject to the dispute resolution procedures set forth in paragraph 23(d) in the Bidding Procedures Order; *provided* that, in the event the Successful Bidder is not the Stalking Horse Bidder, objections to adequate assurance of future performance of the Assigned Contracts by such Successful Bidder shall be heard at a subsequent hearing, as set forth in paragraph 23(c) in the Bidding Procedures Order. The inclusion of an Assigned Contract on a Cure Notice will not (a) obligate the Debtors to assume any Assigned Contract listed thereon nor the Successful Bidder to take assignment of such Assigned Contract or (b) constitute any admission or agreement of the Debtors that such Assigned Contract is an executory contract.

i.     **Dispute Resolution.**    To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under Bankruptcy Code sections 365(b)(1)(A) and (B) (any such dispute, a "Cure Dispute"), such Contract Objection shall be adjudicated at the Sale Hearing or at such other date and time as the Debtors determine, in their discretion and in consultation with the Successful Bidder and the Consultation Parties (subject to the Court's calendar). If such Contract Objection has not been resolved prior to the closing of a Sale (whether by an order of the Court or by agreement with

the Counterparty), the Successful Bidder may (a) treat such Counterparty's contract or lease as part of Excluded Assets or (b) temporarily treat the Counterparty's contract or lease as part of Excluded Assets (a "<u>Designated Agreement</u>"), proceed to the closing of the Sale with respect to all other Assets, and determine whether to treat the Designated Agreement as an Assigned Contract, or part of Excluded Assets within ten (10) business days after resolution of such objection (whether by order of the Court or by written agreement of the applicable Successful Bidder, the Counterparty, and the Debtors).

j.  **Back-Up Bidder Adequate Assurance Objections.** In the event that a Successful Bidder does not consummate the Sale and a Back-Up Bidder (other than the Stalking Horse Bidder) has been previously identified, the Debtors shall file with the Court and post on the case website, https://www.veritaglobal.net/CTNHoldings, a Notice of Intent to Proceed with Back-Up Bid, together with a copy of the Back-Up Bidder's proposed purchase agreement and financial and other information regarding adequate assurance of future performance of the Assigned Contracts by the Back-Up Bidder (including the name of the Back-Up Bidder and description of its business), and serve the Notice of Intent to Proceed with Back-Up Bid on the Counterparties by email, where available, or overnight delivery, and the Counterparties shall have seven (7) days to file and serve on the Objection Notice Parties a Contract Objection solely on the basis of adequate assurance of future performance by the Back-Up Bidder. If any objections are filed, the Debtors shall schedule a hearing, which may be expedited, upon reasonable notice under the circumstances (which shall be no less than ten (10) days after the Notice of Intent to Proceed with Back-Up Bid is filed), with respect to such Contract Objections.

k.  **Contract Assumption at Closing.** No Assigned Contract shall be deemed assumed and assigned pursuant to section 365 of the Bankruptcy Code until the later of (i) the date the Court has entered an order authorizing the assumption and assignment of such Assigned Contracts or (ii) the date the Sale has closed.

26.     Any party who fails to timely file an objection to its scheduled cure amount listed on the Cure Notice or to the assumption and assignment of a Contract or Lease (i) shall be forever barred, estopped and enjoined from objecting thereto, including (a) making any demands for additional cure amounts or monetary compensation on account of any alleged defaults for the period prior to the applicable objection deadline against the Debtors, their estates or the Contract Party or the Stalking Horse Bidder or other Successful Bidder selected at the Auction, if any, with respect to any such Contract or Lease, (b) from contesting the assumable and assignable nature of the Contract or Lease, or (c) from asserting, declaring, or taking any action based upon a default

in existence on the date of the Sale Order under a Contract or Lease, and (b) asserting that the Contract Party or the Successful Bidder has not provided adequate assurance of future performance as of the date of the Sale Order; (ii) shall be deemed to consent to (a) the sale of the Acquired Assets as approved by the Sale Order and (b) the assumption and assignment of the Contracts and Leases; and (iii) shall be forever barred and estopped from asserting or claiming against the Debtors or the assignee of the relevant Contract or Lease that any conditions to assumption and assignment of such Contract or Lease must be satisfied (pursuant to section 365(b)(1) of the Bankruptcy Code or otherwise).

27.    To provide the Counterparties with information concerning the Successful Bidder and any Back-Up Bidder who may take assignment of their contracts or leases and enable them to object to such assignment on adequate assurance grounds (to the extent the Successful Bidder/Back-Up Bidder is not the Stalking Horse Bidder), as soon as practicable after the Auction and in no event less than 24 hours after the Auction, the Debtors shall file with the Court and serve on all Counterparties a Notice of Successful Bidder.

## BASIS FOR RELIEF REQUESTED

**I.      The Relief Sought in the Bidding Procedures Order, Including Entry into the Stalking Horse Agreement, is in the Best Interests of the Debtors' Estates and Should be Approved.**

28.    Section 363(b) of the Bankruptcy Code provides that "[t]he [debtor in possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of a debtor's estate, courts have approved the authorization of a sale of a

debtor's assets if such sale is based upon the sound business judgment of the debtor. *See*, *e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1990)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).

29.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale, (b) whether adequate and reasonable notice of the sale was provided to interested parties, (c) whether the sale will produce a fair and reasonable price for the property, and (d) whether the parties have acted in good faith. *See In re Decora Indus., Inc.*, No. 00-4459 (JJF), U.S. Dist. LEXIS 27031, at *8 (D. Del. May 20, 2002) (citing *In re Del. & H. R. Co.*, 124 B.R. 169, 176 (D. Del. 1991)). Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Resources*, 147 B.R. 650, 656 (S.D.N.Y. 1992).

30.     Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *In re Integrated Res. Inc.*, 147 B.R. at 659 (observing that sale procedures "encourage bidding and...maximize the value of the debtor's assets").

31.     The Debtors have carefully designed a process that they believe will maximize the value of their estates, produce maximum recoveries, and result in a successful restructuring of their estates. This process includes both entry into the Stalking Horse Agreement, to set a baseline bid

for the auction, and the Bidding Procedures, which are designed to promote active bidding from interested parties and to elicit the highest or otherwise best offers available for the Debtors' assets. The Debtors are confident that the Bidding Procedures will allow the Debtors to solicit additional offers and conduct their sale process in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package of consideration for the assets and who can demonstrate the wherewithal to take on the assets, obligations, and liabilities being transferred. In particular, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

32.     The Debtors respectfully submit that the Stalking Horse Agreement and the Bidding Procedures will encourage robust bidding for the assets and are appropriate under, and consistent with, the relevant standards governing overbid processes in bankruptcy proceedings. Accordingly, the Debtors respectfully submit that the Stalking Horse Agreement and the Bidding Procedures should be approved.

## II.     Approval of the Expense Reimbursement and Break-Up Fee is Appropriate

33.     Approval of bid protections in connection with sales pursuant to section 363 of the Bankruptcy Code has become an established practice in chapter 11 cases. The Third Circuit has held that the administrative expense provisions of section 503(b) of the Bankruptcy Code govern the standard for approval of bid protections in the bankruptcy sale context. Accordingly, bid protections must provide an actual benefit to a debtor's estate and be necessary to preserve the value of estate assets. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533–35 (3d Cir. 1999); *In re Reliant Energy Channelview L.P.*, 594 F.3d 200, 208–09 (3d Cir. 2010) (holding that the business judgment rule may not be used as an

alternative to the administrative expenses section of the Bankruptcy Code as a basis for approving certain bid protections). Whether a proposed break-up fee benefits the estate depends on the "totality of the circumstances" and ultimately requires "a judgment call about whether the proposed fee's potential benefits to the estate outweigh any potential harms." *In re Energy Future Holdings Corp.*, 904 F.3d 298, 314 (3d Cir. 2018).

34.     The Third Circuit has identified several instances in which bid protections in the form of a break-up fee or expense reimbursement may be necessary to preserve the value of estate assets. First, a break-up fee or expense reimbursement may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *In re O'Brien Env't Energy, Inc.*, 181 F.3d at 537. Second, "if the availability of breakup fees and expenses were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id*. Third, such bid protections could preserve an estate's value by "assuring that a bidder 'adhered to its bid rather than abandoning its attempt to purchase . . . in the event that the Bankruptcy Court required an auction for [the] sale' of the relevant asset." *In re Energy Future Holdings Corp.*, 904 F.3d at 314 (quoting *In re Reliant Energy Channel View L.P.*, 594 F.3d at 207).

35.     Here, the Expense Reimbursement and Break-Up Fee satisfy these factors. As for the first factor, the Debtors only offered the Expense Reimbursement and Break-Up Fee to the extent that they believe, in the exercise of their business judgment and consistent with their fiduciary duties, that offering these protections would enhance and incentivize bidding. The

35

Expense Reimbursement and Break-Up Fee have enabled the Debtors to secure an adequate floor for the Assets and ensure that competing bids be materially higher or otherwise better than the Stalking Horse Bid, benefiting the Debtors' estates and stakeholders. Moreover, the Stalking Horse Bidder would not agree to hold out its bid and act as a stalking horse without Court approval of the Expense Reimbursement and Break-Up Fee; thus, the Debtors could risk losing out on the opportunity to obtain the highest or otherwise best offer for the Assets and would certainly lose out on the downside protection that the Stalking Horse Bid provides.

36.     Moreover, the Stalking Horse Agreement, Expense Reimbursement, and Break-Up Fee are customary and usual under the circumstances and were negotiated at arm's length. The Expense Reimbursement and Break-Up Fee make up only a small percentage of the price for the Assets that the Stalking Horse Bidder has offered. The Break-Up Fee, for instance, represents only 3% of the consideration offered by the Stalking Horse Bidder. In sum, the Debtors' ability to offer the Expense Reimbursement and Break-Up Fee enables them to ensure the sale of the Assets at a price they believe to be fair, while, at the same time, providing them with the potential to achieve an even greater benefit to the Debtors' estates in the form of a higher or otherwise better offer for the Assets.

37.     This Court has approved protections similar to the Expense Reimbursement and Break-Up Fee proposed here as reasonable. *See, e.g.*, *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Jan. 12, 2023) [D.I. 487] (approving a break-up fee of up to 3.0% of the purchase price and expense reimbursement of up to 0.5% of the stalking horse bid, not to exceed $1.25 million); *In re Armstrong Flooring, Inc.*, No. 22-10426 (MFW) (Bankr. D. Del. May 31, 2022) [D.I. 233] (authorizing debtors to grant break-up fee and expense reimbursement amount in the aggregate not to exceed 3.0% of the cash portion of the purchase price); *In re Ector Cnty. Energy*

*Ctr., LLC*, No. 22-10320 (JTD) (Bankr. D. Del. May 6, 2022) [D.I. 136] (approving break-up fee of 3.0% of the stalking horse bid plus expense reimbursements of up to 0.5% of the stalking horse bid); *In re Valeritas Holdings, Inc.*, No. 20-10290 (JKS) (Bankr. D. Del. Mar. 6, 2020) [D.I. 129] (approving a break-up fee of up to 3.0% of the purchase price and expense reimbursement of up to $1 million); *In re Celadon Grp., Inc.*, No. 19-12606 (KBO) (Bankr. D. Del. Jan. 6, 2020) [D.I. 218] (authorizing the debtors to grant a break-up fee of up to 3.0% of the purchase price and an expense reimbursement of up to 1.5% of the purchase price). Accordingly, the Debtors submit that the Expense Reimbursement and Break-Up Fee will be necessary to preserve the value of the estate, are fair and appropriate under the circumstances, and therefore should be approved.

## III.    The Designation Procedures Should Be Approved.

38.    In connection with the assumption and assignment of certain Assigned Contracts, the Debtors believe it is necessary to establish a process by which (a) the Debtors and counterparties to Assigned Contracts can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code and (b) such counterparties can object to the assumption and assignment of the Assigned Contracts and/or related cure amounts.

39.    The Debtors also request that any party that fails to object to the proposed assumption and assignment of any Assigned Contract be deemed to consent to (a) the assumption and assignment of the applicable Assigned Contract pursuant to section 365 of the Bankruptcy Code and (b) assignment notwithstanding any anti-alienation provision or other restriction on assignment. *See, e.g., Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *In re Gabel*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

40.      The Debtors believe that the Designation Procedures are fair and reasonable, provide sufficient notice to parties to the executory contracts, and provide certainty to all parties in interest regarding their obligations and rights in respect thereof. Accordingly, the Debtors request the Court approve the Designation Procedures set forth in the Bidding Procedures Order.

## IV.    The Form and Manner of the Sale Notice and Notice of Successful Bidder Should Be Approved.

41.      The Sale Notice, which includes information concerning the "free and clear" nature of the Sale, the Bidding Procedures, the Stalking Horse Bid, and other material information, constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002 and Local Rule 6004-1. The Debtors filed contemporaneously herewith a Motion to Shorten the notice period for the hearing on this Motion. Accordingly, no further notice is necessary and the Debtors request that this Court approve the form and manner of the notice of the Sale Notice.

42.      In addition, to provide the Counterparties with information concerning the successful bidder and any Back-Up bidder who may take assignment of their contracts or leases and enable them to object to such assignment on adequate assurance grounds (to the extent the successful bidder/Back-Up bidder is not the Stalking Horse Bidder), as soon as practicable after the Auction and in no event later than 24 hours after the Auction, the Debtors shall file with the Court and serve on all Counterparties the Notice of Successful Bidder. The Debtors submit that such service of the Notice of Successful Bidder is proper and sufficient to timely and proper notice with the Sale. Accordingly, the Debtors request that this Court approve the manner of notice of the Notice of Successful Bidder.

**V.      Approval of the Sale is Appropriate and In the Best Interest of the Debtors' Estate.**

      **A.   The Sale Should Be Approved as an Exercise of the Debtors' Sound Business Judgment.**

43.      Bankruptcy Code section 363(b) provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing. Although Bankruptcy Code section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have found that a debtor's sale or use of its assets outside the ordinary course of business should be approved if the debtor can demonstrate "some articulated business justification." *See In re Martin*, 91 F.3d at 395; *In re Del. & H. R. Co.*, 124 B.R. at 169); *In re Abbotts Dairies*, 788 F.2d 143 (3rd Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1070.

44.      Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995); *see also In re Integrated Res., Inc.*, 147 B.R. at 656; *Committee of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

45.      The Debtors have a sound business justification for the sale of their assets. The Stalking Horse Bid provides a lifeline to the Debtors' business, by providing significant value and ensuring the continuation of the Debtors' operations and employment of the Debtors' employees. Moreover, the Stalking Horse Bid will be subject to the Auction and Bidding Procedures set forth herein, and the competitive bidding process will ensure that the Debtors obtain the best possible value for their assets. As such, the sale of the Debtors' Assets is a valid and sound exercise of the Debtors' business judgment.

### B.   Adequate and Reasonable Notice of the Sale Will Be Provided.

46.     As set forth above, the Sale Notice (a) provides  the date, time and location of the Sale

Hearing, (b) informs interested parties of the deadlines for objecting to the Sale, and (c) otherwise

includes all information relevant to parties interested in or affected by the Sale. Significantly, the form

and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding

Procedures Order, after notice and a hearing, before it is served on parties in interest, and, as such, the

Debtors are confident that the Sale Notice will be properly vetted by the time of service thereof.

### C.   The Sale Has Been Proposed in Good Faith and Without Collusion, and the Successful Bidder Will Be a "Good Faith Buyer".

47.      Pursuant to Bankruptcy Code section 363(m), a good-faith purchaser is one who

purchases assets for value, in good faith, and without notice of adverse claims. *In re Abbotts Dairies*

*of Penn., Inc.*, 788 F.2d at 147 (to constitute lack of good faith, a party's conduct in connection with

the sale must usually amount to fraud, collusion between the purchaser and other bidders or the

trustee or an attempt to take grossly unfair advantage of other bidders); *see also In re Bedford Springs*

*Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839

(D.N.J. 1995) (to constitute lack of good faith, a party's conduct in connection with the sale must

usually amount to fraud, collusion between the buyer and other bidders or the trustee, or an attempt

to take grossly unfair advantage of other bidders).

48.      In other words, a party would have to show fraud or collusion between the

successful bidder and the debtor-in-possession or trustee or other bidders in order to demonstrate a

lack of good faith. *See Pursuit Capital Mgmt. Fund I, L.P. v. Burtch (In re Pursuit Capital Mgmt.,*

*LLC), LLC*, 874 F.3d 124, 135 (3d Cir. 2017) ("The good faith requirement speaks to the integrity

of [the purchaser's] conduct in the course of the sale proceedings. Typically, the misconduct that

would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the

purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In re Dura Auto. Sys., Inc.,* No. 06-11202 KJC, 2007 WL 7728109, at *96 (Bankr. D. Del. Aug. 15, 2007) (same).

49.    The Debtors submit that the successful bidder arising from the Auction (if any), will be a "good faith" purchaser within the meaning of Bankruptcy Code section 363(m) and the terms of any purchase agreement with any successful bidder will be negotiated at arms-length and in good faith without any collusion or fraud.[8] Accordingly, the Debtors will be prepared to show at the hearing to approve any such sale that the successful bidder is entitled to the full protections of Bankruptcy Code section 363(m).

### D. The Sale Should Be Approved "Free and Clear" Under Bankruptcy Code Section 363(f).

50.    Bankruptcy Code section 363(f) permits the Debtors to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets). As Bankruptcy Code section 363(f) is stated in the disjunctive, when proceeding pursuant to section 363(f), it is only necessary to meet one of the five conditions of section 363(f). *See In re Kellstrom Indus.,* 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five

---

[8]    Bankruptcy Code section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

*See* 11 U.S.C. § 363(m).

conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same). The Debtors believe that they will be able to demonstrate at the Sale Hearing that they have satisfied one or more of these conditions.

### E.   Assumption and Assignment of Assigned Contracts Should Be Approved  .

51.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease. *See*, *e.g.*, *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that a debtor's decision to assume or reject executory contract is governed by business judgment standard and may only be overturned if decision is product of bad faith, whim, or caprice). The "business judgment" test in this context only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989).

52.     The Court should approve the decision to assume and assign the executory contracts and unexpired leases in connection with the Sale as a sound exercise of the Debtors' business judgment, consistent with the well-settled standard in this district governing same. The potential Assigned Contracts include those executory contracts and unexpired leases that are necessary to run the Debtors' business. It is unlikely that any purchaser would want to acquire the Debtors' assets on a going-concern basis unless a significant number of the Assigned Contracts needed to

conduct the business and manage the day-to-day operations were included in the transaction. As such, making the potential Assigned Contracts available for assignment is essential to inducing the best offer for the Assets.

53.    Accordingly, the Debtors submit that the assumption and assignment of the Assigned Contracts by way of the Designation Procedures should be approved as an exercise of their business judgment.

54.    Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract or unexpired lease is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code that a debtor (a) cure, or provide adequate assurance of prompt cure of, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder. 11 U.S.C. § 365. This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting nondebtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

55.    The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied. The proposed Designation Procedures set forth in the Bidding Procedures Order provide a clear process by which the Debtors will provide notice of the potential assumption and assignment of executory contracts and unexpired leases and the procedures for resolving any objections thereto. The Designation Procedures afford counterparties a meaningful opportunity to challenge the Debtors' proposed cure amounts and assumption and assignment of any executory contract or unexpired lease. Thus, the Bidding Procedures and Designation Procedures

ensure that all defaults will be cured in connection with the assignment of the Assigned Contracts, as required by section 365(b)(1)(A).

56.     Similarly, the Debtors submit that counterparties will receive adequate assurance of future performance under the Assigned Contracts, as required by section 365(b)(1)(C) of the Bankruptcy Code. "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982). Although no single solution will satisfy every case, the required assurance will fall short of an absolute guarantee of performance. Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *Luce Indus.*, 8 B.R. at 107; *see Androse Assocs. of Allaire, LLC v. A&P (In re A&P)*, 472 B.R. 666, 674 (S.D.N.Y. 2012) ("A debtor need not provide 'an absolute guarantee of performance.'"). The Debtors believe that they will demonstrate that the requirements for assumption and assignment of certain Assigned Contracts to the Stalking Horse Bidder (or other successful bidder) will be satisfied. As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder (*e.g.*, financial credibility, willingness and ability of the interested party to perform under the Assigned Contracts). Further, all counterparties will be provided with notice of the proposed assumption and assignment and will have adequate time and opportunity to object to the assumption or proposed cure amount or otherwise be heard with respect thereto.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

57.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## NOTICE

58.     Notice of this Motion will be provided to: (a) the Office of the United States Trustee; (b) the United States Attorney's Office for the District of Delaware; (c) the Internal Revenue Service; (d) the state attorneys general in states where the Debtors are authorized to do business; (e) counsel to the Stalking Horse Bidder; (f) any parties known or reasonably believed to have expressed an interest in the Debtors' assets; (g) all entities known or reasonably believed to have asserted a lien, encumbrance, claim, or other interest in any of the Debtors' assets; (h) the parties included on the Debtors' consolidated list of their 30 largest unsecured creditors; and (i) all parties entitled to notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, under the circumstances, no other or further notice is required.

## NO PRIOR REQUEST

59.     No prior request for the relief sought in this Motion has been made to this or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding Procedures Order, granting the relief requested in this Motion and such other relief as may be just and proper.

Dated: April 11, 2025
      Wilmington, Delaware

**WHITEFORD, TAYLOR & PRESTON LLC**[9]

_/s/ William F. Taylor, Jr._
William F. Taylor, Jr. (DE No. 2936)
600 North King Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 353-4144
Email: wtaylor@whitefordlaw.com

**WHITEFORD, TAYLOR & PRESTON LLP**
David W. Gaffey (admitted _pro hac vice_)
Brandy M. Rapp (admitted _pro hac vice_)
J. Daniel Vorsteg (admitted _pro hac vice_)
Joshua D. Stiff (admitted _pro hac vice_)
Alexandra G. DeSimone (admitted _pro hac vice_)
3190 Fairview Park Drive, Suite 800
Falls Church, VA 22042-4510
Telephone: (703) 280-9860
Email: dgaffey@whitefordlaw.com
      brapp@whitefordlaw.com
      jdvorsteg@whitefordlaw.com
      jstiff@whitefordlaw.com
      adesimone@whitefordlaw.com

_Proposed Counsel to the Debtors and Debtors in Possession_

---

[9] Whiteford, Taylor & Preston LLP operates as Whiteford, Taylor & Preston LLC in Delaware.