# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CTN HOLDINGS, INC., *et al.*,[1] | Case No. 25-10603 (TMH) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. 65, 171 & ___** |

**ORDER (I) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF CLAIMS, LIENS, AND ENCUMBRANCES, (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF DESIGNATED EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") dated April 11, 2025, of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for the entry of an order (i) (a) approving the bidding procedures (the "Bidding Procedures"), in connection with the sale of all or substantially all of the Debtors' assets; (b) approving various forms and the manner of notice of respective dates, times and places in connection therewith; (c) authorizing the Debtors to enter into and perform under an asset purchase agreement attached hereto as **Exhibit A** (the "Stalking Horse Agreement")[2] between the Debtors (the "Sellers") and Inherent Aspiration, LLC (or its designees, successor, transferee, or assignee) (the "Stalking Horse Bidder"), subject to the solicitation of the highest acceptable offer for the Debtors' assets (the "Acquired Assets"); (d) approving the Expense Reimbursement granted to the Stalking Horse Bidder; (e) approving procedures for the assumption and assignment of certain designated executory contracts and unexpired leases (the "Designation

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are CTN Holdings, Inc. (9122), CTN SPV Holdings, LLC (8689), Make Earth Green Again, LLC (4441), Aspiration QFZ, LLC (1532), Aspiration Fund Adviser, LLC (4214), Catona Climate Solutions, LLC (3375) and Zero Carbon Holdings, LLC (1679). The mailing address for the Debtors is 548 Market Street, PMB 72015, San Francisco, CA 94101-5401.

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Stalking Horse Agreement or in the Motion as applicable.

Procedures"); (f) scheduling an auction (the "Auction") and the date and time of the hearing to approve the sale (the "Sale Hearing") of the Acquired Assets and assumption of certain liabilities of the Debtors (the "Assumed Liabilities"); and (g) granting related relief; and (ii) an order (a) authorizing the sale (the "Sale") of the Acquired Assets to the Stalking Horse Bidder free and clear of all liens, claims, interest and other encumbrances; (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (c) granting related relief; and the Court having considered the Motion and entered the *Order Pursuant to Sections 105, 363, 364, 365 and 541 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9007 and Del. Bankr. L.R. 2002-1 and 6004-1 (A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Approving the Debtors' Entry Into Stalking Horse Agreement and Related Expense Reimbursement; (C) Approving Procedures for the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases; (D) Scheduling an Auction and Sale Hearing; (E) Approving Forms and Manner Of Notice Of Respective Dates, Times, and Places In Connection Therewith; and (F) Granting Related Relief* (D.I. 171) (the "Bidding Procedures Order") approving, among other things, the Bidding Procedures attached thereto as Exhibit 1, authorizing the Debtors to designate Inherent Aspiration, LLC as the Stalking Horse Bidder, the Stalking Horse Agreement as the stalking horse bid for the Acquired Assets (the "Stalking Horse Bid"), the Expense Reimbursement, all as more fully described in the Bidding Procedures Order; and the Debtors having received no Qualified Bids other than the Stalking Horse Bid for the Acquired Assets; and the Debtors, pursuant to the Bidding Procedures, accordingly having canceled the Auction for the sale of the Acquired Assets]; and the Stalking Horse Bidder having been selected as the Successful Bidder for the Acquired Assets; and this Court having conducted the Sale Hearing on June 2, 2025; and all parties in interest having been heard, or having had the

opportunity to be heard, regarding the Stalking Horse Agreement, the Sale and this order (the "Sale Order"); and this Court having reviewed and considered all objections and responses thereto, and the arguments of counsel made, and the evidence adduced, at the hearing with respect to the Bidding Procedures, held on May 14, 2025 (the "Bidding Procedures Hearing") and the Sale Hearing; and upon the entire record of the Bidding Procedures Hearing and the Sale Hearing, and after due deliberation thereon, and good cause appearing therefor:

**IT IS HEREBY FOUND, CONCLUDED, AND DETERMINED THAT:[3]**

**Jurisdiction, Final Order and Statutory Predicates**

A.     This Court has jurisdiction to hear and determine the approval of the Sale under 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these Chapter 11 Cases in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.     This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

C.     The statutory predicates for the relief sought by the Motion are sections 105(a), 363, 365 and 503 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006

---

[3]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are adopted as such. The Court's findings shall also include any oral findings of fact and conclusions of law made by the Court during or at the conclusion of the Sale Hearing. This Sale Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

and 9014, and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United State Bankruptcy Court for the District of Delaware (the "Local Rules").

**Notice of the Sale, Auction and the Cure Amounts**

D.    As evidenced by the *Declaration of Miles Staglik in Support of the Sale of Substantially All of the Debtors' Assets to Inherent Aspiration, LLC* (D.I. 258) (the "Staglik Sale Declaration"), the *Declaration of Teri Stratton Hilco in Support of the Sale of Substantially All of the Debtors' Assets to Inherent Aspiration, LLC* (D.I. 259) (the "Stratton Sale Declaration", and together with the Staglik Sale Declaration, the "Sale Declarations"),  and the certificates of service filed with the Court (D.I. 87, 90, 114, 143, 158, 186, 187, 199, 212, 254, 260, 261 and 262) (collectively, the "Certificates of Service"), proper, timely, adequate, and sufficient notice of the Motion, the Bidding Procedures Order, the Stalking Horse Agreement, the Sale Hearing, the Sale, and transactions contemplated by the Stalking Horse Agreement, including the assumption, assignment and/or transfer of the Assigned Contracts, and a reasonable opportunity to object or be heard with respect thereto and to the entry of this Sale Order has been afforded to all known interested persons and entities entitled to receive such notice, including, but not limited to the Notice Parties set forth in the Bidding Procedures.

E.    In accordance with the provisions of the Bidding Procedures Order, the Debtors have served the *Notice of (I) Possible Treatment of Contracts and Leases, (II) Fixing of Cure Amounts, and (III) Deadline to Object Thereto* (D.I. 177) ("Cure Notice") upon all of the counterparties to the contracts and leases set forth on the schedule attached as Exhibit A (the "Contract and Lease Schedule") to the Cure Notice, as the same may be subsequently modified pursuant to the terms of the Stalking Horse Agreement (each, an "Assigned Contract," and, collectively, the "Assigned Contracts") setting forth: (i) the contract(s) and/or lease(s) that may be assumed by the Sellers and assigned to the Stalking Horse Bidder; (ii) the name of the counterparty

thereto; (iii) notice of the right of the Sellers and/or the Stalking Horse Bidder to withdraw such request for assumption and assignment of the Assigned Contract(s) prior to the Closing; and (iv) the amount, if any, determined by the Sellers to be necessary to be paid by the Sellers to cure and compensate for any existing default in accordance with sections 365(b) and 365(f)(2) of the Bankruptcy Code (the "Cure Amount"). *See* Certificate of Service (D.I. 261). The deadline for a non-Debtor counterparty to file an objection regarding the assumption and assignment of the Assigned Contract and the stated Cure Amount in the Cure Notices (a "Cure Notice Objection") has expired and, to the extent any such party timely filed a Cure Objection, all such Cure Notice Objections have been resolved, withdrawn, overruled or denied, or such Cure Notice Objections have been continued to another date pursuant to the Bidding Procedures without prejudice to the counterparties to have their objections heard by the Court. To the extent that any non-debtor counterparty did not timely file a Cure Notice Objection by the objection deadline listed in the Cure Notices (the "Cure Notice Objection Deadline"), such party shall be deemed to have consented to the (i) assumption and assignment of the Assigned Contract and (ii) proposed Cure Amount set forth on the Cure Notice.

F.       The service of such Cure Notices (i) was good, sufficient and appropriate under the circumstances of these Chapter 11 Cases; (ii) provided such counterparties with a full and fair opportunity to object to such assumption, assignment, or transfer and to the proposed Cure Amount set forth in the Cure Notices; and (iii) was in compliance with the Bidding Procedures Order and applicable provisions of the Bankruptcy Court, the Bankruptcy Rules and Local Rules. Accordingly, no other or further notice need be given in connection with such assumption, assignment, or transfer of the Assigned Contracts or with respect to the Cure Amounts with respect to the Assigned Contracts.

G.      In accordance with the provisions of the Bidding Procedures Order, the Debtors have served evidence of the ability of the Stalking Horse Bidder to provide adequate assurance of future performance under the Assigned Contracts ("Adequate Assurance Notice") upon all of the counterparties of the Assigned Contracts. *See* Certificate of Service (D.I. 254). The deadline for a non-Debtor counterparty to file an objection solely on the issue of whether the Stalking Horse Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code (the "Adequate Assurance Objection") has expired and, to the extent any such party timely filed an Adequate Assurance Objection, all such Adequate Assurance Objections have been resolved, withdrawn, overruled or denied, or such Adequate Assurance Objections have been continued to another date pursuant to the Bidding Procedures without prejudice to the counterparties to have their objections heard by the Court. To the extent that any non-debtor counterparty did not timely file an Adequate Assurance Objection by the objection deadline listed in the Adequate Assurance Notice (the "Adequate Assurance Objection Deadline"), such party shall be deemed to have consented to the adequate assurance of the Stalking Horse Bidder's future performance under the Assigned Contracts.

H.      The service of the Adequate Assurance Notice (i) was good, sufficient and appropriate under the circumstances of these Chapter 11 Cases; (ii) provided such counterparties with a full and fair opportunity to object to whether the Stalking Horse Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code; and (iii) was in compliance with the Bidding Procedures Order and applicable provisions of the Bankruptcy Court, the Bankruptcy Rules and Local Rules. Accordingly, no other or further notice need be given in connection with the adequate assurance of the Stalking Horse Bidder's future performance under the Assigned Contracts.

I.      As evidenced by the Certificates of Service previously filed with this Court and as approved under the Bidding Procedures Order: (i) due, proper, timely, adequate and sufficient notice of the Sale Hearing, the assumption and assignment of the Assigned Contracts, the entry of this Sale Order, and the Sale has been provided to all parties in interest; (ii) such notice was, and is, good, sufficient and appropriate under the circumstances of these Chapter 11 Cases, provided a fair and reasonable opportunity for parties in interest to object, and to be heard, with respect thereto, and was provided in accordance with the Bidding Procedures Order, sections 102(1), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9006, 9007 and 9014, and the applicable Local Rules; and (iii) no other or further notice of such matters is necessary or shall be required.

J.      The Court has considered the *Pro Se Objection to Sale of Catona* (the "Pro Se Objection") filed by Robert Maginn, Jr. (the "Pro Se Creditor") on June 2, 2025 [D.I. 272], and for the reasons stated on the record at the Sale Hearing, the Court finds that the Pro Se Creditor did not establish that he is a creditor or equity holder of the Debtors and did not establish that he has standing to be heard regarding the Sale Motion.  The Court therefore finds that the Pro Se Objection should be and hereby is overruled.

K.

**Title to the Acquired Assets**

L.      The Acquired Assets that are owned by the Debtors constitute property of the Debtors' estates and good title is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  Except as provided in the Stalking Horse Agreement, the Debtors are the sole and rightful owners of such Acquired Assets that are owned by the Debtors with all right, title and interest to transfer and convey the Acquired Assets to the Stalking Horse Bidder, and no other person has any ownership right, title, or interests therein.

**Business Judgment**

M.     The Debtors have demonstrated good, sufficient and sound business purposes and justifications for, and compelling circumstances to promptly consummate, the Sale and other transactions contemplated by the Stalking Horse Agreement and any additional or ancillary documents contemplated thereby (the "Transaction Documents"), including, without limitation, the assumption, assignment, and/or transfer of the Assigned Contracts (collectively, the "Transactions") pursuant to sections 363 and 365 of the Bankruptcy Code, prior to and outside of a plan of reorganization, and such action is an appropriate exercise of the Debtors' business judgment and in the best interests of the Debtors, their estates, and their creditors. Such business reasons include, but are not limited to, the facts that: (i) there is substantial risk of depreciation of the value of the Acquired Assets if the Sale is not consummated promptly; (ii) the Stalking Horse Agreement constitutes the highest and otherwise best offer for the Acquired Assets; (iii) the Stalking Horse Agreement and the Closing will present the best opportunity to realize the value of the Acquired Assets; and (iv) unless the Sale is concluded expeditiously as provided for in this Sale Order and pursuant to the Stalking Horse Agreement, potential creditor recoveries may be substantially diminished.

**Compliance with Bidding Procedures.**

N.     The Bidding Procedures were substantively and procedurally fair to all parties, including all potential bidders, and were the result of arms'-length negotiations. Further, the Bidding Procedures afforded notice and a full, fair, and reasonable opportunity for any Person to make a higher or otherwise better offer to purchase the Acquired Assets. The Debtors, the Stalking Horse Bidder, and their respective counsel and other advisors have complied with the Bidding Procedures and Bidding Procedures Order in all respects. The Stalking Horse Bidder subjected its bid to the competitive Bidding Procedures approved by this Court and the Stalking

Horse Bidder was found eligible to participate in the Auction and was the Successful Bidder for the Acquired Assets in accordance with the Bidding Procedures Order and Bidding Procedures.

**<u>Good Faith of the Stalking Horse Bidder; No Collusion</u>**

O.    The Stalking Horse Bidder is not an insider (as that term is defined in section 101(31) of the Bankruptcy Code) of any of the Debtors or any of their Affiliates.

P.    The Stalking Horse Bidder is purchasing the Acquired Assets in good faith, and is a good faith Stalking Horse Bidder, within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to, and granted pursuant to paragraph 35 below, the full rights, benefits, privileges, and protections of that provision, and the Stalking Horse Bidder and the Sellers have each proceeded in good faith in all respects in connection with the Transaction in that, *inter alia*: (i) the Stalking Horse Bidder recognized that the Debtors were free to deal with any other party interested in acquiring the Acquired Assets; (ii) the Stalking Horse Bidder complied with the provisions in the Bidding Procedures Order; (iii) the Stalking Horse Bidder's bid was subject to the competitive bidding procedures set forth in the Bidding Procedures Order; (iv) the Stalking Horse Bidder has acted in good faith in pursuing the transactions contemplated by the Stalking Horse Bid; (v) the Stalking Horse Bidder is not an insider or affiliate of the Debtors; and (vi) the negotiation and execution of the Stalking Horse Agreement and Transaction Documents were at arms'-length and in good faith. The Purchase Price in respect of the Acquired Assets was not controlled by any agreement among potential bidders and neither the Debtors nor the Stalking Horse Bidder has engaged in any collusion, fraud, or any conduct that would cause or permit the Stalking Horse Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code or that would prevent the application of section 363(m) of the Bankruptcy Code.

Q.      None of the Debtors, the Stalking Horse Bidder, or any of their respective current and former officers, directors, managers, members, partners, managed funds, affiliates, agents, advisors, professionals, and representatives (collectively, the "Representatives"), have engaged in any conduct that would cause or permit the Stalking Horse Agreement or any of the Transaction Documents, or the consummation of the Transaction, to be avoidable or avoided, or for costs or damages to be imposed, under section 363(n) of the Bankruptcy Code, or has acted in bad faith or in any improper or collusive manner with any Person in connection therewith.

### Credit Bid

R.      Pursuant to the Bidding Procedures Order and applicable law, including sections 363(b) and 363(k) of the Bankruptcy Code, the Purchaser, as the Prepetition Collateral Agent under the Prepetition Secured Note Documents and/or as the DIP Collateral Agent under the DIP Loan Agreement, is authorized to credit bid the principal, interest, fees, expenses and other amounts payable under the Prepetition Secured Note Documents and/or the DIP Loan Agreement (such obligations, collectively, the "Obligations"). The Purchaser is authorized to credit bid $20,000,000.00 pursuant to the Bankruptcy Code and the Bidding Procedures Order (the "Credit Bid"), which shall be allocated in the Purchaser's sole discretion as dollar-for-dollar credit against the outstanding obligations under the Prepetition Secured Loan Facility and/or DIP Credit Facility as of the Closing Date.  No additional or further evidence of the Purchaser's ability to include the Credit Bid as consideration within the Stalking Horse Agreement is required.  The Credit Bid and the other consideration set forth in the Stalking Horse Agreement are, collectively, a valid and proper offer pursuant to the Bidding Procedures Order and sections 363(b) and 363(k) of the Bankruptcy Code.  There is no cause to limit the amount of the Credit Bid pursuant to section 363(k) of the Bankruptcy Code.

**Highest and Best Offer**

S.      As demonstrated by the Sale Declarations, the Motion, any evidence proffered or adduced at the Sale Hearing, and the representations of counsel made at the Sale Hearing, the Debtors and their advisors engaged in a robust, diligent and extensive marketing and sale process, which was open and fair, in accordance with the Bidding Procedures Order and the sound exercise of the Debtors' business judgment. The sale process set forth in the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any person or entity to make a higher acceptable offer to purchase the Acquired Assets.

T.      In accordance with the Bidding Procedures Order, the Stalking Horse Bid was deemed a Qualified Bid (as defined in the Bidding Procedures Order) and the Stalking Horse Bidder was eligible to participate at the Auction. The Stalking Horse Bid was the only Qualified Bid received for the Acquired Assets.  Therefore, the Debtors, in accordance with the Bidding Procedures Order, did not conduct an Auction for such Acquired Assets.  *See Notice of Selection of Successful Bidder and Cancellation of Auction (D.I. 235)*.

U.      The Stalking Horse Agreement constitutes the highest and best offer for the Acquired Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Debtors' determination that the Stalking Horse Agreement constitutes the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' fiduciary duties and business judgment.

V.      The Stalking Horse Agreement represents a fair and reasonable offer to purchase the Acquired Assets under the circumstances of these Chapter 11 Cases. No other Person or entity or group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtors' estates than the Stalking Horse Bidder.

W.      Approval of the Stalking Horse Agreement, and the prompt consummation of the Transactions contemplated thereby, is in the best interests of the Debtors, their creditors, their estates and other parties-in-interest.

### No Fraudulent Transfer; Not a Successor

X.      The Stalking Horse Agreement and Transaction Documents were not entered into, and the Transactions are not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors under applicable Law, and none of the Parties to the Stalking Horse Agreement or any of the Transaction Documents are consummating the Transactions with any fraudulent or otherwise improper purpose. The Purchase Price for the Acquired Assets constitutes (i) reasonably equivalent value under the Bankruptcy Code, the Uniform Voidable Transactions Act and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act and (iii) reasonably equivalent value, fair consideration, and fair value under any other applicable Laws of any Governmental Authority.

Y.      Except as expressly set forth in the Stalking Horse Agreement with respect to the Assumed Liabilities, to the greatest extent permitted by applicable Law after the Closing, the Stalking Horse Bidder shall not have any liability, responsibility, or obligations of any kind or nature whatsoever for any Encumbrance (as defined below) of or against the Debtors, or otherwise related to the Acquired Assets (except as expressly set forth in the Stalking Horse Agreement with respect to the Assumed Liabilities), and arising prior to the Closing, by reason of the transfer of the Acquired Assets to the Stalking Horse Bidder. Additionally, the Stalking Horse Bidder shall not be liable for any acts or omissions of the Sellers arising under or related to the Acquired Assets, other than as set forth in the Stalking Horse Agreement. The sale and transfer of the Acquired Assets of the Debtors to the Stalking Horse Bidder, including the assumption by the Debtors and assignment, transfer and/or sale to the Stalking Horse Bidder of the Assigned Contracts, will not

subject the Stalking Horse Bidder to any liability (including any successor liability) under any laws, including any bulk-transfer laws, or any theory of successor or transferee liability, antitrust, environmental, product line, de facto merger or substantial continuity or similar theories, with respect to the operation of the Debtors' business prior to the Closing, except that, upon the Closing or such other date as specified in the Stalking Horse Agreement, the Stalking Horse Bidder shall become liable for the applicable Assumed Liabilities. The Stalking Horse Bidder shall not be deemed, as a result of any action taken in connection with the Transactions, to: (1) be a successor (or other such similarly situated party) to any of the Debtors; (2) have, *de facto* or otherwise, merged or consolidated with or into any of the Debtors; or (3) be a mere continuation or substantial continuation of the Sellers or its enterprise. To the greatest extent permitted by applicable Law, the Stalking Horse Bidder is not acquiring or assuming any Encumbrance arising prior to the Closing, except as expressly set forth in the Stalking Horse Agreement with respect to the Assumed Liabilities.

### **Validity of Transfer**

Z.       Subject to the entry of this Sale Order, the Debtors have full corporate power and authority (i) to perform all of their obligations under the Stalking Horse Agreement and the Transaction Documents, and the Sellers' prior execution and delivery thereof and performance thereunder, has been duly and validly authorized by all necessary corporate or other action of the Debtors and is hereby ratified in full, and (ii) to consummate the Transactions. The Stalking Horse Agreement and Transaction Documents, and the Transactions contemplated thereby, have been duly and validly authorized by all necessary corporate action. No further consents or approvals are required for the Debtors to consummate the Transactions or otherwise perform their respective obligations under the Stalking Horse Agreement or the Transaction Documents, except in each

case as otherwise expressly set forth in the Stalking Horse Agreement or applicable Transaction Documents.

AA.    Effective upon the consummation of the Sale at Closing in accordance with the Stalking Horse Agreement, the transfer of the Acquired Assets to the Stalking Horse Bidder including, without limitation, the assumption, assignment and transfer of the Assigned Contracts, will be a legal, valid, and effective transfer thereof, and vest the Stalking Horse Bidder with all right, title, and interest of the Sellers in and to the Acquired Assets, to the greatest extent permitted by applicable Law, free and clear of all Encumbrances (as defined in paragraph DD of this Sale Order) accruing or arising any time prior to the Closing Date (with such Encumbrances to attach to the proceeds of the Sale with the same priority, validity, force and effect as such Encumbrances had immediately prior to the consummation of such Sale), and except as expressly set forth in the Stalking Horse Agreement with respect to the Assumed Liabilities.

## Section 363(f) Is Satisfied

BB.    The Stalking Horse Bidder would not have entered into the Stalking Horse Agreement and would not consummate the Transactions if the sale of the Acquired Assets, including the assumption, assignment and transfer of the Assigned Contracts, to the Stalking Horse Bidder were not free and clear of all Encumbrances of any kind or nature whatsoever (except as expressly set forth in the Stalking Horse Agreement with respect to the Assumed Liabilities), or if the Stalking Horse Bidder, any of its Affiliates or subsidiaries, or any of their respective Representatives, would, or in the future could, be liable for any of such Encumbrances of any kind or nature whatsoever (except as expressly set forth in the Stalking Horse Agreement with respect to the Assumed Liabilities). The total consideration to be provided under the Stalking Horse Agreement reflects the Stalking Horse Bidder's reliance on this Sale Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the Acquired

Assets owned by the Debtors free and clear of all Claims (including, without limitation, any potential derivative, vicarious, transferee or successor liability claims).

CC.    The Sellers may sell or otherwise transfer the Acquired Assets free and clear of all Encumbrances (except as expressly set forth in the Stalking Horse Agreement with respect to the Assumed Liabilities) because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied. Those holders of Encumbrances against the Debtors, their estates or any portion or subpart of the Acquired Assets who did not object, or who withdrew their objections, to the Sale are deemed to have consented thereto pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of such Encumbrance who did object fall within one or more of the other subsections of section 363(f) and are adequately protected by having their liens, claims, encumbrances, or other Encumbrances, if any, automatically attach to the proceeds of the Sale, ultimately attributable to that portion or subpart of the Acquired Assets in which such creditor alleges or asserts any Encumbrances, in the same order of priority, with the same validity, force and effect, that such Encumbrances had immediately prior to consummation of the Sale as against such portion or subpart of the Acquired Assets, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

DD.    As used in this Sale Order, the term "Encumbrances" includes, in addition to the types of claims described in paragraph EE below, any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), including claims or Liability (as defined in the Stalking Horse Agreement) based on successor liability theories or otherwise under any theory of Law (as defined in the Stalking Horse Agreement) or equity, right, guarantees, actions, suits, licenses, deposits, credits, allowances, options, contractual commitments, liabilities, demand, charge, mortgage, deed of trust, option,

pledge, restrictions, indentures, instruments, security interest or similar interests, hypothecs, trusts or deemed trusts, community property interest, equitable interest, title defects, hypothecations, easements, rights of way, restrictive covenants, rights of first refusal, rights of offset or recoupment (except for those offset or recoupment rights validly exercised before the Petition Date), royalties, conditions, encroachments, preemptive rights, judgments, orders and decrees of any court or foreign domestic governmental entity, taxes (including foreign, state and local taxes), conditional sale or other title retention agreements and other similar impositions, preferences, imperfections or defects of title or restrictions on transfer, voting or use or receipt of income or exercise of any attribute of ownership, whether secured or unsecured, noticed or unnoticed, perfected or unperfected, allowed or disallowed, matured or unmatured, liquidated or unliquidated, disputed or undisputed, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown, whether existing in the United States or elsewhere, whether imposed by agreement, understanding, law, equity, or otherwise, including, but not limited to, (a) mortgages, deeds of trust, pledges, charges, security interests, hypothecations, encumbrances, easements, servitudes, leases, subleases, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of setoff (except for setoffs validly exercised before the Petition Date), rights of use or possession, subleases, leases, conditional sale arrangements, deferred purchase price obligations, or any similar rights; (b) all claims, including, without limitation, all rights or causes of action (whether in law or equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff (except for setoffs validly exercised before the Petition Date), indemnity or contribution or exoneration, demands, claims for reimbursement or subrogation, indemnification claims, or liabilities relating to any act or omission of the Debtors or any other person, consent rights, options,

contract rights, covenants, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity, or otherwise; (c) all debts, liabilities, contractual claims, and labor, employment, and pension claims; (d) any rights that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or consents, or termination of the Debtors' or the Stalking Horse Bidder's interest in the Acquired Assets, or any similar rights; (e) any rights under labor or employment agreements; (f) any rights under pension, multiemployer plan (as such term is defined in section 3(37) or Section 4001(a)(3) of the Employment Retirement Income Security Act of 1974 (as amended, "ERISA")), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (g) any other employee claims related to worker's compensation, occupation disease, or unemployment or temporary disability, including, without limitation, claims that might otherwise arise under or pursuant to (i) ERISA, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Age Discrimination and Employment Act of 1967 and the Age Discrimination in Employment Act, each as amended, (vii) the Americans with Disabilities Act of 1990, (viii) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Internal Revenue Code of any similar state law, (ix) state discrimination laws, (x) state unemployment compensation laws or any other similar state laws, (xi) any other state or federal benefits or claims relating to

17

any employment with the Debtors or any of their predecessors, or (xii) the WARN Act (29 U.S.C. §§ 2101, et seq.) or any state or other laws of similar effect;] (h) any bulk sales or similar law; (i) any taxes arising under or out of, in connection with, or in any way relating to the operation of the Acquired Assets or business of the Debtors before the closing of the Sale; (j) any unexpired and executory contract or unexpired lease to which the Debtors are a party that is not assumed; (k) any other excluded liabilities under the Stalking Horse Agreement; and (l) Encumbrances or other interests arising under or in connection with any acts, or failures to act, of the Debtors or any of their predecessors, affiliates, or subsidiaries, including, but not limited to, Encumbrances or other interests arising under any doctrines of successor liability (to the greatest extent permitted by applicable law), or transferee or vicarious liability, alter ego claims, *de facto* merger claims, violation of the Securities Act of 1933, the Securities Exchange Act of 1934, or other applicable securities laws or regulations, breach of fiduciary duty, or aiding or abetting breach of fiduciary duty, or any similar theories under Contract, applicable Law, equity or otherwise.

EE.    Except as expressly set forth in the Stalking Horse Agreement with respect to the Assumed Liabilities, and without limiting the nature or scope of paragraph DD above, the transfer of the Acquired Assets, including the assumption, assignment and/or transfer of the Assigned Contracts, to the Stalking Horse Bidder, will not subject the Stalking Horse Bidder, or any of its Affiliates or subsidiaries, or any of their respective Representatives to, or subject any Acquired Assets to or provide recourse for, any liability or encumbrance whatsoever with respect to the operation or condition of the Acquired Assets prior to the Closing or with respect to any facts, acts, actions, omissions, circumstances or conditions existing, occurring or accruing with respect thereto prior to the Closing Date, including, without limitation, any liability or encumbrance arising from any of the following: (i) any employment or labor agreements,

consulting agreements, severance arrangements, change in control agreements or other similar agreements to which any Debtor is or was a party, (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices, and programs, including without limitation, any pension plan of the Debtors or any Debtors' affiliates or predecessors or any current or former employees of any of the foregoing, (iii) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs and any obligations with respect thereto that arise from the Employee Retirement Income Security Act of 1974, the Fair Labor Standard Act, Title VII of the Civil rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Americans with Disabilities Act of 1990, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985 or the Worker Adjustment and Retraining Notification Act, (iv) workmen's compensation, occupational disease or unemployment or temporary disability insurance claims, (v) environment liabilities, debts, claims or obligations that may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act or any Environmental Laws, (vi) products liability or warranties, (vii) any bulk sales or similar law, (viii) any litigation by or against the Debtors and (ix) the Laws of the United States, any state, territory or possession thereof, or the District of Columbia based in any theory of products liability, or successor, vicarious or transferee liability. For the avoidance of doubt, the liabilities and encumbrances set forth in this paragraph are included in the defined term "Encumbrances" for all purposes of this Sale Order.

## Assumption, Assignment and/or Transfer of the Assigned Contracts

FF.     The assumption, assignment and/or transfer of the Assigned Contracts to the Stalking Horse Bidder pursuant to the terms of this Sale Order is integral to the Stalking Horse

Agreement and is in the best interests of the Debtors and their estates, creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

GG.    To the extent necessary or required by applicable Law, the Sellers have or will have as of the Closing Date: (i) cured, or provided adequate assurance of cure, of any default existing prior to the Closing Date with respect to the Assigned Contracts, within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code, and (ii) provided compensation, or adequate assurance of compensation, to any party for any actual pecuniary loss to such party resulting from such default, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code. Payment of the Cure Amount is the sole amount required under sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code to cure all such monetary defaults and pay all actual pecuniary losses under the Assigned Contracts.

HH.    The promise of the Stalking Horse Bidder to perform the obligations first arising under the Assigned Contracts after their assumption and assignment to the Stalking Horse Bidder, the Stalking Horse Bidder's financial wherewithal to consummate the transactions contemplated by the Stalking Horse Agreement and the evidence presented at the Sale Hearing demonstrating the Stalking Horse Bidder's ability to perform the obligations under the Assigned Contracts after the Closing Date constitute adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the counterparties to such Assigned Contracts. Any objections, responses or requests with respect to the foregoing, whether formal or informal, the determination of any Cure Amount, or otherwise related to or in connection with the assumption, assignment or transfer of any of the Assigned Contracts to the Stalking Horse Bidder are hereby

overruled on the merits or otherwise treated as set forth in paragraph 4 below. Any parties to Assigned Contracts that did not object to the assumption, assignment or transfer of their applicable Assigned Contract, or to their applicable Cure Amount, are deemed to have consented thereto for all purposes to the assumption and assignment of such Assigned Contract pursuant to this Sale Order.

II.     Pursuant to the Stalking Horse Agreement, the Stalking Horse Bidder shall maintain certain rights to modify the list of the Excluded Assets after the date of this Sale Order. Notwithstanding anything to the contrary in the Stalking Horse Agreement, the Stalking Horse Bidder shall have the ability to add or remove any asset or assets from Schedule 1.2, the list of Excluded Assets, after the consummation of the Sale and the Closing Date, subject to the rights of contract counterparties under the Bidding Procedures Order and Bidding Procedures. The Stalking Horse Bidder would not have agreed to the Transactions without such rights.

JJ.     The Stalking Horse Bidder is purchasing certain rights to receive payment, including the proceeds of damages claims, from or against certain counterparties to contracts pursuant to the Stalking Horse Agreement under section 363 of the Bankruptcy Code. The purchase of those rights is not and shall not be considered to effectuate an assumption of the underlying contracts under section 365 of the Bankruptcy Code, nor shall it (a) entitle the applicable counterparties to assert any entitlement to any Cure Costs, (b) permit or entitle any counterparty to assert any claims against the Stalking Horse Bidder under any circumstances, or (c) create or impose any obligations on the Stalking Horse Bidder to perform under those contracts under any circumstances. The Stalking Horse Bidder is not assuming any liabilities with respect to its purchase of those rights to payment. Any claims or liabilities that could be asserted against the Debtors prior to the Transactions shall remain the sole responsibility of the Debtors and shall

in no respect be or become liabilities of the Stalking Horse Bidder. The Stalking Horse Bidder would not have agreed to the Transactions on different terms.

KK.    The Stalking Horse Bidder and "TREES for the Future" are in the process of negotiating an amendment to that certain Program Agreement, dated as of June 7, 2022, by and between Aspiration Sustainable Impact Services, LLC and TREES for the Future (the "TREES Program Agreement"). The Stalking Horse Bidder and TREES for the Future have agreed that the TREES Program Agreement shall be assumed and assigned to the Stalking Horse Bidder pursuant to the terms and conditions forth in that certain executed Term Sheet between the Stalking Horse Bidder and TREES for the Future dated June 2, 2025 (the "TREES Term Sheet").

LL.    The notice and opportunity to object provided to Counterparties to such Assigned Contracts and to other parties in interest, as set forth in the Assumption and Assignment Procedures contained in the Bidding Procedures Order, fairly and reasonably protects any rights that such counterparties and other parties in interest may have with respect to such Contracts.

## Compelling Circumstances for an Immediate Sale

MM.    To preserve the value of the Acquired Assets and maximize the value of the Debtors' estates, it is essential that the Sale of the Acquired Assets occur within the time constraints set forth in the Stalking Horse Agreement. Time is of the essence in consummating the Sale. The Court expressly finds that there is no just reason for delay in the implementation of this Sale Order. Accordingly, there is sufficient cause to waive the 14-day stay provided in the Bankruptcy Rules 6004(h) and 6006(d).

NN.    Given all of the circumstances of these Chapter 11 Cases and the adequacy and fair value of the Purchase Price under the Stalking Horse Agreement, the proposed transfer of the Acquired Assets to the Stalking Horse Bidder constitutes a reasonable and sound exercise of

the Debtors' business judgment, is in the best interests of the Debtors, their estates, and their creditors, and should be approved.

OO.    The consummation of the Transactions is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105, 363 and 365 of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Transactions.

PP.    The Stalking Horse Agreement is a valid and binding contract between the Debtors and the Stalking Horse Bidder and shall be enforceable pursuant to its terms. The Stalking Horse Agreement and the Transactions themselves, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors, and any chapter 7 or chapter 11 trustee appointed in these chapter 11 cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.

QQ.    The Sale does not constitute a *de facto* plan of reorganization or liquidation or an element of such a plan for any of the Debtors, as it does not and does not propose to: (i) impair or restructure existing debt of, or equity interests in, the Debtors; (ii) impair or circumvent voting rights with respect to any future plan proposed by the Debtors; (iii) circumvent chapter 11 plan safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code; or (iv) classify claims or equity interests, compromise controversies or extend debt maturities. Entry into the Stalking Horse Agreement and the Transactions neither impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictates the terms of a chapter 11 plan for the Debtors. Entry into the Stalking Horse Agreement does not constitute a sub rosa chapter 11 plan.

RR.    The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

SS.     The Stalking Horse Bidder would not consummate the transactions absent the relief provided for in this Sale Order.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

**General Provisions**

1.      The Motion and the relief granted therein to the extent not previously granted by this Court pursuant to the Bidding Procedures Order is granted and approved, as set forth in this Sale Order.

2.      The Transactions contemplated by the Stalking Horse Agreement and the Transaction Documents are approved, as set forth in this Sale Order.

3.      This Court's findings of fact and conclusions of law set forth in the Bidding Procedures Order are incorporated herein by reference.

4.      All Sale Objections, and any joinders thereto, that have not been withdrawn, waived, resolved, or otherwise settled as set forth herein, as announced to this Court at the Sale Hearing or by stipulation filed with this Court, and all reservations of rights included therein, are hereby denied and overruled on the merits with prejudice. For the reasons stated on the record at the Sale Hearing, the Pro Se Objection filed by the Pro Se Creditor is overruled.  All persons and entities who did not object or withdrew their objections to the Motion are deemed to have consented to the Sale and entry of this Sale Order pursuant to section 363(f)(2) of the Bankruptcy Code.

5.      Notice of the Motion and the Sale Hearing was adequate, appropriate, fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, applicable Local Rules, and the Bidding Procedures Order.

**Approval of Stalking Horse Agreement; Binding Nature**

6.       The Stalking Horse Agreement and the other Transaction Documents, and all of the terms and conditions thereof, are hereby approved as set forth herein. The failure specifically to include any particular provision of the Stalking Horse Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Stalking Horse Agreement and the other Transaction Documents be authorized and approved in their entirety, except as provided herein.

7.       The execution, delivery and performance by the Sellers of the Stalking Horse Agreement is approved pursuant to sections 105, 363, and 365 of the Bankruptcy Code.

8.       The consideration provided by the Stalking Horse Bidder for the Acquired Assets under the Stalking Horse Agreement is fair and reasonable and shall be deemed for all purposes to constitute reasonably equivalent value, fair value, and fair consideration under the Bankruptcy Code and any other applicable Law, and the Transactions may not be avoided, or costs or damages imposed or awarded, under section 363(n) or any other provision of the Bankruptcy Code.

9.       Pursuant to sections 363 and 365 of the Bankruptcy Code, the Debtors, as well as their officers, employees and agents, are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the Sale and the other Transactions pursuant to and in accordance with the terms and conditions of the Stalking Horse Agreement and the Transaction Documents, and (b) execute and deliver, perform under, consummate, implement, and take any and all other acts or actions as may be reasonably necessary or appropriate to the performance of their respective obligations as contemplated by the Stalking Horse Agreement and the Transaction Documents or as may be reasonably requested by the Stalking Horse Bidder for the purpose of assigning, transferring, granting, conveying and conferring to the Stalking Horse

Bidder, or reducing to the Stalking Horse Bidder's possession, the Acquired Assets, in each case without further notice to or order of this Court. The Transactions authorized herein shall be of full force and effect, regardless of any Debtor's lack or purported lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.

10.    This Sale Order shall be binding in all respects upon the Debtors, their estates, all creditors, all holders of equity interests in any Debtor, all holders of any claim(s) (whether known or unknown) against any Debtor, any holders of Encumbrances of any kind or nature whatsoever against, in or on all or any portion of the Acquired Assets, all non-Debtor parties to the Assigned Contracts, the Stalking Horse Bidder and all successors and assigns of the Stalking Horse Bidder, including, without limitation, any trustee, if any, subsequently appointed in these Chapter 11 Cases or upon a conversion to cases under chapter 7 under the Bankruptcy Code of any of these Chapter 11 Cases.

**Transfer of Acquired Assets Free and Clear of Encumbrances; Injunction**

11.    Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Debtors are authorized and directed to transfer the Acquired Assets, including but not limited to the Assigned Contracts, to the Stalking Horse Bidder on the Closing Date in accordance with the Stalking Horse Agreement and Transaction Documents. Effective upon the consummation of the sale at Closing as of the Closing Date pursuant to the terms of the Stalking Horse Agreement, such transfer shall constitute a legal, valid, binding, effective and full and complete general assignment, conveyance and transfer of such Acquired Assets transferring good and marketable and indefeasible title and interest in the Acquired Assets to the Stalking Horse Bidder, and the Stalking Horse Bidder shall take title to and possession of such Acquired Assets free and clear of all Encumbrances of any kind or nature whatsoever to the greatest extent permitted by applicable Law (and all such Encumbrances shall attach to the proceeds of the Sale as set forth

in paragraph 13), except as expressly set forth in the Stalking Horse Agreement with respect to the Assumed Liabilities. To the extent required by the Stalking Horse Agreement, the Debtors agree to exercise commercially reasonable efforts to assist the Stalking Horse Bidder in assuring that all Persons that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets will surrender possession of the Acquired Assets to either (i) the Debtors before the Closing Date or (ii) the Stalking Horse Bidder on or after the Closing Date.

12.     Consistent with paragraph H(ix) of the Final DIP Order [D.I. 204] (the "Final DIP Order") and the Settlement Term Sheet attached as Exhibit 3 to the Final DIP Order (the "Settlement Term Sheet") identifying those certain Retained Assets set forth and defined therein, the Acquired Assets being transferred to the Stalking Horse Bidder pursuant to this Sale Order and Stalking Horse Agreement include all claims (as defined in section 101(5) of the Bankruptcy Code) and causes of action of the Sellers against the Prepetition Secured Parties, DIP Secured Parties, any Counterparty whose Assigned Contract is transferred to the Stalking Horse Bidder, and any Person the Stalking Horse Bidder employs post-Closing, including but not limited to those claims and causes of action under chapter 5 of the Bankruptcy Code, contract, and/or tort. For the avoidance of doubt, nothing in this Sale Order modifies the Settlement Term Sheet. Further, the Settlement Term Sheet does not modify the Debtors' release of the Released Parties (as defined in the Final DIP Order) under paragraph H(ix) of the Final DIP Order. Notwithstanding the foregoing, as set forth in and without limiting paragraph H(x) of the Final DIP Order and Settlement Term Sheet, Excluded Assets include any and all claims and causes of action at law or in equity against Joseph Sanberg or any entity controlled at any time by Joseph Sanberg.

13.     Effective upon consummation of the Sale at Closing in accordance with the terms of the Stalking Horse Agreement, all Encumbrances on the Acquired Assets shall

automatically attach solely to the proceeds of the Sale with the same validity, priority, force and effect that they have immediately prior to the consummation of such Sale as against the Acquired Assets, subject to any claims and defenses the Debtors and their estates may possess with respect thereto. This Sale Order shall be effective as a determination that, on and as of the Closing, upon consummation of the Sale in accordance with the Stalking Horse Agreement, all Encumbrances of any kind or nature whatsoever (except as expressly set forth in the Stalking Horse Agreement with respect to the Assumed Liabilities) have to the greatest extent permitted by applicable Law been unconditionally released, discharged and terminated in, on or against the Acquired Assets and such Encumbrances shall attach to the proceeds of the Sale as set forth in the immediately preceding sentence. The provisions of this Sale Order authorizing and approving the transfer of the Acquired Assets free and clear of all Encumbrances shall be self-executing, and neither the Debtors nor the Stalking Horse Bidder shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Sale Order.  All proceeds of the Sale shall be subject to the terms of the interim and final orders authorizing the Debtors to obtain postpetition financing and use of cash collateral (the "DIP Orders") for application to the outstanding Prepetition Secured Loans and DIP Loans (as defined in the DIP Orders) by the Prepetition Collateral Agent and DIP Agent (as defined in the DIP Orders) in accordance with the terms thereof.  All Encumbrances with respect to the Excluded Assets will continue in, under and against the Excluded Assets with the same priority, validity, force and effect as such Encumbrances now have.

14. Except as expressly permitted by the Stalking Horse Agreement or this Sale Order, upon consummation of the Sale at Closing in accordance with the terms of the Stalking Horse Agreement, all persons and entities holding Encumbrances in respect of the Acquired Assets

of any kind or nature whatsoever (other than the Assumed Liabilities) are hereby forever barred, estopped and permanently enjoined from asserting their respective Encumbrances against the Stalking Horse Bidder, any of their respective Affiliates and subsidiaries, and any of their respective Representatives, and each of their respective Acquired Assets and assets, including, without limitation, the Acquired Assets. On and after the Closing Date, upon consummation of the Sale in accordance with the Stalking Horse Agreement, to the extent the holder of an Encumbrance of which the Acquired Assets are free and clear pursuant to the terms hereof does not comply with paragraph 16 of this Sale Order, the Stalking Horse Bidder shall be authorized to execute and file such documents, and to take all other actions as may be necessary, on behalf of each holder of an Encumbrance to release, discharge and terminate such Encumbrances in, on and against the Acquired Assets as provided for herein, as such Encumbrances may have been recorded or may otherwise exist. On and after the Closing Date, upon consummation of the Sale in accordance with the Stalking Horse Agreement, and without limiting the foregoing, to the extent the holder of an Encumbrance (as to which the Acquired Assets are being sold free and clear of pursuant to the terms hereof) does not comply with paragraph 16 of this Sale Order, the Stalking Horse Bidder shall be authorized to file termination statements or lien terminations in any required jurisdiction to remove any record, notice filing, or financing statement recorded to attach, perfect or otherwise notice any Encumbrance that is extinguished or otherwise released pursuant to this Sale Order. This Sale Order constitutes authorization under all applicable jurisdictions and versions of the Uniform Commercial Code for the Stalking Horse Bidder to file, in accordance with the terms of this Sale Order, UCC termination statements with respect to all security interests in or liens on the Acquired Assets.

15.     Other than as specifically provided for in the Stalking Horse Agreement or in this Sale Order, the transfer of the Acquired Assets to the Stalking Horse Bidder pursuant to the Stalking Horse Agreement and Transaction Documents does not require any consents.

16.     On and after the consummation of the Sale at Closing in accordance with the Stalking Horse Agreement, the persons holding an Encumbrance (as to which the Acquired Assets are being sold free and clear of pursuant to the terms hereof), hereby are required to execute such documents and take all other actions as may be reasonably necessary to release their respective Encumbrances in the Acquired Assets, as such Encumbrances may have been recorded or otherwise filed. The Stalking Horse Bidder may, but shall not be required to, file a certified copy of this Sale Order in any filing or recording office in any federal, state, county or other jurisdiction in which any Debtor is incorporated or has real or personal Acquired Assets, or with any other appropriate clerk or recorded with any other appropriate recorder, and such filing or recording shall be sufficient to release, discharge and terminate any of the Encumbrances as to which the Acquired Assets are being sold free and clear of pursuant to the terms hereof, as set forth in this Sale Order as of the Closing Date. All persons and entities that are in possession of any portion of the Acquired Assets on the Closing Date shall promptly surrender possession thereof to the Stalking Horse Bidder at the Closing upon consummation of the Sale in accordance with the Stalking Horse Agreement.

17.     This Sale Order is and shall be binding upon and govern the acts of all persons and entities (including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, and secretaries of state, federal and local officials) who may be required by operation of law, the duties of their office, or contract to accept, file, register or

otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease. Each of the foregoing persons and entities are authorized to accept for filing any and all of the documents and instruments necessary and appropriate to release, discharge and terminate any of the Encumbrances as to which the Acquired Assets are being sold free and clear of pursuant to the terms hereof, or to otherwise consummate the Transactions contemplated by this Sale Order, the Stalking Horse Agreement or any Transaction Document.

**Assigned Contracts; Cure Payments**

18.     Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing Date, the Sellers' assumption, and assignment and transfer to the Stalking Horse Bidder of the Assigned Contracts is hereby authorized and approved in full subject to the terms set forth below.  The Stalking Horse Bidder will, on or prior to the Closing (or as soon thereafter as reasonably practicable), pay the Cure Amounts and cure any and all other defaults and breaches under the Assigned Contracts in accordance with the Stalking Horse Agreement so that such Contracts may be assumed by the Sellers and assigned to the Stalking Horse Bidder as applicable, on the Closing Date in accordance with this Sale Order, the Stalking Horse Agreement, and the Transaction Documents.

19.     Notwithstanding anything in this order to the contrary, pursuant to the Bidding Procedures timely filed Cure Notice Objections and Adequate Assurance Objections have been continued to another date without prejudice to Counterparties or the Stalking Horse Bidder to have such disputes heard by the Court.

31

20.     Upon and as of the Closing, the Sellers are authorized and empowered to, and shall, assume, assign and/or transfer each of the Assigned Contracts to the Stalking Horse Bidder free and clear of all Encumbrances, except as expressly set forth in the Stalking Horse Agreement with respect to the Assumed Liabilities. The payment of the applicable Cure Amounts (if any), or the later payment of such counterparty after the Court's resolution of any dispute regarding the Cure Amount, shall, pursuant to section 365 of the Bankruptcy Code and other applicable Law, (i) effect a cure, or provide adequate assurance of cure, of all defaults existing thereunder as of the Closing and (ii) compensate, or provide adequate assurance of compensation, for any actual pecuniary loss to such non-Debtor party resulting from such default. Accordingly, on and as of the Closing Date, other than such payment, none of the Debtors nor the Stalking Horse Bidder, shall have any further liabilities or obligations to the non-Debtor parties to the Assigned Contracts with respect to, and the non-Debtor parties to the Assigned Contracts shall be forever enjoined and barred from seeking, any additional amounts or claims (as defined in section 101(5) of the Bankruptcy Code) as a result of any defaults that arose, accrued or were incurred at any time on or prior to the Closing. The Stalking Horse Bidder has provided adequate assurance of future performance under the relevant Assigned Contracts within the meaning of sections 365(b) and (f) of the Bankruptcy Code and in accordance with the Bidding Procedures to the extent that any such assurance is required and not waived by the counterparties to such Assigned Contracts. Upon the payment of the applicable Cure Amount, the Assigned Contracts will remain in full force and effect, and no default shall exist, or be deemed to exist, under the Assigned Contracts as of the Closing Date, including any event or condition that, with the passage of time or giving of notice, or both, would constitute such a default.

21.     The Stalking Horse Bidder shall not be required, pursuant to section 365(l) of the Bankruptcy Code or otherwise, to provide any additional deposit or security with respect to any Assigned Contract to the extent not previously provided by the Debtors. All timely filed objections that have asserted requests pursuant to section 365(l) of the Bankruptcy Code or otherwise, to provide any additional deposit or security with respect to any Assigned Contract are hereby adjourned to a hearing at a future date with all parties' rights reserved.

22.     To the extent any provision in any Assigned Contract assumed and assigned pursuant to this Sale Order (including, without limitation, any "change of control" provision) (a) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, such assumption or assignment, or (b) is modified, breached or terminated, or deemed modified, breached or terminated by any of the following: (i) the commencement of these Chapter 11 Cases, (ii) the insolvency or financial condition of any Debtor at any time before the closing of these Chapter 11 Cases, (iii) any Sellers' assumption or assumption and assignment (as applicable) of such Assigned Contract, or (iv) the consummation of the Transactions, including without limitation the transfer of the Acquired Assets and the assignment of the Assigned Contracts,  such provision shall be deemed unenforceable or otherwise modified so as to not entitle the non-Debtor party thereto to prohibit, restrict or condition such assumption or assignment, to modify or terminate such Assigned Contract, or to exercise any other default-related rights or remedies with respect thereto, including, without limitation, any such provision that purports to allow the non-Debtor party thereto to recapture such Assigned Contracts, impose any penalty thereunder, condition any renewal or extension thereof, impose any rent acceleration or assignment fee, or increase or otherwise impose any other premium, penalties, fees or other charges in connection

therewith. All such provisions constitute unenforceable anti-assignment provisions that are void and of no force and effect pursuant to sections 365(b), 365(e) and 365(f) of the Bankruptcy Code.

23.     All requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Sellers and assignment to the Stalking Horse Bidder of the Assigned Contracts have been satisfied. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Stalking Horse Bidder shall be fully and irrevocably vested with all right, title and interest of the Sellers in and under the Assigned Contracts, and each Assigned Contract shall be fully enforceable by the Stalking Horse Bidder in accordance with its respective terms and conditions, except as limited or modified by the provisions of this Sale Order. Upon and as of the Closing, the Stalking Horse Bidder shall be deemed to be substituted for the Sellers as a party to the applicable Assigned Contracts and, accordingly, the Sellers shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assigned Contracts.

24.     Except as provided in the Stalking Horse Agreement or this Sale Order, after the Closing, the Debtors and their estates shall have no further liabilities or obligations with respect to any Assumed Liabilities, and all holders of Claims with respect to any Assumed Liabilities are forever barred and estopped from asserting such Claims against the Debtors, their successors or assigns, their property, or their assets or estates.

25.     The right of the Stalking Horse Bidder to modify the list of the Excluded Assets after the date of this Sale Order is hereby approved.  Notwithstanding anything to the contrary in the Stalking Horse Agreement, after Closing, the Stalking Horse Bidder may add or remove any asset or assets from Schedule 1.2, the list of Excluded Assets, without any adjustment to the Purchase Price, and any such previously considered Excluded Contract that has not been rejected by Sellers that the Stalking Horse Bidder wishes to assume as an Assigned Contract shall be automatically

deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by Sellers to sell and assign to the Stalking Horse Bidder, in each case, without any adjustment to the Purchase Price and with any Cure Costs associated therewith paid by the Stalking Horse Bidder.

26.     To the extent that any counterparty to an Assigned Contract did not object to its Cure Amount or the assumption and assignment of the Assigned Contract, such counterparty to the Assigned Contracts shall be deemed to have consented to such assumption and assignment under section 365(c)(1)(B) of the Bankruptcy Code and the Stalking Horse Bidder shall enjoy all the Sellers' rights, benefits and privileges under each such Assigned Contract as of the applicable date of assumption and assignment without the necessity to obtain any non-Debtor parties' written consent to the assumption or assignment thereof.

27.     Nothing in this Sale Order, the Motion, or in any notice or any other document is or shall be deemed an admission by the Debtors or the Stalking Horse Bidder that any Assigned Contract is an executory contract or unexpired lease under section 365 of the Bankruptcy Code.

28.     The failure of the Debtors or the Stalking Horse Bidder, as applicable, to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of its respective rights to enforce every term and condition of the Assigned Contracts.

29.     To the extent that the Stalking Horse Bidder purchases any rights to receive payment, including the proceeds of damages claims, from or against certain counterparties to contracts pursuant to the Stalking Horse Agreement under section 363 of the Bankruptcy Code, the purchase of those rights is not and shall not be considered to effectuate an assumption of the underlying contracts under section 365 of the Bankruptcy Code, nor shall it (a) entitle the

applicable counterparties to assert any entitlement to any Cure Costs, (b) permit or entitle any counterparty to assert any claims against the Stalking Horse Bidder under any circumstances, or (c) create or impose any obligations on the Stalking Horse Bidder to perform under those contracts under any circumstances.  The Stalking Horse Bidder is not assuming any liabilities with respect to its purchase of those rights to payment.  Any claims or liabilities that could be asserted against the Debtors prior to the Transactions shall remain the sole responsibility of the Debtors and shall in no respect be or become liabilities of the Stalking Horse Bidder.

30.     For the avoidance of doubt, the Cure Amounts due and payable to TREES for the Future is payable upon execution of the definitive documentation contemplated by and pursuant to the terms of the TREES Term Sheet.

**Additional Injunction; No Successor Liability**

31.     Effective upon the consummation of the Sale on the Closing Date in accordance with the Stalking Horse Agreement and except as expressly set forth in the Stalking Horse Agreement and the Transaction Documents with respect to the Assumed Liabilities, all persons and entities are forever prohibited and permanently enjoined from (a) commencing or continuing in any manner any action or other proceeding, the employment of process, or any act (whether in law or equity, in any judicial, administrative, arbitral or other proceeding), to collect, recover or offset any Encumbrance of which the Acquired Assets are sold free and clear; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order with respect to an Encumbrance in respect of the Acquired Assets, (c) creating, perfecting or enforcing any Encumbrance in respect of the Acquired Assets, or (d) asserting any setoff (except for setoffs validly exercised before the Closing) or right of subrogation of any kind with respect to an Encumbrance in respect of the Acquired Assets, in each case as against the Stalking Horse

Bidder, any of its Affiliates or subsidiaries, or any of their respective Representatives, or any of their respective Acquired Assets or assets, including the Acquired Assets.

32.     The Transactions contemplated by the Stalking Horse Agreement and the Transaction Documents do not cause there to be, and there is not (a) a consolidation, merger, or *de facto* merger of the Stalking Horse Bidder, on the one hand, with or into the Debtors or the Debtors' estates, on the other hand, or vice versa, (b) a substantial continuity between the Stalking Horse Bidder, on the one hand, and the Debtors or the Debtors' estates, on the other hand, (c) a common identity between the Stalking Horse Bidder, on the one hand, and the Debtors or the Debtors' estates, on the other hand, or (d) a mere continuation of the Debtors or their estates, on the one hand, with the Stalking Horse Bidder, on the other hand.

33.     Except to the extent expressly set forth in the Stalking Horse Agreement, including with respect to the Assumed Liabilities, the transfer of the Acquired Assets, including, without limitation, the assumption, assignment and transfer of any Assigned Contract, to the Stalking Horse Bidder shall not cause or result in, or be deemed to cause or result in, the Stalking Horse Bidder, any of its Affiliates or subsidiaries, or any of their respective Representatives, having any liability, obligation, or responsibility for, or any Acquired Assets being subject to or being recourse for, any Encumbrance arising prior to the Closing whatsoever, whether arising under any doctrines of successor, transferee or vicarious liability, breach of fiduciary duty, aiding or abetting breach of fiduciary duty or otherwise, whether at Law or in equity, directly or indirectly, and whether by payment, setoff (except for setoffs validly exercised before the Closing), or otherwise.

34.     For the avoidance of doubt, notwithstanding the consummation of the Transactions and the employment by the Stalking Horse Bidder of certain persons previously

employed by the Debtors, (a) except as expressly set forth in the Stalking Horse Agreement, the Stalking Horse Bidder shall not have any obligations or liabilities to any employee of the Debtors or in respect of any employee benefits owing to any employee of the Debtors by the Debtors or by any plan or program administered by the Debtors or for the benefit of the Debtors' employees, and (b) any obligations of the Stalking Horse Bidder to any such Person shall be expressly limited to (i) those obligations owing to any employee solely as a result of the Stalking Horse Bidder's employment of such employee following the Closing Date; (ii) those obligations expressly agreed upon by the Stalking Horse Bidder with such Person; and (iii) those obligations explicitly assumed by the Stalking Horse Bidder under the Stalking Horse Agreement.

## Good Faith

35.    The Transactions contemplated by this Sale Order, the Stalking Horse Agreement and Transaction Documents are undertaken by the Stalking Horse Bidder without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale and other Transactions shall not alter, affect, limit, or otherwise impair the validity of the Sale or such other Transactions (including the assumption, assignment and/or transfer of the Assigned Contracts), unless such authorization and consummation are duly stayed pending such appeal. The Stalking Horse Bidder is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to, and hereby granted, the full rights, benefits, privileges and protections of section 363(m) of the Bankruptcy Code.

36.    Neither the Debtors nor the Stalking Horse Bidder have engaged in any action or inaction that would cause or permit the Sale to be avoided or costs or damages to be

imposed under section 363(n) of the Bankruptcy Code.  The consideration provided by the Stalking Horse Bidder for the Acquired Assets under the Stalking Horse Agreement is fair and reasonable and the Sale may not be avoided, and costs and damages may not be imposed, under section 363(n) of the Bankruptcy Code.

### Other Provisions

37.    Nothing in this Order or the Stalking Horse Agreement releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner, lessee, or operator of property after the date of entry of this Order.  Nothing in this Order or the Stalking Horse Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, (e) certification, or (f) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

38.    From the Closing Date through and including the first anniversary of the Closing Date, the Stalking Horse Bidder shall grant the Debtors or any successor thereto and any of their respective directors, officers, employees, counsel, advisors, representatives, accountants and auditors reasonable access during normal business hours, upon reasonable advance notice, to the books and records transferred to the Stalking Horse Bidder for the purpose of allowing the Debtors or any successor thereto to perform the duties necessary for the wind down and/or liquidation of the Debtors' estates.

39.    Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) these Chapter 11 Cases, (b) any subsequent chapter 7 case into

which any such Chapter 11 Case may be converted, or (c) any related proceeding subsequent to entry of this Sale Order, shall conflict with or derogate from the provisions of the Stalking Horse Agreement or the terms of this Sale Order. To the extent of any such conflict or derogation, the terms of this Sale Order shall govern.

40.     Pursuant to Bankruptcy Rules 6004(h) and 6006(d), this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the 14-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply. Accordingly, the Debtors are authorized and empowered to close the Sale and other Transactions immediately upon entry of this Sale Order.

41.     Nothing in this Sale Order shall modify or waive any closing conditions, post-closing covenants or termination rights in Article VI of the Stalking Horse Agreement, and all such conditions and rights shall remain in full force and effect in accordance with their terms.

42.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Transactions. Except as otherwise expressly provided in the Stalking Horse Agreement, all obligations of the Debtors relating to taxes, whether arising under any law, by the Stalking Horse Agreement, or otherwise, shall be the obligation of and fulfilled and paid by the Debtors.

43.     All payment or reimbursement obligations of the Sellers owed to the Stalking Horse Bidder pursuant to the Stalking Horse Agreement, including, without limitation, Section 7.3, or the Transaction Documents shall be paid solely in accordance with the terms thereof and in the manner provided therein, without further notice to or order of this Court. All such obligations shall constitute allowed administrative claims against the Debtors in accordance with the Stalking Horse Agreement and section 507(b) of the Bankruptcy Code. Until satisfied in full

in cash, all such obligations shall continue to have the protections provided in this Sale Order, and shall not be discharged, modified, or otherwise affected by any reorganization plan for the Debtors.

44.     Pursuant to section 1107(a) of the Bankruptcy Code, the Debtors, in their capacity as debtors-in-possession in the Chapter 11 Cases, are the "trustee" of the Debtors' estates for purposes of state, local, or municipal law or regulation applicable to the transfer of any Permit (as defined below) to the Stalking Horse Bidder. The Debtors' officers shall be authorized to, and hereby have the authority to, execute, on behalf of the Debtors and all other current holders of the Permits (if any), all documents and forms required by any applicable authorities, to transfer the Permits to the Stalking Horse Bidder, subject to approval by such authorities, as applicable. The Stalking Horse Bidder or the Debtors' officers are further authorized to submit a copy of this Sale Order with any such transfer application to establish such authority for purposes of any state, local, municipal law or regulation applicable to the transfer of any Permit to the Stalking Horse Bidder. All existing Permits applicable to the business shall remain in place for Stalking Horse Bidder's benefit until either new Permits are obtained or existing Permits are transferred in accordance with applicable administrative procedures. The Debtors shall reasonably cooperate with the Stalking Horse Bidder prior to Closing in connection with Stalking Horse Bidder's efforts to transfer or obtain new Permits.

45.     To the extent provided by section 525 of the Bankruptcy Code, no Governmental Authority may deny, revoke, suspend, or refuse to renew any permit, license, registration, governmental authorization or approval or similar grant (each a "**Permit**") relating to the operation of the Acquired Assets sold, transferred, or conveyed to the Stalking Horse Bidder on account of the filing or pendency of the Chapter 11 Cases or the consummation of the Transactions contemplated by the Stalking Horse Agreement and the Transaction Documents.  The

Stalking Horse Bidder shall be authorized, as of the Closing to operate under the Permits related to the Acquired Assets, if any, to the extent provided for in the Stalking Horse Agreement and the Transaction Documents, such Permits are deemed to have been, and are hereby directed to be, transferred to the Stalking Horse Bidder as of the Closing.

46.     The failure specifically to include any particular provision of the Stalking Horse Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Stalking Horse Agreement be authorized and approved in their entirety.

47.     The Stalking Horse Agreement and Transaction Documents may be modified, amended or supplemented in a writing signed by the parties thereto and in accordance with the terms thereof, without further notice to or order of this Court, *provided that* any such modification, amendment or supplement shall not have a material adverse effect on the Debtors' estates unless approved by order of this Court.

48.     For the avoidance of doubt, nothing in this Sale Order shall constitute, pursuant to 1146(a), the grant of a tax exemption under a plan confirmed under section 1129 or 1191 of the Bankruptcy Code.

49.     This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b), to, among other things, (i) interpret, implement, and enforce the terms and provisions of this Sale Order, the Stalking Horse Agreement, the Transaction Documents, and any amendments thereto and any waivers and consents given thereunder, (ii) adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, (iii) compel delivery of the Acquired Assets to the Stalking Horse Bidder; (iii) enforce the injunctions and limitations of

liability set forth in this Sale Order and (iv) enter any orders under sections 363 and 365 of the Bankruptcy Code with respect to the Assigned Contracts.

50.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

51.     The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby vacated, modified, and terminated with respect to the Debtors to the extent necessary, without further order of the Court, (i) to allow the Stalking Horse Bidder to give the Debtors any notice provided for in the Stalking Horse Agreement, (ii) to allow the Stalking Horse Bidder to take any and all actions permitted by the Stalking Horse Agreement in accordance with the terms and conditions thereof, including, without limitation, effectuating the Sale and the other transactions contemplated by the Stalking Horse Agreement, and (iii) to otherwise implement the terms and provisions of the Stalking Horse Agreement and this Sale Order. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of the Stalking Horse Agreement and this Sale Order, and this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

52.     To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Motion, the terms of this Sale Order shall govern. To the extent there are any inconsistencies between the terms of this Sale Order or the Bidding Procedures Order, on the one hand, and the Stalking Horse Agreement or any Transaction Document, on the other hand, the terms of this Sale Order and the Bidding Procedures Order shall govern, as applicable.

# EXHIBIT A

**ASSET PURCHASE AGREEMENT**

**DATED AS OF JUNE [·], 2025**

**BY AND AMONG**

**INHERENT ASPIRATION, LLC**

**AS PURCHASER,**

**AND**

**CTN HOLDINGS, INC.**

**AND ITS SUBSIDIARIES NAMED HEREIN,**

**AS SELLERS**

# TABLE OF CONTENTS

**Page**

**ARTICLE I PURCHASE AND SALE OF ACQUIRED ASSETS;  ASSUMPTION OF ASSUMED LIABILITIES** ............................................................................................................2
    Section 1.1    Purchase and Sale of the Acquired Assets ....................................2
    Section 1.2    Excluded Assets ..............................................................................4
    Section 1.3    Assumption of Certain Liabilities...................................................5
    Section 1.4    Excluded Liabilities ........................................................................6
    Section 1.5    Assumption/Rejection of Certain Contracts ...................................6

**ARTICLE II CONSIDERATION; PAYMENT; CLOSING** ........................................................8
    Section 2.1    Consideration; Payment .................................................................8
    Section 2.2    Closing ............................................................................................8
    Section 2.3    Closing Deliveries by Sellers.........................................................9
    Section 2.4    Closing Deliveries by Purchaser ....................................................9

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS**...............................10
    Section 3.1    Organization and Qualification.....................................................10
    Section 3.2    Authorization of Agreement .........................................................10
    Section 3.3    Conflicts; Consents ......................................................................10
    Section 3.4    Title to Assets; Sufficiency of Assets ..........................................11
    Section 3.5    Assigned Contracts ......................................................................11
    Section 3.6    Real Property ................................................................................12
    Section 3.7    Employees; Seller Benefit Plans...................................................12
    Section 3.8    Litigation; Decrees.......................................................................13
    Section 3.9    Data Privacy .................................................................................13
    Section 3.10    Environmental Matters..................................................................13
    Section 3.11    Taxes ............................................................................................14
    Section 3.12    Intellectual Property .....................................................................16
    Section 3.13    Compliance with Laws; Permits ...................................................18
    Section 3.14    No Other Representations or Warranties .......................................18

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** .........................19
    Section 4.1    Organization and Qualification.....................................................19
    Section 4.2    Authorization of Agreement .........................................................19
    Section 4.3    Conflicts; Consents ......................................................................19
    Section 4.4    Brokers.........................................................................................20
    Section 4.5    Solvency.......................................................................................20
    Section 4.6    No Additional Representations or Warranties ...............................20

**ARTICLE V COVENANTS AND AGREEMENTS** .................................................................20
    Section 5.1    Conduct of Sellers ........................................................................20
    Section 5.2    Bankruptcy Actions. .....................................................................21
    Section 5.3    Alternative Transactions ...............................................................21
    Section 5.4    Cure Costs ....................................................................................22
    Section 5.5    Access to Information ...................................................................22

Section 5.6      Employee Matters ...................................................................23
Section 5.7      Further Assurances.................................................................23
Section 5.8      Intellectual Property Matters.................................................24
Section 5.9      Tax Matters ............................................................................24

**ARTICLE VI CONDITIONS TO CLOSING** ...........................................................**26**
Section 6.1      Conditions Precedent to the Obligations of Purchaser and Sellers...........26
Section 6.2      Conditions Precedent to the Obligations of Purchaser ............26
Section 6.3      Conditions Precedent to the Obligations of Sellers ................27
Section 6.4      Waiver of Conditions..............................................................28

**ARTICLE VII TERMINATION** .........................................................................**28**
Section 7.1      Termination of Agreement......................................................28
Section 7.2      Effect of Termination..............................................................29
Section 7.3      Termination Payment..............................................................29

**ARTICLE VIII MISCELLANEOUS** ....................................................................**30**
Section 8.1      Non-Survival of Representations and Warranties and Certain
                 Covenants; Certain Waivers....................................................30
Section 8.2      Expenses .................................................................................30
Section 8.3      Notices ....................................................................................30
Section 8.4      Binding Effect; Purchaser Designee .......................................31
Section 8.5      Amendment and Waiver..........................................................32
Section 8.6      Third Party Beneficiaries ........................................................32
Section 8.7      Non-Recourse .........................................................................32
Section 8.8      Severability .............................................................................33
Section 8.9      Construction............................................................................33
Section 8.10     Complete Agreement ..............................................................33
Section 8.11     Specific Performance ..............................................................34
Section 8.12     Jurisdiction and Exclusive Venue ...........................................34
Section 8.13     Governing Law; Waiver of Jury Trial .....................................35
Section 8.14     Counterparts and PDF.............................................................35
Section 8.15     Publicity ..................................................................................35
Section 8.16     Bulk Sales Laws......................................................................36
Section 8.17     Fiduciary Obligations..............................................................36
Section 8.18     Sellers' Representative............................................................36
Section 8.19     Schedules ................................................................................36
Section 8.20     Approval of the Bankruptcy Court .........................................37

**ARTICLE IX ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS** ............**37**
Section 9.1      Certain Definitions..................................................................37
Section 9.2      Rules of Interpretation ............................................................46

**Exhibits**

Exhibit A        Bill of Sale, Form of Assignment and Assumption Agreement
Exhibit B        Form of Intellectual Property Assignment Agreement

Schedules

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of June [•], 2025, is made by and among (a) Inherent Aspiration, LLC, a Delaware limited liability company ("Purchaser"), and (b)(i) CTN Holdings, Inc., a Delaware corporation ("CTN Holdings"), and (ii) the direct subsidiaries (the "Direct Subsidiaries") and indirect subsidiaries ("Indirect Subsidiaries") of CTN Holdings as set forth in the signature pages attached hereto (the Direct Subsidiaries, Indirect Subsidiaries, and CTN Holdings, each a "Seller" and, collectively, "Sellers"). Purchaser and Sellers are referred to herein individually as a "Party" and together as the "Parties." Capitalized terms used herein shall have the meanings set forth herein including Article IX.

WHEREAS, CTN Holdings and the Direct Subsidiaries (the "Debtor Sellers") each has filed a voluntary petition and commenced a case (together, the "Chapter 11 Cases") under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on March 30, 2025;

WHEREAS, Sellers engage in the business of delivering high quality carbon solutions to businesses and connecting companies with decarbonization plans and carbon removal projects (the "Business");

WHEREAS, Purchaser desires to purchase the Acquired Assets (as defined below) and assume the Assumed Liabilities (as defined below) from Sellers, and Sellers desire to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to the terms of the Bidding Procedures, Bidding Procedures Order and the Sale Order; and

WHEREAS, in connection with the Chapter 11 Cases and subject to the terms and conditions contained herein, following entry of the Sale Order finding Purchaser as the Successful Bidder, Sellers shall sell and transfer to Purchaser, and Purchaser shall purchase and acquire from Sellers, pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, the Acquired Assets, and Purchaser shall assume from Sellers the Assumed Liabilities, in each case, as specifically provided herein and in the Sale Order.

NOW THEREFORE, in consideration of the mutual promises contained herein, the benefits to be derived by each Party hereunder, and other good and valuable consideration, the Parties hereby agree as follows:

**ARTICLE I**
**PURCHASE AND SALE OF ACQUIRED ASSETS;**
**ASSUMPTION OF ASSUMED LIABILITIES**

**Section 1.1    Purchase and Sale of the Acquired Assets**. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing (as defined below) Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "Acquired Assets" means all of each Seller's right, properties, title and interest in and to, as of the Closing, all assets relating to the Business, including, solely to the extent relating to the Business, the following assets of each Seller, but excluding in all cases the Excluded Assets (as defined below):

(a)    subject to Section 1.5, all Contracts relating to the Business  listed on Schedule 1.1(a), including any backup data maintained by Sellers in connection therewith, and all non-disclosure agreements with respect to other bidders and potential bidders for the Business (collectively, the "Assigned Contracts"), and all rights and benefits thereunder;

(b)    copies of the Transferred Employee Records;

(c)    the Transferred Intellectual Property, including as set forth on Schedule 1.1(c);

(d)    the name "Catona Climate", "Make Earth Green Again", "Aspiration" or, in each case, any derivation thereof;

(e)    all Personal Information owned, controlled or otherwise processed by or on behalf of such Seller or any of its respective Subsidiaries, including all databases and data collections containing any such Personal Information;

(f)    all Inventory, including the Inventory set forth on Schedule 1.1(f) and held by such Sellers;

(g)    all goodwill and other intangible assets associated with the Business or the Acquired Assets including, but not limited to, all customer and supplier relationships and records, all rights under any confidentiality agreements executed by any third party for the benefit of such Seller or any of its respective Subsidiaries to the extent relating to the Business or the Acquired Assets, and all information and documents relating thereto;

(h)    all rights of such Seller or any of its respective Subsidiaries under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with any current or former employees, or current or former directors, consultants, independent contractors and agents of such Seller or any of its respective Subsidiaries or Affiliates or with third parties in respect of the Business;

(i)    subject to Section 1.5, all prepaid current insurance policies of such Seller or any of its respective Subsidiaries relating to the Business, the Acquired Assets or the Assumed Liabilities which are set forth on Schedule 1.1(a) (which shall be deemed Acquired Contracts), and all rights

and benefits, proceeds and other amounts payable thereunder, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, to the extent they are related to the Business, the Acquired Assets, the Assumed Liabilities or the operation of such Acquired Assets; provided, however, that any directors and officers insurance, including any recoveries thereunder and rights to assert claims relating thereto shall not constitute an Acquired Asset;

(j)        subject to Section 1.5, all Contracts for the lease or license of real property set forth on Schedule 1.1(j) (the "Assumed Leases", which shall be deemed Acquired Contracts), together with (to the extent of such Seller's and any of its respective Subsidiaries' interest therein) the buildings, fixtures and improvements, including tenant improvements, located on or attached to the underlying real property relating to such Assumed Leases, and all rights arising thereunder, and all tenements, hereditaments, appurtenances, rights of ways, easements, licenses, servitudes and other real property rights and privileges appertaining thereto, subject, in each case, to the rights of the applicable landlord (including rights to ownership or use of such property) under such Assumed Leases;

(k)        subject to Section 1.5, all Contracts pursuant to which such Seller or any of its respective Subsidiaries receives the right or license to use any Intellectual Property Right or Computer System, including those set forth on Schedule 1.1(j) (the "Transferred IP Agreements");

(l)        all royalties, advance or prepaid expenses, prepaid assets, deferred assets, security, deposits or similar amounts of such Seller or any of its respective Subsidiaries, which are related to the Business, but other than those relating to Contracts that are not Assigned Contracts or Assumed Leases;

(m)        all Computer Systems owned, or purported to be owned, by such Seller or any of its respective Subsidiaries;

(n)        the Permits issued to, or for the benefit of, such Seller or any of its respective Subsidiaries, all rights and benefits thereunder and all pending applications or filings therefor and renewals thereof, which are related to the Acquired Assets or the Business, in each case, to the extent transferrable to Purchaser;

(o)        all policies and procedures relating to the Acquired Assets or the Business;

(p)        all Accounts Receivable related to the Business or the Acquired Assets, including rights to recover overpayments and those set forth on Schedule 1.1(p);

(q)        all cash of Sellers and the contents of all bank accounts, safety deposit boxes, lock boxes and securities accounts of such Seller or any of its respective Subsidiaries, in each case related to the Business, but expressly excluding all Excluded Cash;

(r)        a copy of the books and records, databases, files, plans, advertising and promotional and training materials, information, data and other similar items of such Seller or any of its respective Subsidiaries, whether in written or electronic or any other format, related solely to the Business, the Acquired Assets or the Assumed Liabilities;

(s)    all rights, claims, accounts and causes of action (including warranty and similar claims) of such Seller or any of its respective Subsidiaries (regardless of whether or not such claims and causes of action have been asserted by the Sellers), including all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, and all rights of indemnity, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, possessed by such Seller or any of its respective Subsidiaries (regardless of whether such rights are currently exercisable), in each case, (i) against any Person, other than any other Seller, that is a party to or related to any Assigned Contract or Assumed Liability to the extent that such Persons do not assert or maintain any rights, claims or causes of action against Sellers, (ii) against any Transferred Employees, or (iii) related to or arising under the Prepetition Secured Loan Facility and/or DIP Facility;

(t)    all claims, causes of action and avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code and any analogous state law claims, against any Person, other than any other Seller, that is a party to or related to any Assigned Contract or Assumed Liability to the extent that such Persons do not assert or maintain any rights, claims or causes of action against Sellers, against any Transferred Employees, or related to or arising under the Prepetition Secured Loan Facility and/or DIP Facility including any proceeds of the foregoing;

(u)    all rights to any credits, statements, rebates (including vendor or supplier rebates), reimbursement, refunds, returns or rights of set off, including, in each case, with respect to Taxes or otherwise;

(v)    any Seller's rights to net operating losses, Tax credits and/or other Tax Attributes for United States federal or state taxes;

(w)    any Tax Records relating primarily to the Business and/or the Acquired Assets; provided, that the Sellers shall be permitted to keep copies of all of the foregoing to the extent necessary or required by the Bankruptcy Court;

(x)    all tangible personal property of such Seller or any of its respective Subsidiaries relating to the Business, including as set forth on Schedule 1.1(x);

(y)    owned vehicles relating to the Business as set forth on Schedule 1.1(y);

(z)    all Equity Interests of any of such Seller or its respective direct or indirect Subsidiaries; and

(aa)    the items listed on Schedule 1.1(aa); and any and all other assets of such Sellers or any of its respective Subsidiaries (other than Excluded Assets and Excluded Liabilities) necessary for the operation of the Acquired Assets or the Business.

Section 1.2    Excluded Assets. Notwithstanding anything to the contrary in this Agreement, in no event shall any Seller be deemed to sell, transfer, assign, convey or deliver, and each such Seller shall retain all right, title and interest to, in and under any properties, rights interests or other assets of such Seller other than the Acquired Assets (collectively, the "Excluded

Assets"). Without limiting the foregoing, "Excluded Assets" means all of each Seller's right, properties, title and interest in and to the following:

(a)      all of such Seller's rights under this Agreement or any of the ancillary agreements entered into among any of the parties in connection herewith;

(b)      all of such Seller's rights under any Excluded Asset;

(c)      all Contracts to which such Seller is a party other than the Assigned Contracts; provided, however, that Purchaser may purchase rights under any such Contracts, which shall constitute Acquired Assets, to the full extent permitted by law;

(d)      all Contracts for the lease or license of real property to which such Seller is a party, other than the Assumed Leases;

(e)      all Seller Benefit Plans and all assets held with respect to the Seller Benefit Plans;

(f)      all Tax Records of a Seller Tax Group or such Seller or Affiliate thereof, other than any Tax Records listed in Section 1.1(t);

(g)      all current directors and officers insurance policies of such Seller or any of its respective Subsidiaries, and all rights and benefits, proceeds and other amounts payable thereunder, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(h)      any and all claims and causes of action at law or in equity against Joseph Sanberg or any entity controlled at any time, directly or indirectly. by Joseph Sanberg;

(i)      all cash or cash equivalents and contents of deposit accounts that constitute proceeds of the DIP Facility, and all cash held in, or other contents of, the Professional Fee Escrow (together, "Excluded Cash"); and

(j)      The Retained Assets set forth in Section 4 of the Settlement Term Sheet attached as Exhibit 3 to the Final DIP Order [D.I. 204].

At any time on or prior to Closing and with prior written notice to Sellers, Purchaser may add or remove any asset or assets of Sellers from the foregoing list of Excluded Assets by listing such assets on Schedule 1.2; provided, that Sellers shall provide notice to the Office of the United States Trustee and any official committee in the Chapter 11 Cases of any asset or assets added or removed as an Excluded Asset during the period after entry of the Sale Order and prior to Closing.

Section 1.3    **Assumption of Certain Liabilities**. On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, Purchaser shall irrevocably assume from each Seller (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and such Seller shall irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication (collectively, the "Assumed Liabilities"):

(a)      all Liabilities (other than any Liability for Taxes) arising out of or relating to the ownership and operation of the Acquired Assets or Assigned Contracts arising at or after the Closing that become due and payable after the Closing (including, for the avoidance of doubt, accounts payable for services performed or goods purchased after the Closing);

(b)      all Liabilities in respect of Transferred Employees arising from and after the Closing (other than with respect to Seller Benefit Plans); and

(c)      all cure costs required to be paid as determined by the Bankruptcy Court or agreed to by Purchaser and the non-debtor counterparty to the applicable Assigned Contract pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "Cure Costs").

**Section 1.4      Excluded Liabilities**.  Except for the Assumed Liabilities, Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, any of the Sellers of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing before or on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing (collectively, the "Excluded Liabilities").

**Section 1.5      Assumption/Rejection of Certain Contracts**.

(a)   Sellers shall provide timely and proper written notice in accordance with the Bidding Procedures Order to all parties to any executory contracts or unexpired leases to which any Seller is a party that are Assigned Contracts of the proposed assumption and assignment of such Assigned Contracts and take all other actions reasonably necessary to cause such Assigned Contracts to be assumed by Sellers and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code at the Closing.  As of and conditioned on the occurrence of the Closing, and if Purchaser shall have provided adequate assurance of future performance under section 365(b)(1)(C) of the Bankruptcy Code with respect to any Assigned Contract, Sellers shall assign or cause to be assigned to Purchaser or an Affiliate of Purchaser designated by Purchaser, as applicable, the Assigned Contracts. At the Closing, Sellers shall, pursuant to the Sale Order and the Assignment and Assumption Agreement, assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts pursuant to sections 363 and 365 of the Bankruptcy Code.

(b)   Sellers shall transfer and assign, or shall cause to be transferred or assigned, all Assigned Contracts to Purchaser or an Affiliate of Purchaser designated by Purchaser, and Purchaser or such designated Affiliate of Purchaser shall assume all Assigned Contracts, as of the Closing Date pursuant to section 365 of the Bankruptcy Code and the Sale Order. As promptly as practicable following the date hereof, Purchaser and Sellers shall use commercially reasonable efforts to cooperate and determine the Cure Costs under each Assigned Contract, if any, so as to permit the assumption and assignment of each such Assigned Contract pursuant to section 365 of the Bankruptcy Code in connection with the Transactions.

(c)    Notwithstanding anything in this Agreement to the contrary, Purchaser may, in its sole and absolute discretion, amend or revise Schedule 1.1(a) setting forth the Assigned Contracts, in order to add any Contract to, or eliminate any Contract from, such Schedule at any time during the period commencing on the date of this Agreement and ending on the date that is two (2) Business Days prior to the Closing.  Automatically upon the addition of any Contract to Schedule 1.1(a), it shall be an Assigned Contract for all purposes of this Agreement.  Automatically upon the removal of any Contract from Schedule 1.1(a), it shall be an Excluded Asset for all purposes of this Agreement, and no liabilities arising thereunder shall be assumed or borne by the Purchaser unless such liability is otherwise specifically assumed hereunder.

(d)    Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires any consent or approval from any party, including any Governmental Body (other than, and in addition to, and determined after giving effect to any Order of the Bankruptcy Court, including the Sale Order) in order to permit the sale or transfer to Purchaser of the applicable Seller's right, title and interest in and to such asset, and such consent or approval has not been obtained prior to such time as such right, title and interest is to be transferred by Purchaser hereunder, such asset shall not be transferred to, or accepted by, Purchaser. If any Acquired Asset is deemed not to be assigned pursuant to this Section 1.5(d), the Closing shall nonetheless take place subject to the other terms and conditions set forth herein and, thereafter, Sellers and Purchaser shall each (i) use reasonable best efforts to secure such consents or approvals as promptly as practicable after the Closing and (ii) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of Sellers' rights and obligations with respect to any such Acquired Asset, under which (A) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of any direct costs associated with the retention and maintenance of such Acquired Asset incurred by Sellers or their respective Affiliates) with respect to such Acquired Asset with respect to which such consent or approval has not been obtained and (B) Purchaser shall assume and timely discharge all related burdens and obligations with respect to such Acquired Asset. To the extent permitted under Law, the applicable Seller(s) shall hold in trust for and pay to Purchaser promptly upon receipt thereof, such Acquired Asset and all income, proceeds and other monies received by any Seller to the extent related to such Acquired Asset in connection with the arrangements under this Section 1.5(d). Upon satisfying any requisite consent or approval requirement applicable to such Acquired Asset after the Closing, the applicable Seller's right, title and interest in and to such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement, the Sale Order and the Bankruptcy Code.

(e)    If at any time after the Closing, any Seller or Purchaser becomes aware that such Seller continues to hold any Acquired Asset, including an Assigned Contract, or any asset necessary for the operation of the Business that should have been conveyed in accordance with this Agreement, (i) such Party will promptly notify the other Party, and (ii) such Seller shall use its commercially reasonable efforts to transfer (or cause to be transferred) such Acquired Asset or asset to Purchaser or an Affiliate of Purchaser designated by Purchaser. Following written confirmation from Purchaser, Purchaser will assume any Assumed Liabilities associated with the foregoing upon receipt of such Acquired Assets, in each case, without further consideration being due or paid from Purchaser to such Seller. If at any time after the Closing, Purchaser becomes aware that it holds any Excluded Asset, Purchaser will promptly notify Sellers and use its commercially reasonable

efforts to transfer (or cause to be transferred) such Excluded Asset to the applicable Seller, without further consideration being due or paid from any Seller to Purchaser.

(f)     Pursuant to and in accordance with the requirements of the Bidding Procedures Order, Sellers shall deliver to Purchaser and file with the Bankruptcy Court a list of all Contracts that are executory contracts or unexpired leases (the "Contracts List") to which a Seller is a party (which list shall include Sellers' good faith estimate of the Cure Cost associated with each such Contract (collectively, the "Estimated Cure Costs")), which shall reflect, if applicable, the amount of Cure Costs that may have been agreed to between Seller and the applicable counterparty(ies) to any Contract; provided, that, if at any time Purchaser designates any Contract that is an executory contract or unexpired lease as an Assigned Contract which is not a Contract set forth on such Contracts List, or Sellers or Purchaser discover that a Contract should have been listed on the Contracts List, Seller shall promptly upon Purchaser's request therefor provide Sellers' good faith estimate of all Cure Costs pursuant to section 365 of the Bankruptcy Code with respect to each such Contract.

(g)     From and after the date hereof through the Closing, none of the Sellers shall reject or take any action (or fail to take any action that would (or would reasonably be likely to) result in rejection by operation of Law) to reject, repudiate or disclaim any Contract without the prior written consent of Purchaser; provided, that Sellers shall be able to reject any Contract if Sellers have provided written notice to Purchaser or Purchaser's counsel (electronic notice being sufficient) of such rejection (which written notice shall include (in reasonable detail) a description for the basis of such rejection), and Purchaser has not objected to such rejection following the fifth Business Day following Purchaser's receipt of such written notice.

## ARTICLE II
## CONSIDERATION; PAYMENT; CLOSING

**Section 2.1     Consideration; Payment**.  The aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) a credit bid of amounts owed pursuant to the Prepetition Secured Loan Facility and/or pursuant to the DIP Facility (the "Credit Bid") pursuant to section 363(k) of the Bankruptcy Code in an amount equal to $20,000,000.00 (the "Credit Bid Amount"), which shall be allocated in the Purchaser's sole discretion as a dollar-for-dollar credit against the amount of all of the outstanding obligations under the Prepetition Secured Loan Facility and/or DIP Facility as of the Closing Date, (ii) the assumption of Assumed Liabilities, and (iii) payment in full of the Cure Costs.

**Section 2.2     Closing**. The closing of the purchase and sale of the Acquired Assets, the application of the Credit Bid Amount and Purchaser's assumption of the Assumed Liabilities in accordance with this Agreement (the "Closing") will take place remotely by telephone conference and exchange of documents and signatures by electronic mail at 9:00 a.m. Eastern Time on the second Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VI (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), or at such other place, time and date as the Parties may agree in writing.  The date on which the Closing actually occurs is referred to herein as the "Closing Date."

For the purposes of this Agreement, from and after the Closing, the Closing shall be deemed to have occurred at 12:01 a.m. Eastern Time on the Closing Date.

   **Section 2.3**  **Closing Deliveries by Sellers**. At or prior to the Closing, Sellers shall deliver, or cause to be delivered, to Purchaser:

   (a)  a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A attached hereto (the "Assignment and Assumption Agreement") duly executed by each applicable Seller, in each case, with respect to the applicable Acquired Assets;

   (b)  an IRS Form W-9 executed by each Seller or its regarded owner;

   (c)  an Intellectual Property Assignment Agreement substantially in the form of Exhibit B attached hereto (the "Intellectual Property Assignment Agreement") duly executed by each applicable Seller, in each case, with respect to the applicable Transferred Intellectual Property, and such other documents that may be reasonably requested by Purchaser to transfer the Transferred Intellectual Property;

   (d)  a copy of the Sale Order as entered by the Bankruptcy Court;

   (e)  copies of all Assigned Contracts (together with all material amendments, supplements or modifications thereto) to the extent not already located at the offices of the Business;

   (f)  physical possession of all of the Acquired Assets capable of passing by delivery with the intent that title in such Acquired Assets shall pass by and upon delivery;

   (g)  an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of each Seller certifying that the conditions set forth in Section 6.2(a) and Section 6.2(b) have been satisfied; and

   (h)  all other documents, instruments and writings reasonably requested by Purchaser to be delivered by Seller at or prior to the Closing pursuant to this Agreement.

   **Section 2.4**  **Closing Deliveries by Purchaser**. At the Closing, Purchaser shall deliver, or cause to be delivered, to Sellers:

   (a)  the Assignment and Assumption Agreement duly executed by Purchaser;

   (b)  the Intellectual Property Assignment and Assumption Agreement duly executed by Purchaser; and

   (c)  an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the condition set forth in Section 6.3(a) has been satisfied.

# ARTICLE III
# REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Schedules delivered by Sellers concurrently herewith, each Seller represents and warrants to Purchaser as of the date hereof and solely with respect to each such Seller and the applicable Acquired Assets as follows:

**Section 3.1** **Organization and Qualification**. Each Seller is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization. Each Seller is duly licensed or qualified to do business under the Laws of each jurisdiction in which the nature of the business conducted by it makes such licensing or qualification necessary to carry on the Business as now conducted, except where the failure to be so licensed or qualified would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or prevent or materially delay the consummation by such Seller of the Transactions.

**Section 3.2** **Authorization of Agreement**. Subject to entry of the Sale Order:

(a)  such Seller has all necessary power and authority to execute and deliver this Agreement and the other Transaction Agreements to which such Seller is a party and to perform its obligations hereunder and to consummate the Transactions;

(b)  the execution, delivery and performance by such Seller of this Agreement and the other Transaction Agreements to which such Seller is a party, and the consummation by such Seller of the Transactions, have been duly authorized by all requisite corporate action on the part of such Seller and no other organizational proceedings on such Seller's part are necessary to authorize the execution, delivery and performance by such Seller of this Agreement or the other Transaction Agreements and the consummation by it of the Transactions; and

(c)  this Agreement and the other Transaction Agreements to which such Seller is a party have been, or will be, duly executed and delivered by such Seller and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitutes, or will constitute, legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with its and their terms, except that such enforceability (i) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (ii) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "Enforceability Exceptions").

**Section 3.3** **Conflicts; Consents**. Assuming that (i) the Bankruptcy Court enters the Sale Order and (ii) the notices, authorizations, approvals, Orders, permits and consents set forth on Schedule 3.3 are made, given or obtained (as applicable), neither the execution and delivery by such Seller of this Agreement or the other Transaction Agreements, nor the consummation by such Seller of the Transactions, nor performance or compliance by such Seller with any of the terms or provisions hereof or thereof, will (A) require any of the Sellers to give any notice to, make any filing with, or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery by such Seller of this Agreement and the other

Transaction Agreements to which it is or will be a party or the consummation or the performance of the Transactions, (B) conflict with or violate any provision of such Seller's certificate of incorporation, bylaws, shareholders agreement, or other governing documents, as applicable (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any Acquired Asset or accelerate such Seller's obligations under any such Acquired Asset, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any Acquired Assets, except, in each case, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or prevent or materially delay the consummation by such Seller of the Transactions.

**Section 3.4** **Title to Assets; Sufficiency of Assets**.

(a) Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Sellers have good and valid title to, or, in the case of the Assumed Leases, valid and subsisting leasehold interests in, all Acquired Assets, and with respect to the Acquired Assets of the Debtor Sellers free and clear of all Encumbrances (other than Permitted Encumbrances). Pursuant to the Sale Order, the Sellers will convey such title to or rights to use, all of the Acquired Assets, and with respect to the Acquired Assets of the Debtor Sellers free and clear of all Encumbrances (other than Permitted Encumbrances).

(b) Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Acquired Assets constitute the material properties, assets and rights reasonably necessary, and are sufficient in all material respects, for the conduct of the Acquired Assets and the Business as currently conducted, taking into account the fact that the Excluded Assets shall not be acquired by Purchaser pursuant to the terms of this Agreement.

**Section 3.5** **Assigned Contracts**. The Sellers have made available to Purchaser, prior to the date of this Agreement, or will make available to Purchaser promptly following the date of this Agreement, a true, correct and complete copy of each Contract relating to the Business (including, for the avoidance of doubt, all Assigned Contracts and Assumed Leases, collectively, the "Business Contracts"). With respect to each Business Contract, (a) assuming due authorization and delivery by the other party thereto, to the Knowledge of the Sellers, such Business Contract constitutes the valid and legally binding obligation of the Sellers party thereto, enforceable against such Sellers and the counterparty thereto in accordance with its terms and conditions, subject to the Enforceability Exceptions, and (b) except as set forth in Schedule 3.5(b), to the Knowledge of the Sellers, neither such Sellers nor the counterparty thereto is in breach or default under such Business Contract, and to the Knowledge of the Sellers, no event has occurred or condition exists that, with notice or lapse of time, or both, would constitute a default by any Seller or, to the Knowledge of the Sellers, by any other party thereto, except (i) for those defaults that will be cured by the payment of Cure Costs in accordance with the Sale Order or waived in accordance with section 365 of the Bankruptcy Code (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of such Business Contract that is an Assigned Contract) or

(ii) to the extent such breach or default would not reasonably be expected to have a Material Adverse Effect.

Section 3.6    **Real Property**. Schedule 3.6 sets forth a list of each Contract relating to the lease, possession, ownership, use, operation, sublease or license of any real property relating to the Business, as well as the real property location which is the subject thereof (together, the "Leased Real Property").  To the Knowledge of the Sellers, no Person that is not a Seller has any right to possess, use or occupy any of the Leased Real Property except as set forth on Schedule 3.6.  The leasehold interests of the Sellers in the Leased Real Property are subject to no Encumbrances other than Permitted Encumbrances.

Section 3.7    **Employees; Seller Benefit Plans**.

(a)   No Seller or the Business or the Acquired Assets is party to any collective bargaining agreements or similar labor-related Contracts ("Collective Bargaining Agreements") with any labor union representing any current or former employees of Sellers or any of their Subsidiaries. There is no written demand from any labor union seeking recognition as the exclusive bargaining representative of any employees of Sellers or any of their Subsidiaries by such Seller or the Business or the Acquired Assets and there is no pending or, to the Knowledge of the Sellers, threatened, strike, lockout, organized labor slowdown, or concerted work stoppage by any employees of Sellers or any of their Subsidiaries.

(b)   To the Knowledge of the Sellers, each Seller and the Business and the Acquired Assets are in compliance with all applicable Laws respecting employment practices and labor, including those related to wages and hours, collective bargaining, unemployment insurance, workers' compensation, immigration, harassment and discrimination, disability rights and benefits, affirmative action, and employee layoffs except where the failure to be in compliance would not reasonably be expected to result in a Material Adverse Effect.

(c)   There is no Action pending or, to the Knowledge of the Sellers, threatened against such Seller or any Business or Acquired Asset alleging a violation of any applicable labor or employment Law brought by any current or former employees of Sellers or any of their Subsidiaries before any Governmental Body.

(d)   To the Knowledge of the Sellers, each Seller Benefit Plan has been maintained in compliance with its terms and all applicable Laws, except where failure to be in compliance would not reasonably be expected to result in a Material Adverse Effect.

(e)   No Seller nor any other entity that, together with such Seller, would be treated as a single employer under Section 414 of the Tax Code (nor any predecessor) sponsors, maintains, administers or contributes to (or has any obligation to contribute to), or has in the past six years sponsored, maintained, administered or contributed to (or had any obligation to contribute to), or has or is reasonably expected to have any direct or indirect liability with respect to, any plan subject to Title IV of ERISA, including any  "multiemployer plan" as defined in Section 3(37) of ERISA (a "Multiemployer Plan").

(f)   Each Seller Benefit Plan that is intended to be qualified under Section 401(a) of the Tax Code has received a favorable determination or opinion letter from the IRS or has applied to

the IRS for such a letter within the applicable remedial amendment period or such period has not expired and no circumstances exist that would reasonably be expected to result in any such letter being revoked or not being issued or reissued.

**Section 3.8** **Litigation; Decrees**. Except as set forth in Schedule 3.8 or arising in connection with, or out of, the Chapter 11 Cases (or any actions which are the subject matter thereof), there is no Action or Order pending that (a) would reasonably be expected to be material to (or give rise to any material Liability of Purchaser or be materially adverse to the ownership or use by Purchaser of) the  Business, the Acquired Assets or the Assumed Liabilities following Closing, or (b) challenges the validity or enforceability of this Agreement or the Transaction Agreements or that seeks to enjoin, restrain, materially delay, prohibit or otherwise challenge the consummation of the Transactions. Other than the Chapter 11 Cases, no Seller is subject to any outstanding Order that would (i) reasonably be expected to be material to the Business, Acquired Assets or Assumed Liabilities or (ii) prevent or materially delay such Seller's ability to consummate the transactions contemplated by this Agreement or by the Transaction Agreements or perform in any material respect its obligations hereunder or thereunder. There is no Order enjoining any Seller from engaging in or continuing any conduct or practice, or requiring such Seller to take any material action, in connection with the ownership, lease, possession, use or operation of the Acquired Assets owned or held by such Seller, and such Seller is not, nor are any of its respective Affiliates, subject to any outstanding Order relating to the Business, the Acquired Assets, or Assumed Liabilities.

**Section 3.9** **Data Privacy**. Except as  set forth on Schedule 3.9, in connection with its collection, storage, transfer, marketing, sales, security use and other processing of any Personal Information, each Seller and its Subsidiaries is in compliance in all material respects with applicable Laws that regulate data privacy, cybersecurity and/or the collection, storage, transfer, marketing, sales security use and other processing of Personal Information (the "Privacy Laws"). No Seller nor any of its Subsidiaries have received written notice from any Governmental Body or other Person alleging violation of any applicable Privacy Laws and there is no Action pending or, to the Sellers' Knowledge, threatened against any Seller or its Subsidiaries by any Governmental Body or other Person with respect to such matters.  Except as set forth on Schedule 3.9, neither the execution, delivery, or performance of this Agreement, nor the consummation of any of the transactions contemplated under this Agreement shall violate any applicable Privacy Laws in any material respects. Each Seller and its Subsidiaries has commercially reasonable physical, technical, organizational and administrative security measures in place that are designed to protect all Personal Information collected or processed by it or on its behalf from and against unauthorized access, loss, modification, destruction, use or disclosure, and all such measures are in accordance with applicable Privacy Laws in all material respects. There has been no unauthorized access, use, modification, or disclosure of any Personal Information in the possession or control of any Seller or its Subsidiaries, or any event that constitutes a security breach or similar term under applicable Law.

**Section 3.10** **Environmental Matters**.  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

(a)   To the Knowledge of the Sellers, the Sellers have been in compliance in all material respects with all Environmental Laws, which compliance has included obtaining, maintaining, and

making required filings for issuance or renewal of all Material Permits, licenses and authorizations required under Environmental Laws for the operations of the Sellers and their respective Subsidiaries as currently conducted.

(b)  The Sellers have not received, nor is there any pending or, to the Knowledge of the Sellers, any threatened, written notice or Litigation regarding any actual or alleged violation of, or liability or obligation under, Environmental Laws that would reasonably be expected to be material to the Sellers and their respective Subsidiaries taken as a whole.

(c)  Except for a Release that would not reasonably be expected to be material to the Sellers and their Subsidiaries taken as a whole, to the Knowledge of the Sellers, there has been no Release of a Hazardous Substance (x) at, on, about, under or from the corporate offices, or (y) arising from or relating to the operations of the Sellers or their respective Subsidiaries.

(d)  None of the Sellers or any of their respective Subsidiaries, has manufactured, distributed, treated, stored, arranged for or permitted the disposal of, transported, handled, or exposed any Person to, any Hazardous Substance, except for such action that was taken in compliance in all material respects with applicable Environmental Law or would not reasonably be expected to be material to the Sellers and their respective Subsidiaries taken as a whole.

(e)  None of the Sellers or any of their respective Subsidiaries has contractually assumed, pursuant to any acquisition, divestiture, or merger, any obligation of another Person under any Environmental Law that could reasonably be expected to result in material liability or any other material obligation to the Sellers or their respective Subsidiaries under any applicable Environmental Law.

(f)  To the Knowledge of the Sellers, neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will require any investigation or remediation activities or notice to, filing or registration with, or consent of any Governmental Authority or other third party pursuant to any transaction-triggered Environmental Law.

(g)  The Sellers have made available to Purchaser, or will make available to Purchaser promptly following the date of this Agreement, copies and results of any material reports, studies, analyses, tests, or monitoring and any other material documents or correspondence in the Sellers' possession relating to environmental conditions or Liabilities under Environmental Law with respect to the operations of the Sellers and their respective Subsidiaries, corporate offices.

**Section 3.11**    **Taxes**.  Except as disclosed on <u>Schedule 3.11</u> or as would not, individually or in the aggregate, reasonably be expected to (x) result in any material Encumbrances (other than Permitted Encumbrances) on the Acquired Assets or (y) result in any material Tax Liability for Purchaser or any of its Affiliates:

(a)  The Sellers have timely filed all material Tax Returns required to be filed by the Sellers with respect to the Acquired Assets or the Business with the appropriate Governmental Authorities (taking into account any extension of time to file granted or to be obtained on behalf of the Sellers); and all such Tax Returns are true, complete, and correct in all material respects;

(b)   All material Taxes imposed on the Sellers with respect to the Acquired Assets or the Business that are due and owing (taking into account applicable extensions), whether or not shown to be payable on a Tax Return, have been paid (other than any Taxes (i) the nonpayment of which is permitted or required by the Bankruptcy Code, or (ii) that are being contested in good faith and for which appropriate reserves have been made in accordance with GAAP);

(c)   Seller has not agreed to any waiver or extension of any statute of limitations in respect of a material amount of Taxes with respect to the Business and/or the Acquired Assets;

(d)   There are no material pending (or threatened) audits, examinations, investigations or other proceedings, in each case for which a Seller has received written notice or to the Knowledge of the Sellers, relating to a material amount of Taxes with respect to the Acquired Assets or the Business;

(e)   There are no Encumbrances relating to material Taxes (other than Permitted Encumbrances) on any Acquired Assets;

(f)   No claim has been made in writing by a Governmental Authority in a jurisdiction where a Seller does not currently file Tax Returns that such Seller may be subject to Tax by that jurisdiction.

(g)   Sellers have not received written notice of any material Tax deficiency outstanding, proposed or assessed, with respect to the Acquired Assets;

(h)   None of the Acquired Assets constitutes stock, partnership interests or any other equity interest in any Person for U.S. federal income Tax purposes;

(i)   Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party (in each case, to the extent related to the Business and/or the Acquired Assets) and all IRS Forms W-2 and Forms 1099 (or any other applicable Tax forms) required with respect thereto have been properly and timely distributed;

(j)   Seller is not a party to any Tax allocation, Tax indemnification or Tax sharing agreement;

(k)   Seller (i) has not been a member of an affiliated group filing a consolidated federal income Tax Return (other than any group the common parent of which was CTN Holdings or any of its Affiliates), and (ii) does not have liability for the Taxes of any Person under Treasury Regulation 1.1502-6 (or any similar provision of state, local, or non-U.S. law), as a transferee or successor, by Contract (other than a commercial contract entered into in the ordinary course of business the primary purpose of which is unrelated to Tax), or otherwise;

(l)   No Seller has undergone an "ownership change" within the meaning of Section 382 of the Tax Code at any time after the date which is three years prior to the Closing;

(m) Seller is not and has never been a party to any "listed transaction" or "reportable transaction", as defined in Section 6707A(c)(2) of the Tax Code and Treasury Regulation 1.6011-4; and

(n) Seller has, with respect to the Business and/or the Acquired Assets, properly (i) collected and remitted sales and similar Taxes with respect to sales made to its customers, and (ii) for all sales that are exempt from sales and similar Taxes that were made without charging or remitting sales or similar Taxes, received and retained any appropriate Tax exemption certificates and other documentation qualifying such sale as exempt.

**Section 3.12    Intellectual Property.**

(a) Except as set forth on Schedule 3.12(a), the Sellers and their Subsidiaries solely and exclusively own all right, title and interest in and to the Transferred Intellectual Property, and with respect to the Acquired Assets of the Debtor Sellers free and clear of all Encumbrances (other than Permitted Encumbrances). Except as set forth in Schedule 3.12(a), the Transferred Intellectual Property and Transferred IP Contracts, collectively, constitute all of Intellectual Property Rights necessary to conduct the Business. All Transferred Intellectual Property is subsisting, valid and enforceable.

(b) Schedule 3.12(b) contains a complete and accurate list of all issuances, registrations and applications pertaining to Intellectual Property Rights included in the Transferred Intellectual Property, including, as applicable, the (i) owner (and, with respect to any and all domain name registrations, the applicable registrar), (ii) jurisdiction to which the application or registration applies, (iii) application or registration number and (iv) application or registration date (the "Registered Intellectual Property"). The Sellers and their Subsidiaries have paid all maintenance fees, registration fees, renewal fees or annuity expenses due for payment, and have made all filings required, for maintenance of their respective ownership of, and the validity and enforceability of, the Registered Intellectual Property.

(c) Except as set forth in Schedule 3.12(c), (i) neither the Sellers nor their Subsidiaries have brought any Actions that are pending and unresolved alleging infringement, misappropriation or other violation of any of the Transferred Intellectual Property by any Person and (ii) to the Sellers' Knowledge, no Person has infringed, misappropriated or otherwise violated, or is infringing, misappropriating or otherwise violating, any Transferred Intellectual Property. Neither the Sellers nor their Subsidiaries have entered into any Contract granting any third party the right to bring infringement actions with respect to any of the Transferred Intellectual Property that will survive the Closing. There is no Action pending or, to the Sellers' Knowledge, threatened in writing with respect to the Transferred Intellectual Property: (i) contesting the right of the Sellers or their Subsidiaries to use, exercise, sell, license, transfer or dispose of any of the Transferred Intellectual Property; or (ii) challenging the ownership, validity or enforceability of any of the Transferred Intellectual Property. No Transferred Intellectual Property is subject to any outstanding Order or agreement related to or restricting in any manner the use, licensing, assignment, transfer or conveyance thereof by the Sellers or their Subsidiaries.

(d) Except as set forth on Schedule 3.12(a), neither the operation and conduct of the Business, including the Sellers' and their Subsidiaries' marketing, license, sale or use of any

products or services anywhere in the world in connection with the Business nor the use of the Transferred Intellectual Property has infringed, appropriated or otherwise violated, nor does infringe, misappropriate or violate any Intellectual Property Rights of any other Person. There is no pending or, to Sellers' Knowledge, threatened Action alleging that the operation of the Business (including the Sellers' and their Subsidiaries' marketing, license, sale or use of any products or services anywhere in the world in connection with the Business) or the use of the Transferred Intellectual Property infringes, misappropriates or otherwise violates any Intellectual Property Rights of any Person or violates any Contract with any Person to which any Seller or any of its Subsidiaries is a party or by which it is bound.

(e)    Except as set forth on <u>Schedule 3.12(a)</u>, the Sellers and their Subsidiaries have the full right, power and authority to sell, assign, transfer and convey all of their right, title and interest in and to the Transferred Intellectual Property to Purchaser, and upon Closing, Purchaser will acquire from the Sellers good and marketable title to the Transferred Intellectual Property, free of Encumbrances (other than Permitted Encumbrances).

(f)    Except as set forth in <u>Schedule 3.12(a)</u>, the Sellers and their Subsidiaries have secured from each present or former employee, officer, director, agent, outside contractor or consultant of such Sellers or Subsidiary who contributed to the development of any material Transferred Intellectual Property on behalf of the Sellers or the Subsidiaries a written and enforceable agreement that contain (i) a non-disclosure obligation with respect to the Sellers' and the Subsidiaries' confidential information and (ii) a valid assignment to one or more of the Sellers or it Subsidiaries of all rights, title and interest in and to such Transferred Intellectual Property. The Sellers and their Subsidiaries have taken commercially reasonable and appropriate steps to protect, maintain and preserve the confidentiality of any material trade secrets included in the Transferred Intellectual Property and any disclosure by the Sellers or their respective Subsidiaries of such trade secrets to any Person has been pursuant to the terms of a written agreement with such Person.

(g)    All material software owned, licensed, used, or otherwise held for use in the Acquired Assets and the Business is in good working order and condition and is sufficient in all material respects for the purposes for which it is currently used in the Acquired Assets and the Business. Neither Sellers nor any of their Subsidiaries have experienced any material defects in design, workmanship or material in connection with the use of such software that have not been corrected. No such software contains any computer code or any other procedures, routines or mechanisms which may: (i) disrupt, disable, harm or impair in any material way such software's operation, (ii) cause such software to damage or corrupt any data, storage media, programs, equipment or communications of the Sellers or their Subsidiaries, or their respective clients, or otherwise interfere with the Sellers' or their Subsidiaries' operations as currently conducted, or (iii) permit any third party to access any such software to cause disruption, disablement, harm or impairment, damage erasure or corruption (sometimes referred to as "traps", "viruses", "access codes", "back doors" "Trojan horses," "time bombs," "worms," or "drop dead devices"). The Computer Systems used in the Business are sufficient in all material respects for the Sellers' and their Subsidiaries' current needs in the operation of the Business as presently conducted, and there have been no material failures, crashes, security breaches or other adverse events affecting the Computer Systems. The Sellers and the Subsidiaries take commercially reasonable steps to provide for the back-up and recovery of material data and have implemented disaster recovery plans, procedures and facilities and, as applicable, have taken reasonable steps to implement such plans and

procedures. The Sellers and their Subsidiaries have taken reasonable actions designed to protect the integrity and security of the Computer Systems and the information stored therein from unauthorized use, access, or modification by any other Person.

Section 3.13    **Compliance with Laws; Permits**.

(a)    Except as a result of, the filing or pendency of the Chapter 11 Cases, the Sellers are in compliance, in all material respects, with all Laws applicable to the Acquired Assets. Except as related to or, as a result of, the filing or pendency of the Chapter 11 Cases, none of the Sellers has received any written notice of, the material violation of any Laws, and to the Knowledge of the Sellers, no event has occurred or circumstance exists that (with or without notice, passage of time, or both) would constitute or result in a failure by any Seller or its Subsidiaries to comply, in any material respect, with any applicable Law. Except as related to, or as a result of, the filing or pendency of the Chapter 11 Cases, no investigation in relation to any actual or alleged material violation of Law by any Seller or its Subsidiaries is pending or, to the Knowledge of the Sellers, threatened, nor has any Seller or any of its Subsidiaries received any written notice from any Governmental Authority indicating an intention to conduct the same.

(b)    Except as related to, or as a result of, the filing or pendency of the Chapter 11 Cases, all material Permits required for any Seller and its Subsidiaries to conduct the Business as currently conducted by the Sellers are valid and in full force and effect (each a "Material Permit"). No Seller has received notice that any event has occurred that, would reasonably be expected to result in the revocation, cancellation, modification, suspension, lapse, limitation, or non-renewal of any Permit or Permits that, individually or in the aggregate, are material to the operation of the Business as currently conducted by the Sellers or that relate to the Acquired Assets. Each Seller and its Subsidiaries have complied in all material respects, and are currently in compliance in all material respects, with all Permits that, individually or in the aggregate, are material to the operation of the Acquired Assets and the Business as currently conducted by the Sellers, and have made all appropriate filings for issuance or renewal of such Permits. No Action is pending or, to the Knowledge of the Sellers, threatened to terminate, revoke, limit, cancel, suspend or modify any Permit or Permits that, individually or in the aggregate, are material to the operation of the Acquired Assets and the Business as currently conducted by the Sellers, and none of the Sellers has received written notice, or to the Knowledge of the Sellers, oral notice from any Governmental Authority that (i) any such Permit will be revoked or not reissued on the same or similar terms, (ii) any application for any new Permit by any Seller or their respective Subsidiaries or renewal of any Permit or Permits that, individually or in the aggregate, are material to the operation of the Acquired Assets and the Business as currently conducted by the Sellers will be denied, or (iii) the Permit holder is in material violation of any Permit or Permits that, individually or in the aggregate, are material to the operation of the Acquired Assets and the Business as currently conducted by the Sellers.

Section 3.14    **No Other Representations or Warranties**.    Except for the representations and warranties expressly contained in this Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations"), Purchaser is not relying on, and will not rely on the accuracy or completeness or any other express or implied representation and warranty with respect to the Sellers or with respect to the information provided by Sellers to Purchaser and acknowledges

that neither the Sellers nor any other Person on behalf of Sellers makes on behalf of Sellers any other express or implied representation or warranty with respect to Sellers or with respect to any other information provided by Sellers to Purchaser.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers as follows.

**Section 4.1**    **Organization and Qualification**.  Purchaser is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties owned or used by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions.

**Section 4.2**    **Authorization of Agreement**.  Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the Transactions.  Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Parties, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

**Section 4.3**    **Conflicts; Consents**.  Assuming that the Sale Order and all other requisite Bankruptcy Court approvals are obtained, neither the execution and delivery by Purchaser of this Agreement or the other Transaction Agreements, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (i) require Purchaser to give any notice to, make any filing with, or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery by Purchaser of this Agreement and the other Transaction Agreements to which it is or will be a party or, the consummation or the performance of the Transactions, (ii) conflict with or violate any provision of Purchaser's organizational documents,  (iii) violate any Law or Order applicable to Purchaser, (iv) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit

agreement or other material Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, or (v) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its subsidiaries, except, in the case of <u>clauses (i)</u> and <u>(ii)</u>, as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the Transactions.

      **Section 4.4**   **Brokers**.  Purchaser has no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Transactions for which Seller or any or its Subsidiaries is or will become liable.

      **Section 4.5**   **Solvency**. Purchaser is, and immediately after giving effect to the Transactions Purchaser shall be, solvent and at all times shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent Liabilities) and (c) have adequate capital to carry on its business.  No transfer of property is being made and no obligation is being incurred in connection with the Transactions with the intent to hinder, delay or defraud either present or future creditors of Purchaser.  In connection with the Transactions, Purchaser has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

      **Section 4.6**   **No Additional Representations or Warranties**. Except for the representations and warranties contained in this <u>Article IV</u>, Sellers are not relying on, and will not rely on, the accuracy or completeness of any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Sellers by Purchaser and acknowledge that neither Purchaser nor any other Person on behalf of Purchaser makes on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Sellers by Purchaser.

## ARTICLE V
## COVENANTS AND AGREEMENTS

      **Section 5.1**   **Conduct of Sellers**. Except (w) as required by applicable Law, Order or a Governmental Body, (x) for any required limitations or changes of operations as a result of a bankruptcy filing or otherwise imposed by the Bankruptcy Court or the Bankruptcy Code, (y) as expressly contemplated, required or permitted by this Agreement, or (z) to the extent related to an Excluded Asset or an Excluded Liability, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to <u>Article VII</u>), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned), (a) Sellers shall not sell, lease, transfer or assign to any Person, in a single transaction or series of related transactions, any of the Acquired Assets, other than sales in the ordinary course of the Business, and (b) Sellers shall use their commercially reasonable efforts to (i) maintain and operate the Acquired Assets in a manner consistent with past practice, (ii) maintain the books, accounts and records relating to the Acquired Assets and Assumed Liabilities in accordance with past custom and practice in all material respects, (iii) preserve intact,

in all material respects, the business organizations and relationships with third parties of the Acquired Assets and keep available the services of the employees, consultants and agents of the Business in connection with the services such persons provided in respect of the Acquired Assets in the ordinary course of business consistent with past practice, and (iv) comply, in all material respects, with all applicable Laws and Orders applicable to the Acquired Assets and Acquired Liabilities and (v) pay all applicable Taxes as such Taxes become due and payable.

**Section 5.2      Bankruptcy Actions.**

(a)   The Sellers shall seek on an expedited basis, if necessary, entry of the Sale Order and any other necessary orders by the Bankruptcy Court to consummate the Closing, subject to the terms of the Sale Order. Sellers shall consult with Purchaser and its Representatives concerning the Sale Order, any other orders of the Bankruptcy Court relating to the Transactions.  Purchaser shall promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser; provided, however, in no event shall Purchaser or Sellers be required to agree to any amendment of this Agreement.

(b)   From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article VII and (ii) the Closing Date, the Parties shall use their respective commercially reasonable efforts to obtain entry by the Bankruptcy Court of the  Sale Order, which shall be in form and substance reasonably satisfactory to Purchaser.

(c)   Purchaser shall take actions that are reasonably requested by Sellers to assist in obtaining entry of the Sale Order, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement.  Purchaser, on the one hand, and Sellers, on the other hand, shall consult with one another regarding pleadings which any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect, the Bankruptcy Court's entry of the Sale Order.  In the event the entry of the Sale Order shall be appealed in relation to this Agreement, Sellers and Purchaser shall use their respective commercially reasonable efforts to defend such appeal.

**Section 5.3      Alternative Transactions.**

(a)   Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code and the Bidding Procedures Order for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been a sufficient demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors available to testify before the Bankruptcy Court.

(b)    Purchaser and Sellers agree, and relevant Bankruptcy Court filings shall reflect, the fact, that the provisions of this Agreement, including this Section 5.3, are reasonable, were a material inducement to Purchaser to enter into this Agreement and are designed to achieve the highest and best price for the Acquired Assets.

(c)    The Sellers' obligation to pay the Break-Up Fee and the Expense Reimbursement pursuant to Section 7.3 shall survive termination of this Agreement and shall constitute an administrative expense of the Sellers under section 503(b) of the Bankruptcy Code.

(d)    To the extent permitted by the Bidding Procedures, if Sellers receive any interest from a potential purchaser in respect to a potential Alternative Transaction, the Sellers shall consult with the Purchaser, in its capacity as a lender under the DIP Facility and the Prepetition Secured Loan Facility, and, in consultation with Purchaser, shall take into account the projected percentage recovery to the Purchaser, in its capacity as a lender under the DIP Facility and the Prepetition Secured Loan Facility and the certainty of such recovery and any other matters as may be contemplated by the Bidding Procedures.

Section 5.4    **Cure Costs**. Subject to entry of the Sale Order and in connection with the assignment and assumption of the Assigned Contracts, Purchaser shall, on or prior to the Closing, pay the Cure Costs, which Cure Costs shall be the sole responsibility of Purchaser.

Section 5.5    **Access to Information**.

(a)    Sellers shall use commercially reasonable efforts to, prior to the Closing, provide to Purchaser, through its officers, employees and representatives (including their respective legal Advisors and accountants), reasonable access, during normal business hours, and upon reasonable advance written request, to the books and records, including work papers, financial and operating data, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Business, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices, buildings, facilities and properties of Sellers (including for the purpose of better understanding the books and records). The information provided pursuant to this Section 5.5 will be used solely for the purpose of consummating the transactions contemplated hereby (including completing legal or regulatory requirements arising from the transactions, such as submitting a financial report regarding Acquired Assets to the SEC).

(b)    From the Closing Date through and including the first anniversary of the Closing Date, Purchaser shall grant Sellers and their respective representatives reasonable access to the books and records transferred to Purchaser pursuant to this Agreement during regular business hours and upon reasonable notice for the purpose of allowing Sellers or its successors, or their respective representatives to perform the duties necessary for the liquidation of the Estate. Purchaser shall make one or more of the Transferred Employees available to Sellers to assist in Sellers' wind-down of the Estate provided that such access does not unreasonably interfere with the conduct of the Business by Purchaser

**Section 5.6    Employee Matters**.

(a)   Prior to Closing, Sellers shall make available to Purchaser for interviews certain employees as requested by Purchaser. Purchaser may extend to any employee employed by the applicable Seller or Subsidiary thereof a written offer of employment, for employment effective as of the Closing Date, in Purchaser's sole discretion ("Transfer Offer"); provided, that Purchaser shall, and shall cause its Affiliates to, comply with all employment Laws, including anti-discrimination Laws, in connection with making such offers of employment.  Employees who accept such Transfer Offers and begin employment with Purchaser or an Affiliate of Purchaser shall be collectively referred to herein as "Transferred Employees."  For any employee of a Seller that Purchaser makes an offer of employment prior to Closing, Purchaser shall notify such Seller (i) with respect to: each employee to whom it made a Transfer Offer (no later than five Business Days after making such Transfer Offer), and (ii) in a reasonable timeframe (but in any event within five Business Days of receiving a response from the applicable Transferred Employee and no later than immediately prior to the Closing) with respect to whether each such offer has been accepted or rejected. Nothing herein shall be construed as a representation or guarantee by such Seller or any of its Affiliates that any or all employees employed by such Seller will accept the Transfer Offer, or that any Transferred Employee will continue in employment with Purchaser or any of its Affiliates following the Closing for any period of time.

(b)   The provisions of this Section 5.6 are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any Transferred Employees), other than the Parties, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 5.6 or under or by reason of any provision of this Agreement).  Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall alter or limit Purchaser's or such Seller's ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment.

**Section 5.7    Further Assurances**.

(a)   From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions, including to vest in Purchaser all of each Seller's right, title and interest to the Acquired Assets, free and clear of all Liens other than Permitted Liens and Assumed Liabilities.

(b)   From time to time, on or after the Closing Date until the dissolution and liquidation of the Sellers, as and when requested by either Party and at such requesting Party's expense, the other Party will execute and deliver, or cause to be executed and delivered, all such further conveyances, notices, assumptions, assignments, documents and other instruments as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions (including for

the avoidance of doubt, the transfer and conveyance of any Purchased Assets that may be in the possession of any of the Sellers or their Affiliates to Purchaser).

(c)  Without limiting the generality of this Section 5.7, Sellers shall take any and all actions necessary or appropriate to deliver any Equity Interests in or Acquired Assets of any Indirect Subsidiary.

(d)  Except as set forth herein and in this Section 5.7 or Section 1.5(d), nothing in this Agreement shall require either Party (and their respective Subsidiaries or Affiliates, as applicable) to make any expenditure or incur any obligation on their own or on behalf of the other Party.

### Section 5.8    Intellectual Property Matters.

(a)  From and after the Closing Date, the Sellers shall, and shall cause each of their respective Subsidiaries to, as promptly as practicable, remove any and all Trademarks that (i) are included in the Transferred Intellectual Property, (ii) include the name "Catona", "Make Earth Green Again" or "Aspiration"  or (iii) are confusingly similar to any of the foregoing (collectively, the "Business Trademarks") from any and all assets in their respective possession or control (including any publications, signage, corporate letterhead, stationery, business cards, marketing materials or content, internet or other electronic communications vehicles or other materials or as part of the Sellers' or their Subsidiaries' corporate names) and, except as expressly provided for in this Section 5.8, cease and discontinue any and all use of such Business Trademarks.

(b)  No Seller nor any of its Subsidiaries shall contest, challenge or oppose, or knowingly authorize or knowingly facilitate any third party to contest, challenge or oppose, the validity, enforceability or ownership rights of Purchaser or any of its Affiliates of any Business Trademarks or register or seek to register any such Trademarks in any jurisdiction. Any and all goodwill generated by the use of such Business Trademarks, including under this Section 5.8, shall inure solely to the benefit of Purchaser or any of its Affiliates as the respective owner(s) of the applicable Trademark.

### Section 5.9    Tax Matters.

(a)  Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges (including all related interest, penalties, and additions to any of the foregoing) payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "Transfer Taxes") shall be borne and timely paid by the Purchaser and shall be paid to the appropriate taxing authority promptly when due under applicable Law.  The Parties will each timely sign and deliver (or cause to be timely signed and delivered) such certificates or forms as may be necessary or appropriate (and will each otherwise cooperate) to establish any available exemption from (or other reduction in) any Transfer Taxes. The Parties shall cooperate in good faith to minimize, to the fullest extent possible under applicable Law, the amount of any such Transfer Taxes.

(b)  For U.S. federal and applicable state and local income tax purposes, the Purchase Price (and all other relevant items treated as consideration for U.S. federal income tax purposes) shall be allocated to the Acquired Assets (the "Asset Amount").  The Asset Amount shall be allocated consistent with the methodology set forth on Section 1060 of the Tax Code and applicable Treasury

Regulations. Purchaser shall prepare a statement setting forth such allocation of the Asset Amount (the "Purchase Price Allocation Statement"). Purchaser shall deliver the Purchase Price Allocation Statement to Seller within 45 days after the Closing Date (or such longer period as they may agree to in writing). The Sellers shall have thirty days after receipt of the Purchase Price Allocation Statement within which to review and comment on the Purchase Price Allocation Statement, and Purchaser shall consider in good faith any reasonable comments made by the Sellers. The Purchase Price Allocation, as revised in accordance with this Section 5.9(b) (if applicable), shall be binding upon the Parties hereto for all Tax purposes unless otherwise required by applicable Law. The Parties hereto shall report for Tax purposes, act for Tax purposes, and file Tax Returns, in all respects consistent with the Purchase Price Allocation.

(i)         In the case of any Straddle Period, for all applicable purposes of this Agreement, the amount of any Taxes based on or measured by income, gross or net sales, receipts, transactions, proceeds, profits, payroll or similar items allocable to the for the Pre-Closing Tax Period of such Straddle Period shall be determined based on an interim closing of the books as of the end of the day on the Closing Date and the amount of other Taxes (including but not limited to all real property taxes, personal property taxes and similar *ad valorem* obligations levied with respect to the Acquired Assets) allocable to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period; provided, that exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions), other than with respect to property placed in service after the Closing Date, shall be allocated on a per diem basis.

(ii)         The Sellers shall be liable for, and shall pay, and Purchaser shall not assume, pay or have any liability with respect to: (i) any Taxes imposed on or with respect to the Sellers (or any Taxes for which any Seller or any of their Affiliates are otherwise liable, including as a transferee, successor, by contract or otherwise pursuant to applicable Law, or arising as a result of being, or having been a member of any consolidated, combined, unitary or other group or being or having included or required to be included in any Tax Return related thereto), (ii) any Taxes imposed on or with respect to the Business or the Acquired Assets and that are attributable to any Pre-Closing Tax Period, determined, in the case of any Straddle Period, pursuant to this Section 5.9(b) and (iii) any Taxes in respect of the Excluded Assets.

(c)   Purchaser and the Sellers shall cooperate fully with each other, as and to the extent reasonably requested by the other Party, in connection with tax matters related to the Business and/or Acquired Assets, including the preparation, filing and execution of Tax Returns, and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention and (upon the other Party's reasonable request) the provision of records and information that are reasonably relevant to any such audit, litigation or other proceeding during normal business hours and making employees available (as reasonably requested) on a mutually convenient basis to provide additional information and explanation of any materials provided hereunder.

(d)   The Parties agree to cooperate in good faith to minimize any Tax costs to Purchaser, CTN Holdings and their respective direct and indirect subsidiaries in connection with the transactions contemplated by this Agreement, which the Parties acknowledge may include structuring the Transaction as a transaction that qualifies as a "reorganization" within the meaning of Section 368(a) of the Tax Code.

## ARTICLE VI
## CONDITIONS TO CLOSING

**Section 6.1    Conditions Precedent to the Obligations of Purchaser and Sellers**.  The respective obligations of each Party to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)   no court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the Transactions that is still in effect;

(b)   there shall not have occurred any Event of Default unless cured or waived by the Collateral Agent under the DIP Facility and the DIP Facility shall not have been terminated; and

(c)   the Bankruptcy Court shall have entered the Sale Order which shall be in a form and substance reasonably acceptable to Purchaser, shall approve the Credit Bid pursuant to section 363(k) of the Bankruptcy Code, and shall not have been stayed, reversed or vacated since the date of this Agreement.

**Section 6.2    Conditions Precedent to the Obligations of Purchaser**.  The obligations of Purchaser to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), at the Closing, of each of the following conditions:

(a)   the Bankruptcy Court shall have entered the Sale Order by June 3, 2025, which and shall be (i) in full force and effect, (ii) not subject to appeal, and (iii) neither modified nor vacated since the date of this Agreement;

(b)   (i) the representations and warranties made by Sellers in Article III (in each case, other than the Seller Fundamental Representations), disregarding for these purposes any excepting in such representations and warranties relating to materiality or a Material Adverse Effect, shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (A) for those representations and warranties which address matters only as of an earlier date in which case such representation or warranty shall have been true and correct as of such earlier date and (B) to the extent the failure of such representations and warranties to be true and correct as of such dates would not reasonably be expected to have a Material Adverse Effect and (ii) the representations and warranties set forth in Section 3.1 (Organization and Qualification), Section 3.2 (Authorization of Agreement), Section 3.3 (Conflicts; Consents) (collectively, the "Seller Fundamental Representations") shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date (except for those representations and warranties

which address matters only as of an earlier date in which case such representation or warranty shall have been true and correct as of such earlier date);

(c)   none of the Chapter 11 Cases shall have been converted to a case under Chapter 7 of the Bankruptcy Code nor shall a trustee or examiner with expanded powers have been appointed with respect to the Sellers;

(d)   the Chapter 11 Cases shall not have been dismissed;

(e)   (i) the DIP Facility lenders shall have not acquired all or a material part of the Acquired Assets as a result of the exercise of remedies under the DIP Facility and (ii) the DIP Facility shall not have been terminated;

(f)   Sellers shall have performed and complied in all material respects with the covenants required to be performed or complied with by Sellers under this Agreement on or prior to the Closing Date prior to the Closing Date; and

(g)   Sellers shall have delivered, or caused to be delivered, to Purchaser all of the Acquired Assets as well as those items set forth in Section 2.3.

(h)   Purchaser and/or any Affiliate of Purchaser, in its capacity as an agent under the DIP Facility, shall obtain a release of any potential claims against it as provided in the DIP Order.

(i)   The TREES Agreement shall be an Assigned Contract in a form and substance satisfactory to Purchaser in its sole and absolute discretion.

**Section 6.3   Conditions Precedent to the Obligations of Sellers**.  The obligations of Sellers to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), at the Closing, of each of the following conditions:

(a)   (i) the representations and warranties made by Purchaser in Article IV (in each case, other than the Purchaser Fundamental Representations), disregarding for these purposes any excepting in such representations and warranties relating to materiality, shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (A) for those representations and warranties which address matters only as of an earlier date in which case such representation or warranty shall have been true and correct as of such earlier date and (B) to the extent the failure of such representations and warranties to be true and correct as of such dates would not reasonably be expected to materially and adversely affect Purchaser's ability to consummate the Transactions and (ii) the representations and warranties set forth in Section 4.1 (Organization and Qualification), Section 4.2 (Authorization of Agreement), and Section 4.3 (Conflicts; Consent), (collectively, the "Purchaser Fundamental Representations") shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date (except for those representations and warranties which address matters only as of an earlier date in which case such representation or warranty shall have been true and correct as of such earlier date);

(b)   Seller shall have received from Purchaser evidence of the payoff with respect to any portion of the obligations under the DIP Facility and Prepetition Secured Loan Facility that are paid off by the Credit Bid Amount;

(c)   Purchaser shall have performed and complied in all material respects with the covenants required to be performed or complied with by it under this Agreement on or prior to the Closing Date prior to the Closing Date; and

(d)   Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 2.4.


Section 6.4    **Waiver of Conditions**. Upon the occurrence of the Closing, any condition set forth in this Article VI that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or Sellers may rely on the failure of any condition set forth in this Article VI, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the Transactions as required under this Agreement.

**ARTICLE VII**
**TERMINATION**

Section 7.1    **Termination of Agreement**.  This Agreement may be terminated at any time prior to the Closing only in accordance with this Section 7.1, and in no other manner:

(a)   by the mutual written consent of Sellers and Purchaser;

(b)   by written notice of either Purchaser or Sellers, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Closing or declaring unlawful the Transactions, and such Order having become final, binding and non-appealable; provided, that no Party may terminate this Agreement under this Section 7.1(b) if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c)   by written notice of either Purchaser or Sellers, if the Closing shall not have occurred on or before June 6, 2025 (the "Outside Date"); provided, that a Party shall not be permitted to terminate this Agreement pursuant to this Section 7.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement;

(d)   by written notice from Sellers to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in Section 6.3(a) or Section 6.3(b) would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; provided, that (i) if such breach is curable by Purchaser, then Sellers may not terminate this Agreement under this Section 7.1(d) unless such breach has not been cured by the date which that the earlier of (A) two Business Days prior to the Outside Date and (B) ten days after Sellers notify

Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 7.1(d)</u> will not be available to Sellers at any time that Sellers are in material breach of, any covenant, representation or warranty hereunder;

(e)   by written notice from Purchaser to Sellers, upon a material breach of any covenant or agreement on the part of Sellers, or if any material representation or warranty of Sellers will have become untrue, in each case, such that the conditions set forth in <u>Section 6.2(a)</u> or <u>Section 6.2(b)</u> would not be satisfied; provided, that (i) if such breach is curable by Sellers then Purchaser may not terminate this Agreement under this <u>Section 7.1(e)</u> unless such breach has not been cured by the date which is the earlier of (A) two Business Days prior to the Outside Date and (B) ten days after Purchaser notifies Sellers of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 7.1(e)</u> will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(f)   by written notice from Sellers to Purchaser, if all of the conditions set forth in <u>Section 6.1</u> and <u>Section 6.2</u> have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing at the time required by <u>Section 2.2</u>;

(g)   by Purchaser, if following entry by the Bankruptcy Court of the Sale Order, the Sale Order is voided, reversed or vacated or is subject to a stay;

(h)   by Purchaser, if, the Sale Order shall not have been entered by the Bankruptcy Court by May 21, 2025; or

(i)   by Purchaser, if, any of the Chapter 11 Cases shall have been converted to a case under Chapter 7 of the Bankruptcy Code or a trustee or examiner with expanded powers shall have been appointed with respect to the Sellers.

**Section 7.2    Effect of Termination**. In the event of the valid termination of this Agreement pursuant to <u>Section 7.1</u>, this Agreement shall forthwith become null and void and, except in the case of fraud, no Party or any of its partners, officers, directors, managers or equityholders will have any Liability under this Agreement; provided, that this <u>Section 7.2 and Article VIII</u> shall survive any such termination; provided, further, that no termination will relieve any Party from any Liability for damages, losses, costs or expenses resulting from any Willful Breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by any Party to consummate the Closing if and when it is obligated to do so hereunder).

**Section 7.3    Termination Payment.**  In consideration of the substantial commitment of time and resources by the Purchaser to the preparation, negotiation, execution and performance of this Agreement, in the event that any Seller consummates an Alternative Transaction, the Sellers at the closing of such Alternative Transaction shall pay to the Purchaser the amount of $600,000.00 (the "<u>Break-Up Fee</u>") and all reasonable and documented costs and out of pocket expenses incurred by the Purchaser in connection with this Agreement and the transactions contemplated hereby in an amount not to exceed $400,000.00 (the "<u>Expense Reimbursement</u>"). Pursuant to the Bidding Procedures Order, the Break-Up Fee and Expense Reimbursement shall have first priority

administrative expense claim status without the need for any further application or motion of the Sellers or the Purchaser, or the entry of any further order of the Bankruptcy Court. The parties agree that the amount of actual damages which the Purchaser would suffer as a result of a termination of this Agreement as contemplated by this <u>Section 7.3</u> would be extremely difficult to determine and have agreed that the amount of the Break-Up Fee and Expense Reimbursement is a reasonable estimate of the Purchaser's damages and is intended to constitute a fixed amount of liquidated damages in lieu of other remedies available to the Purchaser and is not intended to constitute a penalty.

## ARTICLE VIII MISCELLANEOUS

**Section 8.1    Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers**. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, (a) if time for performance of such post-Closing covenant is specified in this Agreement, survive for 90 days following the expiration of such time, and (b) if time for performance of such post-Closing covenant is not specified in this Agreement, survive for the applicable statute of limitations with respect to a claims for any failure to perform such post-Closing covenant; provided, that if a written notice of any claim with respect to any post-Closing covenant is given prior to the expiration thereof then such post-Closing covenant will survive until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement.

**Section 8.2    Expenses**. Whether or not the Closing takes place, except as otherwise provided in the Sale Order or DIP Order, all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement, the Transaction Agreements and the other agreements contemplated hereby and thereby, the performance of this Agreement, the Transaction Agreements and the other agreements contemplated hereby and thereby and the consummation of the Transactions will be paid by the Party incurring such fees, costs and expenses.

**Section 8.3    Notices**. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), if delivered by 5:00 P.M. local time of the recipient on a Business Day and otherwise on the following Business Day, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

if to Purchaser, to:

>   Inherent Group, LP
>   450 Lexington Avenue, #4503
>   New York, NY 10163
>   Attention: Michael Ellis
>   Email: admin@inherentgroup.com

with a copy (which shall not constitute notice) to:

>   Robert J. Dehney, Esquire
>   Morris, Nichols, Arsht & Tunnell LLP
>   1201 North Market Street, 16th Flr.
>   P.O. Box 1347
>   Wilmington, DE 19899-1347
>   Email: RDehney@morrisnichols.com

if to any Seller, to:

>   548 Market Street
>   PMB 72015
>   San Francisco, CA 94101-5401
>   Attention: Robert Z. Lee
>   Email: rob@catona.com

with a copy (which shall not constitute notice) to:

>   Miles Staglik
>   Chief Restructuring Officer
>   13355 Noel Road, Suite 2005
>   Dallas, TX 75240
>   CTN Holdings, Inc.
>   Email: miles.staglik@cr3partners.com

>   and

>   David W. Gaffey, Esq.
>   Whiteford, Taylor & Preston, LLP
>   3190 Fairview Park Drive, Suite 800
>   Falls Church, VA | 22042
>   Email: dgaffey@whitefordlaw.com

**Section 8.4**    **Binding Effect; Purchaser Designee**.

(a)   This Agreement shall be binding upon Purchaser and, subject to the entry and terms of the Sale Order, Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative

appointed in the Chapter 11 Cases or any successor Chapter 7 cases; provided, that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of each other Party hereto, and any attempted assignment or delegation without such prior written consent shall be null and void. Purchaser may, with the prior written consent of the Sellers, assign its rights and obligations under this Agreement to the Successful Bidder.

(b)   In furtherance of the foregoing, Purchaser may, without the consent of Sellers, designate, in accordance with the terms of this paragraph and effective as of the Closing, one or more Permitted Transferee(s) to acquire all, or any portion of, the Acquired Assets and assume all or any portion of the Assumed Liabilities or to be jointly obligated to pay all or any portion of the Purchase Price (any Person that shall be properly designated by Purchaser in accordance with this Section 8.4(b), a "Purchaser Designee"); provided, that for the avoidance of doubt, any such assignment of the payment obligation shall not relieve Purchaser of its obligation to deliver the Purchase Price under Section 2.1. The above designation may be made by Purchaser by written notice to Sellers at any time prior to the Closing Date. The Parties agree to modify any Closing deliverables in accordance with the foregoing designation.   For the avoidance of doubt, and notwithstanding anything to the contrary herein, all Purchaser Designees appointed in accordance with this Section 8.4 shall be included in the definition of "Purchaser" for all relevant purposes under this Agreement and all such Purchaser Designees shall be deemed to have made all of the covenants, representations and warranties of Purchaser set forth in this Agreement (as modified pursuant to this Section 8.4) to the extent relevant to such Purchaser Designee.

Section 8.5    **Amendment and Waiver**. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing executed by Purchaser and each of the Sellers or (b) waived only in a writing executed by the Party (or Parties) against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default. No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

Section 8.6    **Third Party Beneficiaries**. This Agreement will inure to the benefit of and be binding upon Purchaser, Sellers and their respective successors and permitted assigns. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than (a) for purposes of Section 8.7, the Non-Recourse Persons (as defined below) and (b) the Parties hereto and such permitted assigns, any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

Section 8.7    **Non-Recourse**.  This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as Parties to this Agreement and then only with respect to the specific obligations set forth herein with respect to such Party. Except to the extent named as a Party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party (or any past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor or

any of the foregoing) (each, a "<u>Non-Recourse Person</u>") will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the Parties to this Agreement, any Transaction Agreement or for any Agreement Dispute (as defined below) and (ii) in no event shall any Party have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions, omissions or fraud (including through equitable claims (such as unjust enrichment) not requiring proof of wrongdoing committed by the subject of such claims) of any other Person, and each of such Non-Recourse Persons are intended third party beneficiaries of this <u>Section 8.7</u> and shall be entitled to enforce this <u>Section 8.7</u> as if a party directly hereto.

**Section 8.8    Severability**.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, provided, that if any provision of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be prohibited by, void, unenforceable or invalid under applicable Law in any applicable jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected impaired or invalidated as long as the economic or legal substance of the Transactions is not hereby affected in any manner materially adverse to any Party. Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

**Section 8.9    Construction**.  Purchaser, on the one hand, and the Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by Purchaser, on the one hand, and the Sellers, on the other hand, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson will be applied against any Person with respect to this Agreement.

**Section 8.10    Complete Agreement**.  This Agreement, together with the Transaction Agreements and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Business, the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements among the Parties respecting the sale and purchase of the Business, the Acquired Assets and the Assumed Liabilities and the Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement or the Transaction Agreements, the terms and provisions of the execution version of this Agreement or Transaction Agreements (as applicable) will control and prior drafts of this Agreement and the Transaction Agreements (as applicable) and the documents referenced herein and therein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

**Section 8.11    Specific Performance**.  The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the Transactions.  It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in Section 8.12 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Sellers nor Purchaser would have entered into this Agreement.  The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 8.11 will not be required to provide any bond or other security in connection with any such Order.  The remedies available to the Parties pursuant to this Section 8.11 will be in addition to any other remedy to which they are entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Party from seeking to collect or collecting damages.  If, prior to the Outside Date, any Party brings any action, in each case in accordance with Section 8.12, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (i) for the period during which such action is pending, plus 10 Business Days or (ii) by such other time period established by the court presiding over such action, as the case may be.

**Section 8.12    Jurisdiction and Exclusive Venue**.  Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement, the Transaction Agreements or the Transactions and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "Agreement Dispute") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court, any federal court to which an appeal from the Bankruptcy Court may be validly taken, and the District Court for the District of Delaware to review proposed findings of fact and conclusions of law from the Bankruptcy Court or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Court of Chancery of the State of Delaware (or if such court lacks jurisdiction, any other state or federal court sitting in the State of Delaware) (the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*.  The Parties irrevocably agree that venue would be proper in any of the Chosen Court, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute.  Each of the Parties further

irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 8.3.  Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

**Section 8.13    Governing Law; Waiver of Jury Trial**.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 8.13(B).

**Section 8.14    Counterparts and PDF**. This Agreement, each Transaction Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one Party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. This Agreement and any Transaction Agreement shall become effective when each party hereto or thereto (as applicable) has received a counterparty of such agreement signed by the other party. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

**Section 8.15    Publicity**. Neither Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement, any Transaction Agreement or the Transactions without obtaining the prior written approval of (x) in the case of an issuance by Sellers, Purchaser, and (y) in the case of an issuance by Purchaser, CTN Holdings, which approval will not be

unreasonably conditioned, withheld or delayed, unless, in the reasonable judgment of Purchaser or Sellers, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or the Transactions or by the applicable rules of any stock exchange on which Purchaser or Sellers (or their respective Affiliates) lists securities; provided, that the Party intending to make such release shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.  Sellers and Purchaser shall use reasonable efforts to resolve any objections to any press release or public announcement within 24 hours after the request.

Section 8.16    **Bulk Sales Laws**.  The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets of the Debtor Sellers shall be free and clear of any Encumbrances in the Acquired Assets including any Encumbrances or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.  In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

Section 8.17    **Fiduciary Obligations**.  Nothing in this Agreement, or any document related to the Transactions, will require any Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law.  For the avoidance of doubt, Sellers retain the right to pursue any transaction or restructuring strategy that, in Sellers' business judgment, will maximize the value of its estates.

Section 8.18    **Sellers' Representative**.  Each Party agrees that CTN Holdings has the power and authority to unilaterally act on behalf of all or any of the Sellers for the purposes specified under this Agreement, any Transaction Agreement, and otherwise with respect to the Transactions.  Such power will include the power to make all decisions, actions, consents and determinations on behalf of the Sellers, including to make any waiver of any closing condition or agree to any amendment to this Agreement.  No Seller shall have any right to object, dissent, protest or otherwise contest the same. Purchaser shall be entitled to rely on any action or omission taken by CTN Holdings on behalf of the Sellers.

Section 8.19    **Schedules**.  The Parties agree that any reference in a particular Section of the Schedules shall only be deemed to be an exception to (or, as applicable, a disclosure for purposes of) (i) the representations and warranties (or covenants, as applicable) of the relevant party that are contained in the corresponding Section of this Agreement and (ii) any other representations and warranties of such party that is contained in this Agreement, but only if the relevance of that reference as an exception to (or a disclosure for purposes of) such representations and warranties would be readily apparent to a reasonable person who has read that reference and such representations and warranties, without any independent knowledge on the part of the reader regarding the matter(s) so disclosed.  Notwithstanding anything in this Agreement to the contrary, Purchaser and Seller may amend or revise any Schedule in order to correct any omission or improper inclusion of any item in such Schedule at any time prior to that date that is two (2) Business Days prior to the Closing.

**Section 8.20    Approval of the Bankruptcy Court**.  Notwithstanding anything herein to the contrary, any and all rights, interests or obligations under this Agreement are subject to the approval of the Bankruptcy Court.

## ARTICLE IX
## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

**Section 9.1    Certain Definitions**. A defined term has its defined meaning throughout this Agreement and in each Exhibit and Schedule to this Agreement, regardless of whether it appears before or after the place where it is defined. As used in this Agreement, the following terms have the meanings specified below:

"Accounts Receivable" means, (a) the trade accounts receivable, and other rights to payment, of Sellers and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped or products sold or services rendered by Sellers, (b) the other accounts or notes receivable of Sellers and the full benefit of all security for such accounts or notes, and (c) any claim, cause of action, remedy or other right related to any of the foregoing, in each case, which are related to the Business and/or the Acquired Assets.

"Acquired Assets" shall have the meaning set forth in Section 1.1.

"Action" means any action, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding) or prosecution of any kind whatsoever whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before any Governmental Body.

"Advisors" means, with respect to any Person as of any relevant time, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"Agreement" shall have the meaning set forth in the Preamble.

"Agreement Dispute" shall have the meaning set forth in Section 8.12.

"Alternative Transaction" means any sale or disposition of all or a material portion of the Acquired Assets (including by way of chapter 11 plan), to any Person other than Purchaser, any Purchaser Designee or any Affiliate of Purchaser.

"Asset Amount" shall have the meaning set forth in Section 5.9(b).

"Assigned Contracts" shall have the meaning set forth in Section 1.1(a).

"Assignment and Assumption Agreement" shall have the meaning set forth in Section 2.3(a).

"Assumed Leases" shall have the meaning set forth in Section 1.1(j).

"Assumed Liabilities" shall have the meaning set forth in Section 1.3.

"Bankruptcy Code" shall have the meaning set forth in the Recitals.

"Bankruptcy Court" shall have the meaning set forth in the Recitals.

"Bidding Procedures" means the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order in form and substance satisfactory to Purchaser in its reasonable discretion.

"Bidding Procedures Order" means an order of the Bankruptcy Court approving the Bidding Procedures pursuant to the terms of this Agreement, in form and substance reasonably satisfactory to Purchaser.

"Break-Up Fee" shall have the meaning set forth in Section 7.3.

"Business" shall have the meaning set forth in the Recitals.

"Business Contracts" shall have the meaning set forth in Section 3.5.

"Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York are authorized or required by Law to be closed.

"Business Trademarks" shall have the meaning set forth in Section 5.8(a).

"Credit Bid" shall have the meaning set forth in Section 2.1.

"Credit Bid Amount" shall have the meaning set forth in Section 2.1.

"Chapter 11 Cases" shall have the meaning set forth in the Recitals.

"Chosen Courts" shall have the meaning set forth in Section 8.12.

"Closing" shall have the meaning set forth in Section 2.2.

"Closing Date" shall have the meaning set forth in Section 2.2.

"Collective Bargaining Agreements" shall have the meaning set forth in Section 3.7(a).

"Computer Systems" means any and all computers, firmware, middleware, servers, workstations, hardware, routers, hubs, switches, networking equipment, data

communications lines and all other information technology and networking assets, including all documentation related to any of the foregoing.

"Contract" means any written contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, in each case, other than a purchase order, service order, or sales order.

"CTN Holdings" means CTN Holdings, Inc., a Delaware corporation.

"Cure Costs" shall have the meaning set forth in Section 1.3(c).

"Debtor" or "Debtors" means a Seller or the Sellers, respectively.

"DIP Facility" means the Superpriority Senior Secured Debtor-in-Possession Loan and Security Agreement and Guaranty dated as of March 30, 2025 by and among the Sellers and Purchaser, as amended from time to time.

"DIP Order" means the Interim Order or Final Order, as applicable, as used in the DIP Facility.

"Encumbrances" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, encumbrance, lien, pledge, option to purchase or lease, license, right of first offer or refusal, conditional sale or other title retention agreement or lease in the nature thereof, preemptive right (whether statutory or contractual), adverse claim (as defined in Section 8-102(a)(1) of the Uniform Commercial Code), any subordination arrangement in favor of another Person, security interest or agreement, easement or similar encumbrance, and any encroachment, defect in title, right of way, or similar restriction affecting any right or title, in each case of any type, nature or kind whatsoever, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, material or non-material or known or unknown, including any agreement to give any of the foregoing in the future.

"Enforceability Exceptions" shall have the meaning set forth in Section 3.2(c).

"Environmental Laws" means any applicable Law or any agreement with any Governmental Authority or other third party, relating to human health and safety, the environment or to Hazardous Substances.

"Equity Interests" means, with respect to a Person, any membership interests, partnership interests, profits interests, capital stock or other equity securities (including profit participation features or equity appreciation rights, phantom stock rights or other similar rights) or ownership interests of such Person, or any securities (including debt securities or other indebtedness) exercisable or exchangeable for or convertible into, or other rights to acquire, membership interests, partnership interests, capital stock or other equity securities or ownership interests of such Person (or otherwise constituting an investment in such Person).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Estate" shall mean the estate of the Debtors created by Section 541 of the Bankruptcy Code upon the Petition Date in the Chapter 11 Cases.

"Estimated Cure Costs" shall have the meaning set forth in Section 1.5(f)**Error! Reference source not found.**.

"Excluded Assets" shall have the meaning set forth in Section 1.2.

"Excluded Liabilities" shall have the meaning set forth in Section 1.4.

"Expense Reimbursement" has the meaning set forth in Section 7.3.

"Express Representations" shall have the meaning set forth in Section 3.14.

"Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, transnational, federal, state or local, or any agency, regulatory or administrative agency, commission, ministry, branch, department, official, entity, instrumentality or other authority or political subdivision thereof, or any court or arbitrator of applicable jurisdiction.

"Hazardous Substances" means any pollutant, contaminant, waste or chemical or any toxic, radioactive, ignitable corrosive, reactive or otherwise hazardous substance, waste or material or any substance, waste or material having any constituent elements displaying any of the foregoing characteristics including petroleum, its derivatives, by-products and other hydrocarbons, and any substance, waste or material regulated under any Environmental Law.

"Intellectual Property Assignment Agreement" shall have the meaning set forth in Section 2.3(c).

"Intellectual Property Rights" means, collectively, all intellectual property rights in any jurisdiction throughout the world, whether registered, unregistered, or registrable, including any and all of the following: (a) inventions, discoveries, improvements, ideas, know-how, methodology, models, algorithms, formulae, systems, processes, technology, whether patentable or not, and all patents, patent applications of any kind, industrial designs, utility models, and like rights, and all applications pertaining to the foregoing, in any jurisdiction, including re-issues, continuations, divisionals, continuations-in-part, re-examinations, renewals and extensions; (b) rights in registered and unregistered trademarks, service marks, trade names, trade dress, logos, packaging design, slogans, product configurations, trade names and other indications of origin, and Internet domain names, and registrations and applications for registration of any of the foregoing and all goodwill associated therewith ("Trademarks"); (c) copyrights and registrations and applications for registration thereof, and copyrightable works and any other works of authorship in any medium, including applications or registrations in any jurisdiction for

the foregoing and all moral rights in the foregoing; (d) trade secret and other rights in any information (including inventions, discoveries and invention disclosures (whether or not patented), formulae, patterns, compilations, programs, devices, methods, strategies, techniques, or processes), in each case that derives independent economic value, actual or potential, from not being generally known or readily ascertainable by others who can obtain economic value from its disclosure or use; (e) rights in software, including interpreted or compiled source code, object code, development documentation, programming tools, drawings, specifications, metadata and data; (f) data and database rights; (g) domain names, websites and social media accounts and identifiers, including, as applicable, the usernames and passwords associated therewith and all content contained therein; (h) any other intellectual property or proprietary rights of any kind, nature or description; (i) rights to apply for, obtain, prosecute, register, maintain and defend any of the foregoing; (j) the right to assert, claim or sue and collect damages for the past, present or future infringement, misappropriation or other violation of any of the foregoing, and (k) any tangible embodiments of the foregoing (in whatever form or medium).

"<u>Inventory</u>" means all supplies, goods, materials, work in process, inventory and stock in trade owned by any Seller exclusively for use or sale in the ordinary course of Business (including carbon credit inventory and inventory ordered by any Seller prior to the Closing date but not delivered until after the Closing Date), but specifically excluding (1) goods which belong to sublessees, licensees or concessionaires of any Seller, and (2) goods held by any Seller on memo, on consignment, or as bailee.

"<u>Knowledge of the Sellers</u>", or words of like import, means the actual knowledge, as of the date of this Agreement, after reasonable inquiry, of Miles Staglik, Rob Lee, Mike Shuckerow, or Nate Redmond.

"<u>Law</u>" means any domestic, federal, state, provincial, local (including common law), municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, ordinance, code, decree, treaty, convention, rule, regulation or Order issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body, as amended unless specified otherwise.

"<u>Leased Real Property</u>" shall have the meaning set forth in <u>Section 3.6</u>.

"<u>Liability</u>" means, as to any Person, any direct or indirect debt, adverse claim, liability (including Tax liability), duty, responsibility, Tax, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

"<u>Material Adverse Effect</u>" means a material adverse effect on (i) the condition (financial or otherwise), business, assets, results of operations or prospects of the Business, excluding any effect resulting from (A) changes in the general economic or political

conditions in the United States not having a materially disproportionate effect on the Business relative to other participants in the industry in which the Business operates, (B) changes (including changes of applicable Law) or conditions generally affecting the industry in which the Business operates and not specifically relating to or having a materially disproportionate effect on the Business, (C) acts of war, sabotage or terrorism or natural disasters involving the United States of America not having a materially disproportionate effect on the Business relative to other participants in the industry in which the Business operates or (ii) Sellers' ability to consummate the transactions contemplated by this Agreement.

"Material Permit" shall have the meaning set forth in Section 3.13(b).

"Multiemployer Plan" shall have the meaning set forth in Section 3.7(e).

"Non-Recourse Person" shall have the meaning set forth in Section 8.7.

"Order" means any order, injunction, judgment, decree, ruling, writ, award, judgement, settlement or stipulation issued, promulgated, rendered or entered into by or with any Governmental Body or arbitrator of competent jurisdiction, including any order entered by the Bankruptcy Court in the Chapter 11 Cases (including the Sale Order).

"Outside Date" shall have the meaning set forth in Section 7.1(c).

"Party" or "Parties" shall have the meaning set forth in the Preamble.

"Permit" means any permit, license, franchise, clearance, registration, certificate, approval, qualification, or authorization issued by any Governmental Body or accrediting organization.

"Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable, or that are being contested in good faith and by appropriate proceedings for which appropriate reserves have been established in accordance with GAAP, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets, (iii) materialman's, mechanic's, artisan's, shipper's, warehouseman's or other similar common law or statutory liens incurred in the ordinary course of business consistent with past practice for amounts not yet due and payable or that are being contested by appropriate proceedings, (iv) licenses granted on a non-exclusive basis, (v) such other Encumbrances or title exceptions which do not, individually or in the aggregate, materially and adversely affect the operation of the Acquired Assets, and (vii) solely prior to Closing, any Encumbrances that will be removed or released by operation of the Sale Order.

"Permitted Transferee" means any Affiliate or subsidiary of Purchaser, and any of Purchaser's investors or funding partners.

"Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

"Personal Information" means any information that enables, or could reasonably enable, a Person in possession thereof to identify a natural person or that is otherwise considered personally identifiable information, personal information, personal data or any other similar term under applicable Law.

"Petition Date" means the date of filing of the Chapter 11 Cases.

"Pre-Closing Tax Period" means any taxable period (or portion thereof) ending on or prior to the Closing Date and the portion through the end of the Closing Date of any Straddle Period.

"Prepetition Secured Loan Facility" means the Third Amended and Restated Senior Secured Promissory Note and Guaranty dated as of October 30, 2024 by and among the Sellers, Purchaser, the other lenders party thereto, and Inherent Group, LP, as collateral agent, as amended by the First Amendment thereto dated as of December 30, 2024, the Second Amendment thereto dated as of March 11, 2025 and the Third Amendment thereto dated as of March 24, 2025, as further amended from time to time.

"Privacy Laws" shall have the meaning set forth in Section 3.9.

"Professional Fee Escrow" shall mean the deposit account established by the Seller to deposit and hold monies to pay and satisfy Allowed Professional Fees in the Chapter 11 Cases.

"Purchase Price" shall have the meaning set forth in Section 2.1.

"Purchase Price Allocation" shall refer to the allocation of the Purchase Price contemplated by Section 5.9(b).

"Purchase Price Allocation Statement" shall have the meaning set forth in Section 5.9(b).

"Purchaser" shall have the meaning set forth in the Preamble.

"Purchaser Designee" shall have the meaning set forth in Section 8.4(b).

"Purchaser Fundamental Representations" shall have the meaning set forth in Section 6.3(a).

"Purchaser Group" means Purchaser, any Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

"Release" means any presence, release, spill, emission, leaking, pumping, pouring, emitting, emptying, discharging, placing, injecting, escaping, disposal, dumping, emptying, dispersing, leaching or migrating in, into, onto or through the indoor or outdoor environment.

"Representatives" of a Person means any officer, director, manager, member, partner or employee of such Person or any investment banker, attorney, accountant, consultant, agent or other advisor or representative of such Person.

"Sale Motion" means the *Debtors' Motion for Entry of an Order Approving (I)(A) The Debtors' Entry Into Stalking Horse Agreement and Related Expense Reimbursement and Break-Up Fee, (B) The Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (C) The Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (D) The Form and Manner of Notice of the Sale Hearing, Assumption Procedures, and Auction Results, and (E) Dates for an Auction and Sale Hearing; (II)(A) The Sale of Substantially All of the Debtors' Assets Free and Clear of All Claims, Liens, Liabilities, Rights, Interests, and Encumbrances and (B) The Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) Granting Related Relief* filed by the Seller with the Bankruptcy Court on April 11, 2025 [D.I. 66].

"Sale Order" means the  Order or Orders, which shall be in form and substance reasonably acceptable to Purchaser, and which shall, among other things, (a) in the Purchaser's sole discretion, either grant the Sale Motion  pursuant to sections 105, 363 and 365 of the Bankruptcy Code or confirm a chapter 11 plan of reorganization/liquidation pursuant to section 1123(a)(5)(D) and 1141(c) of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and with respect to the Acquired Assets of the Debtor Sellers free and clear of all Encumbrances (other than Assumed Liabilities and Permitted Encumbrances), (iii) the performance by Sellers and Purchaser of their respective obligations under this Agreement and the Transaction Agreements, (b) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts, (c) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, and find that Purchaser is not a successor to any Seller, and grant Purchaser  the protections of Section 363(m) of the Bankruptcy Code, (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (e) find that Purchaser has provided adequate assurance (as that term is used in Section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts, (f) find that Purchaser shall have no Liability for any Excluded Liabilities and (g) find that Purchaser has not violated Section 363(n) of the Bankruptcy Code by any action or inaction.

"Seller" and "Sellers" shall have the meaning set forth in the Preamble.

"Seller Benefit Plans" means any "employee benefit plan" (as defined under section 3(3) of ERISA, whether or not subject to ERISA) or any agreement, plan, or practice providing for compensation, benefits, severance pay or benefits, change in control payments, equity awards, fringe benefits, or other remuneration or benefit of any kind, whether written or unwritten, funded or unfunded, for the benefit of any current or former employee, contractor, advisor or other service provider of the Business that is sponsored, maintained, contributed to or required to be contributed to by any Seller or pursuant to which any Seller or Subsidiary thereof has any liability (contingent or otherwise), including any Multiemployer Plan or Collective Bargaining Agreement.

"Seller Fundamental Representations" shall have the meaning set forth in Section 6.2(b).

"Seller Tax Group" means any consolidated, combined, unitary or similar Tax group of which Seller or any of its Affiliates is the common parent.

"Straddle Period" means any taxable period that includes (but does not end on) the Closing Date.

"Subsidiary" means, with respect to any Person (or a Subsidiary thereof), any corporation, partnership, limited liability company or other entity, whether incorporated or unincorporated, of which such first Person (i) directly or indirectly owns or controls a majority of the securities or other interests of such Person or (ii) has the power, through the ownership of securities or otherwise, to elect a majority of the board of directors or others performing similar functions of such Person.

"Successful Bidder" means Purchaser as the prevailing party under the Bidding Procedures Order.

"Tax" or "Taxes" means any taxes, charges, fees, levies, and other assessments in the nature of a tax imposed by a Governmental Body, whether computed on a separate, consolidated, unitary or combined basis or in any other manner, together with any interest, additions or penalties deficiencies, surcharges, sanctions, or additions with respect thereto.

"Tax Code" means the United States Internal Revenue Code of 1986, as amended.

"Tax Records" mean all Tax Returns, schedules and work papers, and all material records and other documents relating to Tax matters.

"Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

"Transaction Agreements" means this Agreement, the Assignment and Assumption Agreement, Intellectual Property Assignment Agreement, the Transition Services Agreement (if executed in connection with the Closing), and any other agreements, instruments, certificates or documents entered into pursuant to this Agreement.

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Agreements.

"Transfer Offer" shall have the meaning set forth in Section 5.6.

"Transfer Taxes" shall have the meaning set forth in Section 5.9.

"Transferred Employee Records" means physical or electronic copies of all personnel records (including those as required by applicable Law and those pertaining to performance, training history, job experience and history, and for the three (3)-year period immediately preceding the Closing, compensation history) for the Transferred Employees, except where (i) the transfer or disclosure of such records is prohibited by applicable Law, or (ii) consent of the relevant employee is required by applicable Law but not given.

"Transferred Employees" shall have the meaning set forth in Section 5.6.

"Transferred Intellectual Property" means any and all Intellectual Property Rights owned or purported to be owned, by Sellers or any of their Subsidiaries.

"Transferred IP Agreements" has the meaning set forth in Section 1.1(k).

"TREES Agreement" shall mean that *Program Agreement* effective as of June 8, 2022, by and between Catona Climate Solutions, LLC (formerly Aspiration Sustainable Impact Services, LLC) and TREES for the Future, and all amendments and modifications thereto, and any and all related agreements, contracts, memoranda of understanding and side letter agreements between the same and/or their affiliates.

"Willful Breach" shall mean a deliberate act or a deliberate failure to act regardless of whether breaching was the conscious object of the act or failure to act.

**Section 9.2     Rules of Interpretation**.    Unless otherwise expressly provided, the following rules of interpretation will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)   The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement.

(b)   The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in the construction or interpretation of this Agreement. Section, clause, Schedule and exhibit references contained in this Agreement are references to sections, clauses, Schedules and exhibits in or to this Agreement, unless otherwise specified.  All exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or exhibits but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)   Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation", whether or not they are in

fact followed by those words or words of like import.  Unless otherwise expressly indicated, where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)    The words "to the extent" shall mean "the degree by which" and not simply "if."

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)    Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)    The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)    All references to "writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form.

(i)    All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)    Any document or item will be deemed "delivered," "provided" or "made available" by Sellers, within the meaning of this Agreement if such document or item is (i)  actually delivered or provided to Purchaser or any of Purchaser's Advisors or (ii) made available upon request, including at Sellers' offices.

(k)    Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived; provided, that with respect to any agreement or Contract listed on any schedules hereto, all such amendments, modifications or supplements must also be listed in the appropriate schedule.

(l)    A reference to any Person includes such successors and permitted assigns of such Person

(m)    A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

(n)    References to "law", "laws" or to a particular statute or law shall be deemed also to include any and all applicable Laws.

(o)    Unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder; provided, that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance with, any applicable Law, the reference to such applicable Law means such

applicable Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

*[Signature pages follow.]*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**PURCHASER:**

INHERENT ASPIRATION, LLC
By: Inherent Aspiration MM, LLC, its Managing Member
By: Inherent Group, LP, its Managing Member
By: Inherent Group GP, LLC, its general partner


By: _____
Name: Michael Ellis
Title: Chief Operating Officer

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**SELLERS:**

**CTN HOLDINGS, INC.**, a Delaware corporation

By: _____
Name: Rob Lee
Title: Chief Executive Officer

**MAKE EARTH GREEN AGAIN, LLC**, a Delaware limited liability company
By: CTN Holdings, Inc., its Managing Member

By: _____
Name: Rob Lee
Title: Chief Executive Officer

**ASPIRATION QFZ, LLC**, a Delaware limited liability company
By: CTN Holdings, Inc., its Managing Member

By: _____
Name: Rob Lee
Title: Chief Executive Officer

**CARBON SEQUESTRATION III, LLC**, a Delaware limited liability company
By: Make Earth Green Again, its Sole Member

By: _____
Name: Rob Lee
Title: Chief Executive Officer

**CARBON SEQUESTRATION I, LLC**, a Delaware limited liability company
By: Make Earth Green Again, its Sole Member

By: _____
Name: Rob Lee
Title: Chief Executive Officer

**CARBON SEQUESTRATION II, LLC**, a Delaware
limited liability company
By: CTN Holdings, Inc., its Managing Member


By: _____
Name: Rob Lee
Title: Chief Executive Officer

**REFORESTATION INITIATIVES I, LLC**, a Delaware
limited liability company
By: Make Earth Green Again, its Sole Member


By: _____
Name: Rob Lee
Title: Chief Executive Officer

**REFORESTATION INITIATIVES II, LLC**, a Delaware
limited liability company
By: Make Earth Green Again, its Sole Member


By: _____
Name: Rob Lee
Title: Chief Executive Officer

**ZERO CARBON HOLDINGS, LLC**, a Wyoming limited
liability company
By: CTN Holdings, Inc., its Managing Member


By: _____
Name: Rob Lee
Title: Chief Executive Officer

**CATONA CLIMATE SOLUTIONS, LLC**, a Delaware
limited liability company
By: CTN Holdings, Inc., its Managing Member


By: _____
Name: Rob Lee
Title: Chief Executive Office

**CTN SPV HOLDINGS, LLC**, a Delaware limited liability company

By: CTN Holdings, Inc., its Managing Member


By: _____
Name: Rob Lee
Title: Chief Executive Officer

**ASPIRATION FUND ADVISER, LLC**, a Delaware limited liability company

By: CTN Holdings, Inc., its Managing Member


By: _____
Name: Rob Lee
Title: Chief Executive Officer

**EXHIBIT A**

**BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT**

[To Be Provided]

**EXHIBIT B**

**INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT**

[To Be Provided]

# SCHEDULES

[To Be Provided]